IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNDER SEAL,<br><br>　　　　　　　Plaintiffs,<br><br>　v.<br><br>UNDER SEAL,<br><br>　　　　　　　Defendant. | NO.1:16-cv-01605<br><br><br>JURY TRIAL DEMANDED<br><br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 |

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER ON PACER**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, WISCONSIN the COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, and the DISTRICT OF COLUMBIA, EX REL.GREG SMITH, CLINT HOUCK, BRENT SHIRKEY. | NO. 1:16-cv-01605 |
| | |
| | JURY TRIAL DEMANDED |
| | |
| Plaintiffs, | FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 |
| v. | |
| NOVO NORDISK INC., | |
| Defendant. | |

**AMENDED COMPLAINT**

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................p. 10

II.     JURISDICTION AND VENUE .........................................................p. 16

III.    PARTIES ............................................................................................p. 17

IV.     APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS ...........p. 19
        A.      Government Health Insurance Programs.................................p. 19

        B.      The Anti-Kickback Laws of the United States and the States...............p. 23

        C.      The Federal Food, Drug and Cosmetic Act ...........................p. 29

        D.      The Federal and State False Claims Acts ...............................p. 33

V.      FACTS AND ALLEGATIONS .........................................................p. 37

        A.      Integrated Fraudulent Scheme To Increase Sales of Victoza and Saxenda

                Using Kickbacks, and Other Incentives, Regulatory Violations, and
                Unapproved Diagnoses ...........................................................p. 38

        B.      Off-label, Unapproved Uses of Victoza and Saxenda ...........p. 40

        C.      Off-label Weight Loss Marketing of Victoza and Saxenda. .................P. 41

        D.      A National Sales Program to Merge The Novo Nordisk Sales Force with
                the Medical Department to Market Unapproved Diagnoses of Victoza and
                Saxenda...................................................................................p. 42

        E.      Targeting Multiple Patient Groups for Fraudulent Off-label Marketing of
                Victoza and Saxenda ..............................................................p. 43

        F.      Fraudulently Misleading Physicians and Patients Regarding the Increased
                Risk of Patient Harm From Several Types of Cancer from the Use of
                Victoza and Saxenda ..............................................................p. 44

        G.      Fraudulently Inducing Physicians to Prescribe Victoza Off Label as a
                Substitute for Saxenda and Causing Government Health Insurance
                Programs to Reimburse for Ineligible Victoza Claims.........................p. 45

                1.      Overview and Summary of the Scheme to Defraud ................p. 45

2.    Fraudulently Substituting Victoza For Saxenda In Order To Generate Additional Sales Of Liraglutide By Utilizing Government Funded Managed Care Programs                    p. 49

3.    Increasing Patient Harm By Fraudulently Substituting Victoza "Off Label" For Saxenda Without Providing The Necessary Additional Disclosures Required When Prescribing Higher Doses Of Liraglutide .........................................................................p. 50

4.    Higher Doses of Liraglutide Significantly Increase the Risk of Patient Harm When Victoza is Illegally Substituted for Saxenda p. 52

H.    Specific Knowledge of Relators Houck, Smith and Shirkey about the Novo Nordisk Fraudulent Marketing and Sales Program for Victoza and Saxenda...........................................................................................p. 52

I.    Novo Nordisk Knowingly Failed to Report Violations of its Corporate Integrity Agreement With the United States. ........................................p. 94

J.    Novo Nordisk Retaliated Against Relators Smith, Houck and Shirkey p. 96


VI.    CAUSES OF ACTION........................................................................... p. 97

Count I - VIOLATION OF FALSE CLAIMS ACT,
    31 U.S.C. § 3729(a)(1)(A).....................................................................p, 97

Count II - VIOLATION OF FALSE CLAIMS ACT,
    31 U.S.C. § 3729(a)(1)(B)......................................................................p. 98

Count III - VIOLATION OF FALSE CLAIMS ACT,
    31 U.S.C. § 3729(a)(1)(G).....................................................................p. 99

Count IV - VIOLATION OF FALSE CLAIMS ACT,
    31 U.S.C. § 3729(a)(1)(C) ..................................................................p. 100

Count V -  VIOLATION OF THE STATE OF CALIFORNIA
    FALSE CLAIMS ACT, CAL. GOV'T CODE § 12650, ET SEQ. .....p. 102

Count VI - VIOLATION OF THE STATE OF COLORADO
    FALSE CLAIMS ACT,
    COLO. REV. STAT. § 25.5-4-303.5, ET SEQ. ..................................p. 104

Count VII - VIOLATION OF THE STATE OF CONNECTICUT
    FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS,
    CONN. GEN. STAT. §§ 4-274, ET SEQ...........................................p. 105

Count VIII - VIOLATION OF THE STATE OF DELAWARE
           FALSE CLAIMS AND REPORTING ACT,
           DEL. CODE ANN. tit. 6 § 1201, ET SEQ. .........................................p. 107

Count IX - VIOLATION OF THE DISTRICT OF COLUMBIA
           FALSE CLAIMS ACT, D.C. CODE ANN. § 2.381.01, ET SEQ. .....p. 109

Count X -  VIOLATION OF THE STATE OF FLORIDA
           FALSE CLAIMS ACT, FLA. STAT. § 68.081, ET SEQ..................p. 110

Count XI - VIOLATION OF THE STATE OF GEORGIA
           FALSE MEDICAID CLAIMS ACT,
           GA. CODE ANN. § 49-4-168, ET SEQ...............................................p. 111

Count XII - VIOLATION OF THE STATE OF HAWAII
           FALSE CLAIMS ACT, HAW. REV. STAT. § 661-21, ET SEQ.......p. 113

Count XIII - VIOLATION OF THE STATE OF ILLINOIS
           FALSE CLAMS ACT,
           740 ILL. COMP. STAT. § 175/1, ET SEQ. .........................................p. 114

Count XIV - VIOLATION OF THE STATE OF INDIANA
           FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT,
           IND. CODE § 5-11-5.7, ET SEQ. .........................................................p. 116

Count XV - VIOLATION OF THE STATE OF IOWA
           FALSE CLAIMS ACT, IOWA CODE § 685.1, ET SEQ..................p. 117

Count XVI - VIOLATION OF THE STATE OF LOUISIANA
           MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW,
           LA. REV. STAT. ANN. § 46:437.1, ET SEQ.....................................p. 119

Count XVII - VIOLATION OF THE STATE OF MARYLAND
           FALSE HEALTH CLAIMS ACT,
           MD. CODE ANN. HEALTH-GEN. § 2-601, ET SEQ.......................p. 121

Count XVIII - VIOLATION OF THE COMMONWEALTH
           OF MASSACHUSETTS FALSE CLAIMS ACT,
           MASS. ANN. LAWS ch. 12, § 5A, ET SEQ. .....................................p. 122

Count XIX - VIOLATION OF THE STATE OF MICHIGAN
           MEDICAID FALSE CLAIMS ACT,
           MICH. COMP. LAWS SERV. § 400.601, ET SEQ. ...........................p. 124

Count XX -VIOLATION OF THE STATE OF MINNESOTA
          FALSE CLAIMS ACT, MINN. STAT. § 15C.01, ET SEQ……….. p. 126

Count XXI – VIOLATION OF THE STATE OF MONTANA FALSE CLAIMS
          ACT, MONT. CODE ANN. § 17-8-401, ET SEQ.............................p. 127

Count XXII - VIOLATION OF THE STATE OF NEVADA
          SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL
          GOVERNMENT ACT, NEV. REV. STAT. § 357.010, ET SEQ...........129

Count XXIII - VIOLATION OF THE STATE OF NEW JERSEY
          FALSE CLAIMS ACT, N.J. STAT. ANN. § 2A:32C-1, ET SEQ. ....p. 130

Count XXIV -  VIOLATION OF THE STATE OF NEW MEXICO
          MEDICAID FALSE CLAIMS ACT,
          N.M. STAT. ANN. § 27-14-1, ET SEQ. ............................................p. 132

Count XXV - VIOLATION OF THE STATE OF NEW YORK
          FALSE CLAIMS ACT, N.Y. FIN. LAW § 187, ET SEQ. ................p. 133

Count XXVI - VIOLATION OF THE STATE OF NORTH CAROLINA
          FALSE CLAIMS ACT, N.C. GEN. STAT. § 1-605, ET SEQ. ..........p. 134

Count XXVII - VIOLATION OF THE STATE OF OKLAHOMA
          MEDICAID FALSE CLAIMS ACT,
          OKLA. STAT. tit. 63, § 5053 (2007), ET SEQ...................................p. 136

Count XVIII- VIOLATION OF THE STATE OF RHODE ISLAND
          FALSE CLAIMS ACT, R.I. GEN. LAWS § 9-1.1-1, ET SEQ. .........p. 137

Count XXIX - VIOLATION OF THE STATE OF TENNESSEE
          MEDICAID FALSE CLAIMS ACT,
          TENN. CODE ANN. § 71-5-181, ET SEQ........................................p. 139

Count XXX - VIOLATION OF THE STATE OF TEXAS
          MEDICAID FRAUD PREVENTION ACT,
          TEX. HUM. RES. CODE § 36.001, ET SEQ.  ..................................p. 140

Count XXXI - VIOLATION OF THE STATE OF VERMONT
          FALSE CLAIMS ACT,  32 V.S.A. §7,
          SUBCHAPTER 8, ET SEQ................................................................p. 142

Count XXXII - VIOLATION OF THE COMMONWEALTH OF
          VIRGINIA FRAUD AGAINST TAXPAYERS ACT,
          VA. CODE ANN. § 8.01-216.1, ET SEQ.  .........................................p. 144

Count XXXIII - VIOLATION OF THE WASHINGTON STATE
MEDICAID FRAUD FALSE CLAIMS ACT,
WASH. REV. CODE § 74.66.005, ET SEQ. ....................................p. 146

Count XXXIV- VIOLATION OF THE STATE OF WISCONSIN
FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT,
WIS. STAT. § 20.931, ET SEQ. .........................................................p.147

Count XXXV – RETALIATION AGAINST RELATOR SMITH IN
VIOLATION OF THE FEDERAL FALSE CLAIMS
ACT, 31 U.S.C. § 3730(h), AND THE
COMMONWEALTH OF VIRGINIA FRAUD
AGAINST TAXPAYERS ACT, VA. CODE
ANN. § 8.01-216.8 AND THE COMMON LAW
PROTECTIONS OF THE COMMONWEALTH OF
VIRGINIA .......................................................................p. 149

Count XXXVI – RETALIATION AGAINST RELATOR HOUCK
IN VIOLATION OF THE FEDERAL FALSE CLAIMS
ACT, 31 U.S.C. § 3730(h), AND THE WEST VIRGINIA
HUMAN RIGHTS ACT W. VA CODE § 5-11-9(7) (C)
AND THE COMMON LAW PROTECTIONS OF
THE STATE OF WEST VIRGINIA ...................................................p. 150

Count XXXVII – RETALIATION AGAINST RELATOR SHIRKEY
IN VIOLATION OF THE FEDERAL FALSE CLAIMS
ACT, 31 U.S.C. § 3730(h), AND THE WEST VIRGINIA
HUMAN RIGHTS ACT W. VA CODE § 5-11-9(7) (C)
AND THE COMMON LAW PROTECTIONS OF
THE STATE OF WEST VIRGINIA ...................................................p. 151

VII.    PRAYER FOR RELIEF .................................................................p. 152

VIII.   JURY TRIAL DEMAND...............................................................p. 155

LIST OF EXHIBITS

EXHIBIT A:  VICTOZA FDA "HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION GUIDE"

EXHIBIT B: SAXENDA FDA "HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION GUIDE" - DECEMBER 2014

EXHIBIT C: "TEXAS PRIOR AUTHORIZATION PROGRAMS CLINICAL EDIT CRITERIA" – VICTOZA

EXHIBIT D: TABLE OF VICTOZA  & SAXENDA SALES VOLUME BY YEAR

EXHIBIT E: LIST OF THE SALES DEPARTMENT REPRESENTATIVES WHO INFORMED RELATOR HOUCK

EXHIBIT F: RELATOR SMITH'S 2013 NOVO NORDISK EMPLOYMENT REVIEW ACE YEAR END 2013 GSMI FINAL

EXHIBIT G: EMAIL CONFIRMING SALES PROGRAM FOR PEDIATRIC PROMOTION OF NOVOLOG MIX 70/30

EXHIBIT H: LIST OF THE SALES MANAGERS WHO INSTRUCTED RELATOR SHIRKEY

EXHIBIT I: MODEL OF FIVE POUNDS OF FAT

EXHIBIT J: VICTOZA EXECUTIVE TRAINING CAMP

EXHIBIT K: VICTOZA USB DRIVE MEDICAL SLIDE DECK CONTAINING OFF-LABEL WEIGHT LOSS PROMOTION INFORMATION

EXHIBIT L: FOUR FREE STANDING WEIGHT LOSS SLIDES WHICH DEALT SOLELY WITH THE OFF-LABEL WEIGHT LOSS FOR VICTOZA

EXHIBIT M: Lead 4/5 MEDICAL SLIDES CONTAIN OFF-LABEL WEIGHT LOSS PROMOTIONAL INFORMATION

EXHIBIT N: EARLY DECK OF MEDICAL SLIDES EMPHASIZING WEIGHT QUESTION

EXHIBIT O: RELATOR SMITH 2011-YEAR END ACE REVIEW

EXHIBIT P: EMAILS DOCUMENTING RELATOR SMITH'S WORK TO BRING MEDICAL DEPARTMENT PERSONNEL ON RIDE ALONG PROGRAMS

EXHIBIT Q: VICTOZA FDA FULL PRESCRIBING INFORMATION

EXHIBIT R: SAXENDA FDA FULL PRESCRIBING INFORMATION

EXHIBIT S: COMPARISON LISTING OF SAXENDA AND VICTOZA ADVERSE REACTIONS EXCERPTED FROM FDA FULL PRESCRIBING INFORMATION

I.    **INTRODUCTION**

1.      Plaintiffs and Relators Greg Smith, Clint Houck and Brent Shirkey, identified herein ("Relators" or Plaintiffs-Relators"), by and through their attorneys, bring this action on behalf of the United States of America and certain States (the "*Qui Tam* States") pursuant to the *Qui Tam* provision of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA") and the State False Claims Act statutes identified herein ("State *Qui Tam* statutes" or "State FCAs").  They also bring this action on their own behalf, seeking damages for the Defendant's retaliatory discharge of Relators from their positions of employment, pursuant to 31 U.S.C. § 3730(h) and the corresponding anti-retaliation provisions of the Commonwealth of Virginia Fraud Against Taxpayers Act and the West Virginia Human Rights Act, W. VA Code § 5-11-9(7) (c) and the common law protections of the Commonwealth of Virginia and the State of West Virginia.

2.      This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States, from January 1, 2015 and continuing, arising from false and/or fraudulent record*s*, statements and claims made, used, and presented, and caused to be made, used or presented by Defendant and/or its agents, employees and co-conspirators under the Federal False Claims Act and the State *Qui Tam* statutes. In addition, Relators seek to recover damages for their personal claims of retaliation.

3.      Novo Nordisk, Inc. identified herein ("Novo Nordisk," "NNI," "The Company" or "Defendant") has benefitted from an aggressive, nationwide scheme involving illegal off-label marketing, product switching or substitution, and kickbacks  in the area of weight loss following the approval of the drug Liraglutide trademarked as Victoza for diabetes treatment in 2010 and approved for obesity treatment as Saxenda in 2014. The groundwork for this scheme was laid over many years and culminated with the formal marketing launch of Saxenda in late 2014. Through this sophisticated nationwide scheme, the Defendant maximizes revenue from sales of Victoza and

Saxenda by expanding the market beyond their approved Food and Drug Administration ("FDA") indications and their government health insurance coverage eligibility including through:

a.      The nationwide marketing of Liraglutide, which was trademarked as Victoza and approved by the FDA as a diabetes drug in January 2010, as a weight loss drug to both endocrinologist and primary care physicians and to physicians who established weight loss clinics which drug was reimbursed and paid for by Government healthcare programs. The primary components of the Novo Nordisk fraudulent scheme targets prescribing physicians with two coordinated sales teams, one for Saxenda establishing the weight loss benefit and one for Victoza providing a Managed Care funded source of the "same molecule". Concurrently the Victoza Sales Team is required to stock physicians' refrigerators with Victoza samples at a "1:1 ratio or better" for paid prescriptions written by the practice. Physicians complying with the Novo Nordisk scheme provide patients with the Saxenda weight loss level dosage using Victoza off label through a mix of prescriptions and free samples. This scheme increases the risk of patient harm as the Victoza FDA required Full Prescribing Information inadequately describes the more severe side effects of the higher Saxenda level dosage.

i.      Victoza (Liraglutide): Submitted to the FDA in May 2008 and approved for type 2 diabetes in January 2010. See EXHIBIT A:  VICTOZA FDA "HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION GUIDE" - JANUARY 2010. In 2010, the FDA approved Victoza for the treatment of adults with type 2 diabetes only and not for weight loss or pregnant women or pediatric patients under 18.  See EXHIBIT A:  Sections: 1, 8.1 and 8.4.

b.      The nationwide marketing of Liraglutide, which was trademarked as Saxenda and approved by the FDA as a drug for severely obese patients (with BMI of 30 or over) on December 23, 2014, to physicians by encouraging a substitution of Victoza for merely overweight

patients under the guise of pre-diabetes indications which drug was reimbursed and paid for by Government healthcare programs.

      i.     Saxenda (Liraglutide):  Submitted to the FDA in December 2013, the FDA Advisory Committee voted for approval on September 11, 2014, and it was approved on December 23, 2014 by the Federal Drug Administration for the treatment of obese adults with a Body Mass Index ("BMI") of 30 or higher or overweight adults with a BMI of 27 or higher and at least one weight related comorbid condition (e.g., hypertension, type 2 diabetes or dyslipidemia) and not for individuals with BMI under 27 or with BMI between 27 and 30, but without a comorbid condition, pregnant women and pediatric patients under 18.  See EXHIBIT B: SAXENDA FDA "HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION GUIDE" - DECEMBER 2014- Sections: 1, 8.1 and 8.4. Note: Victoza and Saxenda (Liraglutide) are chemically identical, however Saxenda is approved and indicated to be prescribed with a higher dosage, 3.0 mg as compared to Victoza at 0.6-1.8 mg.

      ii.     State Medicaid programs also include oversight of NNI medications, for example in Texas the State Medicaid/CHIP Vendor Drug Program (VDP)[1] provides statewide access to covered outpatient drugs, including Victoza, for clients enrolled in Medicaid, Texas Children's Health Insurance Program (CHIP), Texas DSHS Children with Special Health Care Needs (CSHCN) Services program, Texas DSHS Kidney Health Care (KHC) program, and Texas Women's Health Program (TWHP): Texas requires prior authorization for certain prescription drugs, including Victoza.[2] The Texas VDP prior authorization process utilizes a questionnaire and decision tree which clearly delineates the approved diagnosis and patient groups. As described

---

[1] http://www.txvendordrug.com/about/

[2] http://www.txvendordrug.com/formulary/index.asp

below NNI routinely did not follow these rules:  See EXHIBIT C:  "TEXAS PRIOR

AUTHORIZATION PROGRAMS CLINICAL EDIT CRITERIA" – VICTOZA.

        iii.     Texas VDP patients who are under 18, or have not received a

diagnosis of type 2 diabetes in the last 365 days or have a history of thyroid cancer are not

authorized to receive Victoza under any of the Texas State programs described above. See

EXHIBIT C: "TEXAS PRIOR AUTHORIZATION PROGRAMS CLINICAL EDIT CRITERIA" –

VICTOZA. pages 3, 4, et al.

        c.     The active nationwide coordination of both the Sales and Medical

Departments of Novo Nordisk by:

        i.     A program of soliciting requests from physicians through the

Electronic Product Information Request Program (herein identified as "EPIR" or "EPIRP") to

involve the Medical Department in disseminating information about off-label indications of

government reimbursed products through which the Medical Department became an extension of

the Sales Department.

        ii.     The active dissemination by the Novo Nordisk Sales Department of

the Medical Department's Slide Decks which included off-label safety and efficacy claims.

        iii.     The involvement of the Medical Department in a "ride along"

program (herein identified as "RAP") with the Sales Department personnel in sales campaigns

involving Victoza and Saxenda, which emphasized off-label safety and efficacy claims.

        d.     The nationwide payment or distribution by Novo Nordisk of monetary and

non-monetary kickbacks to physicians as direct compensation for the issuance of Novo Nordisk

prescriptions for Victoza and Saxenda.

e.      A nationwide pay-to-play corruption of the Novo Nordisk Key Opinion Leader Speakers Program (herein identified as "KOLSP") based, not on the knowledge of the speaker, but on the physician's prescription volume of Novo Nordisk drugs Victoza and Saxenda. These payments included cash payments and travel benefits.

f.      A nationwide sales program of extensive meals for physician staff to encourage medical offices to switch patients from a competitor's drug to Novo Nordisk drugs Victoza and Saxenda.

g.      A nationwide sales program of distributing large volumes of free samples of Novo Nordisk drugs Victoza and Saxenda as a reward for high volumes of prescriptions written by the physicians and to support the off-label marketing and switching/substitution campaign involving Victoza and Saxenda.

h.      A deliberate and step-by-step violation of substantial numbers of the terms of a Corporate Integrity Agreement ("CIA") signed in 2011 by Novo Nordisk executives Francis Bigley, Chief Compliance Officer, James C. Shehan, Corporate Vice President Legal/Government & Quality Affairs and the company's lawyer Sidley Austin and remained in force through May 31, 2016.

4.      In 2015, Novo Nordisk generated approximately $2,000,000,000 in total U.S. sales of Liraglutide based prescription medication. See EXHIBIT D: TABLE OF VICTOZA & SAXENDA SALES VOLUME BY YEAR.  Through this action, Relators seek to recover damages and penalties for Defendant's misconduct with regard to these two drugs since January 1, 2015.

5.      The Defendant's illegal nationwide scheme has caused false and fraudulent claims for payment to the federal and state government funded health care programs since January 1, 2015. On information and belief, these fraudulent schemes are ongoing.

6.      Novo Nordisk actively solicited prescriptions for the off-label weight loss uses for its products Victoza and Saxenda. By definition, such uses had not been approved as safe and effective by the FDA, and were not medically accepted uses covered by federal and state health care programs. Novo Nordisk's pursuit of increasing prescriptions for off-label uses caused it to make false and misleading statements and to engage in inappropriate conduct with respect to its drugs including: furnishing doctors and key purchasing personnel with false reports concerning the drugs' efficacy for off-label purposes, incentivizing and overtly encouraging its sales force to meet goals focused on off-label sales, targeting patient populations for off-label sales, and minimizing or making false and misleading statements about the safety of these drugs when used off-label, including in doses not approved by the FDA.

7.      NNI also employed an illegal kickback strategy to induce Key Opinion Leaders to increase off-label prescriptions. As part of the scheme, the Company paid illegal kickbacks through its key speakers program to doctors, key decision-makers, and other influential health care professionals. Among other effects, the increased use of Novo Nordisk products induced by these payments supplanted use of competitors' products and resulted in higher expenditures and inflated charges reimbursed by Medicare and Medicaid. Additionally, this effort caused switching of drugs without regard to the particular medical condition or welfare of the affected patient.

8.      The kickbacks given to health care professionals included contracted for *honoraria* associated with speaking engagements utilizing a pay-to-play physician kickback scheme.

9.      Another dimension of the kickback strategy was the ample use of free products in order to illegally induce physicians to prescribe, and patients to use, the Novo Nordisk drugs.

10.      Novo Nordisk's illegal conduct caused the United States and the *Qui Tam* States to pay millions of dollars in claims since January 2015 that were ineligible for reimbursement, thereby

enriching the Defendant while patients were subjected to non-approved and/or potentially unsafe uses of their drugs and to unnecessary charges.

11.     When Relators confronted the Defendant's management leaders with aspects of these fraudulent schemes relating in particular to the promotion of Victoza and Saxenda, the Defendant retaliated against the Relators by terminating their employment based on supposed minor violations of corporate policies and procedures.

12.     Under the FCA and similar State provisions, there has been no statutorily relevant public disclosure with respect to this action. Moreover, each Relator is an "original source" as defined by FCA and analogous State provisions to the extent there has been any such public disclosure. The allegations made here arise from each Relator's direct and independent knowledge gained through their years of employment with the Defendant and other experience. The Relators voluntarily disclosed and provided their information, based on their personal knowledge, to both the federal and State Plaintiffs prior to filing this lawsuit and this complaint. Additionally, Relators have knowledge about the misconduct alleged herein that is independent of, and that would materially add to, any publicly disclosed allegations or transactions that may prove to have occurred.

II.    **JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 31 U.S.C. § 3732, and 28 U.S.C. § 1367. The Court has original and supplemental jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

14.     This Court has personal jurisdiction over the Defendant Novo Nordisk because, among other things, NNI transacted and/or is registered to do business in this District and/or engaged in the misconduct alleged in this complaint within this District.

15.     Venue is proper in this District under 31 U.S.C. § 3732(a); 28 U.S.C. §§ 1391(b) and (c); and 28 U.S.C. § 1395(a).   The Defendant transacts business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

III.    **PARTIES**

16.     Relator Houck is a citizen of the United States currently residing in Daniels, West Virginia. Relator Houck is a former employee of Novo Nordisk who joined the company in October of 2001 to launch NovoLog as a territory Sales Representative in the Charleston, West Virginia territory. Over the next thirteen years and with the launch of NovoLog, NovLog Mix 70/30, Levemir, and Victoza, Relator Houck worked with physicians, pharmacists, hospitals, and other health care professionals to expand Novo Nordisk's diabetes business. Relator Houck was a Senior Endocrinology Diabetes Care Specialist when Victoza launched in 2009 and an Executive Diabetes Care Specialist at the time of his termination around Thanksgiving 2014. Relator Houck has extensive personal knowledge about the sales practices in question within both the primary care levels and specialty levels during his tenure. In response to complaints to his superiors about unlawful and unethical practices he witnessed, Relator Houck was unlawfully discharged by Defendant in 2014.

17.     Relator Smith is a citizen of the United States currently residing in Glen Allen, Virginia. He is a former employee of Novo Nordisk who started his relationship with the company in 1998 while employed by Schering Plough and co-promoting a drug called Prandin. He joined Novo Nordisk in 2001 to market a new drug called NovoLog. Overtime he began to sell NovoLog,

NovoLog Mix 70/30 and Levemir. Smith worked with physicians, pharmacists, hospitals, and other health care professionals to sell the new products including Liraglutide trademarked and approved as Victoza for diabetes by using his contacts in the medical community. Smith was an Endocrinology Diabetes Care Specialist when Victoza launched.  In response to complaints to his superiors about the unlawful and unethical practices he witnessed, Relator Smith was unlawfully discharged by the Defendant and terminated in early September 2014.

18.      Relator Shirkey is a citizen of the United States currently residing in Barboursville, West Virginia who joined the company in July of 2006 to launch Levemir as a Senior Diabetes Care Specialist in Huntington, West Virginia. Relator Shirkey's early responsibilities included the promotion and sales of Levemir, NovoLog and NovoLog Mix 70/30. Beginning in late 2009, the majority of Relator Shirkey's sales efforts were concentrated on the two Liraglutide drugs: Victoza and Saxenda. Over his nine (9) years employment at Novo Nordisk, Relator Shirkey was recognized multiple times with "Exceed Expectation" and "Outstanding" reviews.  In response to complaints to his superiors about unlawful and unethical practices he witnessed, Relator Shirkey was unlawfully discharged by Defendant in November 2015.

19.      The United States and the *Qui Tam* States are also parties to this action, as the real parties in interest with respect to the federal and state False Claims Act *Qui Tam* claims. At this time, Plaintiffs-Relators are pursuing their cause of action on behalf of the named Plaintiffs the United States and the States on the FCA *Qui Tam* claims set forth herein pursuant to 31 U.S.C. § 3730(b) and comparable provisions of the State FCAs.

20.      The Defendant, Novo Nordisk, Inc., is incorporated under the laws of New Jersey and operates as a healthcare company that focuses on diabetes care. The Company provides diabetes pharmaceuticals and insulin delivery systems. It also specializes in hemophilia

care, growth hormone therapy, and hormone replacement therapy. Novo Nordisk was incorporated in 1982 and is headquartered in Plainsboro, New Jersey. It has a manufacturing facility in Clayton, North Carolina; and a research and development center in Seattle, Washington. Novo Nordisk operates as a subsidiary of Novo Nordisk A/S., a Danish Limited Liability Company.

IV.   **APPLICABLE FEDERAL AND STATE LAWS AND REGULATIONS**

    A.   **Government Health Insurance Programs**

21.   The Health Insurance for the Aged and Disabled Program, known as Medicare, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 et seq. ("Medicare"), is a health insurance program administered by the United States Government, funded by taxpayer revenue. The United States Department of Health and Human Services ("HHS"), through its Centers for Medicare and Medicaid Services ("CMS"), oversee Medicare.

22.   Medicare was designed to be a health insurance program and to provide for payment of, among other things, medical services and equipment to persons over 65 years of age and certain others who qualify under Medicare's terms and conditions. The Medicare program has four parts: Part A, Part B, Part C and Part D.   Medicare Part A ("Part A"), the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care.   See 42 U.S.C. §§ 1395c-1395i-4.   Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of services performed by physicians and certain other health care providers, such as services provided to Medicare patients by physicians, laboratories, and diagnostic testing facilities. See 42 U.S.C. §§ 1395k, 1395l, 1395x(s). Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

23.     The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"), is a health insurance program administered by the United States Government and the States and is funded jointly by state and federal taxpayer revenue. CMS and HHS oversee Medicaid jointly with agencies in each State. Each named Plaintiff State participates in Medicaid, and each named Plaintiff State's Medicaid program covers the Defendant's drugs at issue in this Complaint.

24.     Medicaid is designed to assist participating States in providing medical services, medical equipment, and prescription drugs to needy individuals that qualify for Medicaid. The States and federal government share reimbursement costs. States directly pay providers, and then obtain the federal contribution from accounts drawn on the United States Treasury. 42 C.F.R. §§ 430.0-430.5, 430.10, 430.12, 430.14-430.16, 430.18, 430.20, 430.25, 430.30, 430.32-430.33, 430.35, 430.38, 430.40, 430.42, 430.45, 430.48 (1994). Federal funding for the Medicaid Program includes support for Medicare Savings Programs which help qualifying Medicare beneficiaries pay Part A and B premiums, co-payments, co-insurance, and deductibles. The Medicare Savings Programs consist of the Qualified Medicare Beneficiary Program, 42 U.S.C. § 1396d(p)(1), the Specified Low-Income Medicare Beneficiary Program, 42 U.S.C. § 1396a(a)(10)(E)(iii), the Qualifying Individual Program, 42 U.S.C. § 1396a(a)(10)(E)(iv), and the Qualified Disabled and Working Individuals Program, 42 U.S.C. § 1396d(s). Medicaid may serve as the primary insurer, or in some instances as the secondary insurer (e.g., with Medicare or private insurance paying primary coverage).

25.     The Civilian Health and Medical Program of the United States (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses

and children of active duty, retired, and deceased members. TRICARE pays for, among other things, medical devices and surgeries for its beneficiaries. CHAMPVA, administered by the United States Department of Veterans Affairs ("VA"), is a health care program for the families of veterans with 100-percent service-connected disability, or for those who died from a VA-rated-service-connected disability.

26.   The Federal Employee Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. It pays for, among other things, medical devices and surgeries for its beneficiaries. Under the FEHBP, the federal employee is covered by private payor health insurance which is in turn subsidized in part by the federal government. As a result, fraud on a patient covered by the FEHBP constitutes fraud on the federal government and the loss of federal funds.

27.   The federal government operates hospitals, including through its Departments of Defense and VA, and receives and uses federal funds to provide medication to patients treated at these facilities and otherwise, as well as outpatient services. A network of already established VA hospitals and services make up the VA health care system. Together, the programs described above, and any other government-funded healthcare programs, are referred to as "Government Health Care Programs."

28.   Reimbursement practices under all Government Health Care Programs closely align with the rules and regulations governing Medicare reimbursement. The most basic reimbursement requirement under Medicare, Medicaid, and other Government Health Care Programs is that the service provided must be reasonable and medically necessary. See, e.g., 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. §§ 1396 et seq.; 42 C.F.R. §§ 410.50, 411.15, 411.406; United States v. Rutgard, 116 F.3d 1270, 1275-76 (9th Cir. 1997) (holding that TRICARE and the Railroad

Retirement Health Insurance Program follow the same rules and regulations as Medicare, citing, e.g., 32 C.F.R. § 199.4(a)(1)(i)). Medical providers are not permitted to bill the government for medically unnecessary services, which includes services that actually harm a patient or are performed for no reason other than obtaining a profit. See, e.g., United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000) (procedures chosen solely for defendant's economic gain are not "medically necessary"). Health care providers must certify that services or items ordered or provided to patients will be provided "economically and only when, and to the extent, medically necessary" and "will be of a quality which meets professionally recognized standards of health care" and "will be supported by evidence of medical necessity and quality." 42 U.S.C. § 1320c-5(a)(1)-(3).

29.     Physicians and hospitals enter into Provider Agreements with CMS in order to establish their eligibility to seek Medicare reimbursements. As part of those agreements, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A, at 48 (for institutional providers); see Form CMS-855I, at 25 (similar; for physicians and non-physician practitioners).

30.     Claims submitted by health care providers to Government Health Care Programs contain similar representations and certifications. See, e.g., Forms CMS-1500; 1450 (UB04).

31.     When submitting a claim for payment, a provider does so subject to and under the terms of his certification to the United States that the services were delivered in accordance with

federal law, including, for example, Government Health Care Program laws and regulations. Similar State Medicaid applicable certifications also incorporate relevant state laws and regulations. Government Health Care Programs require compliance with these certifications as a material condition of payment, and claims that violate these certifications are false or fraudulent claims under the False Claims Act. CMS, its fiscal agents, and relevant State health agencies will not pay claims for medically unnecessary services or claims for services provided in violation of relevant state or federal laws.

32.     Defendants, such as Novo Nordisk, may be liable under the Federal and State FCAs even if they are not the entity submitting the claim for reimbursement to the government.  It is well-settled that a party who *causes* another party, or *conspires with,* another party, is equally or even principally liable as the party submitting the claim.

### B.      The Anti-Kickback Laws of the United States and the States

33.     The Medicare and Medicaid Patient Protection Act, also known as the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions can corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs, Congress enacted a prohibition against the payment of kickbacks in any form. The Anti-Kickback Statute was enacted in 1972, "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, at 90 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093.

34.     In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony, with a penalty of $25,000 and/or five years in jail. See Social Security Amendments of 1972, Pub. L. No. 92-603, § 241(b) & (c), 86 Stat. 1329, 1419; 42 U.S.C. § 1320a-7b(b). In doing so, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that, "cheats taxpayers who must ultimately bear the financial burden of misuse of funds . . . diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and] erodes the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." H.R. Rep. No. 95-393(II), at 44, *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.

35.     In 1987, Congress again strengthened the Anti-Kickback Statute to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. See Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142, 91 Stat. 1200 (1977); Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, 101 Stat. 680.

36.     In 1996, Congress expanded the Anti-Kickback Statute to reach claims involving all "[f]ederal health care programs" defined as, "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5, United States Code)." Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 204(a)(7), 110 Stat. 1936, 1999-2000 (adding 42 U.S.C § 1320a-7b(f).)

37.     In 2010, Congress clarified two important issues regarding the application of the Anti-Kickback Statute. First, Congress clarified that any, "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code" – i.e., the False Claims Act, 31 U.S.C § 3729. Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(f)(1), 124 Stat. 468, 759 (2010) (adding 42 U.S.C. § 1320a-7b(g)). Second, Congress clarified that, "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." Id. § 6402(f)(2) (adding 42 U.S.C. § 1320a-7b(h).)

38.     The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good or item for which payment may be made in whole or in part by a federal health care program, which includes any State health program or health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7b(b), -7b(f).

39.     The statute provides, in pertinent part:

(b) Illegal remunerations

* * *

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

1.     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or

2.     to purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and

upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both. 42 U.S.C. § 1320a-7b(b).

40.    In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject the perpetrator to exclusion from participation in federal health care programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)), and penalties in the amount of three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose, 42 U.S.C. § 1320a-7a(a).

41.    Concern about improper drug marketing practices prompted the Inspector General of the Department of Health and Human Services the ("HHS OIG") to issue a Special Fraud Alert in 1994 concerning prescription drug marketing practices that violated the Anti-Kickback Statute. See Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65372, 65376 (Dec. 19, 1994).

42.    In May 2003, the HHS OIG published further guidance on marketing practices which may constitute kickbacks known as the "OIG Compliance Program Guidance for Pharmaceutical Manufacturers," 68 Fed. Reg. 23731 (May 5, 2003) (the "OIG Guidelines"). The Guidelines address, *inter alia*, the conflicts that may arise when a pharmaceutical manufacturer provides educational or research funding to, "entities in a position to make or influence referrals." Id. at 23735. As a general rule, educational grants should be made without conditions or restrictions, otherwise the arrangement becomes a forbidden *quid pro quo* relationship: Manufacturers should take steps to ensure that neither they, nor their representatives, are using these activities to channel improper remuneration to physicians or others in a position to generate business for the manufacturer or to influence or control the content of the program.  Id. at 23738.

43.    The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits any payment or other remuneration by a drug company to a physician or other person which has as one of its purposes, the inducement of the physician to write prescriptions for the

company's pharmaceutical products or the inducement of the physician to influence or recommend the prescribing of the product.

44.     Remuneration includes the provision of, "services for free or for other than fair market value." 42 U.S.C § 1320a-7a(i)(6). See United States ex rel. Freedman v. Suarez-Hoyos, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011) (citing United States ex rel. Westmoreland v. Amgen, Inc., 738 F. Supp. 2d 267 (D. Mass. 2010)); see also Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (July 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.").

45.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under a Government Health Care Program, including Medicare and the state Medicaid programs. See, e.g., United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 312 (3d Cir. 2011) (citing 42 C.F.R. § 413.24(f)(4)(iv)).

46.     Moreover, compliance with the Anti-Kickback Statute is a precondition of payment for drug claims administered by physicians for which Medicare or Medicaid reimbursement is sought. Violation of the preconditions in statutes, regulations, and provider agreements for payment from or participation in government programs may form the basis for a FCA claim where there is an underlying course of fraudulent conduct. See United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377 (1st Cir. 2011) (Medicare and Anti-Kickback Act); State of New York v. Amgen Inc., 652 F.3d 103 (1st Cir. 2011) (Medicaid and the Anti-Kickback Act); see also United States ex rel. Westmoreland v. Amgen, Inc., 812 F. Supp. 2d 39, 54 (D. Mass. 2011) (collecting cases).  A Medicare claim must be only for reasonable and necessary services. Under 42 U.S.C. § 1395y(a)(1)(A), "no payment may be made [under the Medicare statute] for any expenses incurred

for items or services … which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury."

47.     Therefore, every Medicare claim is an implicit certification that the underlying services were reasonable and necessary. The Second Circuit Court has held that, "[s]ince § 1395y(a)(1)(A) *expressly* prohibits payment if a provider fails to comply with its terms, defendant's submission of the claim forms implicitly certifies compliance with its provision." Mikes v. Strauss, 274 F.3d 687, 701 (2d Cir. 2001); see also Ebeid ex rel. United States. v. Lungwitz, 616 F.3d 993, 996 (9th Cir. 2010); United States ex rel. Smith v. Yale Univ., 415 F. Supp. 2d 58, 98 (D. Conn. 2006); In re Cardiac Devices Qui Tam Litig., 221 F.R.D. 318, 335, 345-47 (D. Conn. 2004); United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 41-42 (D. Mass. 2000); United States ex rel. Kappenman v. Compassionate Care Hospice of the Midwest, L.L.C., No. CIV. 09-4039-KES, 2012 WL 602315 (D.S.D. Feb. 23, 2012).

48.     Kickbacks are, by definition, not reasonable and necessary for the diagnosis or treatment of illness or injury, which is a prerequisite for payment of any claim by Medicare and other governmental health programs.

49.     Further, federal law makes clear that violation of the Anti-Kickback Statute can support False Claims Act liability. See 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act].")); see also United States ex rel. Wilkins, 659 F.3d at 313 (reversing dismissal because the, "amended complaint meets the implied false certification standards for liability as they alleged that appellees received payment from the federal health insurance programs despite their knowing violation of the AKS"); United States ex rel. Hutcheson, supra; State of New York, supra; United States ex rel. McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259

(11th Cir. 2005) (affirming denial of dismissal because, "[w]hen a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the Act, for its submission of those false claims . . . .".)

50.     Many of the named Plaintiff States also have anti-kickback laws similar to the AKS, which apply to medical providers and entities participating in their Medicaid programs. See, e.g., California, Cal. Welf. & Inst. Code § 14107.2; Delaware, Del. Code. Ann. tit. 31, § 1005; Florida, Fla. Stat. Ann. § 409.920(2)(a)(5); Illinois, 305 Ill. Comp. Stat. Ann. 5/8A-3; Louisiana, La. Rev. Stat. Ann. § 46:438.2; Massachusetts, Mass. Gen. Laws Ann. ch. 118E, § 41; Michigan, Mich. Comp. Laws Ann. § 400.604; New York, N.Y. Soc. Serv. Law § 366-d; and Virginia, Va. Code Ann. § 32.1-315.

51.     Violations of the federal or state AKS laws can subject the perpetrator to liability under the federal and state FCAs, for example, for causing the submission of false or fraudulent claims or for making a false or fraudulent statement or record material to a false or fraudulent claim. See, e.g., PPACA, supra, amending the federal AKS, 42 U.S.C. §1320a-7b to add new subsections (g) and (h) (items or services resulting from a violation of the AKS constitute false or fraudulent claims for purposes of the federal FCA and no actual knowledge of this section or specific intent to commit a violation of this section is required); Hutcheson, supra; Westmoreland, supra.

**C.     The Federal Food, Drug and Cosmetic Act**

52.     The Federal Food, Drug and Cosmetic Act ("FFDCA") prohibits the distribution of new pharmaceutical drugs in interstate commerce unless the Food and Drug Administration ("FDA") has determined that the drug is safe and effective for its intended use.  21 U.S.C. § 355 (a) & (d).  An approved drug may be prescribed by doctors for uses other than those approved by the

FDA, but manufacturers are prohibited from marketing or promoting the drug for such unapproved or off-label uses, except under certain narrowly construed exceptions (described below).

53.     Whether a drug is FDA-approved for a particular use is a key and determining factor in whether a prescription of the drug is reimbursed under Government Health Care Programs. For example, reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10)(A).  Covered outpatient drugs do not include drugs that are, "used for a medical indication which is not a medically accepted indication." Id. §1396r-8(k)(3). A medically accepted indication includes a use, "which is approved under the Federal Food, Drug, and Cosmetic Act" or which is included in a specified drug compendia. Id. §1396r-8(k)(6). There is a single exception, not relevant to this Complaint, whereby in certain circumstances Medicaid will reimburse the prescription of certain single-source or multi-source innovator drugs for an off label use where the individual State has determined, inter alia, that the drug is essential to the health of beneficiaries. 42 U.S.C. § 1396r-8(a)(3) (the so-called "humanitarian exemption".)

54.     The FFDCA makes "misbranding" and the, "introduction into interstate commerce" of a misbranded drug, illegal. 21 U.S.C. § 331(a) & (b). A drug is misbranded if any of 26 statutory conditions are met, including as relevant here that, "[a] drug . . . shall be deemed to be misbranded . . . [u]nless its labeling bears . . . adequate directions for use." 21 U.S.C. § 352(f)(1).

55.     The FDA defines the phrase "adequate directions for use" to mean, "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 CFR § 201.5.  For prescription drugs, the "layman" standard is superseded by specific regulation requiring that the, "[l]abeling on or within the package from which the drug is to be dispensed bears adequate information for its use, including indications, effects, dosages, routes, methods, and frequency and

duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended, including all purposes for which it is advertised or represented." 21 CFR § 201.100(c)(1) (defining labeling adequate to satisfy 21 U.S.C § 352(f) for prescription drugs); see United States v. Evers, 643 F.2d 1043, 1051 (5th Cir. 1981.)

56.    The intended purpose of a drug (for which the label must be adequate,) "refer[s] to the objective intent of the persons legally responsible for the labeling of [the] drugs." 21 CFR § 201.128 (defining "intended uses" and related language.) Evidence of objective intent may be shown by, "labeling claims, advertising matter, *or oral or written statements by such persons or their representatives.*" Id. (emphasis added). Additionally, the objective intent of the persons legally responsible for labeling the drug may be shown by, "the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised." Id. Courts have agreed that the off-label use of a drug lacks "adequate information for use" in the label, and thus the intent for a drug to be put to off-label use is sufficient to support a misbranding criminal conviction. See, e.g., United States v. Caronia, 703 F.3d 149, 154 (2d Cir. 2012) ("The government has repeatedly prosecuted—and obtained convictions against—pharmaceutical companies and their representatives for misbranding based on their off-label promotion.")

57.    The government has issued specific regulations governing what kinds of communications regarding off-label uses of drugs may be permissible between drug and device representatives and providers. These regulations are aimed at ensuring that the content of the communications between the parties are truthful, non-misleading, and scientifically reliable.  The regulations, at 21 C.F.R. § 99.101, provide as follows:

31

§ 99.101      Information that may be disseminated.

(a) A manufacturer may disseminate written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling for an approved drug or device or in the statement of intended use for a cleared device, provided that the manufacturer complies with all other relevant requirements under this part. Such information shall:

   (1) Be about a drug or device that has been approved, licensed, or cleared for marketing by FDA;
   (2) Be in the form of:
      (i) An unabridged reprint or copy of an article, peer-reviewed by experts qualified by scientific training or experience to evaluate the safety or effectiveness of the drug or device involved, which was published in a scientific or medical journal. In addition, the article must be about a clinical investigation with respect to the drug or device and must be considered to be scientifically sound by the experts described in this paragraph; or
      (ii) An unabridged reference publication that includes information about a clinical investigation with respect to the drug or device, which experts qualified by scientific training or experience to evaluate the safety or effectiveness of the drug or device that is the subject of the clinical investigation would consider to be scientifically sound;
   (3) Not pose a significant risk to the public health;
   (4) Not be false or misleading. FDA may consider information disseminated under this part to be false or misleading if, among other things, the information includes only favorable publications when unfavorable publications exist or excludes articles, reference publications, or other information required under § 99.103(a)(4) or the information presents conclusions that clearly cannot be supported by the results of the study; and
   (5) Not be derived from clinical research conducted by another manufacturer unless the manufacturer disseminating the information has the permission of such other manufacturer to make the dissemination.
(b) For purposes of this part:
   (1) FDA will find that all journal articles and reference publications (as those terms are defined in § 99.3) are scientifically sound except:
      (i) Letters to the editor;
      (ii) Abstracts of a publication;
      (iii) Those regarding Phase 1 trials in healthy people;
      (iv) Flagged reference publications that contain little or no substantive discussion of the relevant clinical investigation; and
      (v) Those regarding observations in four or fewer people that do not reflect any systematic attempt to collect data, unless the manufacturer demonstrates to FDA that such reports could help guide a physician in his/her medical practice.
   (2) A reprint or copy of an article or reference publication is "unabridged" only if it retains the same appearance, form, format, content, or configuration as the original article or publication. Such reprint, copy of an article, or reference publication shall

> not be disseminated with any information that is promotional in nature. A manufacturer may cite a particular discussion about a new use in a reference publication in the explanatory or other information attached to or otherwise accompanying the reference publication under § 99.103.

58.     The intent of these regulations is to prevent unreliable information from influencing providers' prescription writing practices.  While any restriction on speech raises First Amendment concerns, see Caronia, supra, courts uniformly agree that there is no First Amendment protection for false and misleading promotional practices.  See, e.g., United States v. Harkonen, 510 F. App'x 633, 639 (9th Cir. 2013) (rejecting First Amendment defense on ground that, "[t]he First Amendment does not protect fraudulent speech," and affirming misbranding conviction based on a press release with false information.)

**D**.     **The Federal and State False Claims Acts**

59.     The FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting, or causing to be presented, to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999 and to $10,781 to $21,563 for claims made on or after August 1, 2016.

60.     The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999 and to $10,781 to $21,563 for claims made on or after August 1, 2016.

61.     The FCA, 31 U.S.C. § 3729(a)(1)(B), provides that any person who "knowingly" makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999 and to $10,781 to $21,563 for claims made on or after August 1, 2016.

62.     The FCA, 31 U.S.C. § 3729(a)(1)(C)), makes any person, who conspires to commit a violation of the FCA, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999 and to $10,781 to $21,563 for claims made on or after August 1, 2016.

63.     The FCA defines a "claim" to include, "any request or demand, whether under a contract or otherwise, for money or property," which, "is made to a contractor, grantee, or other recipient," if the United States Government provides, "any portion of the money or property," which is "requested or demanded" or if the Government, "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested." 31 U.S.C. § 3729(b)(2).

64.     The FCA, 31 U.S.C. § 3729(b)(1), provides that, "(1) the terms 'knowing' and 'knowingly' – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud."

65.     The FCA, 31 U.S.C. § 3729(b)(4), provides that, "(4) the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

66.     The FCA, 31 U.S.C. § 3729(b)(3), defines an "obligation" to pay as, "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." Moreover, in the health care context, such as Medicare and Medicaid, the term "obligation" is further defined as: "Any overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation (as defined [in the FCA],)" and an overpayment must be reported, "[b]y the later of . . . 60 days after the date on which the overpayment was identified . . . or the date any corresponding cost report is due, if applicable." Patient Protection and Affordable Care Act ("PPACA"), Pub. L. No. 111-148, § 6402(d)-(e), 124 Stat. 119, 755 (codified at 42 U.S.C. § 1128J9(d)).  See also 42 U.S.C. § 1320a-7k(d).

67.     Claims that are submitted to the government that are premised on violations of other laws, such as the AKA and the FDCA, may render those claims "false" or "fraudulent" under the Federal and State False Claims Acts.

68.     Furthermore, the FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA. Such retaliation may include discharge, demotion, suspension, threats, harassment or any other type of discrimination in the terms and conditions of employment. The employee is entitled to all relief necessary to make that employee whole, including reinstatement, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

69.     Additionally, many states have passed False Claims Act legislation, which in most instances closely tracks the Federal FCA. The State False Claims Act apply, *inter alia,* to the state portion of Medicaid losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program and failure to report and return any overpayments therefrom. The Defendant's acts alleged herein also constitute violations of the California False Claims, Cal. Govt. Code § 12650 et seq.; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. 25.5-4-303.5 et seq.; the Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274, et seq.; the Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, § 1201 et seq.; the Florida False Claims Act, Fla. Stat. § 68.081, et seq.; the Georgia Medicaid False Claims Act, Ga. Code Ann. § 49-4-168, et seq.; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 et seq.; the Illinois False Claims  Act, 740 Ill. Comp. Stat. § 175/1, et seq.; the Indiana Medicaid False Claims Act, Ind. Code § 5-11-5.7, et seq.; the Iowa False Claims Act, Iowa Code § 685.1 et seq.; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Tit. 46 § 437.1 et seq.; the Maryland False Health Claims Act, Maryland Code Ann. Health-Gen. § 2-601 et seq.; the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 § 5A et seq.; the Michigan Medicaid False Claims Act, Stat. Mich. Comp. Laws Serv. § 400.601 et seq.; the Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq.; the Montana False Claims Act, Mont. Code Ann. § 17-8-401, et seq.; the Nevada False Claims Act, Nev. Rev. Stat. 357.010, et seq.; the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1, et seq.; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq.; the New York False Claims Act, N.Y St. Fin. Law § 187, et seq.; the North Carolina State False Claims Act, N.C. Gen. Stat. § 1-605 et seq.; the Oklahoma Medicaid False Claims Act, 63 Okl. St. § 5053, et seq.; the Rhode Island State False Claims Act, R.I. Gen. Laws § 9-1.1-1, et seq.; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, et seq.; the Texas Medicaid Fraud Prevention Law, Tex. Hum.

Res. Code § 36.001, et seq.; the State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1, et seq.; the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code  § 74.66.005 et seq.; Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931, et seq. (repealed non-retroactively effective July 14, 2015); and the District of Columbia False Claims Act, D.C. Code § 2-308.03 et seq. . Each of the statutes listed above contains *Qui Tam* provisions governing, inter alia, a relator's right to claim a share of the State's recovery. These statutes also contain anti-retaliation provisions substantially similar and in some cases identical to the federal anti-retaliation provision.

70.     Relators seek to recover damages and civil penalties in the name of the United States of America and the named States, arising from the false or fraudulent statements and claims for payment made or caused by Defendant to the United States and the above-listed States and other violations of the federal and state FCAs, on or after January 1, 2015.

## V.     FACTS AND ALLEGATIONS

71.     Relators allege that Defendant, Novo Nordisk, engaged in the following illegal practices on a nationwide basis, and that such misconduct is ongoing. The acts described below include acts which laid the groundwork for the Defendant's sophisticated scheme which culminated with the launch of Saxenda in late 2014, the off-label promotion of Victoza and Saxenda, the inducing of physicians to substitute or switch prescriptions from Saxenda to Victoza to obtain government health insurance reimbursement for ineligible drugs and doses, and causing the submission of false or fraudulent claims therefor beginning on January 1, 2015 and continuing.

**A.    Integrated Fraudulent Scheme To Increase Sales of Victoza and Saxenda Using Kickbacks, and Other Incentives, Regulatory Violations, and Unapproved Diagnoses**

72.    Novo Nordisk has benefitted from aggressive illegal off-label marketing practices in the area of weight loss following the approval of the drug Liraglutide trademarked as Victoza for diabetes treatment in 2010 and approved for obesity treatment as Saxenda in 2014. These practices were combined with an aggressive physician pay-to-play and kickback scheme and have continued up until the present day with a sophisticated scheme to maximize Victoza and Saxenda revenue and expand the market beyond the approved indications including so as to support Novo Nordisk's corporate goal of exponential "double digit" revenue growth:

a.    The marketing of Liraglutide, trademarked as Victoza, as a diabetes drug in January 2010, as a weight loss drug to both endocrinologist and primary care physicians as a weight loss solution for diabetic and non-diabetic patients is an illegal and off-label diagnosis and treatment option for this drug. The Defendant even went as far as to use the misnomer of "behavior modification," which is to say the drug could be used as weight loss treatment for the patient (who was concerned with body weight regardless their actual BMI) as compared to diabetes management and treatment options approved by the FDA for Victoza. The Company also used this misnomer with physicians who established weight loss clinics for any patient group (i.e. non-diabetes patients). The payment and reimbursement for this drug by Government health care programs cost taxpayers millions of dollars in false claims since January 1, 2015.

b.    The marketing of Liraglutide, trademarked as Saxenda, after it was approved as an obesity drug for *severely* overweight patients (with a BMI of 30 or over) by the FDA Advisory Committee in September 2014 and later by the FDA in December 2014, to physicians by encouraging the substitution of Victoza for *merely* overweight (with a BMI of 25-29.9) or even non-

diabetic patients simply concerned with bodyweight, under the false guise of pre-diabetes indications.

      c.     The active coordination of both the Sales Department and Medical Departments of Novo Nordisk by:

         i.     Creating a program of soliciting requests from physicians, through the EPIRP, to involve the Medical Department in disseminating information about off-label indications of government reimbursed products through which the Medical Department became an extension of the Sales Department.

         ii.     The active dissemination by the Novo Nordisk Sales Department of the Medical Department's Slide Decks which included off-label safety and efficacy claims and were not peer-reviewed articles as allowed by the FDA for dissemination in this manner.

         iii.     The involvement of the Medical Department in "ride alongs" with the Sales Department employees in sales campaigns which emphasized off-label safety and efficacy claims.

      d.     The payment or distribution by NNI of monetary and non-monetary kickbacks to physicians as direct compensation for the issuance of Novo Nordisk prescriptions including:

         i.     A pay-to-play corruption (which included cash payments and travel benefits) of the Novo Nordisk Key Opinion Leaders Speakers Program ("KOLSP") based on physician prescription volume.

         ii.     A sales program of extensive meals for physician staff to encourage medical offices to switch patients from a competitor's drug to a Novo Nordisk drug.

iii.     A sales program of distributing large volumes of free samples of the Defendant's drugs as a reward for high volumes of prescriptions written by the physicians.

73.     In 2015, alone Novo Nordisk generated approximately $2,000,000,000 in total U.S. sales of Liraglutide based prescription medication, i.e. Victoza and Saxenda, and the Defendant's misconduct is continuing.

74.     The Defendant's deliberate and illegal scheme has caused false and fraudulent claims for payment to the federal and state government funded health care programs since January 1, 2015.  On information and belief, these fraudulent schemes are ongoing.

**B.     Off-label, Unapproved Uses of Victoza and Saxenda**

75.     Novo Nordisk actively solicited prescriptions for the off-label uses for its product, Victoza.  By definition, such uses had not been approved as safe and effective by the FDA, and were not medically accepted uses covered by Federal and State health care programs. NNI's pursuit of increasing prescriptions for off-label uses caused it to make false and misleading statements and engage in inappropriate conduct with respect to its drugs including: furnishing doctors and key purchasing personnel with false reports concerning drugs' efficacy for off-label purposes, incentivizing and overtly encouraging its sales force to meet goals focused on off-label sales, and targeting patient populations for off-label sales.

a.     Novo Nordisk settled a FCA case involving illegal sales acts, including kickbacks and off label promotion, for $25,000,000 in June 2011.  *See United States of America, ex rel. Ian Black, et al. v. Novo Nordisk Inc., et al*., No. 1:08-cv-2900, D. Md., and *United States of America, ex rel. Pepper v. Novo Nordisk, et al.*, No. 05-cv-3505, E.D.N.Y.) As part of that settlement, the Company entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the United States Department of Health and Human Services, in May 2011 for

a five-year period ending on May 31, 2016. During the entire period when this CIA was in force Novo Nordisk committed deliberate and step-by-step violations of a substantial number of the agreement's terms. The specific violation(s) of this CIA will be footnoted below.

### C.    Off-label Weight Loss Marketing of Victoza and Saxenda

76.    Novo Nordisk, at the beginning of 2010, was in a fortunate business position. Novo Nordisk's scientists and Medical Department had created and patented a drug, Liraglutide, which had just been approved under the trademark name Victoza by the FDA for treating the disease of type 2 diabetes which primarily affects adults over the age of 18. Approximately 29 million Americans (including 1.25 million children) have diabetes.[3]

77.    Novo Nordisk also knew from its clinical trials that the same injectable drug (Liraglutide) was effective at treating obesity by causing on average weight loss of in excess of 5 kg. In December of 2013, with a delay of almost four years after the FDA approved Victoza, Novo Nordisk applied for FDA approval of the drug (Liraglutide) for obese patients (over 30 BMI) under the trademarked name Saxenda. This approval was obtained in less than a year from the FDA Advisory Committee in September 2014 and finally from the FDA on December 23, 2014, for obese (or *severely* overweight) patients (30 or higher BMI) or *very* overweight patents (27 BMI) with a weight related comorbid condition. Obesity (30 or higher BMI) affects in excess of 35 percent (35%) of the citizens of the United States or approximately 114 million people.[4]

78.    NNI did not have FDA approval to advertise weight loss for any patients from 2010 to 2014. To present date, the Company still has not received FDA approval to advertise weight loss for the thirty-three percent (33%) of Americans (more than 100 million people) who are *merely* overweight with a BMI between 25- 29.9 (without a weight related comorbid condition) and to any

---

[3] http://www.diabetes.org/diabetes-basics/statistics/
[4] http://www.niddk.nih.gov/health-information/health-statistics/Pages/overweight-obesity-statistics.aspx

patients concerned with weight loss regardless of their actual BMI.[5] In order for Novo Nordisk to support its corporate core message of "double digit growth," company management exhorted the Sales Department to market Liraglutide, as Victoza and Saxenda, to doctors as a non-FDA approved weight loss treatment.

79.      In the United States, the annual expenditure on medications for type 2 diabetes is in excess of $30 Billion and on medications for obesity revenues are in excess of $2 Billion.[6] Some 64% of those medication costs are paid by one or more Federal health care programs.[7] Each off-label prescription paid for by the Federal health care programs resulting from illegal marketing practices for either obese or the overweight patients  who did not actually meet the approved indication, type 2 diabetes, was a false or fraudulent claim on the Federal and state governments.

**D.     A National Sales Program To Merge The Novo Nordisk Sales Force With The Medical Department To Market Unapproved Diagnoses Of Victoza And Saxenda**

80.      The Defendant, in brazen contempt for its then active CIA, created a nationwide scheme to merge its Sales Department with its Medical Department to illegally target sales to patients and doctors who were likely to use treatments which had not been tested or approved by the FDA and to illegally market and submit claims for hundreds of millions of dollars of sales which were then paid for by a variety of Government health care programs including Medicare, Tricare, Medicare Part D, the Veterans Administration and numerous other Health Care Programs.

81.      In their CIA, Novo Nordisk agreed to a course of lawful conduct, but in practice did exactly the opposite; whether it be with regard to facilitating the solicitation of off-label requests from the Medical Department, assigning and placing the Medical Department personnel into the field with Sales Department employees, giving large volumes of free samples to doctors,

---

[5] http://www.niddk.nih.gov/health-information/health-statistics/Pages/overweight-obesity-statistics.aspx
[6] http://www.cdc.gov
[7] http://www.cdc.gov

42

paying for food and entertainment, and grievously paying doctors under the guise of cash speaker payments based on their prescription volumes. This strategic and carefully implemented national sales program was simply illegal. Since 2010, Liraglutide, marketed as an injectable diabetic drug under the name Victoza, was promoted as a weight loss drug for use by obese and overweight patients before FDA approval of a different dose and indication of Liraglutide under the name Saxenda in 2014. Liraglutide, even as Saxenda, has never been approved by the FDA for merely overweight patients with a BMI of 25 or over without a co-morbid condition.

**E.   Targeting Multiple Patient Groups For Fraudulent Off-label Marketing of Victoza and Saxenda**

82.     The Defendant targeted multiple patient groups for the fraudulent off-label marketing scheme for the drug Liraglutide (which is the same molecule as in Victoza and Saxenda):

a.     Obese patients with a BMI of 30 or greater were targeted in the marketing and sales programs for Victoza from January 2010 to the present date. This BMI based marketing program was conducted prior to the eventual approval of Liraglutide, as Saxenda, for obese patients and without the guidelines that were eventually approved.

b.     Overweight patients with a BMI of 25 to 29.9 were targeted in the marketing and sales program for Victoza from January 2010 to the present date. Furthermore, NNI often suggested that Victoza was a great substitution for Saxenda under a pre-diabetic diagnosis. This marketing strategy was a deliberate program focusing on the off-label weight loss of an insulin analog. To emphasize the weight loss effect of their drugs, Novo Nordisk Sales Department employees, beginning with weight neutral off-label claims for the predecessor injectable drug Levemir, had over the years carried models of human fat into doctors' offices. These models could only have the purpose of illustrating a weight loss effect. This fat model marketing practice has continued to the current day with regard to sales programs for Victoza and Saxenda. Furthermore,

Novo Nordisk has a deliberate focus on general practitioners or endocrinologists who have established weight loss clinics and who would prescribe Victoza for overweight patients.

c.      Pediatric patients, served by pediatric endocrinologists, were targeted in the marketing for Victoza even though Victoza has never been approved by the FDA for either pediatric or pediatric endocrinologist patient groups. To present date, the Liraglutide family of injectable drugs, Victoza and Saxenda, have not been studied or approved for use with infants, children, or adolescents for pediatric use in either type I or type 2 diabetes. Nevertheless, the Sales Department was instructed to focus on pediatric physicians. Note that in the United States it's nearly impossible to recruit pediatric trials so there have been no pediatric trials.

d.      Pregnant Patients were targeted in the marketing and sales program for Victoza, even though the drug has never been approved for this patient group. These patients were also targeted in the promotion of Levemir prior to its FDA approval for this group. This included the promotion of drugs for pregnant gestational diabetic mothers prior to approval as a Category B drug (which would not enter the placenta and damage the unborn child).

**F.      Fraudulently Misleading Physicians and Patients Regarding The Increased Risk of Patient Harm From Several Types of Cancer From the Use of Victoza and Saxenda**

83.      The following patient groups and their physicians were fraudulently misled about the increased risk of patient harm from cancer as a result of prescriptions of Victoza and Saxenda:

a.      To minimize negative sales impact of the potential for Victoza and Saxenda to increase patient risk of suffering from acute Pancreatitis and Pancreatic Cancer a deliberate and fraudulent program was created by the Novo Nordisk Sales Department to focus physicians and their patients on the rarity of the occurrence of the cancer and not the very real danger and potentially harmful risks to the patients prescribed Victoza or Saxenda for this type of cancer.

b.      To minimize negative sales impact of the potential for Victoza and Saxenda to increase patient risk of suffering from acute Pituitary Cancer a deliberate and fraudulent program was created by the Novo Nordisk Sales Department to focus physicians and their patients on the rarity of the occurrence of the cancer and not the very real danger and potentially harmful risks to the patients prescribed Victoza or Saxenda for this type of cancer.

c.      To minimize negative sales impact of the potential for Victoza and Saxenda to increase patient risk of suffering from acute Medullary Thyroid Cancer a deliberate and fraudulent program was created by the Novo Nordisk Sales Department to focus physicians and their patients on the rarity of the occurrence of the cancer and not the very real danger and potentially harmful risks to the patients prescribed Victoza or Saxenda for this type of cancer.

**G.      Fraudulently Inducing Physicians to Prescribe Victoza Off Label as a Substitute for Saxenda and Causing Government Health Insurance Programs to Reimburse for Ineligible Victoza Claims**

1.      Overview and Summary of the Scheme to Defraud

84.      With the formal FDA approval of Saxenda in December 2014, defendant Novo Nordisk was faced with a challenge in expanding sales of this new FDA approved indication of Liraglutide because Saxenda, as a weight loss drug, was not yet reimbursed through the typical "Managed Care" process of Medicare, Medicaid and private insurance, and cost as much as $1,000 per month. Given the risk that lack of Managed Care coverage would limit potential sales of Saxenda during the crucial post launch months in 2015, Novo Nordisk management initiated an illegal scheme in which the company's sales force with the support of the Medical Department would persuade physicians to prescribe its established drug Victoza, which was fully covered under the majority of Managed Care Plans, in an off-label manner.   Victoza was very strong in Medicare Part D Plans which Novo Nordisk

45

management, for example Relator Shirkey's manager Shawnee Lewis, addressed regularly on weekly conference calls and monthly managerial ride days. Saxenda and Victoza contain the same medication molecule Liraglutide. Victoza dosage is approved at 0.6, 1.2 and 1.8 mg while Saxenda is approved at 3.0 mg.

85.     The fraudulent scheme was very simple: inform physicians that Victoza at certain dosages was an alternative form of Liraglutide, "the same molecule"[8] as the weight loss approved Saxenda, but would be covered by insurance. The Victoza pitch was very specific, physicians simply needed to just double the [FDA approved maximum] dose [of Victoza] and then Victoza has the same weight loss efficacy as Saxenda. The "double the dose" or substitute the dose activity and conversations were both actual and implied, and using free samples assured that a weight loss dose could and would be reached by paying for only one prescription plus one free sample. In order to support this scheme Novo Nordisk management changed their traditional approach to providing free samples to physicians, which was that Sales Team members were reprimanded for providing any more than modest sample volume of Novo Nordisk's diabetes medicines: Novolog, Novolog Mix 70/30 or Levemir. Whereas with Victoza, Novo Nordisk Sales Team members were reprimanded if they did not maintain " a 1:1 or better ratio of samples to prescriptions" for a medical practice. Curiously, the sample policy for Saxenda was the same as for the older diabetes drugs and Sales Team members were required to provide very small volumes of samples or face corporate reprimand. The practical effect of the sample policy scheme was to expand sales of Managed Care covered Victoza as compared to Saxenda. In West Virginia Sales Manager Chuck Dent and in Louisville, Kentucky Sales Manager Kendra Heffey were responsible for this fraudulent sample policy. The Novo Nordisk Science Department, Management, Sales persons and doctors all

8. See EXHIBIT Q- VICTOZA FDA FULL PRESCRIBING INFORMATION
   & EXHIBIT R- SAXENDA FDA FULL PRESCRIBING INFORMATION

understood the dose that was needed to reach the greatest reductions in weight by using the same molecule regardless of branded pharmaceutical name. The maximum dosage of Victoza is 1.8 mg, thus twice the maximum dosage would equal 3.6 mg or, a dosage that is 20% higher even than the maximum dosage of Saxenda (3.0 mg) and exposed patients to the risk of even more severe side effects than at Saxenda's 3.0 mg dosage.[9] Saxenda was launched in December 2014 just as Victoza's US sales were softening. By the second Quarter of 2015 as the fraudulent scheme matured and Saxenda marketing activity began to ramp up, Victoza sales began to grow once again, increasing by over $100,000,000 in FY2015. US sales constitute approximately 2/3 of global Victoza sales:



86.     This fraudulent scheme created significant risk of patient harm: every patient who was prescribed Victoza as a substitute for Saxenda received the Package Insert (in FDA parlance Full Prescribing Information) with side effect and dosage disclosures for Victoza approved dosages and indications. However, when Victoza is prescribed at a dosage equivalent to (or greater than) the Saxenda dosage level, Liraglutide has many more and much more severe side effects, including

---

[9] One could combine a 1.2mg dose of Victoza with a 1.8mg dose of Victoza to equal the Saxenda approved 3.0mg dose, but the "double the dose" marketing message did not take into account such nuance to Relators' knowledge.

Suicidal Behavior, Acute Hypoglycemia, Acute Pancreatitis and Heart Rate Increase that are not contained in the FDA Package Insert for Victoza. Indeed, a double dose[10] of Victoza, 2 x 1.8 mg or 3.6 mg, is in fact 20% higher than the maximum approved dose of Saxenda and thus is an OVERDOSE and creates the potential risk of even greater harm.

87. This fraudulent scheme also created potential financial risk of additional cost to Medicare and Medicaid as a double dose of Victoza is more expensive than a single dose of Saxenda by as much as $200 a month. Novo Nordisk also used a high, and illegal volume, of free Victoza samples to encourage initial dosage of Victoza at Saxenda level weight loss dosage, or above. Patients were prescribed (and insurance presumably paid for) one Victoza dose and were initially given one dose of Victoza as a free sample. By "owning physicians' refrigerators" the fraudulent scheme was designed to increase Victoza sales using the "halo effect" of Saxenda's potential for weight loss and by using free samples to reach the weight loss dosage for Liraglutide with a Victoza dose paid for by Managed Care. For example, in mid 2016 Novo Nordisk reduced the Saxenda Team coverage of West Virginia from three representatives to one. After this change, as reported to Relator Brent Shirkey by current Novo Nordisk employees, the West Virginia Victoza Team is posting Victoza leading national sales numbers as Saxenda sales are substituted with Managed Care covered Victoza.

88. If even a single dose of Victoza prescribed for weight loss in place of Saxenda is off label and causes an additional fraudulent expense of approximately $600, per patient, per month based on current retail costs of Victoza. If only 5% of 2016 Victoza sales were due to Saxenda substitution, this is an additional burden to the federal government of at least $100,000,000 per annum.

---

10. See EXHIBIT Q- VICTOZA FDA FULL PRESCRIBING INFORMATION
& EXHIBIT R- SAXENDA FDA FULL PRESCRIBING INFORMATION

89.     In summary, Novo Nordisk's management is executing an illegal, fraudulent double or substitute or switching dose scheme to drive the company's stated "double digit" revenue growth goals at great cost to the United States and State Governments. In addition, not satisfied with stealing from government Managed Care Programs, Novo Nordisk's substitution scheme has resulted in the risk of great patient harm by hiding required FDA regulatory disclosures and by recommending "double doses of Victoza" and potentially overdosing many patients with a powerful drug at off -label levels and even beyond the maximum dosage ever approved by the FDA for Liraglutide.

2.      <u>Fraudulently Substituting Victoza For Saxenda In Order To Generate Additional Sales Of Liraglutide By Utilizing Government Funded Managed Care Programs</u>

90.     With the launch of Saxenda, Novo Nordisk Sales professionals were organized into separate teams for each medication: the Victoza sales force was known as the Diabetes Team while the Saxenda sales force was known as the Obesity Team. The Saxenda/Obesity Teams were shadowed by Victoza/Diabetes Teams and acted like a "tag team" in "calling" on physicians. Saxenda Teams went in first and provided the details of how well Saxenda supports weight loss, but had challenges making sales due to lack of Managed Care reimbursement. Victoza Teams then went in and explained to the *same physicians* that Victoza is the same molecule and if patients can't afford Saxenda they can get Managed Care reimbursement for Victoza. This approach was particularly effective as Novo Nordisk already had an existing scheme to sell Victoza "off-label" for weight loss even prior to the FDA approval of Saxenda, as described in detail herein.

91.     Novo Nordisk Sales Teams told physicians to simply double the maximum dose of Victoza, which is not approved as a weight loss medication, to get the same effect as Saxenda.  Yet Saxenda requires higher dosages than Victoza as Liraglutide's efficacy for weight loss has not been

established at lower dosages, i,e,. The maximum approved dosage for Victoza is 1.8mg while Saxenda requires a dosage of 3.0 mg for dosage efficacy. If patients cannot tolerate the required 3.0 mg dosage of Saxenda, the drug must be discontinued.

92.     Novo Nordisk management instructed the Victoza/Diabetes Sales team that "We don't care what form or molecule, just write it, double the dose of Victoza," as evidenced by Sales Team member Susan Jessup and her WV based Manager, Shawnee Lewis.

93.     Though Saxenda was approved and launched as new medication, it has ultimately become the icing on the Victoza cake, given that Victoza sales revenues pre-launch of Saxenda had been flat and now have risen dramatically and are approximately 5 times Saxenda sales revenues.

                3.     <u>Increasing Patient Harm By Fraudulently Substituting Victoza "Off Label" For Saxenda Without Providing The Necessary Additional Disclosures Required When Prescribing Higher Doses Of Liraglutide</u>

94.     The maximum approved dosage of Victoza is 1.8 mg and at this dosage there are disclosures under Indications and Usage, Warnings and Precautions and Adverse Reactions noted in the FDA approved Full Prescribing Information for Victoza, <u>See</u> EXHIBIT Q:  VICTOZA FDA FULL PRESCRIBING INFORMATION.

95.     In contrast, the maximum approved dosage of Saxenda is 3.0 mg at this dosage there are many more negative side effects and disclosures under Indications and Usage, Warnings and Precautions and Adverse Reactions, some very severe, as noted in the FDA approved Full Prescribing Information for Saxenda, See EXHIBIT R:  SAXENDA FDA FULL PRESCRIBING INFORMATION. More specifically, the following list of Saxenda side effects, Indications and Usage, Contraindications, Warnings, Precautions and Additional Reactions describes the more severe and additional challenges when Liraglutide is prescribed at higher doses as Saxenda required to support efficacy in weight loss.

**Additional Indications and Usage for Saxenda:**

- Saxenda is not indicated for the treatment of type 2 diabetes mellitus. Note Victoza _is_ approved for this indication.

- The effects of Saxenda® on cardiovascular morbidity and mortality have not been established.

- The safety and effectiveness of Saxenda in combination with other products intended for weight loss, including prescription drugs, over-the-counter drugs, and herbal preparations, have not been established. Note: Patients seeking weight loss are much more likely to be taking additional weight loss drugs.

**Additional Warnings and Precautions for Saxenda:**

- Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated.

- Heart Rate Increase: Monitor heart rate at regular intervals.

- Suicidal Behavior and Ideation: Monitor for depression or suicidal thoughts. Discontinue Saxenda® if symptoms develop.

**Additional Adverse Reactions:**

- Saxenda patients reported 55 separate Adverse Reactions, in comparison Victoza patients reported just 33 Adverse Reactions, the overwhelming bulk of which are shared with Saxenda, albeit often with less severity. See EXHIBIT S-COMPARISON LISTING OF SAXENDA AND VICTOZA ADVERSE REACTIONS EXCERPTED FROM FDA FULL PRESCRIBING INFORMATION.

**Use In Specific Patient Populations:**

• Finally, whereas Victoza is approved for use by pregnant patients Saxenda is specifically contraindicated and should not be used by pregnant patients.

4. <u>Higher Doses of Liraglutide Significantly Increase the Risk of Patient Harm When Victoza is Illegally Substituted for Saxenda</u>

96. The effects of Novo Nordisk's illegal scheme to substitute Saxenda with Victoza are to significantly increase the risk of patient harm because the Victoza's FDA Contraindications, and Warnings and Precautions and Adverse Reactions are much simpler and milder than the Saxenda disclosures. This is because the higher dose of Liraglutide from Saxenda causes more numerous, and more severe, side effects. If a patient is prescribed Victoza they will receive Victoza's milder FDA Contraindications, and Warnings and Precautions and Adverse Reactions. In addition, a double dose of Victoza causes a patient to receive potentially 3.6mg of Liraglutide, which is an overdose of 0.6mg, i.e., 20% higher than the maximum approved dose of even Saxenda. When patients are prescribed higher dosages of any medication there are more numerous, and more severe, side effects, as can be seen by the Victoza and Saxenda materials described above.

**H. Specific Knowledge of Relators Houck, Smith and Shirkey about the Novo Nordisk Fraudulent Marketing and Sales Program for Victoza and Saxenda**

97. Relator Houck has specific knowledge of the targeting of each of the specific patient groups from his thirteen years of service with Novo Nordisk. Attached, as EXHIBIT E: LIST OF THE SALES DEPARTMENT REPRESENTATIVES WHO INFORMED RELATOR HOUCK, is the list of NNI employees who instructed him to target specific patient groups (and to whom he reported to from 2010 when Victoza was launched) until his termination around Thanksgiving in 2014 after Saxenda had been submitted to the FDA for approval and had received

approval from the FDA Advisory Committee, and launch preparations were underway. Relator Houck has direct and personal knowledge of the off-label sales method described above.

a.       From January 2010 to the present date, Relator Houck has personal knowledge that Novo Nordisk was marketing and selling Victoza for weight loss under a pre diabetic diagnosis to patients who were *merely* overweight with a BMI of 25 to 29.9. Relator Houck had extensive involvement in the sales practices of utilizing Liraglutide as Victoza for *merely* overweight patients by sharing off-label weight loss data with physicians. Relator Houck also has extensive knowledge about the medical and marketing data that focused on weight loss as a BMI off-label indicator. Relator Houck was aware of the company's pipeline of drugs and learned about Liragitude as early as 2004. Shortly after learning about Victoza in 2009, Relator Houck also learned that the company was working on gaining approval of a weight loss diagnosis for Liraglutide at a "double dose" of Victoza; that new drug became Saxenda launched in 2014. Relator Houck is aware that Victoza sales representatives (and often their spouses) used Victoza (even though they did not have type II diabetes or were not diabetic) for weight loss and then personally told the doctors they called on about this (off-label) benefit.   Relator Houck is knowledgeable about the dosing, pricing, and reimbursement for Victoza and Saxenda.

b.       Relator Houck has personal knowledge that Novo Nordisk was fraudulently misleading physicians prescribing Victoza to patients that were at risk for acute Pancreatitis and Pancreatic cancer.

c.       Relator Houck has personal knowledge that Novo Nordisk was fraudulently misleading physicians prescribing Victoza to patients that were at risk for Medullary Thyroid Cancer.  Although Victoza listed Black Box warnings (which are the most potentially harmful risks to patients) for Pancreatitis and Medullary Thyroid cancer, their Medical Department employees,

including Francis Feng who Relator Houck personally witnessed, routinely explained that the risk for cancer with Victoza was overblown because the clinical trials were focused on rats and their genetic make-up predisposed them to develop these types of cancer. The Medical Department preferred to utilize primate data to downplay the associated risk listed in the product Package Insert. At that time the competitor drug Byetta was the only other drug option, and it did not have the Black Box warning about the content, so the Medical Department promoted the downplaying of these risks.

98.     Relator Smith has personal knowledge of the targeted patient groups, the drugs involved and the off-label sales method described above from his nearly 13 years with NNI. In particular, he has specific knowledge as described below.

a.     From January 2010 to the present date, Relator Smith has personal knowledge that Novo Nordisk was marketing and selling Victoza as a weight loss drug to patients who were *merely* overweight with a BMI of 25 to 29.9. Relator Smith also has direct and personal knowledge of the off-label sales method of Victoza from January 2010 to December 2014 to patients who were obese with BMI 30 or greater and for patients who requested weight loss treatment regardless of their BMI. On at least three (3) occasions Relator Smith personally witnessed Novo Nordisk Sales Department Managers Christy Miller and Anne Cannon in the field presenting off-label information about the weight loss benefits of Victoza to targeted Endocrinologists physicians. At the time, Relator Smith and others within the company knew that Saxenda was on the horizon as an approved weight loss drug at double the dose of Victoza. Marketing Victoza for weight loss and to pre-diabetics and other unapproved groups was a way of bridging the gap until Saxenda was approved and launched.  He is also aware that it was a common practice for Novo Nordisk sales representatives (and often their spouses) to use Victoza (even

54

though they were not type II diabetic or diabetic) for weight loss and then personally tell the doctor they called on about this off-label benefit. Relator Smith is knowledgeable about the dosing, pricing, and reimbursement for Victoza and Saxenda.

99.     At a Regional meeting in 2012, the Novo Nordisk Sales Department's Endocrinology Team, of which Relator Smith was a member, was introduced to the concept of "behavior modification" by Regional Sales Department Manager Andreas Seagar. Manager Seagar trained the Sales Department employees to tailor conversations with physicians that the problem to address was diabetes patients and their inability to stay on a diet and their failure to manage body weight. The solution to this problem was for doctors to prescribe Victoza because of its ability to "modify patient behavior" also known as helping patients to lose weight. Manager Seagar told Relator Smith that the endocrinology team's  "core message" was to expand prescribing habits, grow Victoza's market share, and continue Novo Nordisk's targeted double-digit growth using this message even though weight loss was not an approved FDA label for Victoza or even for Saxenda without the restrictive guidelines approved by the FDA. Novo Nordisk Sales Department Mangers used the "behavior modification" sales pitch to physicians as a metric in ongoing formal performance reviews of Sales Department members even though weight loss was not an approved FDA labeling:  See EXHIBIT F: RELATOR SMITH'S 2013 NOVO NORDISK EMPLOYMENT REVIEW ACE YEAR END 2013 GSMI FINAL.[11]

100.     Relator Smith and his partner DeEtte Daniel (who is still employed by NNI) made a Sales call on Dr. Sicat as a prescriber of Novo Nordisk products up to or around 2013 to provide free samples of Victoza, while he transitioned his practice from endocrinology to a weight loss clinic. After Dr. Sicat had fully transitioned to a weight loss clinic, Relator Smith and his partner were told by Novo Nordisk Management to remove him from their territory. On April 20, 2016,

---

[11] The CIA has clear restrictions on the salespersons sales plan which would prohibit this.

Relator Smith had a conversation with Daniel and she informed him that on or around September 2015, Manager Dave Kimber instructed her to start including Dr. Sicat in her territory again using the messaging that Dr. Sicat could, "use Victoza as an alternative to Saxenda, if he couldn't get insurance approval," and to tell him, "it's the same drug as you know." Daniel also informed Relator Smith that she was doing a lunch at Dr. Sicat's office, the week of April 20th, 2016 with her Sales Department Manager Michelle Goode. As part of the Endocrinology Sales Team, Daniel has responsibility for the sale of Victoza, which can be prescribed to type 2 diabetes patients, and not for Saxenda, which is only approved as an obesity drug.

101.    Relator Smith has direct and personal knowledge that pediatric patients served by pediatric endocrinologists were being prescribed NovoLog, NovoLog Mix 70/30, Levemir, and Victoza even though none of these drugs are approved for use in pediatric patients.  Relator Smith was instructed by Novo Nordisk Sales Department management to visit pediatric diabetes practices and promote the use of NovoLog, NovoLog Mix 70/30 to juvenile diabetes patients. In order to persuade doctors to prescribe the drug to patients, despite the fact that it did not have pediatric indications at the time, Sales Representatives would present doctors with "The Bode" study, which boasts about the drug's safety in adults.  From 2004-2012, Relator Smith was incentivized and complemented for his success in this illegal program targeting of off-label sales. See EXHIBIT F: EMAIL CONFIRMING SALES PROGRAM FOR PEDIATRIC PROMOTION OF NOVOLOG MIX 70/30. This sample email dates from 2004, but is representative of Novo Nordisk sponsored activities up through 2012. Similar documents were wiped from Relator Smith's Novo Nordisk issued computer at the time of his termination under the company's protective document management policy in force at that time.

102.     Relator Smith has direct and personal knowledge of pregnant patients being marketed Victoza and Levemir, even though neither drug was approved for use in pregnant persons at the respective times. On multiple occasions Relator Smith personally witnessed Managers Christy Miller and Anne Cannon in the field presenting off-label information about the safety of Levemir for pregnant patients before the drug was approved by the FDA for that patient group.  To date, Victoza is not approved for pregnant patients. Levemir was approved for pregnant patients in 2012, approximately 7 years after its original FDA approval.

103.     Relator Shirkey has direct and personal knowledge of the off-label sales method described above from his nearly 9 years with NNI. In particular, Relator Shirkey has specific knowledge as described below.

104.      Relator Shirkey has direct and personal knowledge of patients who were obese with a BMI of 30 or greater being marketed for Victoza by Novo Nordisk Sales and Medical Department employees from January 2010 to September 2014.

105.     Relator Shirkey has direct and personal knowledge of the use of the term "behavior modification" as directed by NNI management in regards to weight loss. He is also aware that it was a common practice for Novo Nordisk sales representatives (and often their spouses) to use Victoza (even though they were not type II diabetic or diabetic) for weight loss and then personally tell the doctor they called on about this off-label benefit.

106.      Prior to the introduction of Victoza in 2010, Relator Shirkey had been trained on sales promotion for the drug Levemir. Over his 9 years of employment at NNI, Relator Shirkey was recognized multiple times with "Exceed Expectation" and "Outstanding" reviews. He was coached and instructed by his Sales Department Manager to always address the benefits of weight loss when compared to competing diabetes drug, Lantus. Attached as EXHIBIT H: LIST OF THE SALES

MANAGERS WHO INSTRUCTED RELATOR SHIRKEY. The language supplied included, but was not limited to, "in 12 out of 12 clinic trials Levemir had less weight gain than Lantus and in most cases patients lost weight." Relator Shirkey was given 5 pound models of fat to show what that weight loss would look like. See EXHIBIT I: MODEL OF FIVE POUNDS OF FAT, which is a picture of the present model being used for the FDA approved Drug Saxenda. A five pounds of fat model like this was used by the Sales Department to promote the unapproved weight loss diagnosis beginning in 2006 with Levemir and continued though the launch of Victoza. From 2008 and for the years to follow Relator Shirkey and his fellow Sales Department employees used these models for physician presentations. Relator Shirkey witnessed his partner Sales Department employee Shannon Henderson use the 5 pound model on a daily basis and was encouraged to follow the same behavior by Sales Department Manager Chuck Dent.

107.    Relator Shirkey has direct knowledge and can corroborate with the other relators that the same 5 pound fat models were used in the promotional activity of Victoza in order to demonstrate what "5lbs of fat looked like" to physicians in their sales pitches. Sales Department Manager Dent, and later Sales Department Manager Shawnee Lewis, witnessed this behavior and encouraged their employees to use these models to explain the benefits of weight loss to physicians in order to encourage higher volume of prescriptions. Novo Nordisk Sales Department Manager Staci Joy used these models on a regular and consistent basis and used language such as, "people will do anything to lose weight, including putting a needle in the eye." Sales Department employees were actively encouraged and incentivized to use this type of sales and no Sales Department was reprimanded for using these of off-label discussions. EXHIBIT I: MODEL OF FIVE POUNDS OF FAT. This model was also initially used for Victoza promotions, then eliminated from the sales

process prior to the approval of Saxenda in 2014, but reintroduced at the launch of Saxenda as an approved weight loss drug.

108.    Relator Shirkey has direct and personal knowledge that from January 2010 to present date patients who were overweight with a BMI of 25 to 29.9 were marketed for Victoza as a weight loss drug. He also has knowledge of the NNI sales force encouraging pitch sales to substitute Victoza for Saxenda under pre diabetic diagnosis. Relator Smith also has direct and personal knowledge of the off-label sales of Victoza (from January 2010 to present date) for patients who requested weight loss treatment from their physicians regardless of their BMI under the guise of a pre diabetic diagnosis. Relator Shirkey was aware of Saxenda about two years before it was launched. In approximately 2012-2013, there were launch type discussions with Dr. Alan Moses, Senior Vice President and Global Chief Medical Officer of Novo Nordisk, that focused on obesity and the pipeline of drugs and how to talk to doctors about making the decision on how to use a drug. At a National Sales Meeting in or around 2013, Dr. Moses explained that Saxenda would be the "same molecule" at "double the dose." Subsequent to this date multiple representatives of Novo Nordisk's Management and Medical Department were heard to repeat these statements frequently. Relator Shirkey's direct and personal knowledge regarding Novo Nordisk's illegal, national scheme to fraudulently substitute Saxenda with double doses of Victoza after January 1, 2015, to increase revenue at the risk of causing great patient harm, includes the following:

a.    In October 2014, Novo Nordisk began to officially train and prepare the company sales force to market Saxenda in addition to Victoza.  To do so, Novo Nordisk created two separate Sales Teams: Obesity/Saxenda and Diabetes/Victoza.  However, actual separation between Sales Team duties was nominal in that the teams were given nearly identical call responsibility with the same physicians being visited by each team.  Once again, samples were utilized to manipulate

sales, but curiously the Obesity/Saxenda Teams were given very limited access to samples while the Diabetes/Victoza Teams were given open access to samples.  Relator Shirkey is familiar with the Novo Nordisk policies to "own physicians refrigerators" by filling them with Victoza free samples and to track samples in physician's refrigerators which were required to be kept stocked with Victoza samples at a ratio of 1:1 or better compared to the number of Victoza prescriptions written by the practice.

b.    Prior to the launch of Saxenda following final FDA approval in December 2014, Victoza sales were flat and Victoza Sales Team members were typically under performing and missing quotas. Shortly after Saxenda's launch, however, the Diabetes/Victoza Sales Teams began to make and began to exceed sales quotas, while the Obesity/Saxenda Sales Teams struggled to make quotas.  Based on multiple reports to Relator Shirkey from Novo Nordisk Sales Team members named below, while Saxenda sales are weak because of lack of Managed Care access; Diabetes/Victoza sales are strong because the two Sales Teams are marketing the "same molecule" to the same doctors and because Victoza is a well-established drug that is very well covered by Managed Care.

c.    For example, Obesity/Saxenda Sales Team members Anita Watson (Huntington, WV), Mick Munafo (Dayton, OH), and Regina Patton (Charleston, WV), have reported to Relator Shirkey, identical sales experiences beginning with Saxenda's launch in December 2014 up to late August 2016. For example, in Huntington, WV, Doctors James Goetz and Thomas Dannals both explained the patient challenges presented by Saxenda, great weight loss effects, but no Managed Care coverage. The Diabetes/Victoza team, particularly in the person of Sales Team members Susan Jessup, and Max Felix (Huntington, WV), followed up by explaining that Victoza was the "same molecule" and a "double dose" would have the same effect as Saxenda,

but would be paid for by Medicare/Medicaid/Insurance (i.e. Managed Care). In Kentucky, Diabetes/Victoza Sales Team members, Joe Collins and Greg Horn, used the identical sales pitch, "same molecule, double dose." There were multiple times when Relator Shirkey heard of a Victoza sales representative who called on a doctor after Relator Shirkey and pitched the doctor on "double the dose" and using a free sample of Victoza along with one Managed Care paid prescription of Victoza. Doctors often asked Relator Shirkey about insurance coverage for Saxenda and told him that a Victoza representative (e.g., Susan Jessup) said to just use Victoza, plus one free sample to reach the weight loss dose of Liraglutide.

        d.      The above named Obesity/Saxenda Sales Team members reported this illegal marketing scheme to various Novo Nordisk managers on multiple occasions beginning in late 2014 up through the present day, including Manager Mike Hassle, Cincinnati, OH, and managers Shawnee Lewis, Huntington, WV and David Hume, Kentucky. Due to the significant boost this illegal scheme has given to Victoza sales, no effort was made to correct the Diabetes/Victoza Sales Team activities, which are ongoing.

        e.      In Virginia, Novo Nordisk Manager Angie Smith exhorted Diabetes/Victoza Sales Team members to "own the refrigerators" which means very high volumes of Victoza samples were provided so that physicians could initially prescribe one [unapproved] "dose" of Victoza and combine it with a free sample dose to reach a " double dose." Under this scenario, one dose would be paid for by insurance and one dose would come from a sample given to the patient free of charge.  As noted above, Relator Greg Smith and his Sales Team partner DeEtte Daniel were specifically instructed by Manager Angie Smith to stock extra Victoza samples at Endocrinology and Weight Loss clinics, including Dr. Jeffery Sicat in Glen Allen, VA, as he transitioned his practice from Endocrinology to Weight Loss. Even after a full transition to a Weight Loss business,

Dr. Sicat was still visited by Victoza/Endocrinology Sales Team members to perpetuate the fraudulent Victoza "double dose" and sampling scheme.  Conversely, Obesity/Saxenda Sales Team members were given very limited Saxenda samples, a mirror image of the Victoza sample inventory.  In West Virginia, Relator Brent Shirkey and other members of the local Sales Team were coached, on multiple conference calls, by Manager Shawnee Lewis to "own the refrigerators" and stock large volumes of Victoza samples, including free samples to the Hurricane, West Virginia, practice of Doctor Rick Houdersheldt.  Novo Nordisk management tracked the volume of samples in physician's refrigerators and required that the Sales Team maintain a "1:1 or better" ratio of samples to Victoza prescriptions written by the practice.

f.      Novo Nordisk Sales Team members were also instructed to educate physicians that higher doses of Liraglutide did not have increased side effects and had positive patient outcomes.  Victoza was not approved for weight loss, and only approved at dosages up to 1.8 mg of Liraglutide.  Saxenda was approved for weight loss, but only at 3.0 mg of Liraglutide.  In truth, Saxenda has more and more severe FDA Contraindications, Warnings and Precautions and Adverse Reactions. See EXHIBIT S SAXENDA & VICTOZA ADVERSE REACTIONS – SIDE EFFECTS CHART.

g.      In addition, Novo Nordisk management utilized the separate Sales Teams to manipulate the EPIR process and the Medical Department/Sales Department firewall: if a doctor asked the Diabetes/Victoza Team about Saxenda there was an immediate EPIR of Medical Department referral and no attempt was made to utilize the Obesity/Saxenda Sales Team.  Medical Department Team Member Francis Fang, West Virginia, was actively involved in this process during 2015.  Novo Nordisk Medical Department members were also making cold calls to

physicians explaining the "same molecule, dose" scheme, in 2015, including calls made on Daniel Massias, MD, in West Virginia.

       h.    Relator Shirkey is knowledgeable about the dosing, pricing, and reimbursement for Victoza and Saxenda. To the best of his knowledge, the monthly cost of Saxenda is less than the cost of a "double dose" of Victoza, by approximately $200 and the monthly cost of a "single' dose of Victoza can be $600 or more depending on pricing/rebates for Medicare/Medicaid agreements in a specific geography.

       109.    Relator Shirkey has direct and personal knowledge that physicians with pregnant patients were marketed to for Victoza and Levemir even though neither drug was approved for treatment of pregnant persons. Relator Shirkey was directed by Dr. Todd Hobbs, Medical Liaison and now Novo Nordisk Chief Medical Director, to use Medical Department pregnancy data to influence higher volume of prescriptions of Levemir from Dr. Singh of Cabell Huntington Hospital and Marshall University in or about 2008. Upon receiving this directive, Relator Shirkey was instructed to share the information with other physicians, District and Regional Sales Department members, and Company Management. Relator Shirkey's performance with regard to distribution of these materials was monitored and used as a metric in which he was positively recognized in periodic performance reviews for his efforts to follow these instructions. Relator Shirkey was directed by Medical Department Director Hobbs to also present the Medial Department's off-label data to Dr. Singh for gestational diabetes data for Levemir in 2009. Dr. Dewey Bailey, an Endocrinologist in Roanoke, Virginia, and a KOL speaker would commonly refer to risk of "large baby syndrome" with Lantus in comparison to Levemir and its IGF-1 receptor binding affinity in 2009-2012 in which the syndrome did not occur.

110.    The Defendant's Code of Business Conduct ("CBC") which was developed as mandated by the CIA, specifically stated that speaking engagements are, "permissible provided they require the performance of genuine services for Novo Nordisk, compensation is consistent with fair market value and is not related to prescribing or purchasing volume or formulary treatment."[12] Initially, the Key Opinion Leaders Speakers Program was established as part of its sales to endocrinologist specialist physicians. Accordingly, when the program was initially established it was populated with well-known, respected endocrinology specialists who were given a stipend between $1,000 and $5,000 dollars a speech. KOLSP members were under contract and were required to give at least three speeches a year.

111.    Novo Nordisk's Sales Managers later corrupted the speakers' program into a pay-to-play stipend for primary care physicians, particularly physicians who established weight loss clinics. The economic rationale for this change was that KOL Endocrinologists were typically academic experts with relatively modest practices as compared to primary care prescribers operating high revenue, high patient volume clinics. The "double digit growth" goal could simply not be supported without expanding into the high volume core of the market represented by the primary care providers. In addition, primary care providers were often persuaded upon receiving Novo Nordisk speaking fees to switch their entire patient populations from competing diabetes drugs to the equivalent Novo Nordisk products: NovoLog, NovoLog Mix 70/30, Levemir and Victoza. In order to accomplish the required increase in sales, Novo Nordisk Sales Department Managers systematically limited the speaking engagements of KOL endocrinology speakers so they would be disqualified from the program and could then be replaced with primary care physicians. These new doctors were typically dispensing a high volume of the Novo Nordisk family of

---

[12] The CIA stated in paragraph 2 Policies and Procedures subparagraph (k,) "These procedures shall be designed to ensure that the arrangements and related events are used for legitimate and lawful purposes in accordance with applicable Federal health care program and FDA requirements."

injectable drugs, or were prescribing a high volume of competing drugs and were expected to change to Novo Nordisk products as a result of their addition to the KOL speaker kickback program. Many of these high volume primary doctors were not required to actually make the speeches to receive the stipend, or simply spoke to empty forums with the full knowledge of the Novo Nordisk Sales Department management.

112.    A second element of the Defendant's kickback scheme required and encouraged its sales staff to violate the "occasional meals" standard in the CBC by providing frequent, lavish, and expensive meals and food to physicians and their staff. Sales Department Managers directed their employees to focus on the "total office call," which encouraged nurses and other medical office staff to flag patient charts and manipulate prescription favorite lists in order to enhance opportunities for the Novo Nordisk drug portfolio. This tactic created a potential opportunity for switching from a competitor's drugs to one provided by the Defendant.  The "total call" was always a primary focus and part of Sales Department employee's lunch promotions. The Sales Department Managers instructed their employees to discuss the targeted patient types in NNI's promotional materials for chart identification with a physician's entire office staff to gain their assistance with transitioning from competing companies' drugs to Novo Nordisk drugs. The Sales Department employees' ability to manipulate physician's electronic medical records and the patients' prescription favorite lists became a performance metric that Sales Department Manager Shawnee Lewis, a supervisor for Relators Houck and Shirkey, was particularly focused on.

113.    Another dimension of the kickback strategy was the ample use of free samples of drugs and other NNI products in order to illegally induce physicians to prescribe, and patients to use, the Defendant's drugs. In direct contravention of their CBC, the Sales Department Managers directed their employees to leverage sample distribution to generate prescriptions. It is well-known

in the pharmaceutical industry that more samples drive more repeat prescriptions of a company's products. Novo Nordisk required and encouraged its sales staff to register providers on the NovoMedLink site to be able to order free samples with a fax-back-form. Sample activity was tracked and measured for individual physicians. Samples were misused to support physician practices and were used as a reward for favorable prescribing habits.

114.    Relator Houck has specific knowledge of NNI's violations of the Anti-kickback Statute including the following:

a.    Relator Houck learned that the KOLSP was initially established to offer endocrinologist specialist physicians that were considered key opinion leaders in their local markets opportunities to speak on behalf of Novo Nordisk products and not to promote off-label uses. These KOL speakers were typically identified and selected from the endocrinology specialty based on their professional reputations and extensive diabetes knowledge and experience.

b.    Relator Houck has personal knowledge that Novo Nordisk's Medical Department was responsible for helping to establish the KOLSP by providing extensive education for its members focused on the Novo Nordisk brands. Slide presentations were developed that reviewed all of the product information with a variety of end-points and outcomes, as compared to competitive standards of care with both mono-therapy and in combination with other products. All of this information was then carefully reviewed with the selected KOL endocrinologist physicians so that they would not send messages of off-label use. At its inception, off-label questions presented at KOL speaker meetings were required to be sidelined for a one-on-one discussion after the presentation between the speaker and the physician posing the questions. Sales Department employees were also presented with this detailed off-label information during training to ensure that only approved marketing messages were reviewed with customers.

c.      Relator Houck learned, beginning in 2011 with the launch of Victoza, that the original model for the KOLSP was corrupted by Sales Department Managers across the country who directed their employees to switch the program's focus on to the much larger number of primary care doctors. Relator Houck discovered that across the country Sales Department Managers realized that they were missing a huge opportunity to expand Novo Nordisk's business by developing; high prescribing primary care physicians as speakers. Relator Houck learned that the primary care Sales Department Managers had developed a program to disqualify speakers who did not meet the minimum annual requirement of three promotional talks in order to maintain their status with the KOLSP. From 2010 to 2015, a large number of long-term endocrinologist speakers were replaced by high prescribing primary care physicians including physicians who established weight loss clinics. Sales Department Managers across the country forbade their employees from coordinating speaking engagements for endocrinology specialists, thus eliminating them from the program and opening spots for high volume primary care doctors who prescribed Novo Nordisk drugs for both approved FDA and off-label uses.

d.      As one example of many such occurrences, primary care Sales Department employees in Charleston, West Virginia were forbidden by Sales Department Manager Dent to utilize Dr. Stephen Grubb, a respected endocrinologist at the West Virginia University in Charleston, so that he would not be able to maintain his membership in the KOLSP. Once Dr. Grubb was eliminated from the program, he was immediately replaced by Dr. Sathichandra Rao, a high volume prescribing primary care physician in Logan, West Virginia. Relator Houck has personal knowledge that with Sales Department Manager Dent's full knowledge and encouragement, Sales Department, employees fraudulently established KOLSP events for Dr. Rao with very few, or even no attendees. As a result, Dr. Rao received payments of thousands of dollars

for unattended speeches. The reason these events were approved was because Dr. Rao was a very high volume NNI's product prescriber who utilized the drugs for both FDA approved and unapproved off-label uses. Relator Houck believes Dr. Rao held pharmaceutical companies including Novo Nordisk "hostage." That is to say, if he was not receiving additional compensation as a speaker, Dr. Rao would not prescribe the company's drugs.

e.    Relator Houck unsuccessfully challenged former Charleston Primary Care District Sales Department Manager, David Myers, and former Sales Department Diabetes Care Specialist, Chris Kinder, regarding the validity of using Dr. Rao as a speaker for the Novo Nordisk insulin portfolio due to the lack of attendance at his speaking events and the potential loss of credibility for Novo Nordisk products, compared to utilizing legitimate KOL speakers such as Dr. Stephen Grubb.

115.    Relator Houck has personal knowledge that Novo Nordisk encouraged Sales Department employees to use free meals to persuade physicians to prescribe their diabetes drugs. As an example of the abuse of the free meals program, Relator Houck was instructed by Sales Department Managers to spend far more meal funds on physicians with a high volume of prescription.

116.    Relator Houck has personal knowledge that Novo Nordisk encouraged Sales Department employees to use free samples of drugs to persuade physicians to prescribe the company's diabetes drugs. Relator Houck was instructed to institute an excessive sampling practice to drive market share in high volume prescription physician offices. The Sales Department management's direction was to "leverage samples for prescriptions." Competitive insulin manufacturers shipped samples in cooler packs per physician requests to preserve insulin standards and integrity. The Novo Nordisk Sample Distribution personnel often failed to follow FDA

guidelines for storage of injectable temperature standards in order to get substantial number of samples directly into the hands of high volume prescribing physicians.

117.     Relator Smith has specific knowledge that Novo Nordisk violated the Anti-Kickback Statute:

a.      Relator Smith has personal knowledge of the Defendant's illegal pay-to-play physician kickback scheme and the corruption of the KOLSP. He witnessed the early creation of an active KOL speakers program that was comprised primarily of endocrinologist and well respected "thought leaders" in the medical field. He has direct knowledge of the later corruption of the program by NNI's Primary Care Sales Department Managers across the country who intentionally selected speakers who were high volume prescription writers and not necessarily considered "thought leaders." These physicians were selected knowing that they would increase the sales of NNI's drugs in the sales territory in exchange for the speaker's payments. Relator Smith can corroborate the other relators' personal knowledge that the Defendant's Sales Department Managers developed a rule that a speaker would not get approved for the next year unless they did three speeches a year and was told that this was a strategy to get rid of the doctors who were low volume prescribers. The speakers that were added by Managers were internists that had a very high diabetes population among their patients or developed weight loss clinics writing high volume prescriptions. These physicians were not considered to be thought leaders.

b.      As one example of many, Relator Smith's primary care Sales Department Manager removed Dr. Wigand, a KOL Endocrinologist who had been a member of the KOLSP since the launch of NovoLog, and replaced him with Dr. Wasserman, an internist, due to his high volume of prescriptions.

c.      At a National Sales Department Meeting in 2013, primary care Sales Department Manager Joshua Puckett initiated a conversation with Relator Smith stating that Dr. Courtney Harrison was not being a NNI team player. Puckett brought his complaints to Endocrinology Sales Manager Angie Smith and Regional Directors Dave Fields and Nick Fisher. Manager Puckett told Relator Smith that Dr. Harrison, "doesn't sell our products well enough and talks too much about other products in his talks" and that Relator Smith "needed to do something" or he wouldn't continue to use him as a speaker within his district. Relator Smith responded that Dr. Harrison was an excellent, well-respected and fair-balanced speaker and that it was a violation of the NNI Code of Business Conduct to encourage him to favor Novo Nordisk in his speeches.

d.      Management also asked Relator Smith and his partner to ask Dr. Gunawardena, a high volume prescribing physician, if he wanted to become a KOL speaker for Novo Nordisk. When Relator Smith stated that it was a violation of the Novo Nordisk Code of Business Conduct for the Sales Department to become involved with the speaker process, he was retaliated against by his Sales Department Managers in his next performance review and was eventually terminated.

e.      Relator Smith has a history of "Exceeds Expectations" and "Meets Expectations" performance reviews. However, once he started voicing his concerns about Novo Nordisk violations, his performance reviews began reflecting Management's decision to eliminate employees who were rocking the boat. Endocrinology Sales Department Manager Angie Smith gave Relator Smith a review of "Exceeds Expectations" in his 2012 performance evaluation, "Meet's Expectations" in the mid 2013 mid year review, and "Does not Meet Expectations" by his end of year review in 2013.

f.      In 2014 Relator Smith's new endocrinology Sales Department Manager Dave Kimber and Regional Sales Department Director Nick Frager started to add pressure to Relator Smith alleging that he was not doing his job. Relator Smith was also accused of falsifying calls, however, an investigation by Human Resources cleared him of this allegation.

118.    Relator Smith has personal knowledge that Novo Nordisk encouraged Sales Department employees to use free meals to persuade physicians to prescribe the company's diabetes drugs.  Relator Smith was instructed by his Sales Department Manager to spend far more meal funds on physicians with high volumes of prescriptions.  On multiple occasions, Relator Smith's partner, Ricky Grimes, would drop off bags full of food for Dr. Nugarum and Dr. Liu with no educational purpose. Dr. Liu's office staff referred to Mr. Grimes as "The Grocery Boy." Additionally, Grimes would drop off excessive amounts of cheesecake to Bay View Endocrinology with no educational purpose. District Sales Department Manager Dave Kimber approved of this directly through approval of his expense reports.

119.    Relator Smith also has personal knowledge that the Defendant encouraged Sales Department employees to use free samples of drugs to persuade physicians to prescribe the company's diabetes drugs.   Relator Smith was instructed to institute an excessive sampling distribution practice with high volume prescribing physicians.

120.    Relator Shirkey has original knowledge of the illegal pay-to-play kickback scheme. He knew that the Novo Nordisk's KOLSP was designed to offer physicians that were considered Key Opinion Leaders in their local markets opportunities to speak on behalf of the Company's products. These KOLs were typically identified and selected from the endocrinology specialty based on their extensive diabetes knowledge and experience. Novo Nordisk's Medical Department was responsible for developing the KOLSP by providing extensive education focused on the Novo

Nordisk brands. Slide presentations were developed that reviewed all of the product information with a variety of end points and outcomes as compared to competitive standards of care with both mono-therapy and in combination with other products. All of this information was reviewed with these selected physicians. Relator Shirkey can also corroborate with the other relators that in its later years, most of the KOL members speaking events were coordinated by the primary care sales employees as a result of their doctors holding a key majority of the programs membership. While the primary care sales team was responsible for driving attendance, the Endocrinology Sales Department was encouraged to help with the management of the programs speakers. Relator Shirkey learned that many primary care Sales Department Managers realized that they were missing an opportunity to develop high prescribing primary care physicians as speakers in return for the thousands of dollars in speakers' payments. The influx of primary care physicians in the KOLSP became a challenge for endocrinology Sales Department employees because they could not ensure that their KOL speakers would meet the minimum annual requirement of 3 promotional talks to maintain their membership on the in the program. Many long-term well-respected KOL endocrinology doctors were replaced by high prescribing primary care physicians due to the primary care Sales Department Managers forbidding their employees to coordinate events for them.

a.     Relator Shirkey has personal knowledge that the direction to corrupt the speakers program into one that supplied kickbacks for cooperating doctors came from the very top of the Defendant's management  and that their goal was to limit opportunities for endocrinologist KOL speakers in order to ensure that membership positions would open for high prescribing primary care physician speakers who could directly influence drug sales.

b.     In 2010, Relator Shirkey witnessed Sales Department Manager Chuck Dent limit the number of times Dr. Grubb, an endocrinologist, was allowed to speak in order to open a

position for Dr. Rao. Dr. Grubb was a local West Virginian KOL who was a member of multiple pharmaceutical companies' speaking programs and was therefore not writing a high volume of Novo Nordisk drug prescriptions. As a result of this, the primary care Sales Department team stated that Dr. Grubb did not meet the requirements set forth by NNI and removed him as a KOL speaker. He was replaced in West Virginia by Dr. Rao who was not an endocrinologist or considered to be a Key Opinion Leader by industry leaders or in the medical community. However, Dr. Rao, a high volume prescriber of multiple classes of diabetes drugs and had a reputation for growing a pharmaceutical company's share and volume of prescriptions as a member of their speakers program. Dr. Rao was a physician with a "commercial" and a high volume prescriber for the Novo Nordisk portfolio of diabetes prescriptions. Relator Shirkey was told that Novo Nordisk Medical and Sales Department management wanted "commercials" and the volume and share changes associated with a high volume prescriber like Dr. Rao.

   c. Relator Shirkey has personal knowledge that this type of substituting for pay-to-play doctors was implemented by numerous Sales Department Managers including but not limited to Chuck Dent, Stephanie Henrich, Jay Cox, Shawnee Lewis, Michelle Fields, Anita Watson, Staci Joy, Chris Kinder, Brian Semenie, Dr. Francis Feng and others within the Novo Nordisk Sales Department.

   d. Relator Shirkey witnessed Sales Department employee Jay Cox brag about his close relationship and social activities with Dr. Rao which included attending a state basketball tournament and golfing. Cox let everyone know he "won with Rao at Sanofi (his previous company) and he would win with Rao again at Novo." Cox conceded all he had to do was "get Rao on the speaker list." Dr. Rao made the list and Cox was rewarded with several Novo Nordisk paid for vacation trips, as was Sales Department Manager Chuck Dent.

e.      As a representative of the Huntington District, Relator Shirkey witnessed firsthand how the KOLSP events were organized. Dr. Rao would provide a list of attendees to invite to his speech, which consisted of colleagues and friends, and these individuals would rarely attend the speaking engagement. These programs were intentionally organized as a way to pay Dr. Rao for his ability to increase NNI's market share in both the Charleston and Huntington markets and with his high number of NNI drug prescriptions.

f.      Relator Shirkey's new Sales Department Manager was made aware by Relator Shirkey of the lack of attendance at these programs on multiple occasions. However, she continued to encourage Relator Shirkey and his Sales Department team to use Dr. Rao as a speaker because he was "winning" with Victoza. Neither Sales Department Manager Shawnee Lewis, nor any member of the Medical Department, ever attended any of Dr. Rao's speaking events because they were aware of the lack of attendance and knew this was a direct violation of the CBC and CIA. Relator Shirkey voiced his concerns to Lewis, on multiple occasions. Her direction was to continue to let Dr. Rao know that he was going to lose his "opportunity" to speak on behalf of Novo Nordisk if he didn't start writing more Victoza prescriptions.

g.      Another example of which Relator Shirkey has direct knowledge of the nationwide program of kickbacks was the addition of Dr. Tom Dannals to the KOLSP in or around late 2012 or early 2013. Dr. Dannals was added to the speaker list for the purpose of the potential increase in prescription volume and market share that he could provide if he was under a speaking contract with Novo Nordisk. Dr. Dannals addition to the speaker list neutralized the endocrinology Sales Department team and specifically their use of endocrinologist Dr. Daniel Macias. Sales Department management, with the support of the Medical Department, directed the endocrinology Sales Department team to add a local primary care provider as a KOL speaker who would have the

biggest impact on the Novo Nordisk sales goals. The Medical Department suggested that either Dr. Timothy Saxe or Dr. Dannals, join the KOLSP based on what each doctor could "bring to the table," meaning their willingness and ability to prescribe high volumes of Novo Nordisk diabetes drugs. Dr. Dannals was selected due to his understanding that his spot on the speaker list would be secured by changing his prescription writing habits to the Novo Nordisk portfolio, and with his full knowledge that Novo Nordisk would dictate the content of his speeches as a way to grow business. On multiple occasions, Sales Department Manager Dent and later Sales Department Manger Lewis, coached Relator Shirkey and other members of the Sales Department team to "get more" out of Dr. Dannals. They did this by dangling the "speaker carrot" in front of him for an extended amount of time. Dr. Dannals knew that in order for him to be added to the KOLSP he must first improve, that is increase, his writing prescriptions of the Novo Nordisk diabetes drugs. Dr. Dannals also understood he would have to open his door to the Medical Department and specifically, Dr. Feng. Relator Shirkey believed that the speaker program's economic incentive was paramount with Dr. Dannals.

h.      Relator Shirkey has numerous examples of the Medical Department "crossing the line" and using Sales Department employees to create opportunities for off-label discussions with KOL speakers and physicians. On multiple occasions, Medical Department representative Dr. Feng, stated that, "without prescribing experience of our products Dr. Dannals would not be able to guide others within his medical group or peers in the community to change their prescription writing habits and support Novo Nordisk's portfolio." This resulted in Dr. Dannals' numbers of prescriptions of NNI's drugs changing drastically. These numbers were viewed by the Defendant's staff in Novo Nordisk's One Stop Shop information system. Dr. Dannals was added to the speaker list shortly after this increase of NNI drug prescriptions.

i.     Dr. Dannals would often give "speeches" to less than 4 people, which was in direct violation of the Defendant's CBC and the CIA. Relator Shirkey continually protested the use of Dr. Dannals and openly shared his concern that the speaker payments that Dr. Dannals received were really for his high volume of NNI product prescriptions. Relator Shirkey argued on multiple occasions that this was one of the worst business decisions that he had been involved with. Relator Shirkey expressed his displeasure with this practice to the level that he was eventually removed from the process of coordinating KOLSP events.

j.     Another example of which Relator Shirkey has direct knowledge was that primary care Sales Department employees in Charleston, West Virginia, were forbidden by Sales Department Manager Dent to utilize Dr. Stephen Grubb, a respected endocrinologist and KOL, as a speaker so that he would not retain his position on the Novo Nordisk speaker bureau and could be replaced by Dr. Rao, a high volume primary care physician. Relator Shirkey has direct knowledge that Sales Department employees were instructed to set up speaking events with Dr. Rao with the full knowledge that these events were not highly attended. These events were coordinated for the sole reason of paying Dr. Rao for his high volume of NNI drug prescriptions and so he could receive payment for programs without attendees.

k.     Relator Shirkey also has personal knowledge that Novo Nordisk encouraged Sales Department employees to use free meals to persuade physicians to prescribe the company's diabetes drugs. Relator Shirkey had direct knowledge that his Sales Department Managers directed him to offer meals to the largest writers of prescriptions and supporters of the Novo Nordisk drug portfolio. Relator Shirkey and other members of the Novo Nordisk Sales Department would provide free meals to offices on a regular, even bi weekly basis, as another tool to influence the staff and physicians to "play ball" with the Defendant. These improper free meal provisions run counter to

the voluntary code of conduct adopted by the Pharmaceutical Researchers and Manufacturers of America, that "it is appropriate for occasional meals to be offered as a business courtesy" to doctors and members of their staffs attending information presentations by sales reps, if the presentations "provide scientific or educational value," and the meals are "modest" by local standards and not part of an entertainment or recreational event.

121.    Relator Shirkey has personal knowledge that Novo Nordisk encouraged Sales Department employees to use free samples of drugs to persuade physicians to prescribe the company's diabetes drugs. Samples were routinely provided to physicians who were generating large volumes of Novo Nordisk prescriptions and actively used as a tool to drive patients towards Novo Nordisk's products. This practice was well engrained into NNI culture, as Sales Manager Lewis knew of and encouraged over sampling with the NovoLog and Levemir drugs. The Company's management, and specifically Sales Department Manager Lewis, tracked the sample-to-prescription-ratio to determine if Novo Nordisk was getting "the bulk of the medical practices business." Sales Department Manager Lewis stated that this pattern of activity was at the direction of Novo Nordisk Regional Sales Department Management, specifically Greg Reilly. Sales Department employees were required to justify sample distribution activity if their ratio of samples-to-prescriptions did not meet goals management had set.

122.    The Defendant developed and executed a national sales program to merge the Sales Department with the Medical Department to foster promotion of drugs for uses and which had not been approved by the FDA which were not labeled for those uses.

123.    NNI utilized its Electronic Product Information Request Sales Programs (EPIR) program to persuade physicians to contact the medical department for information about

unapproved diagnoses. Novo Nordisk Sales Department management also used EPIR requests to assess and incentivize Sales Department employees.

124.     Novo Nordisk, acting in form as though it was complying with the CIA dated May 26, 2011,[13] instructed its employees in the CBC that they were "prohibited from proactively discussing information about unapproved new products or information that is not consistent with an approved product label. Requests for such information must be referred to the Medical Department or the appropriate field medical employee using the electronic product information request (EPIR) form." Novo Nordisk subsequently systematically encouraged its sales force to induce prescribing physicians to make such EPIR requests. (In previous years Sales Department Managers had also encouraged its employees to increase the unsolicited requests for NovoLog, NovoLog Mix 70/30, and Levemir.) With the approval of Victoza, the "highly encouraged" solicitation of these EPIR request from doctors became a constant focus of the weekly Sales Department teleconferences. The volume of such unsolicited EPIR requests was used as a metric to evaluate the performance (and thus compensation) of each Sales Department employee.[14] In order to accomplish the illegal EPIR initiative, Novo Nordisk Sales Department management at both the district and the regional level obtained Medical Department information describing off-label diagnoses and distributed this information directly to the Sales Department employees for presentation to prescribing physicians. On numerous occasions District and Regional Sales Department Management directly participated in pitches to physician using the Medical Department material. This information was knowingly

---

[13] Paragraph 2 (h) states: "The manner and circumstances under which medical personnel from Medical Affairs interact with or participate in meetings or events, as well as how they handle responses to unsolicited requests about off-label indications of Government Reimbursed Products."

[14] Paragraph 2 (q) states: "Compensation (including through salaries, bonuses, and contests) for Relevant Covered Persons who are sales representatives. These Policies and Procedures shall: 1.) be designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in improper promotion, sales, and marketing of NOVO NORDISK's Government Reimbursed Products; 2.) include mechanisms, where appropriate, to exclude from incentive compensation sales that may indicate off-label promotion of Government Reimbursed Products."

shared to generate physician EPIRs. Sales Department management pressured their employees to increase this activity on weekly conference calls by giving special praise to those that generated high levels of EPIR requests. Specifically, Relators Smith and Houck received this instruction from Sales Department Manager Angie Smith. Similarly, Relator Shirkey received this instruction from Sales Department Manager Shawnee Lewis.

125.   NNI Sales Department management and Medical Department employees utilized Power Point Slides of unapproved drug uses to market the company's diabetic drugs.  These slide presentations were not from peer review medical articles as required by FDA regulations regarding permissible off-label marketing.  Beginning in 2010 Novo Nordisk had its Medical Department develop a series of Power Point slides that described the efficacy and safe use of the drug Liraglutide for both approved and non-approved uses or conditions. It then provided this information in USB drive memory sticks to both the Sales Department Managers who managed the Sales Departments for endocrinologists and the Sales Managers for primary care physicians. These were then used on the Sales Department Managers' Novo Nordisk provided computers. Sales Department Managers in turn provided their sales employees with copies of the USB drives. They then systematically went on sales calls with field level Sales Department employees, such as the Relators, to speak with high volume prescribing doctors to explain the off-label promotional advantages for the drugs. In particular, Sales Department Managers discussed weight loss specific advantages of Victoza, prior to its FDA approval in December 2014 as Saxenda for exclusively obese patients. They also discussed with prescribing physicians the substitution of Victoza for Saxenda for patients that either did not qualify for FDA approved Saxenda conditions such as obesity with a BMI over 30 and a co-morbid condition and were merely overweight. Finally, the

Sales Managers instructed their employees to deflect the risk of prescribing Victoza to patients with risk of MTC, pituitary cancer, pancreatitis and pancreatic cancer.

126.   Novo Nordisk Sales Department management and Medical Department employees utilized an improper "Ride Along" Program to market off-label and non- FDA approved usage of the Company's diabetes drugs.   NNI created a team of Physician Medical Liaisons within the Medical Department to develop medical slides and "collaborative" office visits to target specific doctors with high volume of off-label sales and weight loss uses in their diabetic focused practices. These teams of Medical Liaisons were then scheduled by the Sales Department employees for medical "ride along" days in the field with the prescribing doctors and were frequently present for the discussions between physicians and Sales Department staff.

127.   Novo Nordisk directed its Sales Department and Medical Departments to market Victoza and Saxenda under the BMI/Weight Loss Initiative. This was the same approach as previously used to market other Novo Nordisk drugs such as Levemir.   In this Initiative, NNI actively promoted the weight loss efficacy of Liraglutide as type 2 diabetes drug including Victoza to physicians prior to FDA approval, as Saxenda, for obese individuals in December 2014. On an ongoing basis, they also suggested Victoza for *merely* overweight individuals. Their strategic and deliberate plan to illegally promote Victoza and Saxenda as weight loss drugs began with the Medical Department designing slides specifically focusing on weight loss and then distributing them to Sales Department employees to actively encourage and solicit physician requests for that information through a deliberate scheme of promotions.

128.   This approach of having the Medical Department prepare slides focusing on non-FDA approved weight loss claims and efficacy was well ingrained into NNI's company culture, as this strategy was also used for earlier drugs such as Levemir which was considered "weight neutral"

and this benefit was used to market it in comparison to other drugs. With Victoza, the first step was training Sales Department employees to market the drug based on the unapproved diagnosis of weight loss. An example is the Victoza Executive Training Camp material given to Relator Houck. See EXHIBIT J: VICTOZA EXECUTIVE TRAINING CAMP. The slide deck was prepared and distributed in 2009 and 2010, prior to original FDA approval of Liraglutide for diabetes and the sales program was already focused on weight loss. In this pre-FDA approval Victoza Sales Marketing material there are frequent references to "weight loss" and to "reduction in weight 2.8 kilograms." Sales Department Manager Stephen Adkins supplied his employees with a drug efficacy and safety presentation prepared by the Medical Department on May 20th, 2010. These slides contain at least a dozen references to the weight loss effect of Victoza.  As part of the BMI weight related sales program for Victoza, Sales Department employees took physical models of five pound packages of fat (SEE EXHIBIT I: MODEL OF FIVE POUNDS OF FAT) into doctors' offices to illustrate the weight reductions caused by the use of Victoza even before any such labeling was approved by the FDA and before the product was approved in late 2014, as Saxenda, for obese patients. The Sales Department employees were encouraged by their Managers to inform doctors, particularly doctors who emphasized weight loss or established weight loss clinics, that Victoza (approved as a type 2 diabetes treatment) is "the same molecule" and an alternative to Saxenda (approved as an obesity treatment) and was easier to get Government program or private insurance approval and reimbursement for when prescribed as a pre-diabetic drug.

129.    The Defendant directed its Sales Department to market to physicians specializing in pediatric and gestational diabetes.  Novo Nordisk District and Sales Department Managers directed field level Sales Department employees to visit pediatric and OB/GYN practices with regard to off-label sales of Novo Nordisk diabetes drugs to these two unapproved patient groups.

81

130.     Novo Nordisk initiated this off-label sales program and related scheme of kickbacks in direct contravention to a corporate integrity program designed to specifically curtail this type of illegal activity and designed its corporate records system to hide this activity. The CIA specifically mandated the creation of a Compliance Department and a CBC to prohibit illegal off-label marketing sales activity and the payment of kickbacks. Novo Nordisk then designed a set of activities which both violated the law and the contractual agreement of the Company with the HHS-OIG and designed a corporate records protocol to hide such activities. The CIA required NNI to strictly control the marketing materials in the hands of the sales team.[15] It also strictly controlled the Sales Department employees' call plans.[16] In addition, Novo Nordisk was required to hire an independent organization to perform reviews. The Defendant, knowing that it had developed an illegal scheme, implemented a series of programs to hide or destroy evidence of the existence of the wrongdoing. The Company had a longstanding policy and program for Sales Department employees to report their sales activity by taking electronic notes on the items discussed with the prescribing physicians. Once Novo Nordisk management had signed the CIA, they eliminated the data field on the "call notes," which could provide of the discussions of off-label uses. Similarly, Novo Nordisk attempted to keep the Medical Department slides containing the unapproved efficacy and safety claims in the hands of Sales Department Management level employees who would be

---

[15] Paragraph 2 (f) states that "the materials and information that may be distributed by Novo Nordisk sales representative about Government Reimbursed Products and the manner in which Novo Nordisk sales representatives respond to requests for information about non-FDA approved (or "off-label") uses of Government Reimbursed Products. These Policies and Procedures shall require that sales representatives refer all requests for information about non-FDA approved ("off-label") uses of Government Reimbursed Products to Medical Affairs."

[16] Paragraph 2 (i) states "the development, implementation, and review of call plans for sales representatives who promote Government Reimbursed Products. For each Government Reimbursed Products, the Policies and Procedures shall require Novo Nordisk to review the call plans for the product and the bases upon, and circumstances under which HCPs and HCIs belonging to specified medical specialties or types of clinical practices are included in, or excluded from, the call plans. The Policies and Procedures shall also require that NOVO NORDISK modify the call plans as necessary to ensure that Novo Nordisk is promoting Government Reimbursed Products in a manner that complies with the applicable federal health care program and FDA requirements."

presumed to be more loyal to the company. Novo Nordisk incorporated and created a system to remotely wipe all data off of all of Company employee computers at the time an employee was terminated in an attempt to cover their illegal and noncompliant actions.

131.    Novo Nordisk also instituted a policy linking EPIR requests generated by Sales Department employees to the company's compensation metrics using the improper blend of information transfer from the Medical Department and field visits by Sales Department Managers and Medical Department professionals. Under the guise of "preventing" off-label sales practices, NNI  provided its entire sales team with information of what potential off-label diagnoses existed. This training was particularly effective with the ongoing distribution of Medical Department data, most egregiously with regard to weight loss, to the sales team by Sales Department Managers and by Medical Department members.

132.    Relator Houck has specific knowledge of Novo Nordisk's development and execution of a national sales program to merge the company's Sales Department with the Medical Department to foster promotion of diabetes drugs for uses which had not been approved. Relator Houck has personal knowledge of the dissemination by Sales Department Managers of off-label medical information for NovoLog, NovoLog Mix 70/30, and Levemir which establishes a long term pattern of behavior by the Defendant. He was intimately involved in the sales programs for Liraglutide marketed as Victoza for type 2 diabetes and for overweight patients. Relator Houck was consistently praised for his cross collaboration efforts with the Novo Nordisk Medical Department team. From 2002-2012 he provided access, utilizing his strong relationships with local physicians, to bring Medical Department personnel, including, Karen Lewis, Dr. Harold Daniel, Dr. Gallagher, Anne Cannon, Dr. Feng, and Christy Miller, into the field to meet with prescribing physicians and discuss off-label uses.

133.    Relator Houck has personal knowledge of the EPIR system.  He worked for Sales Department Manager Angie Smith who, in 2012, rewarded illicit behavior by encouraging Sales Department employees to misuse the EPIR system to market physicians to solicit off-label promotions for Novo Nordisk drugs, specifically for Victoza. In 2012, Sales Representatives who followed Manager Smith's direction were rewarded in a variety of ways including in their annual performance reviews, since utilization and recording of EPIR requests was a new metric of success for employees of the Sales Department. Relator Houck has personal knowledge that in 2012, several District of Colombia Metro West Virginia Regional District Sales Department Managers were openly praised for their high utilization of the EPIR system. On the other hand, Sales Department employees who were not willing to participate in the EPIR Program were castigated in weekly regional Sales Department conference calls which were used to track and encourage this illegal practice. This practice continued with Relator Houck's transition to the primary care Sales Department under the supervision of Sales Manager Lewis from 2013-2014.

134.    Relator Houck has personal knowledge of the unapproved use of Power Point Slides prepared by the Defendant's Medical Department. Relator Houck's District Sales Department Manager Adkins utilized a USB drive containing a deck slides, prepared by the Novo Nordisk Medical Department, which he copied to Relator Houck's and Relator Smith's USB drives. See EXHIBIT K: VICTOZA USB DRIVE MEDICAL SLIDE DECK CONTAINING OFF-LABEL WEIGHT LOSS PROMOTION INFORMATION.  Sales Department Manager Adkins also went on sales meetings with Relator Houck to present off-label information to endocrinology and other physicians from the time of Victoza's launch in 2009 and continued thereafter up to his termination by in 2014. Weight reduction was a central message on these Medical Department slides, including descriptions of reductions of abdominal visceral fat. Within the slide deck there were four

freestanding weight loss slides which dealt solely with the off-label weigh loss use. See EXHIBIT L: FOUR FREE STANDING WEIGHT LOSS SLIDES WHICH DEALT SOLELY WITH THE OFF-LABEL WEIGHT LOSS FOR VICTOZA. Relator Houck can provide upon request the names of numerous Sales Department employees across a variety of regional sales forces, who were coerced by their Sales Department Managers to present the Medical Department slides to primary care physicians and endocrinology specialists. Further evidence of illegal activity known to Relator Houck included:

a.      Relator Houck was given a second deck of medical slides by the same Sales Department Manager Adkins, on May 20, 2010. These "Lead 4/5" downloads targeted weight based data for non-FDA approved weight loss benefits. Almost half, 16 of the 37, slides mention or emphasize the weight loss benefits of Victoza. See EXHIBIT M: Lead 4/5 MEDICAL SLIDES CONTAIN OFF-LABEL WEIGHT LOSS PROMOTIONAL INFORMATION.

b.      This aggressive off-label company policy of selling a suite of diabetes drugs based on their supported weight neutral and/or weight loss benefits was not new to Novo Nordisk beginning with the introduction and marketing of NovoLog, NovoLog 70/30 and Levemir in 2005. Relator Houck was also given a deck of medical slides earlier in his career that emphasized similar weight gain and loss issues. See EXHIBIT N: EARLY DECK OF MEDICAL SLIDES EMPHASIZING WEIGHT QUESTION.

135.    Relator Houck has personal knowledge of Novo Nordisk's improper use of the Medical Department's personnel in a Ride Along Program ("RAP") accompanying Sales Department employees on marketing calls to physicians. From 2002-2012, Relator Houck, a Sales Department employee, assisted Medical Department personnel to meet important physicians and other medical staff to discuss the injectable diabetic, obesity and weight loss drugs. On many

occasions Relator Houck scheduled and attended visits with physicians and hospitals, Medicaid personnel and members of the West Virginia DHHR- Diabetes Prevention and Control Program.

136.    Relator Houck has personal knowledge of the unapproved use of Novo Nordisk's BMI/Weight Initiative including extensive knowledge of the BMI Weight Loss Sales Program that was central to the early sales program of Levemir following its launch in 2005. He has direct knowledge concerning the weight loss focused sales program for Victoza from 2010 to 2014. See the previously attached EXHIBIT M:  LEAD 4/5 MEDICAL SLIDES CONTAINS OFF-LABEL WEIGHT LOSS PROMOTIONAL INFORMAITON AND EXHIBIT G: EARLY DECK OF MEDICAL SLIDES EXPLAINING WEIGHT QUESTION.

a.    On January 25, 2010 Relator Houck received a crucial slide deck that revealed, in part, Novo Nordisk's unapproved endorsement of off-label uses for Victoza. Sales Department Manager Adkins gave Relator Houck a copy of the marketing slides for Victoza, which were used to train Sales Executives on how to advertise the drug at a Training Camp for Executives. See EXHIBIT J: VICTOZA EXECUTIVE TRAINING CAMP. This deck begins with an emphasis on patient weight loss.

137.    Relator Houck has personal knowledge of the unapproved marketing of Novo Nordisk drugs Levemir and Victoza to physicians specializing in pediatric and gestational diabetes and that a Pediatric and Gestational Diabetes sales program was in effect during Relator Houck's period of employment at Novo Nordisk.

138.    Relator Houck has extensive personal knowledge of the violations of Novo Nordisk's CIA and CBC. He witnessed Novo Nordisk initiating an off-label Pediatric and Gestational Diabetes sales program and related scheme of kickbacks in direct contravention to a

CIA designed to specifically curtail this type of illegal activity and how they designed its corporate records system to hide this activity.

139.   Relator Smith has extensive personal knowledge of the violations of Novo Nordisk's CIA and CBC.  He witnessed NNI initiating an off-label Pediatric and Gestational Diabetes sales program and related scheme of kickbacks in direct contravention to a CIA designed to specifically curtail this type of illegal activity and how the Company designed its corporate records system to hide this activity.

140.   Relator Smith has personal knowledge of Novo Nordisk's development and execution of a national sales program to merge the Sales Department with the Medical Department to foster promotion of diabetes drugs for uses which had not been approved by the FDA.

141.   Relator Smith has personal knowledge of how Novo Nordisk's EPIR system used to market doctors regarding off-label, unapproved uses of the company's diabetes drugs. Relator Smith has direct knowledge of the Defendant's Sales Department Manager's efforts that began in 2012 to increase and solicit EPIRs request from "the right doctors." In mandatory weekly conference calls, Sales Department Managers shared "Best Practices" about how Sales Department employees could solicit EPIRs to their advantage in order to see a substantial increase in market share. Relator Smith has knowledge of the subsequent emails that were sent to Sales Department employees after these calls, which provided samples of questions to enter into the Novo Nordisk EPIR system in order to get the "right," that is unapproved, off-label information to physicians.

a.      Relator Smith's Sales Department Manager Angie Smith pressured Relator Smith during ride-alongs to "get more EPIRs sent from our key writing doctors." Relator Smith's Sales Department Managers would grade him on the amount of EPIR activity he had, in particular the amount of EPIRs generated in the Novo Nordisk Sales Department employee review system.

b.     Sales Department Manager Smith, during field visits, would ask Relator Smith why he was so low with EPIR requests for his doctor group and was chastised for submitting them only when an off-label question was initiated by the doctors. In Relator Smith's 2011 year-end review about "Accountability Collaboration Extension" he was told that EPIR was an important metric for his success as a Sales Department employee. See EXHIBIT O: RELATOR SMITH 2011-YEAR END ACE REVIEW.

142.     Relator Smith has personal knowledge of Novo Nordisk's Sales Department's use of Power Point slides of unapproved drug use prepared by the Medical Department.  Relator Smith's District Sales Department Manager Stephen Adkins had a USB drive containing a deck of medical slides prepared by NNI Medical Department which he copied to Relator Smith's and Relator Houck's USB drives. (See EXHIBIT K: VICTOZA USB DRIVE MEDICAL SLIDE DECK CONTAINING OFF-LABEL WEIGHT LOSS PROMOTION INFORMATION.) District Sales Department Manager Stephen Adkins also went to sales meetings with Relator Smith to present off-label information to endocrinology physicians about weight loss during and after the Victoza launch in 2009. Weight loss was a central marketing message presented by District Sales Department Manager Adkins including descriptions of reductions of abdominal visceral fat. Within the slide deck there were four freestanding weight loss slides which dealt solely with the off-label weigh loss use. See EXHIBIT M: FOUR FREE STANDING SLIDES WEIGHT LOSS SLIDES WHO DEALT SOLELY WITH THE OFF-LABEL WEIGHT LOSS FOR VICTOZA.

a.     Relator Smith has the names of numerous Sales Department employees across a variety of Novo Nordisk Sales geographic territories that were coerced by their Sales Department Managers to present these saved Medical Department slides to primary care physicians and endocrinologists to market the unapproved off-label weight loss diagnosis.

143.   Relator Smith has personal knowledge of how Novo Nordisk's Medical Department's RAP was designed to market the unapproved weight loss diagnosis.  In 2006-2012, Novo Nordisk began hiring a large volume of Medical Liaisons in to the Medical Department.  The new Medial Liaisons consisted of endocrinologists, internists, pharmacists, and certified Diabetes educators. At the direction of his Sales Department Manager, Relator Smith was initially involved in planning the improper Medical Department's Ride Along visits. Relator Smith would receive requests from the Medical Department to call on "Key Opinion Leaders," which meant high writing physician's that Novo Nordisk thought would be early adopters and likely to prescribe a high volume of diabetes drug prescriptions including Novo log, Novo Log Mix 70/30, Levemir and Victoza. These field visits from the Medical Liaisons were unsolicited by Relator Smith and occurred frequently from 2006 to 2010. During these visits the Medical Department's Medical Liaison's would discuss off-label uses with physicians. Relator Smith was told that his year-end evaluation was, in part, based on how many Medical Department ride along visits he had scheduled. See EXHIBIT P: EMAILS DOCUMENTING RELATOR SMITH'S WORK TO BRING MEDICAL DEPARTMENT PERSONNEL ON RIDE ALONG PROGRAMS.

144.   Relator Smith has personal knowledge of Novo Nordisk's BMI/Weight Initiative to market off-label uses for Novo Nordisk drug Victoza.  On or around April 2009, prior to Victoza approval, Relator Smith was taken on a cruise for a National Sales Training meeting. During this meeting the Sales Department employees were trained on Victoza. Slides and data were shown at the meetings that highlighted weight loss benefits and systolic blood pressure improvement. The Sales Department was also instructed to focus on high BMI, overweight, patients. In January 2010, during a National Sales Department meeting in Las Vegas, NNI repeated their heavy emphasis on High BMI and weight loss for Victoza. Marketing language was developed to paint the picture that

Victoza modifies patient behavior. Detailed language was developed that centered on obese patients with high BMI's. Sub-set data was also detailed showing patients with higher BMI lost more weight.

145.    Relator Smith has personal knowledge of the Defendant's Pediatric and Gestational Diabetes Sales Program targeting physicians with practices focusing on pediatric and gestational diabetes patients even though Victoza was not approved to treat either diagnosis.  Relator Smith has personal knowledge that Sales Department teams sampled Levemir, and then Victoza, to Pediatric Endocrinologists from 2004 to 2010. NNI's strategy was to get patients on their products as early as possible so that they could have "patients for life."

146.    Relator Shirkey has personal knowledge of Novo Nordisk's development and execution of a national sales program to merge the company's Sales Department with the Medical Department to increase promotion of diabetes drugs for uses which they had not been approved.

147.    Relator Shirkey has personal knowledge of how NNI's EPIR was used to market doctors regarding off-label, unapproved uses of the company's diabetes drugs.  Relator Shirkey has direct knowledge that his Sales Department Manager Lewis, with the full support of her supervisors, rewarded illicit behavior by encouraging Sales Department employees to misuse the EPIR system to drive off-label marketing for NNI promoted products. This behavior was recognized and rewarded by Novo Nordisk Sales Department Managers in a variety of ways including a metric for annual performance reviews. Sales Department Manager Lewis's team led the region in EPIRs generated. Sales Department employees were directed to request EPIRs on every marketing call to every physician regardless if the physician requested EPIR data. Sales Department Manager Lewis conducted multiple conference calls around this topic and was very aggressive in demanding this activity take place during all field rides. Many Sales Department

employees, including Relator Shirkey, spoke up against this activity and explained that it was a serious compliance issue. Relator Shirkey and other District's Sales Department employees in West Virginia were told that this was a directive from "upper" Novo Nordisk Management and the company's Medical Department. Several employees across a variety of the Defendant's Sales Departments across the region and the nation told Relator Shirkey that they were directed to follow the same directive to improperly use EPIRs.

148.    Relator Shirkey was trained and encouraged to help physicians and staff members to flag medical charts and manipulate EPIR activity to solicit off-label information. Relator Shirkey was trained by Sales Manager Shawnee Lewis, from 2012-2015, by conference calls on how to manipulate physicians IT Departments and office staff and on how to change their technology, so that Novo Nordisk's portfolio of diabetes drugs were always viewed in the most favorable status on physician's pharmaceutical applications. This training program was conducted at the NNI regional level under the direction of Regional Sales Department Manager Greg Reilly.

149.    Relator Shirkey has personal knowledge of Novo Nordisk's Sales Department's use of Power Point slides of unapproved uses and diagnoses prepared by the company's Medical Department. Relator Shirkey has personal knowledge that Sales Department employees in the field were supplied with Medical Department Slides on a USB that contained off-label weight loss promotions of Victoza. Members of Relator Shirkey's primary care team obtained copies of the USB from the endocrinology team, who were actively disseminating the information to their fellow employees and coaching them to utilize it aggressively. SEE EXHIBIT K: VICTOZA USB DRIVE MEDICINE SLIDE DECK CONTAINS OFF-LABEL WEIGHTLOSS PROMOTION INFORMATION. Weight was a central message for these slides including reductions of abdominal visceral fat.    Relator Shirkey has personal knowledge of the Defendant's Sales Department

employees across a variety of Districts implemented similar improper marketing efforts utilizing direct access to the unapproved data on the USB drives.

150.    Relator Shirkey has personal knowledge of Novo Nordisk's Medical Department's RAP.

151.    From the day he was hired in 2006, Relator Shirkey witnessed Sales Department employees and Medical Department personnel interacting in non-compliant ways. One such instance was with Dr. Robert Holley, who was a member of the KOLSP and needed to complete his on-line training in order to remain eligible for speaking engagements. Relator Shirkey believes Dr. Holley was motivated by the prospect of the payments which NNI provided for his loyal writing of prescriptions for NovoLog Mix 70/30 and his increased writing of Levemir.  Relator Shirkey and his Sales Department partner, Shannon Henderson, were directed by Sales Department Manager Dent and the Medical Department to complete Dr. Holley's training for him, by signing in under Dr. Holley's name on the Novo Nordisk on-line training system. In the course of this effort, Relator Shirkey was exposed to the previously mentioned slide deck containing off-label information just as the Medical Department and other Novo Nordisk thought leaders from around the US were at that time.

152.    Relator Shirkey has personal knowledge of Novo Nordisk's BMI/Weight Initiative to market off-label uses for Novo Nordisk drugs Victoza and Saxenda. The Novo Nordisk corporate target of "Double Digit Growth" message was highlighted at every national sales meeting, particularly around new product launches. The main focus of the Victoza launch at the 2009 National Sales Meeting was weight loss even though this was prior to approval by the FDA for any diagnosis, including Victoza's actual approved diagnosis for diabetes care. Relator Shirkey's group of nineteen newly hired Sales Department employees was told that the way to "win the war" was a

marketing message targeted around the weight loss. He witnessed Sales Department employees in the field being given five-pound models of fat to promote Levemir and later Victoza to support the claim "Light As a Feather."

153.   Relator Shirkey has personal knowledge of Novo Nordisk's Pediatric and Gestational Diabetes Sales Program, which targeted physicians with practices focusing on pediatric and gestational diabetes patients, even though Victoza was not approved as a treatment for either diagnosis.   Relator Shirkey has personal knowledge that the Huntington, West Virginia team sampled Victoza to Pediatricians, Internal Medicine/Pediatric Specialists and to High Risk Gestational Clinics. Those doctors that were sampled, but were not limited to Dr. Bailes, Dr. Singh, Dr. Whitmore and Dr. Moses. This activity started from the 2010 launch of Victoza until approximately 2013.

154.   Relator Shirkey has knowledge of how Novo Nordisk initiated an off-label sales programs and related scheme of kickbacks, in direct contravention to their CIA, which was designed to specifically curtail this type of illegal activity, and designed its corporate records system to hide this activity.   In or around 2008, Relator Shirkey participated in a National Sales Meeting and during this meeting a talent show took place. One district's talent was performing a scene from the movie "A Few Good Men." During this skit, which took place in front of all levels of Novo Nordisk management, the employees addressed call activity, integrity, compliance and other topics related to sales. It was evident to the field staff and management that the humorous skit represented the Defendant's Sales Department employees meeting sales goals, call activity and other parameters in any way they could, approved or unapproved, improper or not, in order to meet company sales goals. These activities included but were not limited to falsifying call activity, promoting off-label uses of the drugs, highlighting Medicare driven sales, discussing pricing

advantages in correlation to managed care pricing and never discussing the price increase that were being driven from the Corporate level. This became very clear when the phrase, "You want the truth, you can't handle the truth!!" was shouted out from the Sales Department employees on the stage. This phrase was used just the same as it was in the movie, meaning and that it was to highlight that the Sales Department employees in the field were being asked to achieve sales and to meet growth goals while pretending to work in a compliant manner. Relator Shirkey believes that the Medical Department and the field Sales Department employees all knew "No one wanted the truth!!" This activity was witnessed by Regional Sales Department Manager George Hampton and District Sales Department Manager Chuck Dent, who both were sitting with Relator Shirkey at the time of the talent show.

I.     **Novo Nordisk Knowingly Failed to Report Violations of Its Corporate Integrity Agreement with the United States.**

157.    As noted above, in May 2011, Defendant Novo Nordisk entered into a CIA with the Office of the Inspector General of the Department of Health and Human Services.   The CIA expressly covers Novo Nordisk as well as its subsidiaries and covers a period of five years, until May 2016.  The CIA requires, *inter alia*, an Annual Report by Novo Nordisk, with the fifth and final reporting period ending May 31, 2016. An integral part of the CIA and the company's compliance obligations was its internal Code of Conduct (see CIA Section I, III.B).

158.    The management of Novo Nordisk relevant to the allegations of this complaint were aware of the CIA, the Code of Conduct, and their obligations under each. They were "Covered Persons" or "Relevant Covered Persons" within the meaning of the CIA (Section II.C.1-2), while others were, in addition, "Certifying Employees" within the meaning of the CIA (Section III.A.4), including Business Regional Directors, Brand Directors, , the Corporate Vice President of National Diabetes Sales, and the Vice President for Victoza.

159.    Under the CIA, each Covered Person is required to certify, in writing, that he or she has received, read, understood, and will abide by Novo Nordisk's Code of Conduct.  Pursuant to the CIA, the Code of Conduct must specify that all Covered Persons shall be expected to comply with the requirements of the CIA.   Moreover, certain employees, most notably the Chief Compliance Officer, must certify and sign an Annual Report and the Certifying Employees must sign an annual certification of compliance (CIA, Section III.A.4). See generally CIA Sections V.B. and C. In addition, the Certifying Employees must sign an annual certification of compliance (CIA, Section III.A.4), and those certifications must be included with the Annual Report (CIA, Section V.C.1).  The Certifying Employees' certification states, *inter alia*, that:

> "I have been trained on and understand the compliance requirements and responsibilities as they relate to [department or functional area], an area under my supervision…Apart from those [issues I have referred internally as potential violations], I am not currently aware of any violations of applicable Federal health care program requirements, FDA requirements, requirements of the Corporate Integrity Agreement, or the requirements of NNI policies. I understand that this certification is being provided to and relied upon by the United States."

160.    In addition, the CIA contains a requirement that requires Novo Nordisk notify HHS-OIG of any "Reportable Event" within thirty (30) days after making the determination that a Reportable Event exists. See Section III.H. The CIA defines a Reportable Event as follows:

> *Definition of Reportable Event*.  For purposes of this CIA, a "Reportable Event" means anything that involves:
>
> a.      a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;
> b.      a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any FDA requirements relating to the promotion of Government Reimbursed Products ….
>
> A Reportable Event may be the result of an isolated event or a series of occurrences."

161.    As noted above, the CIA contains numerous specific provisions relevant to the allegations herein, including regarding the AntiKickback Statute.  The CIA provides that Novo Nordisk will report all probable violations of the AntiKickback Statute and other laws, including off-label promotional activities, to HHS-OIG.

162.    Pursuant to the CIA, Section V.C.2, the Compliance Officer must certify as follows:

C. Certifications.

   The Implementation Report and Annual. Reports shall include a certification by the Compliance Officer that:

   1.    to the best of his or her knowledge, except as otherwise described in the report, NNI is in compliance with …the Federal health care program and FDA and all of the requirements of this CIA;

   2.    he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful . . . .

163.    The Compliance Officer of Novo Nordisk, was aware of the CIA as the person who signed and attested to the truthfulness of the required annual certifications.

164.    Relators are informed and believe that one or more certifications signed by the Compliance Officer and other "Covered Persons" and "Certifying Employees" from Januray 1, 2015 on were materially false in that Novo Nordisk certified that it complied with the obligations and reporting requirements under the CIA when in fact it did not report the violations of the law alleged in this complaint.

165.    Since January 1, 2015 Novo Nordisk submitted one or more false certifications to the OIG falsely attesting that Novo Nordisk and its subsidiaries were in compliance with all of the requirements of the CIA, including compliance with the CIA's reporting requirements.  Such false certification constituted a false record or statement made, used, or caused to be used which was

material to Novo Nordisk's obligation to pay or transmit money to the United States.  Further, through such false certifications, Novo Nordisk knowingly concealed and/or improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

**J.**      **Novo Nordisk Retaliated Against Relators Smith, Houck and Shirkey**

166.    NNI has taken retaliatory employment action against Relators Smith, Houck and Shirkey.  In 2014, Novo Nordisk instituted a program to systematically eliminate Sales Department employees who had knowledge of and who had raised concerns about the legality of the Saxenda and Victoza off-label sales, Medical Department RAP scheme and the pay-to-play kickback scheme.  Relators Houck and Smith were summarily dismissed in 2014 and Relator Shirkey in 2015 for trivial irregularities or supposed violations of expense report procedures, which had in fact been approved by their direct Sales Department Management supervisors. These terminations were in fact based on the Defendant's management's strategic program to eliminate company personnel who were known to have raised concerns about the kickbacks, the targeted patient groups and the various off-label sales processes described in this complaint.

167.    Relator Houck was terminated because he voiced his concerns about the described off-label promotions and specifically the cash bonus payments made to physicians through the speaker pay-to-play programs.

168.    Relator Smith was terminated because he voiced his concerns about the described off-label promotions and physician pay-to-play kickback scheme.

169.    Relator Shirkey was terminated because he voiced his concern about the above described off-label use and the corruption of the Novo Nordisk Key Opinion Leader Speakers Program.

## VI.    CAUSES OF ACTION

## COUNT I

Federal False Claims Act
31 U.S.C. § 3729(a)(1)(A) (2009)

170.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

171.    This is a civil action brought by Relators, on behalf of the United States of America against Defendant under the False Claims Act, 31 U.S.C. §3730(b)(1), for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended, for illegal acts from January 1, 2015 and continuing.

172.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval under the Medicare, Medicaid, and other United States Government health programs to officers, employees, or agents of the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

173.    The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services and provider claims for recipients of United States-funded health insurance programs.

174.    As a result of Defendant's actions as set forth above, the United States has been, and may continue to be, severely damaged, in an amount to be determined at trial.

175.    Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

1

2

3

## COUNT II

Federal False Claims Act
31 U.S.C. § 3729(a)(1)(B) (2009)

176.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

177.    This is a civil action brought by Relators, on behalf of the United States of America against Defendant under the False Claims Act, 31 U.S.C. §3730(b)(1), for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended for illegal acts from January 1, 2015 and continuing.

178.    By and through the acts described above, Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records and/or statements material to false or fraudulent claims under the Medicare, Medicaid, and other United States Government health programs in violation of 31 U.S.C. § 3729(a)(1)(B).

179.    The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services and provider claims for recipients of United States-funded health insurance programs.

180.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

181.    Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

## COUNT III

Federal False Claims Act
31 U.S.C. § 3729(a)(1)(G) (2009)

182.    Relators reallege and incorporate by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

183.    This is a civil action brought by Relators, on behalf of the United States of America against Defendant under the False Claims Act, 31 U.S.C. §3730(b)(1), for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended, for illegal acts from January 1, 2015 and continuing.

184.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government and/or concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the United States Government, all under the Medicare, Medicaid, and other United States Government health programs, in violation of 31 U.S.C. § 3729(a)(1)(G).

185.    The Government, unaware of the false records and statements and the concealment or other misconduct by the Defendant, has not made demand for or collected overpayments due from the Defendant since January 1, 2015 and continuing.

186.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

187.    Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

1

## COUNT IV

2

Federal False Claims Act
3
31 U.S.C. § 3729(a)(1)(C) (2009)
and STATE ACTS, as listed below,

4

188.     Relators reallege and incorporate by reference the allegations contained in the
5
foregoing paragraphs above as though fully set forth herein.
6

7     189.     This is a civil action brought by Relators, on behalf of the United States of America

8  against Defendant under the False Claims Act, 31 U.S.C. §3730(b)(1), for treble damages and

9  penalties under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended, for illegal acts from
10
January 1, 2015 and continuing.
11

12     190.     By and through the acts described above, Defendant conspired to commit violations

13  of 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

14     191.     Defendant's ongoing business model constituted an ongoing conspiracy to defraud

15  Government Health Care Programs.  Defendant created a conspiracy between itself as a corporation

16  and certain officers and employees as described herein and otherwise.  Defendant and certain
17
officers and employees established a concrete and definite plan to structure Defendant's policies
18
19  and practices to encourage aggressive, deceptive, and outright fraudulent sales tactics in order to

20  maximize reimbursement from Government Health Care Programs. In exchange for cooperation,

21  Defendant richly rewarded participating officers and employees and terminated non-participating or
22
under-selling employees as well as Relators.
23

24     192.     Defendant's officers and employees took concrete and affirmative steps in

25  furtherance of the conspiracy, which, on information and belief, continues to the present day.  These

26  acts included, but were not limited to, the acts described above, including kickbacks, off label

27

28

marketing, and false and deceptive sales and marketing tactics.  Defendant and its officers and employees both individually and jointly profited from the conspiracy.

193.   Through the actions described herein, Defendant, certain of its officers and its employees, and its agents knowingly agreed and conspired to violate the FCA.  This conspiracy has caused the United States and Plaintiff States to suffer damages.

194.   Defendant's Managers, identified herein, and others conspired to commit the violations of the sub-sections of the False Claims Act enumerated above.

195.   The United States, unaware of the conspiracy and violations of the False Claims Act paid, and may continue to pay, for prescription drugs and drug-related management services and provider claims for recipients of United States-funded health insurance programs.

196.   By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

197.   Additionally, the United States is entitled to the maximum penalty of up to $21,563 for each and every violation alleged herein.

**COUNT V**

VIOLATION OF THE STATE OF CALIFORNIA FALSE CLAIMS ACT,
CAL. GOV'T CODE § 12650, ET SEQ.

198.   Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

199.   This is a civil action brought by Relators on behalf of the State of California against Defendant under the California False Claims Act, Cal. Gov. Code § 12652(c), for illegal acts from January 1, 2015 and continuing.

200.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or

caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of California or its political subdivisions, false or fraudulent claims for payment, in violation of Cal. Gov. Code § 12651(a)(1).

201.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim in violation of Cal. Gov. Code § 12651(a)(2).

202.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of California or its political subdivisions in violation of Cal. Gov. Code § 12651(a)(7).

203.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of California or its political subdivisions in violation of Cal. Gov. Code § 12651(a)(7).

204.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drug-related management services for recipients of state and state subdivision-funded health insurance programs.

205.   As a result of Defendant's actions as set forth above, including conspiracy in violation of the federal and state FCAs, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

## COUNT VI

VIOLATION OF THE STATE OF COLORADO MEDICAID FALSE CLAIMS ACT, COLO. REV. STAT. § 25.5-4-303.5, ET SEQ.

206.   Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

207.   This is a civil action brought by Relators, in the name of the State of Colorado, against Defendant pursuant to the State of Colorado False Claims Act, Colo. Rev. Stat. § 25.5-4-306,for illegal acts from January 1, 2015 and continuing.

208.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4- 305(1)(a).

209.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim to the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

210.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or

caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f).

211.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f).

212.     The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state and state subdivision-funded health insurance programs.

213.     As a result of Defendant's actions as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Colorado, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT VII**

VIOLATION OF THE STATE OF CONNECTICUT FALSE CLAIMS ACT, CONN. GEN. STAT. §§ 4-274, ET SEQ.

214.     Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

215.     This is a civil action brought by Relators, in the name of the State of Connecticut, against Defendant pursuant to the State of Connecticut False Claims Act § 4-274 for illegal acts from January 1, 2015 and continuing.

216.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under medical assistance programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. § 4-275(a) (1).

217.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims for payment or approval under medical assistance programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. § 4-275(a)(2).

218.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state under medical assistance programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. § 4-275(a)(7).

219.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing,

obligations to pay or transmit money or property to the state under medical assistance programs administered by the Department of Social Services of the state of Connecticut, in violation of Conn. Gen. Stat. § 4-275(a)(8).

220.    The State of Connecticut, its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state and state subdivision-funded health insurance programs.

221.    As a result of Defendant's actions as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Connecticut, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT VIII**

VIOLATION OF THE STATE OF DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE ANN. tit. 6 § 1201, ET SEQ.

222.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

223.    This is a civil action brought by Relators on behalf of the Government of the State of Delaware against Defendant under the State of Delaware's False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b)(1) for illegal acts from January 1, 2015 and continuing.

224.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly,

to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

225.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, directly or indirectly, false records or statements material to a false or fraudulent claim, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

226.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of Delaware, or knowingly has and is continuing to conceal or to knowingly and improperly avoid or decrease an obligation to pay or transmit money to the Government of Delaware, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

227.   The Government of the State of Delaware, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health care programs funded by the Government of the State of Delaware.

228.   As a result of Defendant's actions as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Delaware, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT IX**

VIOLATION OF THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C. CODE ANN. § 2.381.01, ET SEQ.

229.     Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

230.     This is a civil action brought by Relators, in the name of the District of Columbia against Defendant under the District of Columbia False Claims Act, D.C. Code Ann. § 2-381.03(b)(1) for illegal acts from January 1, 2015 and continuing.

231.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, a false or fraudulent claim for payment or approval, in violation of D.C. Code Ann. § 2-381.02(a)(l).

232.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may continue to be making, using, or causing to be made or used, false records and/or statements material to a false or fraudulent claims, in violation of D.C. Code Ann. § 2-381.02(a)(2).

233.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, an obligation to pay or transmit money to the District, in violation of D.C. Code Ann. § 2-381.02(a)(7).

234.     The District of Columbia, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription and non-prescription drugs and drug-related management services for recipients of health insurance programs funded by the District.

235.     As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the District of Columbia has been, and continues to be, severely damaged.

**COUNT X**

VIOLATION OF THE STATE OF FLORIDA FALSE CLAIMS ACT, FLA. STAT. § 68.081, ET SEQ.

236.     Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

237.     This is a civil action brought by Relators on behalf of the State of Florida against Defendant under the State of Florida's False Claims Act, Fla. Stat. § 68.083(2) for illegal acts from January 1, 2015 and continuing.

238.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

239.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or

caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of Fla. Stat. § 68.082(2)(b).

240.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of Fla. Stat. § 68.082(2)(g).

241.    The State of Florida and its agencies, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription and drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

242.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**COUNT XI**

VIOLATION OF STATE OF GEORGIA FALSE MEDICAID CLAIMS ACT, GA. CODE ANN. § 49-4-168, ET SEQ.

243.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

244.    This is a civil action brought by Relators, in the name of the State of Georgia, against Defendant pursuant to the State of Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b) for illegal acts from January 1, 2015 and continuing.

245.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to presented, and may still be presenting or causing to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

246.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

247.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit property or money to the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

248.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit property or money to the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

249.     The State of Georgia or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these

claims and/or statements, paid, and may continue to pay, for prescription or non-prescription drugs and prescription or non-prescription drug-related management services for recipients of Medicaid.

250.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Georgia or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XII**

VIOLATION OF THE STATE OF HAWAII FALSE CLAIMS ACT, HAW. REV. STAT. § 661-21, ET SEQ.

251.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

252.    This is a civil action brought by Relators on behalf of the State of Hawaii and its political subdivisions against Defendant under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-25(a) for illegal acts from January 1, 2015 and continuing.

253.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

254.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim, in violation of Haw. Rev. Stat. § 661-21(a)(2).

255.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661- 21(a)(6).

256.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(6).

257.     The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription and drug-related management services for recipients of state-funded health insurance programs.

258.     As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**

VIOLATION OF THE STATE OF ILLINOIS FALSE CLAIMS ACT, 740 ILL. COMP. STAT. § 175/1, ET SEQ.

259.     Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

260.    This is a civil action brought by Relators on behalf of the State of Illinois against Defendant under the State of Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/4(b), for illegal acts from January 1, 2015 and continuing.

261.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois or a member of the Illinois National Guard a false or fraudulent claim for payment or approval, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(A).

262.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(B).

263.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(G).

264.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing obligations to pay or transmit money to the State of Illinois, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(G).

265.     The State of Illinois, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription and drug-related management services for recipients of state funded health insurance programs.

266.     As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Illinois has been, and may continue to be, severely damaged.

**COUNT XIV**

VIOLATION OF THE STATE OF INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IND. CODE § 5-11-5.7, ET SEQ.

267.     Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

268.     This is a civil action brought by Relators on behalf of the State of Indiana against Defendant under the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.7-4(a), for illegal acts from January 1,2015 and continuing.

269.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Ind. Code § 5-11-5.7-2(a)(l).

270.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false

record or statement material to a  false or fraudulent claim , in violation of Ind. Code § 5-11-5.7-2(a)(2).

271.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements concerning an obligation to pay or transmit money to the State of Indiana, in violation of Ind. Code § 5-11-5.7-2(a)(6)(A). Further Defendant has concealed or knowingly and improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, an obligation to pay or transmit money to the State of Indiana, in violation of Ind. Code § 5-11-5.7-2(a)(6)(B).

272.    The State of Indiana, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

273.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Indiana has been, and may continue to be, severely damaged.

**COUNT XV**

VIOLATION OF THE STATE OF IOWA FALSE CLAIMS ACT, IOWA CODE § 685.1, ET SEQ.

274.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

275.   This is a civil action brought by Relators on behalf of the State of Iowa against Defendant under the State of Iowa False Claims Act, Iowa Code § 685.3(2).a, for illegal acts from January 1, 2015 and continuing.

276.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Iowa Code § 685.2(1).a.

277.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement material to a  false or fraudulent claim, in violation of Iowa Code § 685.2(1).b.

278.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Iowa, in violation of Iowa Code § 685.2(1).g.

279.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing and improperly avoiding or decreasing obligations to pay or transmit money to the State of Iowa, in violation of Iowa Code § 685.2(1).g.

280.   The State of Iowa, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of those claims and/or statements,

paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

281.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Iowa has been, and may continue to be, severely damaged.

## COUNT XVI

VIOLATION OF THE STATE OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW, LA. REV. STAT. ANN. § 46:437.1, ET SEQ.

282.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

283.    This is a civil action brought by Relators on behalf of the State of Louisiana's medical assistance programs against Defendant under the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.A for illegal acts from January 1, 2015 and continuing.

284.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3.A.

285.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, engaged in misrepresentation, and may still be engaging in misrepresentation, or made, used, or caused to be made, and may still be making, using, or causing to be made, false records or statements material to a false or fraudulent claim, in violation of La. Rev. Stat. Ann. § 46:438.3.B.

286.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the medical assistance programs of the state of Louisiana, in violation of La. Rev. Stat. Ann. § 46:438.3.C.

287.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed, avoided, or decreased, and may still be concealing, avoiding, or decreasing, obligations to pay or transmit money to the medical assistance programs of the state of Louisiana, in violation of La. Rev. Stat. Ann. § 46:438.3.C.

288.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, attempted to defraud the Louisiana state medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim, in violation of La. Rev. Stat. Ann. § 46:438.3.D.

289.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of LA. REV. STAT, ANN. § 46:438.3.E(1).

290.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, or their actions as set forth above, acted in reliance, and may continue to act in

reliance, on the accuracy of Defendant's claims and/or statements in paying for prescription drugs and drug-related management services for medical assistance program recipients.

291.    As a result of Defendant's actions, the State of Louisiana, including conspiracy in violation of the federal and state FCAs, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

**COUNT XVII**

VIOLATION OF THE STATE OF MARYLAND FALSE HEALTH CLAIMS ACT, MD. CODE ANN. HEALTH-GEN. § 2-601, ET SEQ.

292.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

293.    This is a civil action brought by Relators on behalf of the State of Maryland against Defendant under the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a)(1)(i) for illegal acts from January 1, 2015 and continuing.

294.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).

295.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

296.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money to the State of Maryland, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(7).

297.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money to the State of Maryland, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(8).

298.    The State of Maryland, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

299.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Maryland has been, and may continue to be, severely damaged.


**COUNT XVIII**

VIOLATION OF THE COMMONWEALTH OF MASSACHUSETTS FALSE CLAIMS ACT, MASS. ANN. LAWS ch. 12, § 5A, ET SEQ.

300.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

301.    This is a civil action brought by Relators on behalf of the Commonwealth of Massachusetts against Defendant under the Massachusetts False Claims Act, Mass. Ann. Laws, ch. 12, § 5C(2), for illegal acts from January 1, 2015 and continuing.

302.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to the Commonwealth of Massachusetts or its political subdivisions, in violation of Mass. Ann. Laws, ch. 12, § 5B(1).

303.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim in violation of Mass. Ann. Laws, ch. 12, § 5B(2).

304.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the Commonwealth of Massachusetts, or knowingly  concealed, or knowingly and improperly avoided or decreased, and may still be concealing, avoiding, or decreasing, an obligation to pay or transmit money to the Commonwealth of Massachusetts or one of its political subdivisions, in violation of Mass. Ann. Laws, ch. 12, § 5B(9).

305.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on

the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

306.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the Commonwealth of Massachusetts or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIX**

VIOLATION OF THE STATE OF MICHIGAN MEDICAID FALSE CLAIMS ACT, MICH. COMP. LAWS SERV. § 400.601, ET SEQ.

307.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

308.    This is a civil action brought by Relators in the name of the State of Michigan against Defendant under the State of Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.610a(l), for illegal acts from January 1, 2015 and continuing.

309.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, or awareness of the nature of their conduct and awareness that it is substantially certain to cause the payment of a Medicaid benefit, made or caused to be made, and may still be making or causing to be made, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of Mich. Comp. Laws. Serv. § 400.603(1).

310.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, or awareness of the nature of their conduct and awareness that it is substantially certain to cause the payment of a

Medicaid benefit, knowingly made or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws. Serv. § 400.603(2).

311.    Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly presented or made or caused to be presented or made, and may still be presenting or causing to be presented a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, in violation of Mich. Comp. Laws. Serv. § 400.607(1).

312.    Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, used, or caused to be made or used a false record or statement, and may be continuing knowingly to make, use, or cause to be made or used a false record or statement, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act, in violation of Mich. Comp. Laws. Serv. § 400.607(3).

313.    The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription and non-prescription drugs and prescription and nonprescription drug- related management services for recipients of Medicaid.

314.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Michigan or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XX**

VIOLATION OF THE STATE OF MINNESOTA FALSE CLAIMS ACT, MINN. STAT. § 15C.01, ET SEQ.

315.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

316.    This is a civil action brought by Relators on behalf of the State of Minnesota and its political subdivisions against Defendant under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a), for illegal acts from January 1, 2015 and continuing.

317.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of the state Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(1).

318.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement material to a  false or fraudulent claim, in violation of Minn. Stat. § 15C.02(a)(2).

319.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of Minnesota, or knowingly concealed or knowingly and improperly avoided or decreased, and may still be

126

concealing, avoiding, or decreasing, an obligation to pay or transmit money to the State of Minnesota, in violation of Minn. Stat. § 15C.02(a)(7).

320.    The State of Minnesota, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

321.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Minnesota has been, and may continue to be, severely damaged.

**COUNT XXI**

VIOLATION OF THE STATE OF MONTANA FALSE CLAIMS ACT, MONT. CODE ANN. § 17-8-401, ET SEQ.

322.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

323.    This is a civil action brought by Relators on behalf of the State of Montana and its political subdivisions against Defendant under the State of Montana False Claims Act, Mont. Code Ann. § 17-8-406(1), for illegal acts from January 1, 2015 and continuing.

324.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of the state Montana or a political subdivision thereof, in violation of Mont. Code Ann. § 17-8-403(1)(a).

325.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim, in violation of Mont. Code Ann. § 17-8-403(1)(b).

326.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of Montana, or knowingly has concealed, or knowingly and improperly has avoided or decreased, and may still be concealing, avoiding, or decreasing, an obligation to pay or transmit money to the State of Montana or a political subdivision thereof, in violation of Mont. Code Ann. § 17-8-403(1)(g).

327.     The State of Montana, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

328.     As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Montana has been, and may continue to be, severely damaged.

**COUNT XXII**

VIOLATION OF THE STATE OF NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT ACT, NEV. REV. STAT. § 357.010, ET SEQ.

329.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

330.    This is a civil action brought by Relators on behalf of the State of Nevada against Defendant under the State of Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. § 357.080(1), for illegal acts from January 1, 2015 and continuing.

331.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Nev. Rev. Stat. § 357.040(l)(a).

332.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to a false or fraudulent claim in violation of Nev. Rev. Stat. § 357.040(1)(b).

333.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of Nevada or one of its political subdivisions, or knowingly concealed, or knowingly and improperly avoided or decreased, and may still be concealing, avoiding, or decreasing, an obligation to pay or transmit

money to the State of Nevada or one of its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

334.    The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

335.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Nevada or its political subdivisions have been, and may continue to be, severely damaged.


**COUNT XXIII**

VIOLATION OF STATE OF NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. ANN. § 2A:32C-1, ET SEQ.

336.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

337.    This is a civil action brought by Relators, in the name of the State of New Jersey, against Defendant pursuant to the State of New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-5.b, for illegal acts from January 1, 2015 and continuing.

338.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an employee, officer, or agent of the State of New Jersey, or to

any contractor, grantee, or other recipient of State funds , in violation of N.J. Stat. Ann. § 2A:32C-3.a.

339.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the State of New Jersey, in violation of N.J. Stat. Ann. § 2A:32C-3.b.

340.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey or one of its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3.g.

341.    The State of New Jersey or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of Medicaid.

342.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of New Jersey or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XXIV**

VIOLATION OF STATE OF NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. ANN. § 27-14-1, ET SEQ.

343.	Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

344.	This is a civil action brought by Relators on behalf of the State of New Mexico against Defendant under the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B), for illegal acts from January 1, 2015 and continuing.

345.	Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

346.	Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the state, in violation of N.M. Stat. Ann. § 27-14-4(C).

347.	Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

348.    The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

349.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.


**COUNT XXV**

VIOLATION OF THE STATE OF NEW YORK FALSE CLAIMS ACT, N.Y. FIN. LAW § 187, ET SEQ.

350.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

351.    This is a civil action brought by Relators on behalf of the State of New York against Defendant under the State of New York False Claims Act, N.Y. Fin. Law § 190(2), for illegal acts from January 1, 2015 and continuing.

352.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.Y. Fin. Law § 189(1)(a).

353.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or

caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  a false or fraudulent , in violation of N.Y. Fin. Law § 189(1)(b).

354.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state or a local government, in violation of N.Y. Fin. Law § 189(1)(g), or knowingly concealed, or knowingly and improperly avoided or decreased, and may still be concealing, avoiding, or decreasing, an obligation to pay or transmit money or property to the State of New York or a local government, in violation of N.Y. Fin. Law § 189(1)(h).

355.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

356.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of New York or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI

VIOLATION OF STATE OF NORTH CAROLINA FALSE CLAIMS ACT, N.C. GEN. STAT. § 1-605, ET SEQ.

357.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

358.    This is a civil action brought by Relators on behalf of the State of North Carolina against Defendant under the State of North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b), for illegal acts from January 1, 2015 and continuing.

359.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

360.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1- 607(a)(2).

361.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of North Carolina in violation of N.C. Gen. Stat. § 1-607(a)(7).

362.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the State of North Carolina in violation of N.C. Gen. Stat. § 1-607(a)(7).

363.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the

accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

364.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of North Carolina or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVII**

VIOLATION OF STATE OF OKLAHOMA MEDICAID FALSE CLAIMS ACT, OKLA. STAT. tit. 63, § 5053 (2007), ET SEQ.

365.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

366.    This is a civil action brought by Relators, in the name of the State of Oklahoma, against Defendant pursuant to the State of Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B), for illegal acts from January 1, 2015 and continuing.

367.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be making or causing to be presented, to an officer or employee of the State of Oklahoma, false or fraudulent claims for payment or approval under the Oklahoma Medicaid program, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

368.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false

records and statements to get false or fraudulent claims paid or approved by the state of Oklahoma, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

369.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease obligations to pay or transmit money or property to the state, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

370.    The State of Oklahoma or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of Medicaid.

371.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Oklahoma or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT XXVIII

VIOLATION OF STATE OF RHODE ISLAND FALSE CLAIMS ACT, R.I. GEN. LAWS § 9-1.1-1, ET SEQ.

372.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

373.    This is a civil action brought by Relators, in the name of the State of Rhode Island, against Defendant pursuant to the State of Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b), for illegal acts from January 1, 2015 and continuing.

374.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the state of Rhode Island false or fraudulent claims for payment or approval under the Rhode Island Medicaid program, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

375.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to a false or fraudulent claim , in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

376.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money or property to the state, or knowingly concealed, or knowingly and improperly avoided or decreased, and may still be concealing, avoiding, or decreasing, an obligation to pay or transmit money or property to the state, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

377.     The State of Rhode Island or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of Medicaid.

378.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Rhode Island or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT XXIX

VIOLATION OF THE STATE OF TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE ANN. § 71-5-181, ET SEQ.

379.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

380.    This is a civil action brought by Relators in the name of the State of Tennessee against Defendant under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b)(1), for illegal acts from January 1, 2015 and continuing.

381.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee false or fraudulent claims for payment or approval under the Tennessee Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(A).

382.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Tenn. Code Ann. § 71-5-182(a)(l)(B).

383.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or

caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money, or property to the state of Tennessee, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

384.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state of Tennessee, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

385.    The State of Tennessee, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of the Medicaid program.

386.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Tennessee has been, and may continue to be, severely damaged.

**COUNT XXX**

VIOLATION OF THE STATE OF TEXAS MEDICAID FRAUD PREVENTION ACT, TEX. HUM. RES. CODE § 36.001, ET SEQ.

387.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

388.    This is a civil action brought by Relators in the name of the State of Texas against Defendant under the State of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code § 36.101(a), for illegal acts from January 1, 2015 and continuing.

389.     Defendant, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of Tex. Hum. Res. Code § 36.002(1).

390.     Defendant, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or failed to disclose information, and may still be concealing or failing to disclose information, that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, in violation of Tex. Hum. Res. Code § 36.002(2).

391.     Defendant, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code § 36.002(4)(B).

392.     Defendant, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made or caused to be made, and may still be making or causing to be made, a claim under the Medicaid program (A) a product that has not been approved or acquiesced in by a treating physician or health

care practitioner; (B) a product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or (C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate, in violation of Tex. Hum. Res. Code § 36.002(7)(A)-(C).

393.    Defendant, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused the making or use, and may still be making, using, or causing the making or use, of false records or statements material to an obligation to pay or transmit money or property to the state, or knowingly  concealed, or knowingly and improperly avoided or decreased, and may still be concealing, avoiding, or decreasing, an obligation to pay or transmit money or property to the state of Texas under the Medicaid program, in violation of Tex. Hum. Res. Code § 36.002(12).

394.    The State of Texas, its political subdivisions or the Department, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of Medicaid.

**395.**    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Texas, its political subdivisions or the Department has been, and may continue to be, severely damaged.

## COUNT XXXI

VIOLATION OF THE STATE OF VERMONT FALSE CLAIMS ACT, 32 V.S.A. CHAPTER 7, SUBCHAPTER 8, ET SEQ.

396.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

397.     This is a civil action brought by Relators in the name of the State of Vermont against Defendant under the State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, § 631, 632, for illegal acts from January 1, 2015 and continuing.

398.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, § 631(1).

399.      Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records material to false or fraudulent claims, in violation of State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, § 631(2).

400.     Defendant, entered into a written agreement or contract with an official of the State of Vermont or its agent, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,  in violation of State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, § 631(8).

401.

402.     Defendant, in reckless disregard of or with conscious indifference to the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused the making or use, and may still be making, using, or causing the making or use, of false records or statements material to an obligation to pay or transmit money or property to the state, or knowinglyconcealed, or knowingly and improperly avoided or decreased, and may still be

concealing, avoiding, or decreasing, an obligation to pay or transmit money or property to the state of Vermont under the Medicaid program, in violation of State of Vermont False Claims Act, 32 V.S.A. Chapter 7, Subchapter 8, § 631(9)-(10).

403.    The State of Vermont, its political subdivisions or the Department, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of Medicaid.

404.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Vermont, its political subdivisions or the Department has been, and may continue to be, severely damaged.

## COUNT XXXII

VIOLATION OF THE COMMONWEALTH OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. § 8.01-216.1, ET SEQ.

405.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

406.    This is a civil action brought by Relators on behalf of the Commonwealth of Virginia against Defendant under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A), for illegal acts from January 1, 2015 and continuing.

407.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth, a false or fraudulent claim for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(l).

408.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

409.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the Commonwealth, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

410.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the Commonwealth, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

411.   The Commonwealth of Virginia, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription and nonprescription drugs and prescription and non-prescription drug-related management services for recipients of state-funded health insurance programs.

412.   As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the Commonwealth of Virginia, its political subdivisions or the Department has been, and may continue to be, severely damaged.

## COUNT XXXIII

VIOLATION OF THE WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT, WASH. REV. CODE § 74.66.005, ET SEQ.

413.    Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

414.    This is a civil action brought by Relators on behalf of the State of Washington against Defendant under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1), for illegal acts from January 1, 2015 and continuing.

415.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(a).

416.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

417.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

418.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

419.     The State of Washington, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state-funded health insurance programs.

420.     As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.


**COUNT XXXIV**

VIOLATION OF THE STATE OF WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT, WIS. STAT. § 20.931, ET SEQ.

421.     Relators incorporate by reference the preceding paragraphs as though fully set forth herein.

422.     This is a civil action brought by Relators on behalf of the State of Wisconsin against Defendant under the State of Wisconsin False Claims for Medical Assistance, Wis. Stat. § 20.931(5)(a) for illegal acts from January 1, 2015 and continuing until the non-retroactive repeal of that law effective July 14, 2015.

423.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused

147

to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the state, a false claim for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

424.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

425.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program, in violation of Wis. Stat. § 20.931(2)(g).

426.    Further, Defendant violated the Wisconsin FCA through conspiracy in violation of Wis. Stat. § 20.931(2)(c).

427.    The State of Wisconsin, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of state-funded health insurance programs.

428.    As a result of Defendant's actions, as set forth above, including conspiracy in violation of the federal and state FCAs, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXV**

RETALIATION AGAINST RELATOR SMITH IN VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(h), AND ANTI-RETALIATION PROVISION OF THE COMMONWEALTH OF VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. § 8.01-216.8 AND THE COMMON LAW PROTECTIONS OF THE COMONWEALTH OF VIRGINIA.

429.   Relator Smith incorporates by reference the proceeding paragraphs as thus fully set forth herein.

430.   As a result of Relator's lawful acts in furtherance of protected activities in the reporting of fraud, and Defendant's knowledge thereof, Defendant retaliated against Relator Smith.

431.   Defendant's retaliatory acts against Relator included failure to provide bonuses and merit increases, effective stripping of job duties and promotional and growth opportunities, and other forms of discrimination, ultimately leading to Relator Smith's constructive discharge.

432.   Defendant harassed, discriminated against, threatened, and ultimately discharged Relator Smith in his employment because of lawful acts Relator Smith undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendant's retaliation also independently violates the federal FCA, 31 U.S.C.   § 3730(h), the and Anti-Retaliation Provision of the Commonwealth Of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.8 and the common law protections of the Commonwealth of Virginia, particularly violating the Virginia public policy exception for at-will employment because Relator Smith reported fraudulent behavior by Novo Nordisk attempting to make Novo Nordisk comply with State and Federal laws cited above.

433.   Defendant's retaliatory acts caused Relator Smith to suffer, and continue to suffer, compensatory and special damages, including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search

expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

434.    Defendant's actions were knowing, malicious, willful, and with conscious disregard for Relator's rights under the law. Relator Smith is further entitled to exemplary and punitive damages in an amount to be determined at trial.

## COUNT XXVI

RETALIATION AGAINST RELATOR HOUCK IN VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(h), AND THE WEST VIRGINIA HUMAN RIGHTS ACT, W. VA CODE § 5-11-9(7) (C) AND THE COMMON LAW PROTECTIONS OF THE STATE OF WEST VIRGINIA.

435.    Relator Houck incorporates by reference the proceeding paragraphs as thus fully set forth herein.

436.    As a result of Relator Houck's lawful acts in furtherance of protected activities in the reporting of fraud, and Defendant's knowledge thereof, Defendant retaliated against Relator Houck.

437.    Defendant's retaliatory acts against Relator Houck included failure to provide bonuses and merit increases, effective stripping of job duties and promotional and growth opportunities, and other forms of discrimination, ultimately leading to Relator Houck's constructive discharge.

438.    Defendant harassed, discriminated against, threatened, and ultimately discharged Relator Houck in his employment because of lawful acts Relator Houck undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendant's retaliation also independently violates the federal FCA, 31 U.S.C.  § 3730(h), the West Virginia Human Rights Act, W. VA Code § 5-11-9(7) (C) and the common law protections of the State of West Virginia particularly violating the West Virginia public policy exception for at-will employment because

Relator Houck reported fraudulent behavior by Novo Nordisk while attempting to make Novo Nordisk comply with State and Federal laws cited above.

439.    Defendant's retaliatory acts caused Relator Houck to suffer, and continue to suffer, compensatory and special damages, including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

440.    Defendant's actions were knowing, malicious, willful, and with conscious disregard for Relator Houck's rights under the law. Relator Houck is further entitled to exemplary and punitive damages in an amount to be determined at trial.

**COUNT XXVII**

RETALIATION AGAINST RELATOR SHIRKEY IN VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(h), AND THE WEST VIRGINIA HUMAN RIGHTS ACT, W. VA CODE § 5-11-9(7) (C) AND THE COMMON LAW PROTECTIONS OF THE STATE OF WEST VIRGINIA.

441.    Relator Shirkey incorporates by reference the proceeding paragraphs as though fully set forth herein.

442.    As a result of Relator Shirkey's lawful acts in furtherance of protected activities in the reporting of fraud, and Defendant's knowledge thereof, Defendant retaliated against Relator Shirkey.

443.    Defendant's retaliatory acts against Relator Shirkey included failure to provide bonuses and merit increases, effective stripping of job duties and promotional and growth opportunities, and other forms of discrimination, ultimately leading to Relator Shirkey's constructive discharge.

444.    Defendant harassed, discriminated against, threatened, and ultimately discharged Relator Smith in his employment because of lawful acts Relator Shirkey undertook to stop violations of, and a conspiracy to violate, the False Claims Act. Defendant's retaliation also independently violates the federal FCA, 31 U.S.C. § 3730(h), the West Virginia Human Rights Act, W. VA Code § 5-11-9(7) (C) and the common law protections of the State of West Virginia particularly violating the West Virginia public policy exception for at-will employment because Relator Houck reported fraudulent behavior by Novo Nordisk while attempting to make Novo Nordisk comply with State and Federal laws cited above.

445.    Defendant's retaliatory acts caused Relator Shirkey to suffer, and continue to suffer, compensatory and special damages, including, but not limited to, past and future earnings, lost employment benefits (including health insurance benefits and retirement contributions), job-search expenses, humiliation, mental anguish, and emotional distress, all collectively in an amount to be determined at trial.

446.    Defendant's actions were knowing, malicious, willful, and with conscious disregard for Relator's rights under the law. Relator Shirkey is further entitled to exemplary and punitive damages in an amount to be determined at trial.

## VII.    PRAYER FOR RELIEF

WHEREFORE, on behalf of the Plaintiffs United States and States, and on their own behalf, Relators pray for judgment against Defendant as follows:

A.    That Defendant be ordered to cease and desist from submitting any more false claims, or further violating the FCA and the State *Qui Tam* Statutes;

B.      That judgment be entered in the United States of America's favor and against Defendant in the amount of each and every false or fraudulent claim on or after January 1, 2015, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less $5,500 or more than $11,000 per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.      That judgment be entered in the *Qui Tam* States' favor and against Defendant in the amount of the damages sustained by the State *Qui Tam* Statutes multiplied as provided for in the State *Qui Tam* Statutes, plus civil penalties in the ranges provided by the State *Qui Tam* Statutes;

D.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(G), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 4-275 (b), Del. Code Ann. Tit. 6, § 1205, D.C. Code Ann. § 2- 381.03(F)(1), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2, Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(D), Ind. Code § 5-11-5.5 (b), Iowa Code § 685.3, La. Rev. Ann. Stat. § 46:439.4, Md. Code Ann. Health-Gen. § 2-605, Mass. Ann. Laws Ch. 12, § 5F, Mich. Comp. Laws Serv. § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.220, N.J. Stat Ann. § 2A:32C-7, N.M. Stat. Ann. § 27-14-9, N.Y. Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. Tit. 63, § 5053.4, R.I. Gen. Laws § 9-1,1-4(D), Tenn. Code Ann. § 71-5-183(D)(1)(A), Tex. Hum. Res. Code § 36.110, The State of Vermont False Claims Act,  32 V.S.A. §7, Subchapter 8, et seq., Va. Code Ann. § 8.01-216.7, Wash. Rev. Code § 74.66.070, and WIS. STAT. § 20.931, et seq.

E.      That Defendant be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct from January 1, 2015 and continuing;

F.      That judgment be granted for Relators against Defendant for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relators in the prosecution of the Qui Tam claims;

G.      That Relators be awarded all available damages, prejudgment interest, fees and costs pursuant to each of their personal claims for retaliation under the federal FCA, 31 U .S.C. § 3730(h), the Virginia FCA or the West Virginia Human Rights Act, and common law, including, without limitation, two times back pay plus interest (and prejudgment interest), reinstatement or in lieu thereof front pay, and compensation for any special damages and/or exemplary or punitive damages, and litigation costs, and attorneys' fees; and

H.      That Relator and the United States and the States be granted such other and further relief as the Court deems just and proper.

_____

## VIII.   JURY TRIAL DEMAND

Relators hereby demand a trial by jury in this action for all issues so triable.

Dated: October 12, 2016



_____
Lee Glass (DC Bar #975416)
Protectus Law
1025 Connecticut Avenue NW, Suite 1000
Washington DC 20036
(213) 943-4042
Fax: (213) 627-4754
Email: lglass@protectuslaw.com

Neal A. Roberts (DC Bar #1027892 & CA Bar#048550)
Protectus Law
1025 Connecticut Avenue NW, Suite 1000
Washington DC 20036
(213) 943-4062
Fax: (213) 627-4754
Email: nroberts@protectuslaw.com

Suzanne E. Durrell (Mass. BBO #139280)
DURRELL LAW OFFICE
180 Williams Avenue
Milton, Massachusetts 02186
(617) 371-1072
Fax: (888) 676-7420
Email: suzanne.durrell@verizon.net

Robert M. Thomas, Jr. (Mass. BBO #645600)
THOMAS & ASSOCIATES
20 Park Plaza, Suite 438
Boston, MA 02116-4322
(617) 371-1072
Fax: (888) 676-7420
Email: rmt@thomasandassoc.net

_Attorneys for Relators_

LIST OF EXHIBITS

EXHIBIT A:  VICTOZA FDA "HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION GUIDE"

EXHIBIT B: SAXENDA FDA "HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION GUIDE" - DECEMBER 2014

EXHIBIT C: "TEXAS PRIOR AUTHORIZATION PROGRAMS CLINICAL EDIT CRITERIA" – VICTOZA

EXHIBIT D: TABLE OF VICTOZA  & SAXENDA SALES VOLUME BY YEAR

EXHIBIT E: LIST OF THE SALES DEPARTMENT REPRESENTATIVES WHO INFORMED RELATOR HOUCK

EXHIBIT F: RELATOR SMITH'S 2013 NOVO NORDISK EMPLOYMENT REVIEW ACE YEAR END 2013 GSMI FINAL

EXHIBIT G: EMAIL CONFIRMING SALES PROGRAM FOR PEDIATRIC PROMOTION OF NOVOLOG MIX 70/30

EXHIBIT H: LIST OF THE SALES MANAGERS WHO INSTRUCTED RELATOR SHIRKEY

EXHIBIT I: MODEL OF FIVE POUNDS OF FAT

EXHIBIT J: VICTOZA EXECUTIVE TRAINING CAMP

EXHIBIT K: VICTOZA USB DRIVE MEDICAL SLIDE DECK CONTAINING OFF-LABEL WEIGHT LOSS PROMOTION INFORMATION

EXHIBIT L: FOUR FREE STANDING WEIGHT LOSS SLIDES WHICH DEALT SOLELY WITH THE OFF-LABEL WEIGHT LOSS FOR VICTOZA

EXHIBIT M: Lead 4/5 MEDICAL SLIDES CONTAIN OFF-LABEL WEIGHT LOSS PROMOTIONAL INFORMATION

EXHIBIT N: EARLY DECK OF MEDICAL SLIDES EMPHASIZING WEIGHT QUESTION

EXHIBIT O: RELATOR SMITH 2011-YEAR END ACE REVIEW

EXHIBIT P: EMAILS DOCUMENTING RELATOR SMITH'S WORK TO BRING MEDICAL DEPARTMENT PERSONNEL ON RIDE ALONG PROGRAMS

EXHIBIT Q: VICTOZA FDA FULL PRESCRIBING INFORMATION

EXHIBIT R: SAXENDA FDA FULL PRESCRIBING INFORMATION

EXHIBIT S: COMPARISON LISTING OF SAXENDA AND VICTOZA ADVERSE REACTIONS EXCERPTED FROM FDA FULL PRESCRIBING INFORMATION

**Exhibit A**


SAXENDA FDA HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION
GUIDE - DECEMBER 2014

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use SAXENDA® safely and effectively. See full prescribing information for SAXENDA.**

**SAXENDA (liraglutide [rDNA origin] injection), solution for subcutaneous use**
**Initial U.S. Approval: 2014**

---

**WARNING: RISK OF THYROID C-CELL TUMORS**
***See full prescribing information for complete boxed warning.***
- **Liraglutide causes thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether Saxenda causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined (5.1).**
- **Saxenda is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the risk of MTC and the symptoms of thyroid tumors (4, 5.1, 13.1).**

---

**--------------------------INDICATIONS AND USAGE--------------------------**
Saxenda is a glucagon-like peptide-1 (GLP-1) receptor agonist indicated as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adult patients with an initial body mass index (BMI) of
- $30 \text{ kg/m}^2$ or greater (obese) (1) or
- $27 \text{ kg/m}^2$ or greater (overweight) in the presence of at least one weight-related comorbid condition (e.g. hypertension, type 2 diabetes mellitus, or dyslipidemia) (1).

Limitations of Use:
- Saxenda is not indicated for the treatment of type 2 diabetes (1).
- Saxenda should not be used in combination with any other GLP-1 receptor agonist (1).
- Saxenda should not be used with insulin (1, 5.4).
- The effects of Saxenda on cardiovascular morbidity and mortality have not been established (1).
- The safety and efficacy of coadministration with other products for weight loss have not been established (1).
- Saxenda has not been studied in patients with a history of pancreatitis (1, 5.2).

**----------------------DOSAGE AND ADMINISTRATION----------------------**
- Recommended dose of Saxenda is 3 mg daily. Administer at any time of day, without regard to the timing of meals (2).
- Initiate at 0.6 mg per day for one week. In weekly intervals, increase the dose until a dose of 3 mg is reached (2).
- Inject subcutaneously in the abdomen, thigh or upper arm (2).
- The injection site and timing can be changed without dose adjustment (2).

**----------------------DOSAGE FORMS AND STRENGTHS----------------------**
- Solution for subcutaneous injection, pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg (6 mg/mL, 3 mL) (3).

**----------------------------CONTRAINDICATIONS----------------------------**
- Personal or family history of medullary thyroid carcinoma or Multiple Endocrine Neoplasia syndrome type 2 (4, 5.1).
- Hypersensitivity to liraglutide or any product components (4, 5.7).
- Pregnancy (4, 8.1).

**----------------------WARNINGS AND PRECAUTIONS----------------------**
- Thyroid C-cell Tumors: Counsel patients regarding the risk of medullary thyroid carcinoma and the symptoms of thyroid tumors (5.1).
- Acute Pancreatitis: Discontinue promptly if pancreatitis is suspected. Do not restart if pancreatitis is confirmed (5.2).
- Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated (5.3).
- Serious Hypoglycemia: Can occur when Saxenda is used with an insulin secretagogue (e.g. a sulfonylurea). Consider lowering the dose of anti-diabetic drugs to reduce the risk of hypoglycemia (2, 5.4).
- Heart Rate Increase: Monitor heart rate at regular intervals (5.5).
- Renal Impairment: Has been reported postmarketing, usually in association with nausea, vomiting, diarrhea, or dehydration which may sometimes require hemodialysis. Use caution when initiating or escalating doses of Saxenda in patients with renal impairment (5.6).
- Hypersensitivity Reactions: Postmarketing reports of serious hypersensitivity reactions (e.g., anaphylactic reactions and angioedema). Discontinue Saxenda and other suspect medications and promptly seek medical advice (5.7).
- Suicidal Behavior and Ideation: Monitor for depression or suicidal thoughts. Discontinue Saxenda if symptoms develop (5.8).

**----------------------------ADVERSE REACTIONS----------------------------**
- Most common adverse reactions, reported in greater than or equal to 5% are: nausea, hypoglycemia, diarrhea, constipation, vomiting, headache, decreased appetite, dyspepsia, fatigue, dizziness, abdominal pain, and increased lipase (6.1).

**To report SUSPECTED ADVERSE REACTIONS, contact Novo Nordisk Inc. at 1-877-484-2869 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**----------------------------DRUG INTERACTIONS----------------------------**
- Saxenda delays gastric emptying. May impact absorption of concomitantly administered oral medications. Use with caution (7).

**----------------------USE IN SPECIFIC POPULATIONS----------------------**
- Nursing Mothers: Discontinue drug or nursing (8.3).
- Pediatric Use: Safety and effectiveness not established and use not recommended (8.4).

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

Revised: 12/2014

---

**FULL PRESCRIBING INFORMATION:  CONTENTS***
**BOXED WARNING:  RISK OF THYROID C-CELL TUMORS**

**1     INDICATIONS AND USAGE**
**2     DOSAGE AND ADMINISTRATION**
**3     DOSAGE FORMS AND STRENGTHS**
**4     CONTRAINDICATIONS**
**5     WARNINGS AND PRECAUTIONS**
      5.1   Risk of Thyroid C-cell Tumors
      5.2   Acute Pancreatitis
      5.3   Acute Gallbladder Disease
      5.4   Risk for Hypoglycemia with Concomitant Use of
            Anti-Diabetic Therapy
      5.5   Heart Rate Increase
      5.6   Renal Impairment
      5.7   Hypersensitivity Reactions
      5.8   Suicidal Behavior and Ideation
**6     ADVERSE REACTIONS**
      6.1   Clinical Trials Experience
      6.2   Postmarketing Experience
**7     DRUG INTERACTIONS**
      7.1   Oral Medications
**8     USE IN SPECIFIC POPULATIONS**
      8.1   Pregnancy
      8.3   Nursing Mothers
      8.4   Pediatric Use
      8.5   Geriatric Use
      8.6   Renal Impairment
      8.7   Hepatic Impairment
      8.8   Gastroparesis
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
      12.1  Mechanism of Action
      12.2  Pharmacodynamics
      12.3  Pharmacokinetics
**13    NONCLINICAL TOXICOLOGY**
      13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility
**14    CLINICAL STUDIES**
**16    HOW SUPPLIED/STORAGE AND HANDLING**
      16.1  How Supplied
      16.2  Recommended Storage
**17    PATIENT COUNSELING INFORMATION**
      17.1  FDA-Approved Medication Guide
      17.2  Instructions
      17.3  Risk of Thyroid C-cell Tumors
      17.4  Acute Pancreatitis
      17.5  Acute Gallbladder Disease
      17.6  Hypoglycemia in Patients with Type 2 Diabetes Mellitus on
            Anti-Diabetic Therapy
      17.7  Heart Rate Increase
      17.8  Dehydration and Renal Impairment
      17.9  Hypersensitivity Reactions
      17.10 Suicidal Behavior and Ideation
      17.11 Jaundice and Hepatitis
      17.12 Never Share a Saxenda Pen Between Patients
*Sections or subsections omitted from the full prescribing information are not listed.

1

**FULL PRESCRIBING INFORMATION**

---

**WARNING:  RISK OF THYROID C-CELL TUMORS**

- **Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether Saxenda causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined *[see Warnings and Precautions (5.1) and Nonclinical Toxicology (13.1)]*.**
- **Saxenda is contraindicated in patients with a personal or family history of MTC and in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the risk of MTC with use of Saxenda and inform them of symptoms of thyroid tumors (e.g., a mass in the neck, dysphagia, dyspnea, persistent hoarseness). Routine monitoring of serum calcitonin or using thyroid ultrasound is of uncertain value for early detection of MTC in patients treated with Saxenda *[see Contraindications (4), Warnings and Precautions (5.1)]*.**

---

## 1      INDICATIONS AND USAGE

Saxenda is indicated as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adult patients with an initial body mass index (BMI) of

- 30 kg/m$^2$ or greater (obese), or
- 27 kg/m$^2$ or greater (overweight) in the presence of at least one weight-related comorbid condition (e.g., hypertension, type 2 diabetes mellitus, or dyslipidemia)

Limitations of Use
- Saxenda is not indicated for the treatment of type 2 diabetes mellitus.

- Saxenda and Victoza® both contain the same active ingredient, liraglutide, and therefore should not be used together. Saxenda should not be used in combination with any other GLP-1 receptor agonist.

- Saxenda has not been studied in patients taking insulin. Saxenda and insulin should not be used together *[see Warnings and Precautions (5.4)]*.

- The effects of Saxenda on cardiovascular morbidity and mortality have not been established.

- The safety and effectiveness of Saxenda in combination with other products intended for weight loss, including prescription drugs, over-the-counter drugs, and herbal preparations, have not been established.

- Saxenda has not been studied in patients with a history of pancreatitis *[see Warnings and Precautions (5.2)]*.

## 2      DOSAGE AND ADMINISTRATION

The recommended dosage of Saxenda is 3 mg daily. The dose escalation schedule in Table 1 should be used to reduce the likelihood of gastrointestinal symptoms. If patients do not tolerate an increased dose during dose escalation, consider delaying dose escalation for approximately one additional week. Saxenda should be discontinued, however, if a patient cannot tolerate the 3 mg dose, as efficacy has not been established at lower doses (0.6, 1.2, 1.8, and 2.4 mg).

**Table 1.**        **Dose Escalation Schedule**

| Week | Daily Dose |
|---|---|
| 1 | 0.6 mg |
| 2 | 1.2 mg |
| 3 | 1.8 mg |
| 4 | 2.4 mg |
| 5 and onward | 3 mg |

Saxenda should be taken once daily at any time of day, without regard to the timing of meals. Saxenda can be injected subcutaneously in the abdomen, thigh, or upper arm. The injection site and timing can be changed without dose adjustment. Saxenda must not be administered intravenously or intramuscularly.

When initiating Saxenda in patients taking insulin secretagogues (such as sulfonylureas), consider reducing the dose of the insulin secretagogue (for example, by one-half) to reduce the risk for hypoglycemia, and monitor blood glucose. Saxenda and insulin should not be used together *[see Warnings and Precautions (5.4) and Adverse Reactions (6.1)]*. Conversely, if discontinuing Saxenda in patients with type 2 diabetes, monitor for an increase in blood glucose.

Evaluate the change in body weight 16 weeks after initiating Saxenda and discontinue Saxenda if the patient has not lost at least 4% of baseline body weight, since it is unlikely that the patient will achieve and sustain clinically meaningful weight loss with continued treatment.

If a dose is missed, the once-daily regimen should be resumed as prescribed with the next scheduled dose. An extra dose or increase in dose should not be taken to make up for the missed dose. If more than 3 days have elapsed since the last Saxenda dose, patients should reinitiate Saxenda at 0.6 mg daily and follow the dose escalation schedule in Table 1, which may reduce the occurrence of gastrointestinal symptoms associated with reinitiation of treatment.

Prior to initiation of Saxenda, patients should be trained by their healthcare professional on proper injection technique. Training reduces the risk of administration errors such as needle sticks and incomplete dosing. Refer to the accompanying Instructions for Use for complete administration instructions with illustrations.

Saxenda solution should be inspected prior to each injection, and the solution should be used only if it is clear, colorless, and contains no particles.

BMI is calculated by dividing weight in (kilograms) by height (in meters) squared. A chart for determining BMI based on height and weight is provided in Table 2.

**Table 2.  BMI Conversion Chart**

| Weight (lb) | 125 | 130 | 135 | 140 | 145 | 150 | 155 | 160 | 165 | 170 | 175 | 180 | 185 | 190 | 195 | 200 | 205 | 210 | 215 | 220 | 225 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (kg) | 56.8 | 59.1 | 61.4 | 63.6 | 65.9 | 68.2 | 70.5 | 72.7 | 75.0 | 77.3 | 79.5 | 81.8 | 84.1 | 86.4 | 88.6 | 90.9 | 93.2 | 95.5 | 97.7 | 100.0 | 102.3 |
| Height (in) / (cm) | | | | | | | | | | | | | | | | | | | | |
| 58 / 147.3 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| 59 / 149.9 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 43 | 44 | 45 | 46 |
| 60 / 152.4 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 |
| 61 / 154.9 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 |
| 62 / 157.5 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 41 |
| 63 / 160.0 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 36 | 37 | 38 | 39 | 40 |
| 64 / 162.6 | 22 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 34 | 35 | 36 | 37 | 38 | 39 |
| 65 / 165.1 | 21 | 22 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 28 | 29 | 30 | 31 | 32 | 32 | 33 | 34 | 35 | 36 | 37 | 38 |
| 66 / 167.6 | 20 | 21 | 22 | 23 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 35 | 36 | 36 |
| 67 / 170.2 | 20 | 20 | 21 | 22 | 23 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 35 | 35 |
| 68 / 172.7 | 19 | 20 | 21 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 33 | 34 |
| 69 / 175.3 | 18 | 19 | 20 | 21 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 32 | 33 |
| 70 / 177.8 | 18 | 19 | 19 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 29 | 30 | 31 | 32 | 32 |
| 71 / 180.3 | 17 | 18 | 19 | 20 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 29 | 29 | 30 | 31 | 31 |
| 72 / 182.9 | 17 | 18 | 18 | 19 | 20 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 | 29 | 30 | 31 |
| 73 / 185.4 | 17 | 17 | 18 | 19 | 19 | 20 | 20 | 21 | 22 | 22 | 23 | 24 | 25 | 25 | 26 | 26 | 27 | 28 | 28 | 29 | 30 |
| 74 / 188.0 | 16 | 17 | 17 | 18 | 19 | 19 | 20 | 21 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 | 29 |
| 75 / 190.5 | 16 | 16 | 17 | 17 | 18 | 19 | 19 | 20 | 21 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 |
| 76 / 193.0 | 15 | 16 | 16 | 17 | 18 | 18 | 19 | 19 | 20 | 21 | 21 | 22 | 23 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 27 |

## 3   DOSAGE FORMS AND STRENGTHS

Solution for subcutaneous injection, pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg, or 3 mg (6 mg/mL, 3 mL).

## 4   CONTRAINDICATIONS

Saxenda is contraindicated in the following conditions:

- Patients with a personal or family history of medullary thyroid carcinoma (MTC) or patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2) *[see Warnings and Precautions (5.1)]*
- Patients with a prior serious hypersensitivity reaction to liraglutide or to any of the product components *[see Warnings and Precautions (5.7)]*
- Pregnancy *[see Use in Specific Populations (8.1)]*

## 5   WARNINGS AND PRECAUTIONS

### 5.1   Risk of Thyroid C-cell Tumors

Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors (adenomas and/or carcinomas) at clinically relevant exposures in both genders of rats and mice *[see Nonclinical Toxicology (13.1)]*. Malignant thyroid C-cell carcinomas were detected in rats and mice. It is unknown whether Saxenda will cause thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined.

Cases of MTC in patients treated with liraglutide have been reported in the postmarketing period; the data in these reports are insufficient to establish or exclude a causal relationship between MTC and liraglutide use in humans.

Saxenda is contraindicated in patients with a personal or family history of MTC or in patients with MEN 2. Counsel patients regarding the risk for MTC and inform them of symptoms of thyroid tumors (e.g., a mass in the neck, dysphagia, dyspnea, persistent hoarseness).

Routine monitoring of serum calcitonin or using thyroid ultrasound is of uncertain value for early detection of MTC in patients treated with Saxenda. Such monitoring may increase the risk of unnecessary procedures, due to low test specificity for serum calcitonin and a high background incidence of thyroid disease. Significantly elevated serum calcitonin may indicate MTC, and patients with MTC usually have calcitonin values greater than 50 ng/L. If serum calcitonin is measured and found to be elevated, the patient should be further evaluated. Patients with thyroid nodules noted on physical examination or neck imaging should also be further evaluated.

## 5.2    Acute Pancreatitis

Based on spontaneous postmarketing reports, acute pancreatitis, including fatal and non-fatal hemorrhagic or necrotizing pancreatitis, has been observed in patients treated with liraglutide. After initiation of Saxenda, observe patients carefully for signs and symptoms of pancreatitis (including persistent severe abdominal pain, sometimes radiating to the back and which may or may not be accompanied by vomiting). If pancreatitis is suspected, Saxenda should promptly be discontinued and appropriate management should be initiated. If pancreatitis is confirmed, Saxenda should not be restarted.

In Saxenda clinical trials, acute pancreatitis was confirmed by adjudication in 9 (0.3%) of 3291 Saxenda-treated patients and 1 (0.1%) of 1843 placebo-treated patients. In addition, there were 2 cases of acute pancreatitis in Saxenda-treated patients who prematurely withdrew from these clinical trials, occurring 74 and 124 days after the last dose, and 1 additional case in a Saxenda-treated patient during an off-treatment follow-up period within 2 weeks of discontinuing Saxenda.

It is unknown whether patients with a history of pancreatitis are at increased risk for pancreatitis while using Saxenda, since these patients were excluded from clinical trials.

## 5.3    Acute Gallbladder Disease

In Saxenda clinical trials, 1.5% of Saxenda-treated patients reported adverse events of cholelithiasis versus 0.5% of placebo-treated patients. The incidence of cholecystitis was 0.6% in Saxenda-treated patients versus 0.2% in placebo-treated patients. The majority of Saxenda-treated patients with adverse events of cholelithiasis and cholecystitis required cholecystectomy. Substantial or rapid weight loss can increase the risk of cholelithiasis; however, the incidence of acute gallbladder disease was greater in Saxenda-treated patients than in placebo-treated patients even after accounting for the degree of weight loss. If cholelithiasis is suspected, gallbladder studies and appropriate clinical follow-up are indicated.

## 5.4    Risk for Hypoglycemia with Concomitant Use of Anti-Diabetic Therapy

The risk for serious hypoglycemia is increased when Saxenda is used in combination with insulin secretagogues (for example, sulfonylureas) in patients with type 2 diabetes mellitus. Therefore, patients may require a lower dose of sulfonylurea (or other concomitantly administered insulin secretagogues) in this setting *[see Dosage and Administration (2) and Adverse Reactions (6.1)]*. Saxenda should not be used in patients taking insulin.

Saxenda can lower blood glucose *[see Clinical Pharmacology (12.2)]*. Monitor blood glucose parameters prior to starting Saxenda and during Saxenda treatment in patients with type 2 diabetes. If needed, adjust co-administered anti-diabetic drugs based on glucose monitoring results and risk of hypoglycemia.

## 5.5    Heart Rate Increase

Mean increases in resting heart rate of 2 to 3 beats per minute (bpm) were observed with routine clinical monitoring in Saxenda-treated patients compared to placebo in clinical trials. More patients treated with Saxenda, compared with placebo, had changes from baseline at two consecutive visits of more than 10 bpm (34% versus 19%, respectively) and 20 bpm (5% versus 2%, respectively). At least one resting heart rate exceeding 100 bpm was recorded for 6% of Saxenda-treated patients compared with 4% of placebo-treated

patients, with this occurring at two consecutive study visits for 0.9% and 0.3%, respectively. Tachycardia was reported as an adverse reaction in 0.6% of Saxenda-treated patients and in 0.1% of placebo-treated patients.

In a clinical pharmacology trial that monitored heart rate continuously for 24 hours, Saxenda treatment was associated with a heart rate that was 4 to 9 bpm higher than that observed with placebo.

The clinical significance of the heart rate elevation with Saxenda treatment is unclear, especially for patients with cardiac and cerebrovascular disease as a result of limited exposure in these patients in clinical trials.

Heart rate should be monitored at regular intervals consistent with usual clinical practice. Patients should inform health care providers of palpitations or feelings of a racing heartbeat while at rest during Saxenda treatment. For patients who experience a sustained increase in resting heart rate while taking Saxenda, Saxenda should be discontinued.

## 5.6   Renal Impairment
In patients treated with GLP-1 receptor agonists, including Saxenda, there have been reports of acute renal failure and worsening of chronic renal failure, sometimes requiring hemodialysis *[see Adverse Reactions (6.2)]*. Some of these events were reported in patients without known underlying renal disease. A majority of the reported events occurred in patients who had experienced nausea, vomiting, or diarrhea leading to volume depletion. Some of the reported events occurred in patients receiving one or more medications known to affect renal function or volume status. Altered renal function has been reversed in many of the reported cases with supportive treatment and discontinuation of potentially causative agents, including liraglutide. Use caution when initiating or escalating doses of Saxenda in patients with renal impairment *[see Use in Specific Populations (8.6)]*.

## 5.7   Hypersensitivity Reactions
There have been reports of serious hypersensitivity reactions (e.g., anaphylactic reactions and angioedema) in patients treated with liraglutide *[see Adverse Reactions (6.1, 6.2)]*. If a hypersensitivity reaction occurs, the patient should discontinue Saxenda and other suspect medications and promptly seek medical advice.

Angioedema has also been reported with other GLP-1 receptor agonists. Use caution in a patient with a history of angioedema with another GLP-1 receptor agonist because it is unknown whether such patients will be predisposed to angioedema with Saxenda.

## 5.8   Suicidal Behavior and Ideation
In Saxenda clinical trials, 6 (0.2%) of 3384 Saxenda-treated patients and none of the 1941 placebo-treated patients reported suicidal ideation; one of these Saxenda-treated patients attempted suicide. Patients treated with Saxenda should be monitored for the emergence or worsening of depression, suicidal thoughts or behavior, and/or any unusual changes in mood or behavior. Discontinue Saxenda in patients who experience suicidal thoughts or behaviors. Avoid Saxenda in patients with a history of suicidal attempts or active suicidal ideation.

## 6   ADVERSE REACTIONS
The following serious adverse reactions are described below or elsewhere in the prescribing information:
- Risk of Thyroid C-Cell Tumors *[see Warnings and Precautions (5.1)]*
- Acute Pancreatitis *[see Warnings and Precautions (5.2)]*
- Acute Gallbladder Disease *[see Warnings and Precautions (5.3)]*
- Risk for Hypoglycemia with Concomitant Use of Anti-Diabetic Therapy *[see Warnings and Precautions (5.4)]*
- Heart Rate Increase *[see Warnings and Precautions (5.5)]*

- Renal Impairment *[see Warnings and Precautions (5.6)]*
- Hypersensitivity Reactions *[see Warnings and Precautions (5.7)]*
- Suicidal Behavior and Ideation *[see Warnings and Precautions (5.8)]*

## 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Saxenda was evaluated for safety in 5 double-blind, placebo controlled trials that included 3384 overweight or obese patients treated with Saxenda for a treatment period up to 56 weeks (3 trials), 52 weeks (1 trial), and 32 weeks (1 trial). All patients received study drug in addition to diet and exercise counseling. In these trials, patients received Saxenda for a mean treatment duration of 45.9 weeks (median, 55.9 weeks). Of these, 1087 Saxenda-treated patients and 497 placebo-treated patients have been exposed in their original randomized groups beyond the primary endpoint for an additional mean duration of 53.0 weeks (median, 56.9 weeks). Baseline characteristics included a mean age of 47 years, 71% women, 85% white, 39% with hypertension, 15% with type 2 diabetes, 34% with dyslipidemia, 29% with a BMI greater than 40 $kg/m^2$, and 9% with cardiovascular disease. Dosing was initiated and increased weekly to reach the 3 mg dose.

In clinical trials, 9.8% of patients treated with Saxenda and 4.3% of patients treated with placebo prematurely discontinued treatment as a result of adverse reactions. The most common adverse reactions leading to discontinuation were nausea (2.9% versus 0.2% for Saxenda and placebo, respectively), vomiting (1.7% versus less than 0.1%), and diarrhea (1.4% versus 0%).

Adverse reactions reported in greater than or equal to 2% of Saxenda-treated patients and more frequently than in placebo-treated patients are shown in Table 3.

**Table 3.       Adverse Reactions Reported in Greater Than or Equal to 2% of Saxenda-treated Patients and More Frequently than with Placebo**

|  | Placebo N = 1941 % | Saxenda N = 3384 % |
|---|---|---|
| **Gastrointestinal Disorders** |  |  |
| Nausea | 13.8 | 39.3 |
| Diarrhea | 9.9 | 20.9 |
| Constipation | 8.5 | 19.4 |
| Vomiting | 3.9 | 15.7 |
| Dyspepsia | 2.7 | 9.6 |
| Abdominal Pain | 3.1 | 5.4 |
| Upper Abdominal Pain | 2.7 | 5.1 |
| Gastroesophageal Reflux Disease | 1.7 | 4.7 |
| Abdominal Distension | 3.0 | 4.5 |
| Eructation | 0.2 | 4.5 |
| Flatulence | 2.5 | 4.0 |
| Dry Mouth | 1.0 | 2.3 |
| **Metabolism and Nutrition Disorders** |  |  |
| Hypoglycemia in T2DM[1] | 12.7 | 23.0 |
| Decreased Appetite | 2.3 | 10.0 |
| **Nervous System Disorders** |  |  |

| | | |
|---|---|---|
| Headache | 12.6 | 13.6 |
| Dizziness | 5.0 | 6.9 |
| **General Disorders and Administration Site Conditions** | | |
| Fatigue | 4.6 | 7.5 |
| Injection site Erythema | 0.2 | 2.5 |
| Injection Site Reaction | 0.6 | 2.5 |
| Asthenia | 0.8 | 2.1 |
| **Infections and Infestations** | | |
| Gastroenteritis | 3.2 | 4.7 |
| Urinary Tract Infection | 3.1 | 4.3 |
| Viral Gastroenteritis | 1.6 | 2.8 |
| **Investigations** | | |
| Increased Lipase | 2.2 | 5.3 |
| **Psychiatric Disorders** | | |
| Insomnia | 1.7 | 2.4 |
| Anxiety | 1.6 | 2.0 |

[1] Documented symptomatic (defined as documented symptoms of hypoglycemia in combination with a plasma glucose less than or equal to 70 mg/dL) in patients with type 2 diabetes (Study 2). See text below for further information regarding hypoglycemia in patients with and without type 2 diabetes. T2DM = type 2 diabetes mellitus

Hypoglycemia

Saxenda can lower blood glucose. In a clinical trial involving patients with type 2 diabetes mellitus and overweight or obesity, severe hypoglycemia (defined as requiring the assistance of another person) occurred in 3 (0.7%) of 422 Saxenda-treated patients and in none of the 212 placebo-treated patients. Each of these 3 Saxenda-treated patients was also taking a sulfonylurea. In the same trial, among patients taking a sulfonylurea, documented symptomatic hypoglycemia (defined as documented symptoms of hypoglycemia in combination with a plasma glucose less than or equal to 70 mg/dL) occurred in 48 (43.6%) of 110 Saxenda-treated patients and 15 (27.3%) of 55 placebo-treated patients. The doses of sulfonylureas were reduced by 50% at the beginning of the trial per protocol. The frequency of hypoglycemia may be higher if the dose of sulfonylurea is not reduced. Among patients not taking a sulfonylurea, documented symptomatic hypoglycemia occurred in 49 (15.7%) of 312 Saxenda-treated patients and 12 (7.6%) of 157 placebo-treated patients.

In Saxenda clinical trials involving patients without type 2 diabetes mellitus, there was no systematic capturing or reporting of hypoglycemia, as patients were not provided with blood glucose meters or hypoglycemia diaries. Spontaneously reported symptomatic episodes of unconfirmed hypoglycemia were reported by 46 (1.6%) of 2962 Saxenda-treated patients and 19 (1.1%) of 1729 placebo-treated patients. Fasting plasma glucose values obtained at routine clinic visits less than or equal to 70 mg/dL, irrespective of hypoglycemic symptoms, were reported as "hypoglycemia" in 92 (3.1%) Saxenda-treated patients and 13 (0.8%) placebo-treated patients.

Gastrointestinal Adverse Reactions

In the clinical trials, approximately 68% of Saxenda-treated patients and 39% of placebo-treated patients reported gastrointestinal disorders; the most frequently reported was nausea (39% and 14% of patients treated with Saxenda and placebo, respectively). The percentage of patients reporting nausea declined as treatment continued. Other common adverse reactions that occurred at a higher incidence among Saxenda-treated patients included diarrhea, constipation, vomiting, dyspepsia, abdominal pain, dry mouth, gastritis, gastroesophageal reflux disease, flatulence, eructation and abdominal distension. Most episodes of gastrointestinal events were mild or moderate and did not lead to discontinuation of therapy (6.2% with Saxenda versus 0.8% with placebo discontinued treatment as a result of gastrointestinal adverse reactions). There have been reports of

gastrointestinal adverse reactions, such as nausea, vomiting, and diarrhea, associated with volume depletion and renal impairment *[see Warnings and Precautions (5.6)]*.

Asthenia, Fatigue, Malaise, Dysgeusia and Dizziness
Events of asthenia, fatigue, malaise, dysgeusia and dizziness were mainly reported within the first 12 weeks of treatment with Saxenda and were often co-reported with gastrointestinal events such as nausea, vomiting, and diarrhea.

Immunogenicity
Patients treated with Saxenda may develop anti-liraglutide antibodies. Anti-liraglutide antibodies were detected in 42 (2.8%) of 1505 Saxenda-treated patients with a post-baseline assessment. Antibodies that had a neutralizing effect on liraglutide in an *in vitro* assay occurred in 18 (1.2%) of 1505 Saxenda-treated patients. Presence of antibodies may be associated with a higher incidence of injection site reactions and reports of low blood glucose. In clinical trials, these events were usually classified as mild and resolved while patients continued on treatment.

The detection of antibody formation is highly dependent on the sensitivity and specificity of the assay. Additionally, the observed incidence of antibody (including neutralizing antibody) positivity in an assay may be influenced by several factors including assay methodology, sample handling, timing of sample collection, concomitant medications, and underlying disease. For these reasons, the incidence of antibodies to Saxenda cannot be directly compared with the incidence of antibodies of other products.

Allergic reactions
Urticaria was reported in 0.7% of Saxenda-treated patients and 0.5% of placebo-treated patients. Anaphylactic reactions, asthma, bronchial hyperreactivity, bronchospasm, oropharyngeal swelling, facial swelling, angioedema, pharyngeal edema, type IV hypersensitivity reactions have been reported in patients treated with liraglutide in clinical trials. Cases of anaphylactic reactions with additional symptoms such as hypotension, palpitations, dyspnea, and edema have been reported with marketed use of liraglutide. Anaphylactic reactions may potentially be life-threatening.

Injection site reactions
Injection site reactions were reported in approximately 13.9% of Saxenda-treated patients and 10.5% of placebo-treated patients. The most common reactions, each reported by 1% to 2.5% of Saxenda-treated patients and more commonly than by placebo-treated patients, included erythema, pruritus, and rash at the injection site. 0.6% of Saxenda-treated patients and 0.5% of placebo-treated patients discontinued treatment due to injection site reactions.

Breast Cancer
In Saxenda clinical trials breast cancer confirmed by adjudication was reported in 14 (0.6%) of 2379 Saxenda-treated women compared with 3 (0.2%) of 1300 placebo-treated women, including invasive cancer (11 Saxenda- and 2 placebo-treated women) and ductal carcinoma *in situ* (3 Saxenda- and 1 placebo-treated woman). The majority of cancers were estrogen- and progesterone-receptor positive. There were too few cases to determine whether these cases were related to Saxenda. In addition, there are insufficient data to determine whether Saxenda has an effect on pre-existing breast neoplasia.

Papillary Thyroid Cancer
In Saxenda clinical trials, papillary thyroid carcinoma confirmed by adjudication was reported in 7 (0.2%) of 3291 Saxenda-treated patients compared with no cases among 1843 placebo-treated patients. Four of these papillary thyroid carcinomas were less than 1 cm in greatest diameter and 4 were diagnosed in surgical pathology specimens after thyroidectomy prompted by findings identified prior to treatment.

Colorectal Neoplasms

In Saxenda clinical trials, benign colorectal neoplasms (mostly colon adenomas) confirmed by adjudication were reported in 17 (0.5%) of 3291 Saxenda-treated patients compared with 4 (0.2%) of 1843 placebo-treated patients. Two positively adjudicated cases of malignant colorectal carcinoma were reported in Saxenda-treated patients (0.1%) and none in placebo-treated patients.

Cardiac Conduction Disorders

In Saxenda clinical trials, 11 (0.3%) of 3384 Saxenda-treated patients compared with none of the 1941 placebo-treated patients had a cardiac conduction disorder, reported as first degree atrioventricular block, right bundle branch block, or left bundle branch block.

Hypotension

Adverse reactions related to hypotension (that is, reports of hypotension, orthostatic hypotension, circulatory collapse, and decreased blood pressure) were reported more frequently with Saxenda (1.1%) compared with placebo (0.5%) in Saxenda clinical trials. Systolic blood pressure decreases to less than 80 mmHg were observed in 4 (0.1%) Saxenda-treated patients compared with no placebo-treated patients. One of the Saxenda-treated patients had hypotension associated with gastrointestinal adverse reactions and renal failure *[see Warnings and Precautions (5.6)]*.

Laboratory Abnormalities

*Liver Enzymes*

Increases in alanine aminotransferase (ALT) greater than or equal to 10 times the upper limit of normal were observed in 5 (0.15%) Saxenda-treated patients (two of whom had ALT greater than 20 and 40 times the upper limit of normal) compared with 1 (0.05%) placebo-treated patient during the Saxenda clinical trials. Because clinical evaluation to exclude alternative causes of ALT and aspartate aminotransferase (AST) increases was not done in most cases, the relationship to Saxenda is uncertain. Some increases in ALT and AST were associated with other confounding factors (such as gallstones).

*Serum Calcitonin*

Calcitonin, a biological marker of MTC, was measured throughout the clinical development program *[see Warnings and Precautions (5.1)]*. More patients treated with Saxenda in the clinical trials were observed to have high calcitonin values during treatment, compared with placebo. The proportion of patients with calcitonin greater than or equal to 2 times the upper limit of normal at the end of the trial was 1.2% in Saxenda-treated patients and 0.6% in placebo-treated patients. Calcitonin values greater than 20 ng/L at the end of the trial occurred in 0.5% of Saxenda-treated patients and 0.2% of placebo-treated patients; among patients with pre-treatment serum calcitonin less than 20 ng/L, none had calcitonin elevations to greater than 50 ng/L at the end of the trial.

*Serum Lipase and Amylase*

Serum lipase and amylase were routinely measured in the Saxenda clinical trials. Among Saxenda-treated patients, 2.1% had a lipase value at anytime during treatment of greater than or equal to 3 times the upper limit of normal compared with 1.0% of placebo-treated patients. 0.1% of Saxenda-treated patients had an amylase value at anytime in the trial of greater than or equal to 3 times the upper limit of normal versus 0.1% of placebo-treated patients. The clinical significance of elevations in lipase or amylase with Saxenda is unknown in the absence of other signs and symptoms of pancreatitis *[see Warnings and Precautions (5.2)]*.

## 6.2    Post-Marketing Experience

The following adverse reactions have been reported during post-approval use of liraglutide, the active ingredient of Saxenda. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Neoplasms*
    Medullary thyroid carcinoma *[see Warnings and Precautions (5.1)]*
*Gastrointestinal Disorders*
    Acute pancreatitis, hemorrhagic and necrotizing pancreatitis, sometimes resulting in death *[see Warnings and Precautions (5.2)]*
*Metabolism and Nutrition Disorders*
    Dehydration resulting from nausea, vomiting and diarrhea *[see Adverse Reactions (6.1)]*
*Renal and Urinary Disorders*
    Increased serum creatinine, acute renal failure or worsening of chronic renal failure, sometimes requiring hemodialysis *[see Warnings and Precautions (5.6)]*
*General Disorders and Administration Site Conditions*
    Allergic reactions: rash and pruritus *[see Adverse Reactions (6.1)]*
*Immune System Disorders*
    Angioedema and anaphylactic reactions *[see Warnings and Precautions (5.7)]*
*Hepatobiliary Disorders*
    Elevations of liver enzymes, hyperbilirubinemia, cholestasis and hepatitis *[see Adverse Reactions (6.1)]*

## 7    DRUG INTERACTIONS
### 7.1    Oral Medications
Saxenda causes a delay of gastric emptying, and thereby has the potential to impact the absorption of concomitantly administered oral medications. In clinical pharmacology trials, liraglutide did not affect the absorption of the tested orally administered medications to any clinically relevant degree. Nonetheless, monitor for potential consequences of delayed absorption of oral medications concomitantly administered with Saxenda.

## 8    USE IN SPECIFIC POPULATIONS
### 8.1    Pregnancy
Pregnancy Category X.

Risk Summary
Saxenda is contraindicated during pregnancy because weight loss offers no potential benefit to a pregnant woman and may result in fetal harm. There are no adequate and well-controlled studies of Saxenda in pregnant women. Saxenda should not be used during pregnancy. If a patient wishes to become pregnant, or pregnancy occurs, treatment with Saxenda should be discontinued.

Clinical Considerations
A minimum weight gain, and no weight loss, is recommended for all pregnant women, including those who are already overweight or obese, due to the necessary weight gain that occurs in maternal tissues during pregnancy.

Animal Data
Liraglutide has been shown to be teratogenic in rats at or above 0.8-times systemic exposures in obese humans resulting from the maximum recommended human dose (MRHD) of 3 mg/day based on plasma area under the time-concentration curve (AUC) comparison. Liraglutide has been shown to cause reduced growth and increased total major abnormalities in rabbits at systemic exposures below exposure in obese humans at the MRHD based on plasma AUC comparison.

1

Female rats given subcutaneous doses of 0.1, 0.25 and 1 mg/kg/day liraglutide beginning 2 weeks before mating through gestation day 17 had estimated systemic exposures 0.8-, 3-, and 11-times the exposure in obese humans at the MRHD based on plasma AUC comparison.  The number of early embryonic deaths in the 1 mg/kg/day group increased slightly. Fetal abnormalities and variations in kidneys and blood vessels, irregular ossification of the skull, and a more complete state of ossification occurred at all doses. Mottled liver and minimally kinked ribs occurred at the highest dose. The incidence of fetal malformations in liraglutide-treated groups exceeding concurrent and historical controls were misshapen oropharynx and/or narrowed opening into larynx at 0.1 mg/kg/day and umbilical hernia at 0.1 and 0.25 mg/kg/day.

Pregnant rabbits given subcutaneous doses of 0.01, 0.025 and 0.05 mg/kg/day liraglutide from gestation day 6 through day 18 inclusive, had estimated systemic exposures less than the exposure in obese humans at the MRHD of 3 mg/day at all doses, based on plasma AUC comparison. Liraglutide decreased fetal weight and dose-dependently increased the incidence of total major fetal abnormalities at all doses. The incidence of malformations exceeded concurrent and historical controls at 0.01 mg/kg/day (kidneys, scapula), greater than or equal to 0.01 mg/kg/day (eyes, forelimb), 0.025 mg/kg/day (brain, tail and sacral vertebrae, major blood vessels and heart, umbilicus), greater than or equal to 0.025 mg/kg/day (sternum) and at 0.05 mg/kg/day (parietal bones, major blood vessels). Irregular ossification and/or skeletal abnormalities occurred in the skull and jaw, vertebrae and ribs, sternum, pelvis, tail, and scapula; and dose-dependent minor skeletal variations were observed. Visceral abnormalities occurred in blood vessels, lung, liver, and esophagus. Bilobed or bifurcated gallbladder was seen in all treatment groups, but not in the control group.

In pregnant female rats given subcutaneous doses of 0.1, 0.25 and 1 mg/kg/day liraglutide from gestation day 6 through weaning or termination of nursing on lactation day 24, estimated systemic exposures were 0.8-, 3-, and 11-times exposure in obese humans at the MRHD of 3 mg/day, based on plasma AUC comparison. A slight delay in parturition was observed in the majority of treated rats. Group mean body weight of neonatal rats from liraglutide-treated dams was lower than neonatal rats from control group dams. Bloody scabs and agitated behavior occurred in male rats descended from dams treated with 1 mg/kg/day liraglutide. Group mean body weight from birth to postpartum day 14 trended lower in $F_2$ generation rats descended from liraglutide-treated rats compared to $F_2$ generation rats descended from controls, but differences did not reach statistical significance for any group.

## 8.3    Nursing Mothers

It is not known whether Saxenda is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for tumorigenicity shown for liraglutide in animal studies, a decision should be made whether to discontinue nursing or to discontinue Saxenda, taking into account the importance of the drug to the mother. In lactating rats, liraglutide was excreted unchanged in milk at concentrations approximately 50% of maternal plasma concentrations.

## 8.4    Pediatric Use

Safety and effectiveness of Saxenda have not been established in pediatric patients.  Saxenda is not recommended for use in pediatric patients.

## 8.5    Geriatric Use

In the Saxenda clinical trials, 232 (6.9%) of the Saxenda-treated patients were 65 years of age and over, and 17 (0.5%) of the Saxenda-treated patients were 75 years of age and over. No overall differences in safety or effectiveness were observed between these patients and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

## 8.6    Renal Impairment

There is limited experience with Saxenda in patients with mild, moderate, and severe renal impairment, including end-stage renal disease. However, there have been postmarketing reports of acute renal failure and worsening of chronic renal failure with liraglutide, which may sometimes require hemodialysis *[see Warnings and Precautions (5.6) and Adverse Reactions (6.2)]*. Saxenda should be used with caution in this patient population *[see Clinical Pharmacology (12.3)]*.

## 8.7   Hepatic Impairment
There is limited experience in patients with mild, moderate, or severe hepatic impairment. Therefore, Saxenda should be used with caution in this patient population *[see Clinical Pharmacology (12.3)]*.

## 8.8   Gastroparesis
Saxenda slows gastric emptying. Saxenda has not been studied in patients with pre-existing gastroparesis.

## 10   OVERDOSAGE
Overdoses have been reported in clinical trials and post-marketing use of liraglutide. Effects have included severe nausea and severe vomiting. In the event of overdosage, appropriate supportive treatment should be initiated according to the patient's clinical signs and symptoms.

## 11   DESCRIPTION
Saxenda contains liraglutide, an analog of human GLP-1 and acts as a GLP-1 receptor agonist. The peptide precursor of liraglutide, produced by a process that includes expression of recombinant DNA in *Saccharomyces cerevisiae,* has been engineered to be 97% homologous to native human GLP-1 by substituting arginine for lysine at position 34. Liraglutide is made by attaching a C-16 fatty acid (palmitic acid) with a glutamic acid spacer on the remaining lysine residue at position 26 of the peptide precursor. The molecular formula of liraglutide is $C_{172}H_{265}N_{43}O_{51}$ and the molecular weight is 3751.2 Daltons. The structural formula (Figure 1) is:



**Figure 1.**      **Structural Formula of liraglutide**

Saxenda is a clear, colorless solution. Each 1 mL of Saxenda solution contains 6 mg of liraglutide and the following inactive ingredients: disodium phosphate dihydrate, 1.42 mg; propylene glycol, 14 mg; phenol, 5.5 mg; and water for injection. Each pre-filled pen contains a 3 mL solution of Saxenda equivalent to 18 mg liraglutide (free-base, anhydrous).

## 12   CLINICAL PHARMACOLOGY
## 12.1   Mechanism of Action
Liraglutide is an acylated human glucagon-like peptide-1 (GLP-1) receptor agonist with 97% amino acid sequence homology to endogenous human GLP-1(7-37). Like endogenous GLP-1, liraglutide binds to and activates the GLP-1 receptor, a cell-surface receptor coupled to adenylyl cyclase activation through the stimulatory G-protein, Gs. Endogenous GLP-1 has a half-life of 1.5-2 minutes due to degradation by the

ubiquitous endogenous enzymes, dipeptidyl peptidase 4 (DPP-4) and neutral endopeptidases (NEP). Unlike native GLP-1, liraglutide is stable against metabolic degradation by both peptidases and has a plasma half-life of 13 hours after subcutaneous administration. The pharmacokinetic profile of liraglutide, which makes it suitable for once-daily administration, is a result of self-association that delays absorption, plasma protein binding, and stability against metabolic degradation by DPP-4 and NEP.

GLP-1 is a physiological regulator of appetite and calorie intake, and the GLP-1 receptor is present in several areas of the brain involved in appetite regulation. In animal studies, peripheral administration of liraglutide resulted in the presence of liraglutide in specific brain regions regulating appetite, including the hypothalamus. Although liraglutide activated neurons in brain regions known to regulate appetite, specific brain regions mediating the effects of liraglutide on appetite were not identified in rats.

## 12.2   Pharmacodynamics

Liraglutide lowers body weight through decreased calorie intake. Liraglutide does not increase 24-hour energy expenditure.

As with other GLP-1 receptor agonists, liraglutide stimulates insulin secretion and reduces glucagon secretion in a glucose-dependent manner. These effects can lead to a reduction of blood glucose.

*Cardiac Electrophysiology (QTc) in healthy volunteers*

The effect of liraglutide on cardiac repolarization was tested in a QTc study. Liraglutide at steady-state concentrations after daily doses up to 1.8 mg did not produce QTc prolongation. The maximum liraglutide plasma concentration ($C_{max}$) in overweight and obese subjects treated with liraglutide 3 mg is similar to the $C_{max}$ observed in the liraglutide QTc study in healthy volunteers.

## 12.3   Pharmacokinetics

Absorption - Following subcutaneous administration, maximum concentrations of liraglutide are achieved at 11 hours post dosing. The average liraglutide steady state concentration ($AUC\tau_{/24}$) reached approximately 116 ng/mL in obese (BMI 30-40 kg/m$^2$) subjects following administration of Saxenda. Liraglutide exposure increased proportionally in the dose range of 0.6 mg to 3 mg. The intra-subject coefficient of variation for liraglutide AUC was 11% following single dose administration. Liraglutide exposures were considered similar among three subcutaneous injection sites (upper arm, abdomen, and thigh). Absolute bioavailability of liraglutide following subcutaneous administration is approximately 55%.

Distribution - The mean apparent volume of distribution after subcutaneous administration of liraglutide 3 mg is 20-25 L (for a person weighing approximately 100 kg). The mean volume of distribution after intravenous administration of liraglutide is 0.07 L/kg. Liraglutide is extensively bound to plasma protein (greater than 98%).

Metabolism - During the initial 24 hours following administration of a single [3H]-liraglutide dose to healthy subjects, the major component in plasma was intact liraglutide. Liraglutide is endogenously metabolized in a similar manner to large proteins without a specific organ as a major route of elimination.

Elimination - Following a [3H]-liraglutide dose, intact liraglutide was not detected in urine or feces. Only a minor part of the administered radioactivity was excreted as liraglutide-related metabolites in urine or feces (6% and 5%, respectively). The majority of urine and feces radioactivity was excreted during the first 6-8 days. The mean apparent clearance following subcutaneous administration of a single dose of liraglutide is approximately 0.9-1.4 L/h with an elimination half-life of approximately 13 hours, making liraglutide suitable for once daily administration.

## Specific Populations

1

Elderly - No dosage adjustment is required based on age. Age had no effect on the pharmacokinetics of liraglutide based on a pharmacokinetic study in healthy elderly subjects (65 to 83 years) and population pharmacokinetic analyses of data from overweight and obese patients 18 to 82 years of age *[see Use in Specific Populations (8.5)]*.

Gender - Based on the results of population pharmacokinetic analyses, females have 24% lower weight adjusted clearance of Saxenda compared to males. Based on the exposure response data, no dose adjustment is necessary based on gender.

Race and Ethnicity - Race and ethnicity had no effect on the pharmacokinetics of liraglutide based on the results of population pharmacokinetic analyses that included overweight and obese patients of Caucasian, Black, Asian and Hispanic/Non-Hispanic groups.

Body Weight - Body weight significantly affects the pharmacokinetics of liraglutide based on results of population pharmacokinetic analyses conducted in patients with body weight range of 60-234 kg. The exposure of liraglutide decreases as baseline body weight increases.

Pediatric - Saxenda has not been studied in pediatric patients *[see Use in Specific Populations (8.4)]*.

Renal Impairment - The single-dose pharmacokinetics of liraglutide were evaluated in subjects with varying degrees of renal impairment. Subjects with mild (estimated creatinine clearance 50-80 mL/min) to severe (estimated creatinine clearance less than 30 mL/min) renal impairment and subjects with end-stage renal disease requiring dialysis were included in the trial. Compared to healthy subjects, liraglutide AUC in mild, moderate, and severe renal impairment and in end-stage renal disease was on average 35%, 19%, 29% and 30% lower, respectively *[see Use in Specific Populations (8.6)]*.

Hepatic Impairment - The single-dose pharmacokinetics of liraglutide were evaluated in subjects with varying degrees of hepatic impairment. Subjects with mild (Child Pugh score 5-6) to severe (Child Pugh score greater than 9) hepatic impairment were included in the trial. Compared to healthy subjects, liraglutide AUC in subjects with mild, moderate and severe hepatic impairment was on average 11%, 14% and 42% lower, respectively *[see Use in Specific Populations (8.7)]*.

*Drug Interactions*
*In vitro assessment of drug−drug interactions*
Liraglutide has low potential for pharmacokinetic drug-drug interactions related to cytochrome P450 (CYP) and plasma protein binding.

*In vivo assessment of drug−drug interactions*
The drug-drug interaction studies were performed at steady state with liraglutide 1.8 mg/day. The effect on rate of gastric emptying was equivalent between liraglutide 1.8 mg and 3 mg (acetaminophen $AUC_{0-300min}$). Administration of the interacting drugs was timed so that $C_{max}$ of liraglutide (8-12 h) would coincide with the absorption peak of the co-administered drugs.

Oral Contraceptives
A single dose of an oral contraceptive combination product containing 0.03 mg ethinylestradiol and 0.15 mg levonorgestrel was administered under fed conditions and 7 hours after the dose of liraglutide at steady state. Liraglutide lowered ethinylestradiol and levonorgestrel $C_{max}$ by 12% and 13%, respectively. There was no effect of liraglutide on the overall exposure (AUC) of ethinylestradiol. Liraglutide increased the levonorgestrel $AUC_{0-\infty}$ by 18%. Liraglutide delayed $T_{max}$ for both ethinylestradiol and levonorgestrel by 1.5 h.

Digoxin
A single dose of digoxin 1 mg was administered 7 hours after the dose of liraglutide at steady state. The concomitant administration with liraglutide resulted in a reduction of digoxin AUC by 16%; $C_{max}$ decreased by 31%. Digoxin median time to maximal concentration ($T_{max}$) was delayed from 1 h to 1.5 h.

Lisinopril
A single dose of lisinopril 20 mg was administered 5 minutes after the dose of liraglutide at steady state. The co-administration with liraglutide resulted in a reduction of lisinopril AUC by 15%; $C_{max}$ decreased by 27%. Lisinopril median $T_{max}$ was delayed from 6 h to 8 h with liraglutide.

Atorvastatin
Liraglutide did not change the overall exposure (AUC) of atorvastatin following a single dose of atorvastatin 40 mg, administered 5 hours after the dose of liraglutide at steady state. Atorvastatin $C_{max}$ was decreased by 38% and median $T_{max}$ was delayed from 1 h to 3 h with liraglutide.

Acetaminophen
Liraglutide did not change the overall exposure (AUC) of acetaminophen following a single dose of acetaminophen 1000 mg, administered 8 hours after the dose of liraglutide at steady state. Acetaminophen $C_{max}$ was decreased by 31% and median $T_{max}$ was delayed up to 15 minutes.

Griseofulvin
Liraglutide did not change the overall exposure (AUC) of griseofulvin following co-administration of a single dose of griseofulvin 500 mg with liraglutide at steady state. Griseofulvin $C_{max}$ increased by 37% while median $T_{max}$ did not change.

Insulin Detemir
No pharmacokinetic interaction was observed between liraglutide and insulin detemir when separate subcutaneous injections of insulin detemir 0.5 Unit/kg (single-dose) and liraglutide 1.8 mg (steady state) were administered to patients with type 2 diabetes mellitus.

## 13    NONCLINICAL TOXICOLOGY
### 13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
A 104-week carcinogenicity study was conducted in male and female CD-1 mice at doses of 0.03, 0.2, 1, and 3 mg/kg/day liraglutide administered by bolus subcutaneous injection yielding systemic exposures 0.2-, 2-, 10- and 43-times the exposure in obese humans, respectively, at the maximum recommended human dose (MRHD) of 3 mg/day based on plasma AUC comparison. A dose-related increase in benign thyroid C-cell adenomas was seen in the 1 and the 3 mg/kg/day groups with incidences of 13% and 19% in males and 6% and 20% in females, respectively. C-cell adenomas did not occur in control groups or 0.03 and 0.2 mg/kg/day groups. Treatment-related malignant C-cell carcinomas occurred in 3% of females in the 3 mg/kg/day group. Thyroid C-cell tumors are rare findings during carcinogenicity testing in mice. A treatment-related increase in fibrosarcomas was seen on the dorsal skin and subcutis, the body surface used for drug injection, in males in the 3 mg/kg/day group. These fibrosarcomas were attributed to the high local concentration of drug near the injection site. The liraglutide concentration in the clinical formulation (6 mg/mL) is 10-times higher than the concentration in the formulation used to administer 3 mg/kg/day liraglutide to mice in the carcinogenicity study (0.6 mg/mL).

A 104-week carcinogenicity study was conducted in male and female Sprague Dawley rats at doses of 0.075, 0.25 and 0.75 mg/kg/day liraglutide administered by bolus subcutaneous injection with exposures 0.5-, 2- and 7-times the exposure in obese humans, respectively, resulting from the MRHD based on plasma AUC comparison. A treatment-related increase in benign thyroid C-cell adenomas was seen in males in 0.25 and 0.75

1

mg/kg/day liraglutide groups with incidences of 12%, 16%, 42%, and 46% and in all female liraglutide-treated groups with incidences of 10%, 27%, 33%, and 56% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. A treatment-related increase in malignant thyroid C-cell carcinomas was observed in all male liraglutide-treated groups with incidences of 2%, 8%, 6%, and 14% and in females at 0.25 and 0.75 mg/kg/day with incidences of 0%, 0%, 4%, and 6% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. Thyroid C-cell carcinomas are rare findings during carcinogenicity testing in rats.

Studies in mice demonstrated that liraglutide-induced C-cell proliferation was dependent on the GLP-1 receptor and that liraglutide did not cause activation of the REarranged during Transfection (RET) proto-oncogene in thyroid C-cells.

Human relevance of thyroid C-cell tumors in mice and rats is unknown and has not been determined by clinical studies or nonclinical studies *[see Boxed Warning and Warnings and Precautions (5.1)]*.

Liraglutide was negative with and without metabolic activation in the Ames test for mutagenicity and in a human peripheral blood lymphocyte chromosome aberration test for clastogenicity. Liraglutide was negative in repeat-dose *in vivo* micronucleus tests in rats.

In rat fertility studies using subcutaneous doses of 0.1, 0.25 and 1 mg/kg/day liraglutide, males were treated for 4 weeks prior to and throughout mating and females were treated 2 weeks prior to and throughout mating until gestation day 17. No direct adverse effects on male fertility was observed at doses up to 1 mg/kg/day, a high dose yielding an estimated systemic exposure 11-times the exposure in obese humans at the MRHD, based on plasma AUC comparison. In female rats, an increase in early embryonic deaths occurred at 1 mg/kg/day. Reduced body weight gain and food consumption were observed in females at the 1 mg/kg/day dose.

# 14    CLINICAL STUDIES

The safety and efficacy of Saxenda for chronic weight management in conjunction with reduced caloric intake and increased physical activity were studied in three 56-week, randomized, double-blind, placebo-controlled trials. In all studies, Saxenda was titrated to 3 mg daily during a 4-week period. All patients received instruction for a reduced calorie diet (approximately 500 kcal/day deficit) and exercise counseling (recommended increase in physical activity of minimum 150 mins/week) that began with the first dose of study medication or placebo and continued throughout the trial.

Study 1 was a 56-week trial that enrolled 3731 patients with obesity (BMI greater than or equal to 30 kg/m$^2$) or with overweight (BMI 27-29.9 kg/m$^2$) and at least one weight-related comorbid condition such as treated or untreated dyslipidemia or hypertension; patients with type 2 diabetes mellitus were excluded. Patients were randomized in a 2:1 ratio to either Saxenda or placebo. The mean age was 45 years (range 18-78), 79% were women, 85% were Caucasian, 10% were African American, and 11% were Hispanic/Latino. Mean baseline body weight was 106.3 kg and mean BMI was 38.3 kg/m$^2$.

Study 2 was a 56-week trial that enrolled 635 patients with type 2 diabetes and with either overweight or obesity (as defined above). Patients were to have an HbA$_{1c}$ of 7-10% and be treated with metformin, a sulfonylurea, or a glitazone as single agent or in any combination, or with diet and exercise alone. Patients were randomized in a 2:1 ratio to receive either Saxenda or placebo. The mean age was 55 years (range 18-82), 50% were women, 83% were Caucasian, 12% were African American, and 10% were Hispanic/Latino. Mean baseline body weight was 105.9 kg and mean BMI was 37.1 kg/m$^2$.

Study 3 was a 56-week trial that enrolled 422 patients with obesity (BMI greater than or equal to 30 kg/m$^2$) or with overweight (BMI 27-29.9 kg/m$^2$) and at least one weight-related comorbid condition such as treated or untreated dyslipidemia or hypertension; patients with type 2 diabetes mellitus were excluded. All patients were

1

first treated with a low-calorie diet (total energy intake 1200-1400 kcal/day) in a run-in period lasting up to 12 weeks. Patients who lost at least 5% of their screening body weight after 4 to 12 weeks during the run-in were then randomized, with equal allocation, to receive either Saxenda or placebo for 56 weeks. The mean age was 46 years (range 18-73), 81% were women, 84% were Caucasian, 13% were African American, and 7% were Hispanic/Latino. Mean baseline body weight was 99.6 kg and mean BMI was 35.6 kg/m$^2$.

The proportions of patients who discontinued study drug in the 56-week trials were 27% for the Saxenda-treated group and 35% for the placebo-treated group. Approximately 10% of patients treated with Saxenda and 4% of patients treated with placebo discontinued treatment due to an adverse reaction *[see Adverse Reactions (6.1)]*. The majority of patients who discontinued Saxenda due to adverse reactions did so during the first few months of treatment.

### *Effect of Saxenda on Body Weight*

For Study 1 and Study 2, the primary efficacy parameters were mean percent change in body weight and the percentages of patients achieving greater than or equal to 5% and 10% weight loss from baseline to week 56. For Study 3, the primary efficacy parameters were mean percent change in body weight from randomization to week 56, the percentage of patients not gaining more than 0.5% body weight from randomization (i.e., after run-in) to week 56, and the percentage of patients achieving greater than or equal to 5% weight loss from randomization to week 56. Because losing at least 5% of fasting body weight through lifestyle intervention during the 4- to 12-week run-in was a condition for their continued participation in the randomized treatment period, the results may not reflect those expected in the general population.

Table 4 presents the results for the changes in weight observed in Studies 1, 2, and 3. After 56 weeks, treatment with Saxenda resulted in a statistically significant reduction in weight compared with placebo. Statistically significantly greater proportions of patients treated with Saxenda achieved 5% and 10% weight loss than those treated with placebo. In Study 3, statistically significantly more patients randomized to Saxenda than placebo had not gained more than 0.5% of body weight from randomization to week 56.

**Table 4.      Changes in Weight at Week 56 for Studies 1, 2, and 3**

|  | Study 1 (Obesity or overweight with comorbidity) | | Study 2 (Type 2 diabetes with obesity or overweight) | | Study 3 (Obesity or overweight with comorbidity following at least 5% weight loss with diet) | |
|---|---|---|---|---|---|---|
|  | Saxenda N=2487 | Placebo N=1244 | Saxenda N=423 | Placebo N=212 | Saxenda N=212 | Placebo N=210 |
| **Weight** | | | | | | |
| Baseline mean (SD) (kg) | 106.2 (21.2) | 106.2 (21.7) | 105.7 (21.9) | 106.5 (21.3) | 100.4 (20.8) | 98.7 (21.2) |
| Percent change from baseline (LSMean) | -7.4 | -3.0 | -5.4 | -1.7 | -4.9 | 0.3 |
| Difference from placebo (LSMean) (95% CI) | -4.5* (-5.2;-3.8) | | -3.7* (-4.7;-2.7) | | -5.2* (-6.8;-3.5) | |
| **% of Patients losing greater than or equal to 5% body weight** | 62.3% | 34.4% | 49.0% | 16.4% | 44.2% | 21.7% |
| Difference from placebo (LSMean) (95% CI) | 27.9* (23.9;31.9) | | 32.6* (25.1;40.1) | | 22.6* (13.9;31.3) | |

1

| % of Patients losing greater than 10% body weight | 33.9% | 15.4% | 22.4% | 5.5% | 25.4% | 6.9% |
|---|---|---|---|---|---|---|
| Difference from placebo (LSMean) (95% CI) | 18.5* (15.2;21.7) | | 16.9* (11.7;22.1) | | 18.5* (11.7;25.3) | |

SD = Standard Deviation; CI = Confidence Interval
* p < 0.0001 compared to placebo.  Type 1 error was controlled across the three endpoints.
Includes all randomized subjects who had a baseline body weight measurement. All available body weight data during the 56 week treatment period are included in the analysis. In Studies 1 and 2 missing values for week 56 were handled using multiple imputations analysis. In Study 3 missing values for week 56 were handled using weighted regression analysis.

The cumulative frequency distributions of change in body weight from baseline to week 56 are shown in Figure 2 for Studies 1 and 2. One way to interpret this figure is to select a change in body weight of interest on the horizontal axis and note the corresponding proportions of patients (vertical axis) in each treatment group who achieved at least that degree of weight loss. For example, note that the vertical line arising from -10% in Study 1 intersects the Saxenda and placebo curves at approximately 34% and 15%, respectively, which correspond to the values shown in Table 4.



**Figure 2.** **Change in body weight (%) from baseline to week 56 (Study 1 on left and Study 2 on right)**

The time courses of weight loss with Saxenda and placebo from baseline through week 56 are depicted in Figures 3 and 4.



**Figure 3.** **Change from baseline (%) in body weight (Study 1 on left and Study 2 on right)**



Observed values for patients on study drug completing each scheduled visit, and ITT with weighted average (ITT-WA)

**Figure 4.      Change from baseline (%) in body weight during Study 3**

### *Effect of Saxenda on Anthropometry and Cardiometabolic Parameters*

Changes in waist circumference and cardiometabolic parameters with Saxenda are shown in Table 5 for Study 1 (patients without diabetes mellitus) and Table 6 for Study 2 (patients with type 2 diabetes). Results from Study 3, which also enrolled patients without diabetes mellitus, were similar to Study 1.

**Table 5.      Mean Changes in Anthropometry and Cardiometabolic Parameters in Study 1 (Patients without Diabetes)**

| | Saxenda N = 2487 | | Placebo N = 1244 | | |
|---|---|---|---|---|---|
| | **Baseline** | **Change from Baseline (LSMean[1])** | **Baseline** | **Change from Baseline (LSMean[1])** | **Saxenda minus Placebo (LSMean)** |
| Waist Circumference (cm) | 115.0 | -8.2 | 114.5 | -4.0 | -4.2 |
| Systolic blood pressure (mmHg) | 123.0 | -4.3 | 123.3 | -1.5 | -2.8 |
| Diastolic blood pressure (mmHg) | 78.7 | -2.7 | 78.9 | -1.8 | -0.9 |
| Heart Rate (bpm) | 71.4 | 2.6 | 71.3 | 0.1 | 2.5 |
| | **Baseline** | **% change from Baseline (LSMean[1])** | **Baseline** | **% change from Baseline (LSMean[1])** | **Relative Difference of Saxenda to Placebo (LSMean)** |
| Total Cholesterol (mg/dL)* | 193.8 | -3.2 | 194.4 | -0.9 | -2.3 |
| LDL Cholesterol (mg/dL)* | 111.8 | -3.1 | 112.3 | -0.7 | -2.4 |
| HDL Cholesterol (mg/dL)* | 51.4 | 2.3 | 50.9 | 0.5 | 1.9 |
| Triglycerides (mg/dL)† | 125.7 | -13.0 | 128.3 | -4.1 | -7.1 |

Based on last observation carried forward method while on study drug
[1] Least squares mean adjusted for treatment, country, sex, pre-diabetes status at screening, baseline BMI stratum and an interaction between pre-diabetes status at screening and BMI stratum as fixed factors, and the baseline value as covariate.
* Baseline value is the geometric mean
†Values are baseline median, median % change, and the Hodges-Lehmann estimate of the median treatment difference.

1

**Table 6.**      **Mean Changes in Anthropometry and Cardiometabolic Parameters in Study 2 (Patients with Diabetes Mellitus)**

| | Saxenda N = 423 | | Placebo N = 212 | | |
|---|---|---|---|---|---|
| | Baseline | Change from Baseline (LSMean[1]) | Baseline | Change from Baseline (LSMean[1]) | Saxenda minus Placebo (LSMean) |
| Waist Circumference (cm) | 118.1 | -6.0 | 117.3 | -2.8 | -3.2 |
| Systolic Blood Pressure (mmHg) | 128.9 | -3.0 | 129.2 | -0.4 | -2.6 |
| Diastolic Blood Pressure (mmHg) | 79.0 | -1.0 | 79.3 | -0.6 | -0.4 |
| Heart Rate (bpm) | 74.0 | 2.0 | 74.0 | -1.5 | 3.4 |
| | Baseline | % change from Baseline (LSMean[1]) | Baseline | % change from Baseline (LSMean[1]) | Relative Difference of Saxenda to Placebo (LSMean) |
| Total Cholesterol (mg/dL)* | 171.0 | -1.4 | 169.4 | 2.4 | -3.7 |
| LDL Cholesterol (mg/dL)* | 86.4 | 0.9 | 85.2 | 3.3 | -2.3 |
| HDL Cholesterol (mg/dL)* | 45.2 | 4.8 | 45.4 | 1.9 | 2.9 |
| Triglycerides (mg/dL)† | 156.2 | -14.5 | 155.8 | -0.7 | -13.5 |

Based on last observation carried forward method while on study drug
[1] Least squares mean adjusted for treatment, country, sex, background treatment, baseline $HbA_{1c}$ stratum and an interaction between background treatment and $HbA_{1c}$ stratum as fixed factors, and the baseline value as covariate.
* Baseline value is the geometric mean
†Values are baseline median, median % change, and the Hodges-Lehmann estimate of the median treatment difference.

# 16      HOW SUPPLIED/STORAGE AND HANDLING
## 16.1      How Supplied
Saxenda is available in the following package sizes containing disposable, pre-filled, multi-dose pens. Each individual pen delivers doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg (6 mg/mL, 3 mL).

3 x Saxenda pen NDC 0169-2800-13
5 x Saxenda pen NDC 0169-2800-15

Each Saxenda pen is for use by a single patient. A Saxenda pen should never be shared between patients, even if the needle is changed.

## 16.2      Recommended Storage
Prior to first use, Saxenda should be stored in a refrigerator between 36ºF to 46ºF (2ºC to 8ºC) (Table 7). Do not store in the freezer or directly adjacent to the refrigerator cooling element. Do not freeze Saxenda and do not use Saxenda if it has been frozen.

After initial use of the Saxenda pen, the pen can be stored for 30 days at controlled room temperature (59°F to 86°F; 15°C to 30°C) or in a refrigerator (36°F to 46°F; 2°C to 8°C). Keep the pen cap on when not in use. Saxenda should be protected from excessive heat and sunlight. Always remove and safely discard the needle after each injection and store the Saxenda pen without an injection needle attached. This will reduce the potential for contamination, infection, and leakage while also ensuring dosing accuracy.

1

**Table 7.        Recommended Storage Conditions for Saxenda**

| Prior to first use | After first use | |
|---|---|---|
| Refrigerated<br>36°F to 46°F<br>(2°C to 8°C) | Room Temperature<br>59°F to 86°F<br>(15°C to 30°C) | Refrigerated<br>36°F to 46°F<br>(2°C to 8°C) |
| Until expiration date | 30 days | |

## 17        PATIENT COUNSELING INFORMATION

### 17.1        FDA-Approved Medication Guide

See FDA-Approved Medication Guide.

### 17.2        Instructions

Saxenda is indicated for chronic weight management in conjunction with a reduced-calorie diet and increased physical activity.

Advise patients to take Saxenda exactly as prescribed. Patients should be instructed to follow the dose escalation schedule and not to take more than the recommended dose of Saxenda.

Instruct patients to discontinue use of Saxenda if they have not achieved 4% weight loss by 16 weeks of treatment.

### 17.3        Risk of Thyroid C-cell Tumors

Inform patients that liraglutide causes benign and malignant thyroid C-cell tumors in mice and rats and that the human relevance of this finding has not been determined. Counsel patients to report symptoms of thyroid tumors (e.g., a lump in the neck, hoarseness, dysphagia or dyspnea) to their physician *[see Boxed Warning and Warnings and Precautions (5.1)]*.

### 17.4        Acute Pancreatitis

Patients should be informed of the potential risk for acute pancreatitis. Explain that persistent severe abdominal pain that may radiate to the back and which may or may not be accompanied by vomiting, is the hallmark symptom of acute pancreatitis. Instruct patients to discontinue Saxenda promptly and contact their physician if persistent severe abdominal pain occurs.

### 17.5        Acute Gallbladder Disease

Patients should be informed that substantial or rapid weight loss can increase the risk of cholelithiasis. Cholelithiasis may also occur in the absence of substantial or rapid weight loss. Patients should be instructed to contact their physician if cholelithiasis is suspected for appropriate clinical follow-up.

### 17.6        Hypoglycemia in Patients with Type 2 Diabetes Mellitus on Anti-Diabetic Therapy

Patients with type 2 diabetes mellitus on anti-diabetic therapy should be advised to monitor their blood glucose levels and report symptoms of hypoglycemia to their physician.

### 17.7        Heart Rate Increase

Patients should be informed to report symptoms of sustained periods of heart pounding or racing while at rest to their physician. For patients who experience a sustained increase in resting heart rate while taking Saxenda, Saxenda should be discontinued.

### 17.8        Dehydration and Renal Impairment

1

Patients treated with Saxenda should be advised of the potential risk of dehydration due to gastrointestinal adverse reactions and take precautions to avoid fluid depletion. Patients should be informed of the potential risk for worsening renal function, which in some cases may require dialysis.

### 17.9   Hypersensitivity Reactions
Patients should be informed that serious hypersensitivity reactions have been reported during use of liraglutide. If symptoms of hypersensitivity reactions occur, patients must stop taking Saxenda and seek medical advice promptly.

### 17.10   Suicidal Behavior and Ideation
Patients treated with Saxenda should be advised to report emergence or worsening of depression, suicidal thoughts or behavior, and/or any unusual changes in mood or behavior. Patients should be informed that if they experience suicidal thoughts or behaviors, Saxenda should be discontinued.

### 17.11   Jaundice and Hepatitis
Inform patients that jaundice and hepatitis have been reported during postmarketing use of liraglutide. Instruct patients to contact their physician if they develop jaundice.

### 17.12   Never Share a Saxenda Pen Between Patients
Patients should be informed that they should never share a Saxenda pen with another person, even if the needle is changed. Sharing of the pen between patients may pose a risk of transmission of infection.

Version: 1

Saxenda® and Victoza® are registered trademarks of Novo Nordisk A/S.

Saxenda® is covered by US Patent Nos. 6,268,343, 6,458,924, 7,235,627, 8,114,833 and other patents pending.

Saxenda® pen is covered by US Patent Nos. 6,899,699, 7,686,786, 8,672,898, 8,684,969 and other patents pending.

© 2014 Novo Nordisk

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark

For information about Saxenda contact:
Novo Nordisk Inc.
800 Scudders Mill Road
Plainsboro, NJ 08536

1-844-363-4448

**Medication Guide**
**Saxenda® (sax-end-ah)**
**(liraglutide [rDNA origin])**
**Injection**

Read this Medication Guide and Patient Instructions for Use that come with Saxenda before you start using Saxenda and each time you get a refill. There may be new information.  This Medication Guide does not take the place of talking with your healthcare provider about your medical condition or your treatment.  If you have questions about Saxenda after reading this information, ask your healthcare provider or pharmacist.

**What is the most important information I should know about Saxenda?**

Serious side effects may happen in people who take Saxenda, including:

1. **Possible thyroid tumors, including cancer**.  During the drug testing process, the medicine in Saxenda caused rats and mice to develop tumors of the thyroid gland. Some of these tumors were cancers. It is not known if Saxenda will cause thyroid tumors or a type of thyroid cancer called medullary thyroid cancer in people. If medullary thyroid cancer occurs, it may lead to death if not detected and treated early. If you develop tumors or cancer of the thyroid, your thyroid may have to be surgically removed.

   • Before you start taking Saxenda, tell your healthcare provider if you or any of your family members have had thyroid cancer, especially medullary thyroid cancer, or Multiple Endocrine Neoplasia syndrome type 2. Do not take Saxenda if you or any of your family members have medullary thyroid cancer, or if you have Multiple Endocrine Neoplasia syndrome type 2. People with these conditions already have a higher chance of developing medullary thyroid cancer in general and should not take Saxenda.

   • While taking Saxenda, tell your healthcare provider if you get a lump or swelling in your neck, hoarseness, trouble swallowing, or shortness of breath. These may be symptoms of thyroid cancer.

2. **Inflammation of the pancreas** (**pancreatitis),** which may be severe and lead to death.

   **Before taking Saxenda, tell your healthcare provider if you have had:**

   • pancreatitis
   • stones in your gallbladder (gallstones)
   • a history of alcoholism
   • high blood triglyceride levels

   These medical conditions can make you more likely to get pancreatitis in general.  It is not known if having these conditions will lead to a higher chance of getting pancreatitis while taking Saxenda.

**While taking Saxenda:**

Stop taking Saxenda and call your healthcare provider right away if you have pain in your stomach area (abdomen) that is severe and will not go away. The pain may happen with or without vomiting.  The pain may be felt going from your abdomen through to your back. This type of pain may be a symptom of pancreatitis.

**What is Saxenda?**

- Saxenda is an injectable prescription medicine that may help some obese adults or overweight adults who also have weight related medical problems lose weight and keep the weight off.

- Saxenda should be used with a reduced calorie diet and increased physical activity.

- Saxenda is not for the treatment of type 2 diabetes mellitus.

- Saxenda and Victoza® have the same active ingredient, liraglutide. Saxenda and Victoza should not be used together.

- Saxenda should not be used with other GLP-1 receptor agonist medicines.

- Saxenda and insulin should not be used together.

- It is not known if Saxenda is safe and effective when taken with other prescription, over-the-counter, or herbal weight loss products.

- It is not known if Saxenda changes your risk of heart problems or stroke or of death due to heart problems or stroke.

- It is not known if Saxenda can be used safely in people who have had pancreatitis.

- It is not known if Saxenda is safe and effective in children under 18 years of age.  Saxenda is not recommended for use in children.

**Who should not use Saxenda?**

**Do not use Saxenda if:**

- you or any of your family members have a history of medullary thyroid cancer.

- you have Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).  This is a disease where people have tumors in more than one gland in their body.

- you are allergic to liraglutide or any of the ingredients in Saxenda. See the end of this Medication Guide for a complete list of ingredients in Saxenda.

    Symptoms of a serious allergic reaction may include:

    o   swelling of your face, lips, tongue, or throat

    o   fainting or feeling dizzy

- o   very rapid heartbeat

- o   problems breathing or swallowing

- o   severe rash or itching

Talk with your healthcare provider if you are not sure if you have any of these conditions.

- are pregnant or planning to become pregnant. Saxenda may harm your unborn baby.

## What should I tell my healthcare provider before using Saxenda?

Before taking Saxenda, tell your healthcare provider if you:

- have any of the conditions listed in the section "What is the most important information I should know about Saxenda?"

- are taking certain medications called GLP-1 receptor agonists.

- are allergic to liraglutide or any of the other ingredients in Saxenda. See the end of this Medication Guide for a list of ingredients in Saxenda.

- have severe problems with your stomach, such as slowed emptying of your stomach (gastroparesis) or problems with digesting food.

- have or have had kidney or liver problems.

- have or have had depression or suicidal thoughts.

- have any other medical conditions.

- are pregnant or plan to become pregnant.  Saxenda may harm your unborn baby. Tell your healthcare provider if you become pregnant while taking Saxenda.  If you are pregnant you should stop using Saxenda.

- are breastfeeding or plan to breastfeed.  It is not known if Saxenda passes into your breast milk.  You and your healthcare provider should decide if you will take Saxenda or breastfeed.  You should not do both without talking with your healthcare provider first.

Tell your healthcare provider about all the medicines you take including prescription and non-prescription medicines, vitamins, and herbal supplements.  Saxenda slows stomach emptying and can affect medicines that need to pass through the stomach quickly.  Saxenda may affect the way some medicines work and some other medicines may affect the way Saxenda works.  Tell your healthcare provider if you take other diabetes medicines, especially sulfonylurea medicines or insulin.

Know the medicines you take.  Keep a list of them with you to show your healthcare provider and pharmacist each time you get a new medicine.

## How should I use Saxenda?

- Use Saxenda exactly as prescribed by your healthcare provider.  Your dose should be increased after using Saxenda for 1 week until you reach

the 3 mg dose.  After that, do not change your dose unless your healthcare provider tells you to.

- Saxenda is injected 1 time each day, at any time during the day.

- You can take Saxenda with or without food.

- Your doctor should start you on a diet and exercise program when you start taking Saxenda.  Stay on this program while you are taking Saxenda.

- Saxenda comes in a prefilled pen.

- Your healthcare provider must teach you how to inject Saxenda before you use it for the first time.  If you have questions or do not understand the instructions, talk to your healthcare provider or pharmacist.  See the Patient Instructions for Use that come with this Medication Guide for detailed information about the right way to use your Saxenda pen.

- Pen needles are not included.  Use the Saxenda pen with Novo Nordisk disposable needles. You may need a prescription to get pen needles from your pharmacist.  Ask your healthcare provider which needle size is best for you.

- When starting a new prefilled Saxenda pen, you must follow the "Check the Saxenda flow with each new pen" (see the detailed Patient Instructions for Use that comes with this Medication Guide).  You only need to do this 1 time with each new pen. You should also do this if you drop your pen.  If you do the "Check the Saxenda flow with each new pen" before each injection, you will run out of medicine too soon.

- Inject your dose of Saxenda under the skin (subcutaneous injection) in your stomach area (abdomen), upper leg (thigh), or upper arm, as instructed by your healthcare provider.  **Do not inject into a vein or muscle.**

- If you take too much Saxenda, call your healthcare provider right away.  Too much Saxenda may cause severe nausea and vomiting.

- If you miss your daily dose of Saxenda, use Saxenda as soon as you remember. Then take your next daily dose as usual on the following day. Do not take an extra dose of Saxenda or increase your dose on the following day to make up for your missed dose. If you miss your dose of Saxenda for **3 days or more**, call your healthcare provider to talk about how to restart your treatment.

- Never share your Saxenda pen or needles with another person.  You may give an infection to them, or get an infection from them.

**What are the possible side effects of Saxenda?**

Saxenda **may cause serious side effects, including:**

- **possible thyroid tumors, including cancer.** See "What is the most important information I should know about Saxenda?"

- **inflammation of the pancreas (pancreatitis).**  See "What is the most important information I should know about Saxenda?"

- **gallbladder problems.**  Saxenda may cause gallbladder problems including gallstones.  Some gallbladder problems need surgery. Call your healthcare provider if you have any of the following symptoms:
  - pain in your upper stomach (abdomen)
  - fever
  - yellowing of your skin or eyes (jaundice)
  - clay-colored stools

- **low blood sugar (hypoglycemia) in people with type 2 diabetes mellitus who also take medicines to treat type 2 diabetes mellitus.** Saxenda can cause low blood sugar in people with type 2 diabetes mellitus who also take medicines used to treat type 2 diabetes mellitus (such as sulfonylureas).  In some people, the blood sugar may get so low that they need another person to help them. If you take a sulfonylurea medicine, the dose may need to be lowered while you use Saxenda. Signs and symptoms of low blood sugar may include:

  - shakiness
  - sweating
  - headache
  - drowsiness
  - weakness
  - dizziness
  - confusion
  - irritability
  - hunger
  - fast heartbeat
  - feeling jittery

  Talk to your healthcare provider about how to recognize and treat low blood sugar. Make sure that your family and other people who are around you a lot know how to recognize and treat low blood sugar. You should check your blood sugar before you start taking Saxenda and while you take Saxenda.

- **increased heart rate.**  Saxenda can increase your heart rate while you are at rest.  Your healthcare provider should check your heart rate while you take Saxenda.  Tell your healthcare provider if you feel your heart racing or pounding in your chest and it lasts for several minutes when taking Saxenda.

- **kidney problems (kidney failure).** Saxenda may cause nausea, vomiting or diarrhea leading to loss of fluids (dehydration). Dehydration may cause kidney failure which can lead to the need for dialysis. This can happen in people who have never had kidney problems before. Drinking plenty of fluids may reduce your chance of dehydration.

Call your healthcare provider right away if you have nausea, vomiting, or diarrhea that does not go away, or if you cannot drink liquids by mouth.

- **serious allergic reactions**. Serious allergic reactions can happen with Saxenda. Stop using Saxenda, and get medical help right away if you

have any symptoms of a serious allergic reaction **See "Who should not use Saxenda?"**

- **depression or thoughts of suicide.**  You should pay attention to any mental changes, especially sudden changes, in your mood, behaviors, thoughts, or feelings.  Call your healthcare provider right away if you have any mental changes that are new, worse, or worry you.

Common side effects of Saxenda include:

- nausea
- diarrhea
- constipation
- low blood sugar (hypoglycemia)
- vomiting
- headache
- decreased appetite
- upset stomach
- tiredness
- dizziness
- stomach pain
- changes in enzyme (lipase) levels in your blood

Nausea is most common when first starting Saxenda, but decreases over time in most people as their body gets used to the medicine.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

These are not all the side effects with Saxenda.  For more information, ask your healthcare provider or pharmacist.

Call your doctor for medical advice about side effects.  You may report side effects to FDA at 1-800-FDA-1088.

**Keep your Saxenda pen, pen needles, and all medicines out of the reach of children.**

**General information about the safe and effective use of Saxenda.**
Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide.  Do not use Saxenda for a condition for which it was not prescribed.  Do not give Saxenda to other people, even if they have the same symptoms you have. It may harm them.

This Medication Guide summarizes the most important information you should know about using Saxenda.  If you would like more information, talk with your healthcare provider.  You can ask your pharmacist or healthcare provider for information about Saxenda that is written for health professionals.

For more information, go to saxenda.com or call 1-844-363-4448.

**What are the ingredients in Saxenda?**

**Active Ingredient:** liraglutide
**Inactive Ingredients:** disodium phosphate dihydrate, propylene glycol, phenol and water for injection



*For more information go to www.saxenda.com*

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark

For information about Saxenda contact:
Novo Nordisk Inc.
800 Scudders Mill Road
Plainsboro, NJ 08536
1-844-363-4448

Issued: December 2014
Version: 1

This Medication Guide has been approved by the U.S. Food and Drug Administration.

Saxenda®, Victoza®, NovoFine®, and NovoTwist® are registered trademarks of Novo Nordisk A/S.

Saxenda® is covered by US Patent Nos. 6,268,343, 6,458,924, 7,235,627 and 8,114,833 and other patents pending.

Saxenda® pen is covered by US Patent Nos. 6,899,699, 7,686,786, 8,672,898, 8,684,969 and other patents pending.

© 2014 Novo Nordisk



## Instructions for Use

- **Read these instructions carefully before using your Saxenda® pen.**

- **Do not use your pen without proper training from your healthcare provider.** Make sure that you know how to give yourself an injection with the pen before you start your treatment.

⚠ **If you are blind or have poor eyesight and cannot read the dose counter on the pen, do not use this pen without help.** Get help from a person with good eyesight who is trained to use the Saxenda pen.

- **You can refresh your training at any time by watching the online training video at [www.saxenda.com](http://www.saxenda.com).**

- **Start by checking your pen to make sure that it contains Saxenda, then look at the pictures below to get to know the different parts of your pen and needle.**

- **Your pen is a prefilled dial-a-dose pen.** It contains 18 mg of liraglutide, and you can select doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg and 3 mg. Your pen is made to be used with **NovoFine® or NovoTwist®** disposable needles up to a length of 8 mm.

**Saxenda pen and needle (example)**



Pen cap

Pen scale

Pen window

Dose counter
Dose pointer

Dose selector
Dose button

**NovoFine**

Outer needle cap

Inner needle cap

Needle

Paper tab

**NovoTwist**

Outer needle cap

Inner needle cap

Needle

Paper tab

Flow check symbol

**Step 1. Prepare your pen with a new needle**

- **Wash your hands** with soap and water.
- **Check the name and colored label** of your pen, to make sure that it contains Saxenda. This is especially important if you take more than 1 type of medicine.
- **Pull off the pen cap.**

- **Check that Saxenda in your pen is clear** and colorless. Look through the pen window. If Saxenda looks cloudy, do not use the pen.

- **Take a new needle,** and tear off the paper tab.

NovoFine®   NovoTwist®

- **Push the needle straight onto the pen. Turn until it is on tight.**

- **Pull off the outer needle cap.** Do not throw it away.

- **Pull off the inner needle cap** and throw it away.

  A drop of Saxenda may appear at the needle tip. This is normal, but you must still check the Saxenda flow, if you use a new pen for the first time.

⚠ **Always use a new needle for each injection.**

  This will prevent contamination, infection, leakage of Saxenda, and blocked needles leading to the wrong  dose.

  **Never use a bent or damaged needle.**

ⓘ **Do not attach a new needle** to your pen until you are ready to take your injection.

**Step 2. Check the Saxenda flow with each new pen.**



G

- Check the Saxenda flow **before your first injection with each new pen.**

  If your Saxenda pen is already in use, go to Step 3 "Select your dose".

- Turn the dose selector **until the dose counter shows the flow check symbol ( •• — ).**

Flow check symbol selected



H

- Hold the pen with the needle pointing up.

  **Press and hold in the dose button** until the dose counter shows 0. The 0 must line up with the dose pointer.

  A drop of Saxenda will appear at the needle tip.

- **If no drop appears,** repeat Step 2 above as shown in Figures **G** and **H** up to 6 times. If there is still no drop, change the needle and repeat Step 2 as shown in Figures **G** and **H** 1 more time.

  **Do not use the pen** if a drop of Saxenda still does not appear**.** Contact Novo Nordisk at 1-877-484-2869.

⚠ **Always make sure that a drop appears** at the needle tip before you use a new pen for the first time. This makes sure that Saxenda flows.

  If no drop appears, you will **not** inject any Saxenda, even though the dose counter may move. **This may mean that there is a blocked or damaged needle.**

ⓘ A small drop may remain at the needle tip, but it will not be injected.

  **Only check the Saxenda flow before your first injection with each new pen.**

**Step 3. Select your dose**



I

- **Turn the dose selector until the dose counter shows your dose (0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg).**

  Make sure you know the dose of Saxenda you should use.

  If you select the wrong dose, you can turn the dose selector forward or backwards to the correct dose.

⚠ **Always use the dose counter and the dose pointer to see how many mg you select.**

  You will hear a "click" every time you turn the dose selector.  **Do not set the dose by counting the number of clicks you hear.**

  Do not use the pen scale to set the dose. It does not show exactly how much Saxenda is left in your pen.

  **Only doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg can be selected with the dose selector.** The selected dose must line up exactly with the dose pointer to make sure that you get a correct dose.

ⓘ The dose selector changes the dose. Only the dose counter

Example
0.6 mg selected

and dose pointer will show how many mg you select for each dose.

You can select up to 3 mg each dose. When your pen contains less than 3 mg the dose counter stops before 3 mg is shown.

The dose selector clicks differently when turned forward, backwards or past the number of mg left. Do not count the pen clicks.

---

ⓘ **How much Saxenda is left?**

- The **pen scale** shows you about how much Saxenda is left in your pen.



---

- **To see how much Saxenda is left,** use the dose counter:

  Turn the dose selector until the **dose counter** stops.

  If it shows 3, **at least 3 mg** are left in your pen. If the **dose counter stops before 3 mg,** there is not enough Saxenda left for a full dose of 3 mg.

ⓘ **If you need more Saxenda than what is left in your pen**

Only if trained or told by your healthcare provider, you may split your dose between your current pen and a new pen. Use a calculator to plan the doses as instructed by your healthcare provider.

⚠ **Be very careful to calculate correctly.**

  If you are not sure how to split your dose using 2 pens, then select and inject the dose you need with a new pen.



---

**Step 4. Inject your dose**

- **Insert the needle into your skin** as your healthcare provider has shown you.

- **Make sure you can see the dose counter.** Do not cover it with your fingers. This could stop the injection.



---

- **Press and hold down the dose button until the dose counter shows 0.** The 0 must line up with the dose pointer. You may then hear or feel a click.



- **Keep the needle in your skin after** the dose counter has returned to 0 and **count slowly to 6.**
- If the needle is removed earlier, you may see a stream of Saxenda coming from the needle tip. If this happens, the full dose will not be delivered.



- **Remove the needle from your skin.**

  If blood appears at the injection site, press lightly. Do not rub the area.

⚠ **Always watch the dose counter to know how many mg you inject.** Hold the dose button down until the dose counter shows 0.

**How to identify a blocked or damaged needle?**

- If 0 does not appear in the dose counter after continuously pressing the dose button, you may have used a blocked or damaged needle.
- If this happens you have **not** received **any** Saxenda even though the dose counter has moved from the original dose that you have set.

**How to handle a blocked needle?**

Change the needle as described in Step 5, and repeat all steps starting with Step 1: **"Prepare your pen with a new needle".** Make sure you select the full dose you need.

**Never touch the dose counter when you inject.** This can stop the injection.

ⓘ You may see a drop of Saxenda at the needle tip after injecting. This is normal and does not affect your dose.



**Step 5. After your injection**

- **Carefully remove the needle from the pen.** Do not put the needle caps back on the needle, to avoid needle sticks.



- **Place the needle in a sharps container** right away to reduce the risk of needle sticks.



- **Put the pen cap on** your pen after each use to protect Saxenda from light.



ⓘ If you do not have a sharps container, follow a 1-handed needle recapping method. Carefully slip the needle into the outer needle cap. Dispose of the needle in a sharps container as soon as possible.



⚠ **Never try to put the inner needle cap back on the needle.** You may stick yourself with the needle.

**Always remove the needle from your pen.**

This prevents contamination, infection, leakage of Saxenda, and blocked needles leading to the wrong dose.  If the needle is blocked, you will **not** inject any Saxenda.

ⓘ **Always dispose of the needle after each injection**.

- **Do not throw away in the household trash.** Put the needle and any empty Saxenda pen or any pen used for 30 days still containing Saxenda in a FDA-cleared sharps disposal container right away after use.

- If you do not have a FDA-cleared sharps disposal container, you may use a household container that is:

  o made of a heavy-duty plastic

  o can be closed with a tight-fitting, puncture-resistant lid, without sharps being able to come out upright and stable during use

  o leak-resistant

  o properly labeled to warn of hazardous waste inside the container

- When your sharps disposal container is almost full, you will need to follow your community guidelines for the right way to dispose of your sharps disposal container. There may be state or local laws about how you should throw away used needles and syringes. For more information about the safe sharps disposal, and for specific information about sharps disposal in the state that you live in, go to the FDA's website at: http://www.fda.gov/safesharpsdisposal

- Do not dispose of your used sharps disposal container in your household trash unless your community guidelines permit this. Do not recycle your used sharps disposal container.

- Safely dispose of Saxenda that is out of date or no longer

| | |
|---|---|
| needed. | |

| | |
|---|---|
| ⚠ **Important** <br> • Caregivers must **be very careful when handling used needles** to prevent needle sticks and cross infection. <br> • Never use a syringe to withdraw Saxenda from your pen. <br> • **Always carry an extra pen and new needles** with you, in case of loss or damage. <br> • Always keep your pen and needles **out of reach of others,** especially children. <br> • **Do not share your Saxenda pen or needles with anyone else.** You may give an infection to them or get an infection from them. <br> • **Always keep your pen with you.** Do not leave it in a car or other place where it can get too hot or too cold. | |
| **Caring for your pen** <br> • **Do not drop your pen or** knock it against hard surfaces. If you drop it or suspect a problem, attach a new needle and check the Saxenda flow before you inject. <br> • **Do not try to repair your pen** or pull it apart. <br> • **Do not expose your pen to dust, dirt or liquid.** <br> • **Do not wash, soak, or lubricate your pen.** If necessary, clean it with mild detergent on a moistened cloth. <br><br> **How should I store my Saxenda pen?** <br> • Store your **new, unused** Saxenda pens in the refrigerator at 36°F to 46°F (2°C to 8°C). <br> • **Store your pen in use** for 30 days at 59ºF to 86ºF (15ºC to 30ºC) or in a refrigerator at 36°F to 46°F (2°C to 8°C). <br> • The Saxenda pen you are using should be thrown away after 30 days, even if it still has Saxenda left in it. <br> • **Do not** freeze Saxenda. **Do not** use Saxenda if it has been frozen. <br> • Unused Saxenda pens may be used until the expiration date printed on the label, if kept in the refrigerator. <br> • Keep Saxenda away from heat and out of the light. | |

**This Medication Guide and Instructions for Use have been approved by the U.S. Food and Drug Administration.**

December 2014

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

---------------------------------------------------

JAMES P SMITH
12/23/2014

**Exhibit B**

VICTOZA FDA HIGHLIGHTS OF PRESCRIBING INFORMATION AND MEDICATION
GUIDE - JANUARY 2010

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use Victoza safely and effectively.  See full prescribing information for Victoza.

Victoza® (liraglutide [rDNA origin] injection), solution for subcutaneous use
Initial U.S. Approval: 2010

---

**WARNING: RISK OF THYROID C-CELL TUMORS**
*See full prescribing information for complete boxed warning.*
- **Liraglutide causes thyroid C-cell tumors at clinically relevant exposures in rodents.  It is unknown whether Victoza causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as human relevance could not be determined by clinical or nonclinical studies (5.1).**
- **Victoza is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2) (5.1).**

---

-----------------------------INDICATIONS AND USAGE----------------------------
Victoza is a glucagon-like peptide-1 (GLP-1) receptor agonist indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus (1).

**Important Limitations of Use (1.1):**
- Not recommended as first-line therapy for patients inadequately controlled on diet and exercise (5.1).
- Has not been studied sufficiently in patients with a history of pancreatitis. Use caution (5.2).
- Not for treatment of type 1 diabetes mellitus or diabetic ketoacidosis.
- Has not been studied in combination with insulin.

-----------------------DOSAGE AND ADMINISTRATION----------------------
- Administer once daily at any time of day, independently of meals (2).
- Inject subcutaneously in the abdomen, thigh or upper arm (2).
- The injection site and timing can be changed without dose adjustment (2).
- Initiate at 0.6 mg per day for one week.  This dose is intended to reduce gastrointestinal symptoms during initial titration, and is not effective for glycemic control.  After one week, increase the dose to 1.2 mg.  If the 1.2 mg dose does not result in acceptable glycemic control, the dose can be increased to 1.8 mg (2).
- When initiating Victoza, consider reducing the dose of concomitantly-administered insulin secretagogues to reduce the risk of hypoglycemia (2).

------------------------DOSAGE FORMS AND STRENGTHS-----------------------
- Solution for subcutaneous injection, pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg (6 mg/mL, 3 mL) (3).

-----------------------------CONTRAINDICATIONS----------------------------
Do not use in patients with a personal or family history of medullary thyroid carcinoma or in patients with Multiple Endocrine Neoplasia syndrome type 2 (4).

-----------------------WARNINGS AND PRECAUTIONS----------------------
- Thyroid C-cell tumors in animals: Human relevance unknown. Counsel patients regarding the risk of medullary thyroid carcinoma and the symptoms of thyroid tumors (5.1).
- Pancreatitis: In clinical trials, there were more cases of pancreatitis among Victoza-treated patients than among comparator-treated patients.  If pancreatitis is suspected, Victoza and other potentially suspect drugs should be discontinued.  Victoza should not be restarted if pancreatitis is confirmed.  Use with caution in patients with a history of pancreatitis (5.2).
- Serious hypoglycemia: Can occur when Victoza is used with an insulin secretagogue (e.g. a sulfonylurea). Consider lowering the dose of the insulin secretagogue to reduce the risk of hypoglycemia (5.3).
- Macrovascular outcomes: There have been no studies establishing conclusive evidence of macrovascular risk reduction with Victoza or any other antidiabetic drug (5.4).

-----------------------------ADVERSE REACTIONS----------------------------
- The most common adverse reactions, reported in ≥5% of patients treated with Victoza and more commonly than in patients treated with placebo, are: headache, nausea, diarrhea and anti-liraglutide antibody formation (6).
- Immunogenicity-related events, including urticaria, were more common among Victoza-treated patients (0.8%) than among comparator-treated patients (0.4%) in clinical trials (6).

To report SUSPECTED ADVERSE REACTIONS, contact Novo Nordisk Inc. at 1-877-484-2869 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

-----------------------------DRUG INTERACTIONS----------------------------
- Victoza delays gastric emptying.  May impact absorption of concomitantly administered oral medications.  Use caution (7).

-----------------------USE IN SPECIFIC POPULATIONS----------------------
- There are no data in patients below 18 years of age (8.4).
- Use with caution in patients with renal or hepatic impairment. Limited data (8.6, 8.7).

See 17 for PATIENT COUNSELING INFORMATION and FDA-Approved Medication Guide.

Revised: 1/2010

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
BOXED WARNING: RISK OF THYROID C-CELL TUMORS

1    INDICATIONS AND USAGE
       1.1    Important Limitations of Use
2    DOSAGE AND ADMINISTRATION
3    DOSAGE FORMS AND STRENGTHS
4    CONTRAINDICATIONS
5    WARNINGS AND PRECAUTIONS
       5.1    Risk of Thyroid C-cell Tumors
       5.2    Pancreatitis
       5.3    Use with Medications Known to Cause Hypoglycemia
       5.4    Macrovascular Outcomes
6    ADVERSE REACTIONS
       6.1    Clinical Trials Experience
7    DRUG INTERACTIONS
       7.1    Oral Medications
8    USE IN SPECIFIC POPULATIONS
       8.1    Pregnancy
       8.3    Nursing Mothers
       8.4    Pediatric Use
       8.5    Geriatric Use
       8.6    Renal Impairment
       8.7    Hepatic Impairment
       8.8    Gastroparesis

10    OVERDOSAGE
11    DESCRIPTION
12    CLINICAL PHARMACOLOGY
       12.1    Mechanism of Action
       12.2    Pharmacodynamics
       12.3    Pharmacokinetics
13    NONCLINICAL TOXICOLOGY
       13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
14    CLINICAL STUDIES
       14.1    Monotherapy
       14.2    Combination Therapy
16    HOW SUPPLIED/STORAGE AND HANDLING
       16.1    How Supplied
       16.2    Recommended Storage
17    PATIENT COUNSELING INFORMATION
       17.1    Risk of Thyroid C-cell Tumors
       17.2    Pancreatitis
       17.3    Never Share a Victoza Pen Between Patients
       17.4    Instructions
       17.5    Laboratory Tests
       17.6    FDA-Approved Medication Guide

\*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

---

**WARNING:  RISK OF THYROID C-CELL TUMORS**

Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice.  It is unknown whether Victoza causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as human relevance could not be ruled out by clinical or nonclinical studies. Victoza is contraindicated in patients with a personal or family history of MTC and in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Based on the findings in rodents, monitoring with serum calcitonin or thyroid ultrasound was performed during clinical trials, but this may have increased the number of unnecessary thyroid surgeries.  It is unknown whether monitoring with serum calcitonin or thyroid ultrasound will mitigate human risk of thyroid C-cell tumors.  Patients should be counseled regarding the risk and symptoms of thyroid tumors *[see Contraindications (4), Warnings and Precautions (5.1) and Nonclinical Toxicology (13.1)]*.

---

## 1      INDICATIONS AND USAGE

Victoza is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

### 1.1      Important Limitations of Use

- Because of the uncertain relevance of the rodent thyroid C-cell tumor findings to humans, prescribe Victoza only to patients for whom the potential benefits are considered to outweigh the potential risk. Victoza is not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise.

- In clinical trials of Victoza, there were more cases of pancreatitis with Victoza than with comparators. Victoza has not been studied sufficiently in patients with a history of pancreatitis to determine whether these patients are at increased risk for pancreatitis while using Victoza.  Use with caution in patients with a history of pancreatitis.

- Victoza is not a substitute for insulin.  Victoza should not be used in patients with type 1 diabetes mellitus or for the treatment of diabetic ketoacidosis, as it would not be effective in these settings.

- The concurrent use of Victoza and insulin has not been studied.

## 2      DOSAGE AND ADMINISTRATION

Victoza can be administered once daily at any time of day, independently of meals, and can be injected subcutaneously in the abdomen, thigh or upper arm.  The injection site and timing can be changed without dose adjustment.

For all patients, Victoza should be initiated with a dose of 0.6 mg per day for one week.  The 0.6 mg dose is a starting dose intended to reduce gastrointestinal symptoms during initial titration, and is not effective for glycemic control.  After one week at 0.6 mg per day, the dose should be increased to 1.2 mg.  If the 1.2 mg dose does not result in acceptable glycemic control, the dose can be increased to 1.8 mg.

When initiating Victoza, consider reducing the dose of concomitantly administered insulin secretagogues (such as sulfonylureas) to reduce the risk of hypoglycemia *[see Warnings and Precautions (5.3) and Adverse Reactions (6)]*.

Victoza solution should be inspected prior to each injection, and the solution should be used only if it is clear, colorless, and contains no particles.

## 3      DOSAGE FORMS AND STRENGTHS

Solution for subcutaneous injection, pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg (6 mg/mL, 3 mL).

## 4      CONTRAINDICATIONS

Victoza is contraindicated in patients with a personal or family history of medullary thyroid carcinoma (MTC) or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).

## 5      WARNINGS AND PRECAUTIONS
### 5.1     Risk of Thyroid C-cell Tumors

Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors (adenomas and/or carcinomas) at clinically relevant exposures in both genders of rats and mice *[see Nonclinical Toxicology (13.1)]*.  Malignant thyroid C-cell carcinomas were detected in rats and mice. A statistically significant increase in cancer was observed in rats receiving liraglutide at 8-times clinical exposure compared to controls.  It is unknown whether Victoza will cause thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors could not be determined by clinical or nonclinical studies *[see Boxed Warning, Contraindications (4)]*.

In the clinical trials, there have been 4 reported cases of thyroid C-cell hyperplasia among Victoza-treated patients and 1 case in a comparator-treated patient (1.3 vs. 0.6 cases per 1000 patient-years).  One additional case of thyroid C-cell hyperplasia in a Victoza-treated patient and 1 case of MTC in a comparator-treated patient have subsequently been reported. This comparator-treated patient with MTC had pre-treatment serum calcitonin concentrations >1000 ng/L suggesting pre-existing disease.  All of these cases were diagnosed after thyroidectomy, which was prompted by abnormal results on routine, protocol-specified measurements of serum calcitonin. Four of the five liraglutide-treated patients had elevated calcitonin concentrations at baseline and throughout the trial.  One liraglutide and one non-liraglutide-treated patient developed elevated calcitonin concentrations while on treatment.

Calcitonin, a biological marker of MTC, was measured throughout the clinical development program. The serum calcitonin assay used in the Victoza clinical trials had a lower limit of quantification (LLOQ) of 0.7 ng/L and the upper limit of the reference range was 5.0 ng/L for women and 8.4 ng/L for men. At Weeks 26 and 52 in the clinical trials, adjusted mean serum calcitonin concentrations were higher in Victoza-treated patients compared to placebo-treated patients but not compared to patients receiving active comparator. At these timepoints, the adjusted mean serum calcitonin values (~ 1.0 ng/L) were just above the LLOQ with between-group differences in adjusted mean serum calcitonin values of approximately 0.1 ng/L or less. Among patients with pre-treatment serum calcitonin below the upper limit of the reference range, shifts to above the upper limit of the reference range which persisted in subsequent measurements occurred most frequently among patients treated with Victoza 1.8 mg/day.  In trials with on-treatment serum calcitonin measurements out to 5-6 months, 1.9% of patients treated with Victoza 1.8 mg/day developed new and persistent calcitonin elevations above the upper limit of the reference range compared to 0.8-1.1% of patients treated with control medication or the 0.6 and 1.2 mg doses of Victoza. In trials with on-treatment serum calcitonin measurements out to 12 months, 1.3% of patients treated with Victoza 1.8 mg/day had new and persistent elevations of calcitonin from below or within the reference range to above the upper limit of the reference range, compared to 0.6%, 0% and 1.0% of patients treated

with Victoza 1.2 mg, placebo and active control, respectively.  Otherwise, Victoza did not produce consistent dose-dependent or time-dependent increases in serum calcitonin.

Patients with MTC usually have calcitonin values >50 ng/L.  In Victoza clinical trials, among patients with pre-treatment serum calcitonin <50 ng/L, one Victoza-treated patient and no comparator-treated patients developed serum calcitonin >50 ng/L.  The Victoza-treated patient who developed serum calcitonin >50 ng/L had an elevated pre-treatment serum calcitonin of 10.7 ng/L that increased to 30.7 ng/L at Week 12 and 53.5 ng/L at the end of the 6-month trial.  Follow-up serum calcitonin was 22.3 ng/L more than 2.5 years after the last dose of Victoza.  The largest increase in serum calcitonin in a comparator-treated patient was seen with glimepiride in a patient whose serum calcitonin increased from 19.3 ng/L at baseline to 44.8 ng/L at Week 65 and 38.1 ng/L at Week 104.  Among patients who began with serum calcitonin <20 ng/L, calcitonin elevations to >20 ng/L occurred in 0.7% of Victoza-treated patients, 0.3% of placebo-treated patients, and 0.5% of active-comparator-treated patients, with an incidence of 1.1% among patients treated with 1.8 mg/day of Victoza.  The clinical significance of these findings is unknown.

Counsel patients regarding the risk for MTC and the symptoms of thyroid tumors (e.g. a mass in the neck, dysphagia, dyspnea or persistent hoarseness).  It is unknown whether monitoring with serum calcitonin or thyroid ultrasound will mitigate the potential risk of MTC, and such monitoring may increase the risk of unnecessary procedures, due to low test specificity for serum calcitonin and a high background incidence of thyroid disease.  Patients with thyroid nodules noted on physical examination or neck imaging obtained for other reasons should be referred to an endocrinologist for further evaluation.  Although routine monitoring of serum calcitonin is of uncertain value in patients treated with Victoza, if serum calcitonin is measured and found to be elevated, the patient should be referred to an endocrinologist for further evaluation.

## 5.2     Pancreatitis

In clinical trials of Victoza, there were 7 cases of pancreatitis among Victoza-treated patients and 1 case among comparator-treated patients (2.2 vs. 0.6 cases per 1000 patient-years).  Five cases with Victoza were reported as acute pancreatitis and two cases with Victoza were reported as chronic pancreatitis.  In one case in a Victoza-treated patient, pancreatitis, with necrosis, was observed and led to death; however clinical causality could not be established.  One additional case of pancreatitis has subsequently been reported in a Victoza-treated patient.  Some patients had other risk factors for pancreatitis, such as a history of cholelithiasis or alcohol abuse.  There are no conclusive data establishing a risk of pancreatitis with Victoza treatment.  After initiation of Victoza, and after dose increases, observe patients carefully for signs and symptoms of pancreatitis (including persistent severe abdominal pain, sometimes radiating to the back and which may or may not be accompanied by vomiting).  If pancreatitis is suspected, Victoza and other potentially suspect medications should be discontinued promptly, confirmatory tests should be performed and appropriate management should be initiated.  If pancreatitis is confirmed, Victoza should not be restarted.  Use with caution in patients with a history of pancreatitis.

## 5.3     Use with Medications Known to Cause Hypoglycemia

Patients receiving Victoza in combination with an insulin secretagogue (e.g., sulfonylurea) may have an increased risk of hypoglycemia.  In the clinical trials of at least 26 weeks duration, hypoglycemia requiring the assistance of another person for treatment occurred in 7 Victoza-treated patients and in no comparator-treated patients.  Six of these 7 patients treated with Victoza were also taking a sulfonylurea.  The risk of hypoglycemia may be lowered by a reduction in the dose of sulfonylurea or other insulin secretagogues *[see Adverse Reactions (6.1)]*.

**5.4     Macrovascular Outcomes**

There have been no clinical studies establishing conclusive evidence of macrovascular risk reduction with Victoza or any other antidiabetic drug.

**6     ADVERSE REACTIONS**

**6.1     Clinical Trials Experience**

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

The safety of Victoza was evaluated in a 52-week monotherapy trial and in four 26-week, add-on combination therapy trials.  In the monotherapy trial, patients were treated with Victoza 1.2 mg daily, Victoza 1.8 mg daily, or glimepiride 8 mg daily.  In the add-on to metformin trial, patients were treated with Victoza 0.6 mg, Victoza 1.2 mg, Victoza 1.8 mg, placebo, or glimepiride 4 mg.  In the add-on to glimepiride trial, patients were treated with Victoza 0.6 mg, Victoza 1.2 mg, Victoza 1.8 mg, placebo, or rosiglitazone 4 mg.  In the add-on to metformin + glimepiride trial, patients were treated with Victoza 1.8 mg, placebo, or insulin glargine.  In the add-on to metformin + rosiglitazone trial, patients were treated with Victoza 1.2 mg, Victoza 1.8 mg or placebo *[see Clinical Studies (14)]*.

*Withdrawals*

The incidence of withdrawal due to adverse events was 7.8% for Victoza-treated patients and 3.4% for comparator-treated patients in the five controlled trials of 26 weeks duration or longer.  This difference was driven by withdrawals due to gastrointestinal adverse reactions, which occurred in 5.0% of Victoza-treated patients and 0.5% of comparator-treated patients.  The most common adverse reactions leading to withdrawal for Victoza-treated patients were nausea (2.8% versus 0% for comparator) and vomiting (1.5% versus 0.1% for comparator).  Withdrawal due to gastrointestinal adverse events mainly occurred during the first 2-3 months of the trials.

Tables 1 and 2 summarize the adverse events reported in ≥5% of Victoza-treated patients in the five controlled trials of 26 weeks duration or longer.

**Table 1 Adverse events reported in ≥ 5% of Victoza-treated patients or ≥5% of glimepiride-treated patients: 52-week monotherapy trial**

| Adverse Event Term | All Victoza N = 497 (%) | Glimepiride N = 248 (%) |
|---|---|---|
| Nausea | 28.4 | 8.5 |
| Diarrhea | 17.1 | 8.9 |
| Vomiting | 10.9 | 3.6 |
| Constipation | 9.9 | 4.8 |
| Upper Respiratory Tract Infection | 9.5 | 5.6 |
| Headache | 9.1 | 9.3 |
| Influenza | 7.4 | 3.6 |
| Urinary Tract Infection | 6.0 | 4.0 |
| Dizziness | 5.8 | 5.2 |
| Sinusitis | 5.6 | 6.0 |
| Nasopharyngitis | 5.2 | 5.2 |
| Back Pain | 5.0 | 4.4 |
| Hypertension | 3.0 | 6.0 |

**Table 2 Adverse events reported in ≥ 5% of Victoza-treated patients and occurring more frequently with Victoza compared to placebo: 26-week combination therapy trials**

| Add-on to Metformin Trial | | | |
|---|---|---|---|
| | All Victoza + Metformin N = 724 | Placebo + Metformin N = 121 | Glimepiride + Metformin N = 242 |
| **Adverse Event Term** | (%) | (%) | (%) |
| Nausea | 15.2 | 4.1 | 3.3 |
| Diarrhea | 10.9 | 4.1 | 3.7 |
| Headache | 9.0 | 6.6 | 9.5 |
| Vomiting | 6.5 | 0.8 | 0.4 |
| **Add-on to Glimepiride Trial** | | | |
| | All Victoza + Glimepiride N=695 | Placebo + Glimepiride N=114 | Rosiglitazone + Glimepiride N=231 |
| **Adverse Event Term** | (%) | (%) | (%) |
| Nausea | 7.5 | 1.8 | 2.6 |
| Diarrhea | 7.2 | 1.8 | 2.2 |
| Constipation | 5.3 | 0.9 | 1.7 |
| Dyspepsia | 5.2 | 0.9 | 2.6 |
| **Add-on to Metformin + Glimepiride** | | | |
| | Victoza 1.8+ Metformin + Glimepiride N = 230 | Placebo + Metformin + Glimepiride N = 114 | Glargine + Metformin + Glimepiride N = 232 |
| **Adverse Event Term** | (%) | (%) | (%) |
| Nausea | 13.9 | 3.5 | 1.3 |
| Diarrhea | 10.0 | 5.3 | 1.3 |
| Headache | 9.6 | 7.9 | 5.6 |
| Dyspepsia | 6.5 | 0.9 | 1.7 |
| Vomiting | 6.5 | 3.5 | 0.4 |
| **Add-on to Metformin + Rosiglitazone** | | | |
| | All Victoza + Metformin + Rosiglitazone N = 355 | Placebo + Metformin + Rosiglitazone N = 175 | |
| **Adverse Event Term** | (%) | (%) | |
| Nausea | 34.6 | 8.6 | |
| Diarrhea | 14.1 | 6.3 | |
| Vomiting | 12.4 | 2.9 | |
| Decreased Appetite | 9.3 | 1.1 | |
| Anorexia | 9.0 | 0.0 | |
| Headache | 8.2 | 4.6 | |
| Constipation | 5.1 | 1.1 | |
| Fatigue | 5.1 | 1.7 | |

*Gastrointestinal adverse events*
In the five clinical trials of 26 weeks duration or longer, gastrointestinal adverse events were reported in 41% of Victoza-treated patients and were dose-related. Gastrointestinal adverse events occurred in 17% of comparator-treated patients. Events that occurred more commonly among Victoza-treated patients included nausea, vomiting, diarrhea, dyspepsia and constipation. In clinical trials of 26 weeks duration or longer, the percentage of patients who reported nausea declined over time. Approximately 13% of Victoza-treated patients and 2% of comparator-treated patients reported nausea during the first 2 weeks of treatment.

*Immunogenicity*

Consistent with the potentially immunogenic properties of protein and peptide pharmaceuticals, patients treated with Victoza may develop anti-liraglutide antibodies.  Approximately 50-70% of Victoza-treated patients in the five clinical trials of 26 weeks duration or longer were tested for the presence of anti-liraglutide antibodies at the end of treatment.  Low titers (concentrations not requiring dilution of serum) of anti-liraglutide antibodies were detected in 8.6% of these Victoza-treated patients.  Sampling was not performed uniformly across all patients in the clinical trials, and this may have resulted in an underestimate of the actual percentage of patients who developed antibodies.  Cross-reacting anti-liraglutide antibodies to native glucagon-like peptide-1 (GLP-1) occurred in 6.9% of the Victoza-treated patients in the 52-week monotherapy trial and in 4.8% of the Victoza-treated patients in the 26-week add-on combination therapy trials.  These cross-reacting antibodies were not tested for neutralizing effect against native GLP-1, and thus the potential for clinically significant neutralization of native GLP-1 was not assessed.  Antibodies that had a neutralizing effect on liraglutide in an *in vitro* assay occurred in 2.3% of the Victoza-treated patients in the 52-week monotherapy trial and in 1.0% of the Victoza-treated patients in the 26-week add-on combination therapy trials.

Among Victoza-treated patients who developed anti-liraglutide antibodies, the most common category of adverse events was that of infections, which occurred among 40% of these patients compared to 36%, 34% and 35% of antibody-negative Victoza-treated, placebo-treated and active-control-treated patients, respectively.  The specific infections which occurred with greater frequency among Victoza-treated antibody-positive patients were primarily nonserious upper respiratory tract infections, which occurred among 11% of Victoza-treated antibody-positive patients; and among 7%, 7% and 5% of antibody-negative Victoza-treated, placebo-treated and active-control-treated patients, respectively.  Among Victoza-treated antibody-negative patients, the most common category of adverse events was that of gastrointestinal events, which occurred in 43%, 18% and 19% of antibody-negative Victoza-treated, placebo-treated and active-control-treated patients, respectively.  Antibody formation was not associated with reduced efficacy of Victoza when comparing mean $HbA_{1c}$ of all antibody-positive and all antibody-negative patients.  However, the 3 patients with the highest titers of anti-liraglutide antibodies had no reduction in $HbA_{1c}$ with Victoza treatment.

In clinical trials of Victoza, events from a composite of adverse events potentially related to immunogenicity (e.g. urticaria, angioedema) occurred among 0.8% of Victoza-treated patients and among 0.4% of comparator-treated patients.  Urticaria accounted for approximately one-half of the events in this composite for Victoza-treated patients.  Patients who developed anti-liraglutide antibodies were not more likely to develop events from the immunogenicity events composite than were patients who did not develop anti-liraglutide antibodies.

*Injection site reactions*

Injection site reactions (e.g., injection site rash, erythema) were reported in approximately 2% of Victoza-treated patients in the five clinical trials of at least 26 weeks duration.  Less than 0.2% of Victoza-treated patients discontinued due to injection site reactions.

*Papillary thyroid carcinoma*

In clinical trials of Victoza, there were 6 reported cases of papillary thyroid carcinoma in patients treated with Victoza and 1 case in a comparator-treated patient (1.9 vs. 0.6 cases per 1000 patient-years).  Most of these papillary thyroid carcinomas were <1 cm in greatest diameter and were diagnosed in surgical pathology specimens after thyroidectomy prompted by findings on protocol-specified screening with serum calcitonin or thyroid ultrasound.

*Hypoglycemia*

In the clinical trials of at least 26 weeks duration, hypoglycemia requiring the assistance of another person for treatment occurred in 7 Victoza-treated patients (2.6 cases per 1000 patient-years) and in no comparator-treated patients.  Six of these 7 patients treated with Victoza were also taking a sulfonylurea. One other patient was taking Victoza in combination with metformin but had another likely explanation for the hypoglycemia (this event occurred during hospitalization and after insulin infusion) (Table 3). Two additional cases of hypoglycemia requiring the assistance of another person for treatment have subsequently been reported in patients who were not taking a concomitant sulfonylurea. Both patients were receiving Victoza, one as monotherapy and the other in combination with metformin. Both patients had another likely explanation for the hypoglycemia (one received insulin during a frequently-sampled intravenous glucose tolerance test, and the other had intracranial hemorrhage and uncertain food intake).

**Table 3 Incidence (%) and Rate (episodes/patient year) of Hypoglycemia in the 52-Week Monotherapy Trial and in the 26-Week Combination Therapy Trials**

| | **Victoza Treatment** | **Active Comparator** | **Placebo Comparator** |
|---|---|---|---|
| **Monotherapy** | **Victoza** (N = 497) | **Glimepiride** (N = 248) | **None** |
| Patient not able to self-treat | 0 | 0 | - |
| Patient able to self-treat | 9.7 (0.24) | 25.0 (1.66) | - |
| Not classified | 1.2 (0.03) | 2.4 (0.04) | - |
| **Add-on to Metformin** | **Victoza + Metformin** (N = 724) | **Glimepiride + Metformin** (N = 242) | **Placebo + Metformin** (N = 121) |
| Patient not able to self-treat | 0.1 (0.001) | 0 | 0 |
| Patient able to self-treat | 3.6 (0.05) | 22.3 (0.87) | 2.5 (0.06) |
| **Add-on to Glimepiride** | **Victoza + Glimepiride** (N = 695) | **Rosiglitazone + Glimepiride** (N = 231) | **Placebo + Glimepiride** (N = 114) |
| Patient not able to self-treat | 0.1 (0.003) | 0 | 0 |
| Patient able to self-treat | 7.5 (0.38) | 4.3 (0.12) | 2.6 (0.17) |
| Not classified | 0.9 (0.05) | 0.9 (0.02) | 0 |
| **Add-on to Metformin + Rosiglitazone** | **Victoza + Metformin + Rosiglitazone** (N = 355) | **None** | **Placebo + Metformin + Rosiglitazone** (N = 175) |
| Patient not able to self-treat | 0 | - | 0 |
| Patient able to self-treat | 7.9 (0.49) | - | 4.6 (0.15) |
| Not classified | 0.6 (0.01) | - | 1.1 (0.03) |
| **Add-on to Metformin + Glimepiride** | **Victoza + Metformin + Glimepiride** (N = 230) | **Insulin glargine + Metformin + Glimepiride** (N = 232) | **Placebo + Metformin + Glimepiride** (N = 114) |
| Patient not able to self-treat | 2.2 (0.06) | 0 | 0 |
| Patient able to self-treat | 27.4 (1.16) | 28.9 (1.29) | 16.7 (0.95) |
| Not classified | 0 | 1.7 (0.04) | 0 |

In a pooled analysis of clinical trials, the incidence rate (per 1,000 patient-years) for malignant neoplasms (based on investigator-reported events, medical history, pathology reports, and surgical reports from both blinded and open-label study periods) was 10.9 for Victoza, 6.3 for placebo, and 7.2 for active comparator. After excluding papillary thyroid carcinoma events *[see Adverse Reactions (6.1)]*, no particular cancer cell type predominated. Seven malignant neoplasm events were reported beyond 1 year of exposure to study medication, six events among Victoza-treated patients (4 colon, 1 prostate and 1 nasopharyngeal), no events with placebo and one event with active comparator (colon). Causality has not been established.

**Laboratory Tests**
In the five clinical trials of at least 26 weeks duration, mildly elevated serum bilirubin concentrations (elevations to no more than twice the upper limit of the reference range) occurred in 4.0% of Victoza-treated patients, 2.1% of placebo-treated patients and 3.5% of active-comparator-treated patients. This finding was not accompanied by abnormalities in other liver tests. The significance of this isolated finding is unknown.

## 7      DRUG INTERACTIONS
### 7.1    Oral Medications
Victoza causes a delay of gastric emptying, and thereby has the potential to impact the absorption of concomitantly administered oral medications. In clinical pharmacology trials, Victoza did not affect the absorption of the tested orally administered medications to any clinically relevant degree. Nonetheless, caution should be exercised when oral medications are concomitantly administered with Victoza.

## 8      USE IN SPECIFIC POPULATIONS
### 8.1    Pregnancy
Pregnancy Category C.
There are no adequate and well-controlled studies of Victoza in pregnant women. Victoza should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. Liraglutide has been shown to be teratogenic in rats at or above 0.8 times the human systemic exposures resulting from the maximum recommended human dose (MRHD) of 1.8 mg/day based on plasma area under the time-concentration curve (AUC). Liraglutide has been shown to cause reduced growth and increased total major abnormalities in rabbits at systemic exposures below human exposure at the MRHD based on plasma AUC.

Female rats given subcutaneous doses of 0.1, 0.25 and 1.0 mg/kg/day liraglutide beginning 2 weeks before mating through gestation day 17 had estimated systemic exposures 0.8-, 3-, and 11-times the human exposure at the MRHD based on plasma AUC comparison. The number of early embryonic deaths in the 1 mg/kg/day group increased slightly. Fetal abnormalities and variations in kidneys and blood vessels, irregular ossification of the skull, and a more complete state of ossification occurred at all doses. Mottled liver and minimally kinked ribs occurred at the highest dose. The incidence of fetal malformations in liraglutide-treated groups exceeding concurrent and historical controls were misshapen oropharynx and/or narrowed opening into larynx at 0.1 mg/kg/day and umbilical hernia at 0.1 and 0.25 mg/kg/day.

Pregnant rabbits given subcutaneous doses of 0.01, 0.025 and 0.05 mg/kg/day liraglutide from gestation day 6 through day 18 inclusive, had estimated systemic exposures less than the human exposure at the MRHD of 1.8 mg/day at all doses, based on plasma AUC. Liraglutide decreased fetal weight and dose-dependently increased the incidence of total major fetal abnormalities at all doses. The incidence of

malformations exceeded concurrent and historical controls at 0.01 mg/kg/day (kidneys, scapula), ≥ 0.01 mg/kg/day (eyes, forelimb), 0.025 mg/kg/day (brain, tail and sacral vertebrae, major blood vessels and heart, umbilicus), ≥ 0.025 mg/kg/day (sternum) and at 0.05 mg/kg/day (parietal bones, major blood vessels). Irregular ossification and/or skeletal abnormalities occurred in the skull and jaw, vertebrae and ribs, sternum, pelvis, tail, and scapula; and dose-dependent minor skeletal variations were observed. Visceral abnormalities occurred in blood vessels, lung, liver, and esophagus. Bilobed or bifurcated gallbladder was seen in all treatment groups, but not in the control group.

In pregnant female rats given subcutaneous doses of 0.1, 0.25 and 1.0 mg/kg/day liraglutide from gestation day 6 through weaning or termination of nursing on lactation day 24, estimated systemic exposures were 0.8-, 3-, and 11-times human exposure at the MRHD of 1.8 mg/day, based on plasma AUC. A slight delay in parturition was observed in the majority of treated rats. Group mean body weight of neonatal rats from liraglutide-treated dams was lower than neonatal rats from control group dams. Bloody scabs and agitated behavior occurred in male rats descended from dams treated with 1 mg/kg/day liraglutide. Group mean body weight from birth to postpartum day 14 trended lower in $F_2$ generation rats descended from liraglutide-treated rats compared to $F_2$ generation rats descended from controls, but differences did not reach statistical significance for any group.

**8.3     Nursing Mothers**
It is not known whether Victoza is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for tumorigenicity shown for liraglutide in animal studies, a decision should be made whether to discontinue nursing or to discontinue Victoza, taking into account the importance of the drug to the mother. In lactating rats, liraglutide was excreted unchanged in milk at concentrations approximately 50% of maternal plasma concentrations.

**8.4     Pediatric Use**
Safety and effectiveness of Victoza have not been established in pediatric patients. Victoza is not recommended for use in pediatric patients.

**8.5     Geriatric Use**
In the Victoza clinical trials, a total of 797 (20%) of the patients were 65 years of age and over and 113 (2.8%) were 75 years of age and over. No overall differences in safety or effectiveness were observed between these patients and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

**8.6     Renal Impairment**
There is limited experience in patients with mild, moderate, and severe renal impairment, including end-stage renal disease. Therefore, Victoza should be used with caution in this patient population. No dose adjustment of Victoza is recommended for patients with renal impairment *[see Clinical Pharmacology (12.3)]*.

**8.7     Hepatic Impairment**
There is limited experience in patients with mild, moderate or severe hepatic impairment. Therefore, Victoza should be used with caution in this patient population. No dose adjustment of Victoza is recommended for patients with hepatic impairment *[see Clinical Pharmacology (12.3)]*.

**8.8     Gastroparesis**
Victoza slows gastric emptying. Victoza has not been studied in patients with pre-existing gastroparesis.

## 10      OVERDOSAGE

In a clinical trial, one patient with type 2 diabetes experienced a single overdose of Victoza 17.4 mg subcutaneous (10 times the maximum recommended dose).  Effects of the overdose included severe nausea and vomiting requiring hospitalization.  No hypoglycemia was reported.  The patient recovered without complications.  In the event of overdosage, appropriate supportive treatment should be initiated according to the patient's clinical signs and symptoms.

## 11      DESCRIPTION

Victoza contains liraglutide, an analog of human GLP-1 and acts as a GLP-1 receptor agonist.  The peptide precursor of liraglutide, produced by a process that includes expression of recombinant DNA in *Saccharomyces cerevisiae,* has been engineered to be 97% homologous to native human GLP-1 by substituting arginine for lysine at position 34.  Liraglutide is made by attaching a C-16 fatty acid (palmitic acid) with a glutamic acid spacer on the remaining lysine residue at position 26 of the peptide precursor.  The molecular formula of liraglutide is $C_{172}H_{265}N_{43}O_{51}$ and the molecular weight is 3751.2 Daltons.  The structural formula (Figure 1) is:



**Figure 1 Structural Formula of liraglutide**

Victoza is a clear, colorless solution.  Each 1 mL of Victoza solution contains 6 mg of liraglutide.  Each pre-filled pen contains a 3 mL solution of Victoza equivalent to 18 mg liraglutide (free-base, anhydrous) and the following inactive ingredients: disodium phosphate dihydrate, 1.42 mg; propylene glycol, 14 mg; phenol, 5.5 mg; and water for injection.

## 12      CLINICAL PHARMACOLOGY

### 12.1      Mechanism of Action

Liraglutide is an acylated human Glucagon-Like Peptide-1 (GLP-1) receptor agonist with 97% amino acid sequence homology to endogenous human GLP-1(7-37).  GLP-1(7-37) represents <20% of total circulating endogenous GLP-1.  Like GLP-1(7-37), liraglutide activates the GLP-1 receptor, a membrane-bound cell-surface receptor coupled to adenylyl cyclase by the stimulatory G-protein, Gs, in pancreatic beta cells.  Liraglutide increases intracellular cyclic AMP (cAMP) leading to insulin release in the presence of elevated glucose concentrations.  This insulin secretion subsides as blood glucose concentrations decrease and approach euglycemia.  Liraglutide also decreases glucagon secretion in a glucose-dependent manner.  The mechanism of blood glucose lowering also involves a delay in gastric emptying.

GLP-1(7-37) has a half-life of 1.5-2 minutes due to degradation by the ubiquitous endogenous enzymes, dipeptidyl peptidase IV (DPP-IV) and neutral endopeptidases (NEP).  Unlike native GLP-1, liraglutide is stable against metabolic degradation by both peptidases and has a plasma half-life of 13 hours after subcutaneous administration.  The pharmacokinetic profile of liraglutide, which makes it suitable for once daily administration, is a result of self-association that delays absorption, plasma protein binding and stability against metabolic degradation by DPP-IV and NEP.

## 12.2    Pharmacodynamics

Victoza's pharmacodynamic profile is consistent with its pharmacokinetic profile observed after single subcutaneous administration as Victoza lowered fasting, premeal and postprandial glucose throughout the day *[see Clinical Pharmacology (12.3)]*.

Fasting and postprandial glucose was measured before and up to 5 hours after a standardized meal after treatment to steady state with 0.6, 1.2 and 1.8 mg Victoza or placebo.  Compared to placebo, the postprandial plasma glucose $AUC_{0-300min}$ was 35% lower after Victoza 1.2 mg and 38% lower after Victoza 1.8 mg.

### Glucose-dependent insulin secretion
The effect of a single dose of 7.5 mcg/kg (~ 0.7 mg) Victoza on insulin secretion rates (ISR) was investigated in 10 patients with type 2 diabetes during graded glucose infusion.  In these patients, on average, the ISR response was increased in a glucose-dependent manner (Figure 2).



**Figure 2 Mean Insulin Secretion Rate (ISR) versus Glucose Concentration Following Single-Dose Victoza 7.5 mcg/kg (~0.7 mg) or Placebo in Patients with Type 2 Diabetes (N=10) During Graded Glucose Infusion**

### Glucagon secretion
Victoza lowered blood glucose by stimulating insulin secretion and lowering glucagon secretion.  A single dose of Victoza 7.5 mcg/kg (~ 0.7 mg) did not impair glucagon response to low glucose concentrations.

*Gastric emptying*
Victoza causes a delay of gastric emptying, thereby reducing the rate at which postprandial glucose appears in the circulation.

*Cardiac Electrophysiology (QTc)*
The effect of Victoza on cardiac repolarization was tested in a QTc study.  Victoza at steady state concentrations with daily doses up to 1.8 mg did not produce QTc prolongation.

## 12.3    Pharmacokinetics

*Absorption* - Following subcutaneous administration, maximum concentrations of liraglutide are achieved at 8-12 hours post dosing.  The mean peak ($C_{max}$) and total (AUC) exposures of liraglutide were 35 ng/mL and 960 ng·h /mL, respectively, for a subcutaneous single dose of 0.6 mg.  After subcutaneous single dose administrations, $C_{max}$ and AUC of liraglutide increased proportionally over the therapeutic dose range of 0.6 mg to 1.8 mg.  At 1.8 mg Victoza, the average steady state concentration of liraglutide over 24 hours was approximately 128 ng/mL.  $AUC_{0-\infty}$ was equivalent between upper arm and abdomen, and between upper arm and thigh.  $AUC_{0-\infty}$ from thigh was 22% lower than that from abdomen.  However, liraglutide exposures were considered comparable among these three subcutaneous injection sites.  Absolute bioavailability of liraglutide following subcutaneous administration is approximately 55%.

*Distribution* - The mean apparent volume of distribution after subcutaneous administration of Victoza 0.6 mg is approximately 13 L.  The mean volume of distribution after intravenous administration of Victoza is 0.07 L/kg.  Liraglutide is extensively bound to plasma protein (>98%).

*Metabolism* - During the initial 24 hours following administration of a single [$^3$H]-liraglutide dose to healthy subjects, the major component in plasma was intact liraglutide.  Liraglutide is endogenously metabolized in a similar manner to large proteins without a specific organ as a major route of elimination.

*Elimination* - Following a [$^3$H]-liraglutide dose, intact liraglutide was not detected in urine or feces.  Only a minor part of the administered radioactivity was excreted as liraglutide-related metabolites in urine or feces (6% and 5%, respectively).  The majority of urine and feces radioactivity was excreted during the first 6-8 days.  The mean apparent clearance following subcutaneous administration of a single dose of liraglutide is approximately 1.2 L/h with an elimination half-life of approximately 13 hours, making Victoza suitable for once daily administration.

## Specific Populations

*Elderly* - Age had no effect on the pharmacokinetics of Victoza based on a pharmacokinetic study in healthy elderly subjects (65 to 83 years) and population pharmacokinetic analyses of patients 18 to 80 years of age *[see Use in Specific Populations (8.5)]*.

*Gender* - Based on the results of population pharmacokinetic analyses, females have 34% lower weight-adjusted clearance of Victoza compared to males.  Based on the exposure response data, no dose adjustment is necessary based on gender.

*Race and Ethnicity* - Race and ethnicity had no effect on the pharmacokinetics of Victoza based on the results of population pharmacokinetic analyses that included Caucasian, Black, Asian and Hispanic/Non-Hispanic subjects.

*Body Weight* - Body weight significantly affects the pharmacokinetics of Victoza based on results of population pharmacokinetic analyses. The exposure of liraglutide decreases with an increase in baseline body weight. However, the 1.2 mg and 1.8 mg daily doses of Victoza provided adequate systemic exposures over the body weight range of 40 – 160 kg evaluated in the clinical trials. Liraglutide was not studied in patients with body weight >160 kg.

*Pediatric* - Victoza has not been studied in pediatric patients *[see Use in Specific Populations (8.4)]*.

*Renal Impairment* - The single-dose pharmacokinetics of Victoza were evaluated in subjects with varying degrees of renal impairment. Subjects with mild (estimated creatinine clearance 50-80 mL/min) to severe (estimated creatinine clearance <30 mL/min) renal impairment and subjects with end-stage renal disease requiring dialysis were included in the trial. Compared to healthy subjects, liraglutide AUC in mild, moderate, and severe renal impairment and in end-stage renal disease was on average 35%, 19%, 29% and 30% lower, respectively *[see Use in Specific Populations (8.6)]*.

*Hepatic Impairment* - The single-dose pharmacokinetics of Victoza were evaluated in subjects with varying degrees of hepatic impairment. Subjects with mild (Child Pugh score 5-6) to severe (Child Pugh score > 9) hepatic impairment were included in the trial. Compared to healthy subjects, liraglutide AUC in subjects with mild, moderate and severe hepatic impairment was on average 11%, 14% and 42% lower, respectively *[see Use in Specific Populations (8.7)]*.

*Drug Interactions*
*In vitro assessment of drug-drug interactions*
Victoza has low potential for pharmacokinetic drug-drug interactions related to cytochrome P450 (CYP) and plasma protein binding.

*In vivo assessment of drug-drug interactions*
The drug-drug interaction studies were performed at steady state with Victoza 1.8 mg/day. Before administration of concomitant treatment, subjects underwent a 0.6 mg weekly dose increase to reach the maximum dose of 1.8 mg/day. Administration of the interacting drugs was timed so that $C_{max}$ of Victoza (8-12 h) would coincide with the absorption peak of the co-administered drugs.

*Digoxin*
A single dose of digoxin 1 mg was administered 7 hours after the dose of Victoza at steady state. The concomitant administration with Victoza resulted in a reduction of digoxin AUC by 16%; $C_{max}$ decreased by 31%. Digoxin median time to maximal concentration ($T_{max}$) was delayed from 1 h to 1.5 h.

*Lisinopril*
A single dose of lisinopril 20 mg was administered 5 minutes after the dose of Victoza at steady state. The co-administration with Victoza resulted in a reduction of lisinopril AUC by 15%; $C_{max}$ decreased by 27%. Lisinopril median $T_{max}$ was delayed from 6 h to 8 h with Victoza.

*Atorvastatin*
Victoza did not change the overall exposure (AUC) of atorvastatin following a single dose of atorvastatin 40 mg, administered 5 hours after the dose of Victoza at steady state. Atorvastatin $C_{max}$ was decreased by 38% and median $T_{max}$ was delayed from 1 h to 3 h with Victoza.

*Acetaminophen*
Victoza did not change the overall exposure (AUC) of acetaminophen following a single dose of acetaminophen 1000 mg, administered 8 hours after the dose of Victoza at steady state. Acetaminophen $C_{max}$ was decreased by 31% and median $T_{max}$ was delayed up to 15 minutes.

*Griseofulvin*
Victoza did not change the overall exposure (AUC) of griseofulvin following co-administration of a single dose of griseofulvin 500 mg with Victoza at steady state. Griseofulvin $C_{max}$ increased by 37% while median $T_{max}$ did not change.

*Oral Contraceptives*
A single dose of an oral contraceptive combination product containing 0.03 mg ethinylestradiol and 0.15 mg levonorgestrel was administered under fed conditions and 7 hours after the dose of Victoza at steady state. Victoza lowered ethinylestradiol and levonorgestrel $C_{max}$ by 12% and 13%, respectively. There was no effect of Victoza on the overall exposure (AUC) of ethinylestradiol. Victoza increased the levonorgestrel $AUC_{0-\infty}$ by 18%. Victoza delayed $T_{max}$ for both ethinylestradiol and levonorgestrel by 1.5 h.

## 13   NONCLINICAL TOXICOLOGY
### 13.1   Carcinogenicity, Mutagenicity, Impairment of Fertility
A 104-week carcinogenicity study was conducted in male and female CD-1 mice at doses of 0.03, 0.2, 1.0, and 3.0 mg/kg/day liraglutide administered by bolus subcutaneous injection yielding systemic exposures 0.2-, 2-, 10- and 45-times the human exposure, respectively, at the MRHD of 1.8 mg/day based on plasma AUC comparison. A dose-related increase in benign thyroid C-cell adenomas was seen in the 1.0 and the 3.0 mg/kg/day groups with incidences of 13% and 19% in males and 6% and 20% in females, respectively. C-cell adenomas did not occur in control groups or 0.03 or 0.2 mg/kg/day groups. Treatment-related malignant C-cell carcinomas occurred in 3% of females in the 3.0 mg/kg/day group. Thyroid C-cell tumors are rare findings during carcinogenicity testing in mice. A treatment-related increase in fibrosarcomas was seen on the dorsal skin and subcutis, the body surface used for drug injection, in males in the 3 mg/kg/day group. These fibrosarcomas were attributed to the high local concentration of drug near the injection site. The liraglutide concentration in the clinical formulation (6 mg/mL) is 10-times higher than the concentration in the formulation used to administer 3 mg/kg/day liraglutide to mice in the carcinogenicity study (0.6 mg/mL).

A 104-week carcinogenicity study was conducted in male and female Sprague Dawley rats at doses of 0.075, 0.25 and 0.75 mg/kg/day liraglutide administered by bolus subcutaneous injection with exposures 0.5-, 2- and 8-times the human exposure, respectively, resulting from the MRHD based on plasma AUC comparison. A treatment-related increase in benign thyroid C-cell adenomas was seen in males in 0.25 and 0.75 mg/kg/day liraglutide groups with incidences of 12%, 16%, 42%, and 46% and in all female liraglutide-treated groups with incidences of 10%, 27%, 33%, and 56% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. A treatment-related increase in malignant thyroid C-cell carcinomas was observed in all male liraglutide-treated groups with incidences of 2%, 8%, 6%, and 14% and in females at 0.25 and 0.75 mg/kg/day with incidences of 0%, 0%, 4%, and 6% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. Thyroid C-cell carcinomas are rare findings during carcinogenicity testing in rats.

Human relevance of thyroid C-cell tumors in mice and rats is unknown and could not be determined by clinical studies or nonclinical studies *[see Boxed Warning and Warnings and Precautions (5.1)]*.

Liraglutide was negative with and without metabolic activation in the Ames test for mutagenicity and in a human peripheral blood lymphocyte chromosome aberration test for clastogenicity. Liraglutide was negative in repeat-dose *in vivo* micronucleus tests in rats.

In rat fertility studies using subcutaneous doses of 0.1, 0.25 and 1.0 mg/kg/day liraglutide, males were treated for 4 weeks prior to and throughout mating and females were treated 2 weeks prior to and throughout mating until gestation day 17. No direct adverse effects on male fertility was observed at doses up to 1.0 mg/kg/day, a high dose yielding an estimated systemic exposure 11- times the human exposure at the MRHD, based on plasma AUC. In female rats, an increase in early embryonic deaths occurred at 1.0 mg/kg/day. Reduced body weight gain and food consumption were observed in females at the 1.0 mg/kg/day dose.

## 14    CLINICAL STUDIES

A total of 3978 patients with type 2 diabetes participated in 5 double-blind (one of these trials had an open-label active control insulin glargine arm), randomized, controlled clinical trials, one of 52 weeks duration and four of 26 weeks duration. These multinational trials were conducted to evaluate the glycemic efficacy and safety of Victoza in type 2 diabetes as monotherapy and in combination with one or two oral anti-diabetic medications. The 4 add-on combination therapy trials enrolled patients who were previously treated with anti-diabetic therapy, and approximately two-thirds of patients in the monotherapy trial also were previously treated with anti-diabetic therapy. In total, 272 (7%) of the 3978 patients in these 5 trials were new to anti-diabetic therapy. In these 5 clinical trials, patients ranged in age from 19-80 years old and 54% were men. Approximately 77% of patients were Caucasian, and 6% were Black. In the 2 trials where ethnicity was captured, 27% of patients were Hispanic/Latino and 73% were Non-Hispanic/Latino. In each of these trials, treatment with Victoza produced clinically and statistically significant improvements in hemoglobin $A_{1c}$ and fasting plasma glucose (FPG) compared to placebo. Victoza did not have adverse effects on blood pressure.

All Victoza-treated patients started at 0.6 mg/day. The dose was increased in weekly intervals by 0.6 mg to reach 1.2 mg or 1.8 mg for patients randomized to these higher doses. Victoza 0.6 mg is not effective for glycemic control and is intended only as a starting dose to reduce gastrointestinal intolerance *[see Dosage and Administration (2)]*.

### 14.1    Monotherapy

In this 52-week trial, 746 patients were randomized to Victoza 1.2 mg, Victoza 1.8 mg, or glimepiride 8 mg. Patients who were randomized to glimepiride were initially treated with 2 mg daily for two weeks, increasing to 4 mg daily for another two weeks, and finally increasing to 8 mg daily. Treatment with Victoza 1.8 mg and 1.2 mg resulted in a statistically significant reduction in $HbA_{1c}$ compared to glimepiride (Table 4). The percentage of patients who discontinued due to ineffective therapy was 3.6% in the Victoza 1.8 mg treatment group, 6.0% in the Victoza 1.2 mg treatment group, and 10.1% in the glimepiride-treatment group.

**Table 4 Results of a 52-week monotherapy trial[a]**

|  | Victoza 1.8 mg | Victoza 1.2 mg | Glimepiride 8 mg |
|---|---|---|---|
| **Intent-to-Treat Population (N)** | 246 | 251 | 248 |
| **HbA$_{1c}$ (%) (Mean)** |  |  |  |
|    Baseline | 8.2 | 8.2 | 8.2 |
|    Change from baseline (adjusted mean) [b] | -1.1 | -0.8 | -0.5 |
|    Difference from glimepiride arm (adjusted mean) [b] <br>    95% Confidence Interval | -0.6** <br> (-0.8, -0.4) | -0.3* <br> (-0.5, -0.1) |  |
| Patients (%) achieving A$_{1c}$ <7% | 51 | 43 | 28 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** |  |  |  |
|    Baseline | 172 | 168 | 172 |
|    Change from baseline (adjusted mean) [b] | -26 | -15 | -5 |
|    Difference from glimepiride arm (adjusted mean) [b] <br>    95% Confidence Interval | -20** <br> (-29, -12) | -10* <br> (-19, -1) |  |
| **Body Weight (kg) (Mean)** |  |  |  |
|    Baseline | 92.6 | 92.1 | 93.3 |
|    Change from baseline (adjusted mean) [b] | -2.5 | -2.1 | +1.1 |
|    Difference from glimepiride arm (adjusted mean) [b] <br>    95% Confidence Interval | -3.6** <br> (-4.3, -2.9) | -3.2** <br> (-3.9, -2.5) |  |

[a] Intent-to-treat population using last observation on study
[b] Least squares mean adjusted for baseline value
*p-value <0.05
**p-value <0.0001



*p-value = 0.0014 for VICTOZA 1.2 mg compared to glimepiride. †p-value < 0.0001 for VICTOZA 1.8 mg compared to glimepiride.
P values derived from change from baseline ANCOVA model.

**Figure 3 Mean HbA$_{1c}$ for patients who completed the 52-week trial and for the Last Observation Carried Forward (LOCF, intent-to-treat) data at Week 52 (Monotherapy)**

## 14.2   Combination Therapy

*Add-on to Metformin*
In this 26-week trial, 1091 patients were randomized to Victoza 0.6 mg, Victoza 1.2 mg, Victoza 1.8 mg, placebo, or glimepiride 4 mg (one-half of the maximal approved dose in the United States), all as add-on to metformin.  Randomization occurred after a 6-week run-in period consisting of a 3-week initial forced metformin titration period followed by a maintenance period of another 3 weeks.  During the titration period, doses of metformin were increased up to 2000 mg/day.

Treatment with Victoza 1.2 mg and 1.8 mg as add-on to metformin resulted in a significant mean HbA$_{1c}$ reduction relative to placebo add-on to metformin and resulted in a similar mean HbA$_{1c}$ reduction relative to glimepiride 4 mg add-on to metformin (Table 5).  The percentage of patients who discontinued due to ineffective therapy was 5.4% in the Victoza 1.8 mg + metformin treatment group, 3.3% in the Victoza 1.2 mg + metformin treatment group, 23.8% in the placebo + metformin treatment group, and 3.7% in the glimepiride + metformin treated group.

**Table 5 Results of a 26-week trial of Victoza as add-on to metformin[a]**

|  | Victoza 1.8 mg + Metformin | Victoza 1.2 mg + Metformin | Placebo + Metformin | Glimepiride 4 mg[†] Metformin |
|---|---|---|---|---|
| **Intent-to-Treat Population (N)** | 242 | 240 | 121 | 242 |
| **HbA$_{1c}$ (%) (Mean)** |  |  |  |  |
| Baseline | 8.4 | 8.3 | 8.4 | 8.4 |
| Change from baseline (adjusted mean)[b] | -1.0 | -1.0 | +0.1 | -1.0 |
| Difference from placebo + metformin arm (adjusted mean)[b] 95% Confidence Interval | -1.1** (-1.3, -0.9) | -1.1** (-1.3, -0.9) |  |  |
| Difference from glimepiride + metformin arm (adjusted mean)[b] 95% Confidence Interval | 0.0 (-0.2, 0.2) | 0.0 (-0.2, 0.2) |  |  |
| Patients (%) achieving A$_{1c}$ <7% | 42 | 35 | 11 | 36 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** |  |  |  |  |
| Baseline | 181 | 179 | 182 | 180 |
| Change from baseline (adjusted mean)[b] | -30 | -30 | +7 | -24 |
| Difference from placebo + metformin arm (adjusted mean)[b] 95% Confidence Interval | -38** (-48, -27) | -37** (-47, -26) |  |  |
| Difference from glimepiride + metformin arm (adjusted mean)[b] 95% Confidence Interval | -7 (-16, 2) | -6 (-15, 3) |  |  |
| **Body Weight (kg) (Mean)** |  |  |  |  |
| Baseline | 88.0 | 88.5 | 91.0 | 89.0 |
| Change from baseline (adjusted mean)[b] | -2.8 | -2.6 | -1.5 | +1.0 |
| Difference from placebo + metformin arm (adjusted mean)[b] 95% Confidence Interval | -1.3* (-2.2, -0.4) | -1.1* (-2.0, -0.2) |  |  |
| Difference from glimepiride + metformin arm (adjusted mean)[b] 95% Confidence Interval | -3.8** (-4.5, -3.0) | -3.5** (-4.3, -2.8) |  |  |

[a] Intent-to-treat population using last observation on study
[b] Least squares mean adjusted for baseline value
[†] For glimepiride, one-half of the maximal approved United States dose.
*p-value <0.05
**p-value <0.0001

*Add-on to Sulfonylurea*
In this 26-week trial, 1041 patients were randomized to Victoza 0.6 mg, Victoza 1.2 mg, Victoza 1.8 mg, placebo, or rosiglitazone 4 mg (one-half of the maximal approved dose in the United States), all as add-on to glimepiride.  Randomization occurred after a 4-week run-in period consisting of an initial, 2-week, forced-glimepiride titration period followed by a maintenance period of another 2 weeks.  During the titration period, doses of glimepiride were increased to 4 mg/day.  The doses of glimepiride could be reduced (at the discretion of the investigator) from 4 mg/day to 3 mg/day or 2 mg/day (minimum) after randomization, in the event of unacceptable hypoglycemia or other adverse events.

Treatment with Victoza 1.2 mg and 1.8 mg as add-on to glimepiride resulted in a statistically significant reduction in mean HbA$_{1c}$ compared to placebo add-on to glimepiride (Table 6).  The percentage of patients who discontinued due to ineffective therapy was 3.0% in the Victoza 1.8 mg + glimepiride

treatment group, 3.5% in the Victoza 1.2 mg + glimepiride treatment group, 17.5% in the placebo + glimepiride treatment group, and 6.9% in the rosiglitazone + glimepiride treatment group.

**Table 6 Results of a 26-week trial of Victoza as add-on to sulfonylurea[a]**

| | Victoza 1.8 mg + Glimepiride | Victoza 1.2 mg + Glimepiride | Placebo + Glimepiride | Rosiglitazone 4 mg[†] + Glimepiride |
|---|---|---|---|---|
| **Intent-to-Treat Population (N)** | 234 | 228 | 114 | 231 |
| **HbA$_{1c}$ (%) (Mean)** | | | | |
| Baseline | 8.5 | 8.5 | 8.4 | 8.4 |
| Change from baseline (adjusted mean)[b] | -1.1 | -1.1 | +0.2 | -0.4 |
| Difference from placebo + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -1.4** (-1.6, -1.1) | -1.3** (-1.5, -1.1) | | |
| Patients (%) achieving A$_{1c}$ <7% | 42 | 35 | 7 | 22 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** | | | | |
| Baseline | 174 | 177 | 171 | 179 |
| Change from baseline (adjusted mean)[b] | -29 | -28 | +18 | -16 |
| Difference from placebo + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -47** (-58, -35) | -46** (-58, -35) | | |
| **Body Weight (kg) (Mean)** | | | | |
| Baseline | 83.0 | 80.0 | 81.9 | 80.6 |
| Change from baseline (adjusted mean)[b] | -0.2 | +0.3 | -0.1 | +2.1 |
| Difference from placebo + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -0.1 (-0.9, 0.6) | 0.4 (-0.4, 1.2) | | |

[a] Intent-to-treat population using last observation on study
[b] Least squares mean adjusted for baseline value
[†] For rosiglitazone, one-half of the maximal approved United States dose.
**p-value <0.0001

*Add-on to Metformin and Sulfonylurea*
In this 26-week trial, 581 patients were randomized to Victoza 1.8 mg, placebo, or insulin glargine, all as add-on to metformin and glimepiride. Randomization took place after a 6-week run-in period consisting of a 3-week forced metformin and glimepiride titration period followed by a maintenance period of another 3 weeks. During the titration period, doses of metformin and glimepiride were to be increased up to 2000 mg/day and 4 mg/day, respectively. After randomization, patients randomized to Victoza 1.8 mg underwent a 2 week period of titration with Victoza. During the trial, the Victoza and metformin doses were fixed, although glimepiride and insulin glargine doses could be adjusted. Patients titrated glargine twice-weekly during the first 8 weeks of treatment based on self-measured fasting plasma glucose on the day of titration. After Week 8, the frequency of insulin glargine titration was left to the discretion of the investigator, but, at a minimum, the glargine dose was to be revised, if necessary, at Weeks 12 and 18. Only 20% of glargine-treated patients achieved the pre-specified target fasting plasma glucose of ≤100 mg/dL. Therefore, optimal titration of the insulin glargine dose was not achieved in most patients.

Treatment with Victoza as add-on to glimepiride and metformin resulted in a statistically significant mean reduction in HbA$_{1c}$ compared to placebo add-on to glimepiride and metformin (Table 7). The percentage of patients who discontinued due to ineffective therapy was 0.9% in the Victoza 1.8 mg + metformin + glimepiride treatment group, 0.4% in the insulin glargine + metformin + glimepiride treatment group, and 11.3% in the placebo + metformin + glimepiride treatment group.

**Table 7 Results of a 26-week trial of Victoza as add-on to metformin and sulfonylurea[a]**

|  | Victoza 1.8 mg + Metformin + Glimepiride | Placebo + Metformin + Glimepiride | Insulin glargine[†] + Metformin + Glimepiride |
|---|---|---|---|
| **Intent-to-Treat Population (N)** | 230 | 114 | 232 |
| **HbA$_{1c}$ (%) (Mean)** |  |  |  |
|     Baseline | 8.3 | 8.3 | 8.1 |
|     Change from baseline (adjusted mean) [b] | -1.3 | -0.2 | -1.1 |
|     Difference from placebo + metformin + glimepiride arm (adjusted mean) [b]<br>    95% Confidence Interval | -1.1**<br>(-1.3, -0.9) |  |  |
| Patients (%) achieving A$_{1c}$ <7% | 53 | 15 | 46 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** |  |  |  |
|     Baseline | 165 | 170 | 164 |
|     Change from baseline (adjusted mean) [b] | -28 | +10 | -32 |
|     Difference from placebo + metformin + glimepiride arm (adjusted mean) [b]<br>    95% Confidence Interval | -38**<br>(-46,- 30) |  |  |
| **Body Weight (kg) (Mean)** |  |  |  |
|     Baseline | 85.8 | 85.4 | 85.2 |
|     Change from baseline (adjusted mean) [b] | -1.8 | -0.4 | 1.6 |
|     Difference from placebo + metformin + glimepiride arm (adjusted mean) [b]<br>    95% Confidence Interval | -1.4*<br>(-2.1, -0.7) |  |  |

[a]Intent-to-treat population using last observation on study

[b]Least squares mean adjusted for baseline value

[†] For insulin glargine, optimal titration regimen was not achieved for 80% of patients.

*p-value <0.05

**p-value <0.0001

*Add-on to Metformin and Thiazolidinedione*
In this 26-week trial, 533 patients were randomized to Victoza 1.2 mg, Victoza 1.8 mg or placebo, all as add-on to rosiglitazone (8 mg) plus metformin (2000 mg).  Patients underwent a 9 week run-in period (3-week forced dose escalation followed by a 6-week dose maintenance phase) with rosiglitazone (starting at 4 mg and increasing to 8 mg/day within 2 weeks) and metformin (starting at 500 mg with increasing weekly increments of 500 mg to a final dose of 2000 mg/day).  Only patients who tolerated the final dose of rosiglitazone (8 mg/day) and metformin (2000 mg/day) and completed the 6-week dose maintenance phase were eligible for randomization into the trial.

Treatment with Victoza as add-on to metformin and rosiglitazone produced a statistically significant reduction in mean HbA$_{1c}$ compared to placebo add-on to metformin and rosiglitazone (Table 8).  The percentage of patients who discontinued due to ineffective therapy was 1.7% in the Victoza 1.8 mg + metformin + rosiglitazone treatment group, 1.7% in the Victoza 1.2 mg + metformin + rosiglitazone treatment group, and 16.4% in the placebo + metformin + rosiglitazone treatment group.

**Table 8 Results of a 26-week trial of Victoza as add-on to metformin and thiazolidinedione[a]**

| | Victoza 1.8 mg + Metformin + Rosiglitazone | Victoza 1.2 mg + Metformin + Rosiglitazone | Placebo + Metformin + Rosiglitazone |
|---|---|---|---|
| **Intent-to-Treat Population (N)** | 178 | 177 | 175 |
| **HbA$_{1c}$ (%) (Mean)** | | | |
| Baseline | 8.6 | 8.5 | 8.4 |
| Change from baseline (adjusted mean) [b] | -1.5 | -1.5 | -0.5 |
| Difference from placebo + metformin + rosiglitazone arm (adjusted mean) [b] 95% Confidence Interval | -0.9** (-1.1, -0.8) | -0.9** (-1.1, -0.8) | |
| Patients (%) achieving A$_{1c}$ <7% | 54 | 57 | 28 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** | | | |
| Baseline | 185 | 181 | 179 |
| Change from baseline (adjusted mean) [b] | -44 | -40 | -8 |
| Difference from placebo + metformin + rosiglitazone arm (adjusted mean) [b] 95% Confidence Interval | -36** (-44, 27) | -32** (-41, -23) | |
| **Body Weight (kg) (Mean)** | | | |
| Baseline | 94.9 | 95.3 | 98.5 |
| Change from baseline (adjusted mean) [b] | -2.0 | -1.0 | +0.6 |
| Difference from placebo + metformin + rosiglitazone arm (adjusted mean) [b] 95% Confidence Interval | -2.6** (-3.4, -1.8) | -1.6** (-2.4, -1.0) | |

[a]Intent-to-treat population using last observation on study
[b]Least squares mean adjusted for baseline value
**p-value <0.0001

# 16    HOW SUPPLIED/STORAGE HANDLING
## 16.1    How Supplied
Victoza is available in the following package sizes containing disposable, pre-filled, multi-dose pens. Each individual pen delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg (6 mg/mL, 3 mL).

2 x Victoza pen    NDC 0169-4060-12
3 x Victoza pen    NDC 0169-4060-13

Each Victoza pen is for use by a single patient.  A Victoza pen should never be shared between patients, even if the needle is changed.

## 16.2    Recommended Storage
Prior to first use, Victoza should be stored in a refrigerator between 36ºF to 46ºF (2ºC to 8ºC) (Table 9). Do not store in the freezer or directly adjacent to the refrigerator cooling element.  Do not freeze Victoza and do not use Victoza if it has been frozen.

After initial use of the Victoza pen, the pen can be stored for 30 days at controlled room temperature (59°F to 86°F; 15°C to 30°C) or in a refrigerator (36°F to 46°F; 2°C to 8°C).  Keep the pen cap on when not in use.  Victoza should be protected from excessive heat and sunlight.  Always remove and safely discard the needle after each injection and store the Victoza pen without an injection needle attached. This will reduce the potential for contamination, infection, and leakage while also ensuring dosing accuracy.

**Table 9 Recommended Storage Conditions for the Victoza Pen**

| Prior to first use | After first use | |
|---|---|---|
| Refrigerated<br>36°F to 46°F<br>(2°C to 8°C) | Room Temperature<br>59°F to 86°F<br>(15°C to 30°C) | Refrigerated<br>36°F to 46°F<br>(2°C to 8°C) |
| Until expiration date | 30 days | |

# 17    PATIENT COUNSELING INFORMATION
## 17.1    Risk of Thyroid C-cell Tumors
Patients should be informed that liraglutide causes benign and malignant thyroid C-cell tumors in mice and rats and that the human relevance of this finding is unknown.  Patients should be counseled to report symptoms of thyroid tumors (e.g., a lump in the neck, hoarseness, dysphagia or dyspnea) to their physician.

## 17.2    Pancreatitis
Patients should be informed that persistent severe abdominal pain, that may radiate to the back and which may (or may not) be accompanied by vomiting, is the hallmark symptom of acute pancreatitis.  Patients should be instructed to discontinue Victoza promptly, and to contact their physician, if persistent severe abdominal pain occurs *[see Warnings and Precautions (5.2)]*.

## 17.3    Never Share a Victoza Pen Between Patients
Counsel patients that they should never share a Victoza pen with another person, even if the needle is changed.  Sharing of the pen between patients may pose a risk of transmission of infection.

## 17.4    Instructions
Patients should be informed of the potential risks and benefits of Victoza and of alternative modes of therapy.  Patients should also be informed about the importance of adherence to dietary instructions, regular physical activity, periodic blood glucose monitoring and $A_{1c}$ testing, recognition and management of hypoglycemia and hyperglycemia, and assessment for diabetes complications.  During periods of stress such as fever, trauma, infection, or surgery, medication requirements may change and patients should be advised to seek medical advice promptly.

Patients should be advised that the most common side effects of Victoza are headache, nausea and diarrhea.  Nausea is most common when first starting Victoza, but decreases over time in the majority of patients and does not typically require discontinuation of Victoza.

Physicians should instruct their patients to read the Patient Medication Guide before starting Victoza therapy and to reread each time the prescription is renewed.  Patients should be instructed to inform their doctor or pharmacist if they develop any unusual symptom, or if any known symptom persists or worsens.

## 17.5    Laboratory Tests
Patients should be informed that response to all diabetic therapies should be monitored by periodic measurements of blood glucose and $A_{1c}$ levels, with a goal of decreasing these levels towards the normal range.  $A_{1c}$ is especially useful for evaluating long-term glycemic control.

**17.6   FDA-Approved Medication Guide**
See separate leaflet.

Rx only

Date of Issue: January 2010
Version: 1

*Victoza® is a registered trademark of Novo Nordisk A/S.*

Victoza® is covered by US Patent Nos. 6,268,343, 6,458,924 and 7,235,627 and other patents pending.

Victoza® Pen is covered by US Patent Nos. 6,004,297, 6,235,004, 6,582,404 and other patents pending.

© 2010 Novo Nordisk A/S

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark

For information about Victoza contact:
Novo Nordisk Inc.
100 College Road West
Princeton, NJ 08540
1-877-484-2869

**Medication Guide**
**Victoza® (VIC-tow-za)**
**(liraglutide [rDNA origin])**
**Injection**

Read this Medication Guide and Patient Instructions for Use that come with Victoza before you start using Victoza and each time you get a refill. There may be new information.  This Medication Guide does not take the place of talking with your healthcare provider about your medical condition or your treatment.  If you have questions about Victoza after reading this information, ask your healthcare provider or pharmacist.

**What is the most important information I should know about Victoza?**

Serious side effects may happen in people who take Victoza, including:

1. **Possible thyroid tumors, including cancer**.  During the drug testing process, the medicine in Victoza caused rats and mice to develop tumors of the thyroid gland. Some of these tumors were cancers. It is not known if Victoza will cause thyroid tumors or a type of thyroid cancer called medullary thyroid cancer in people. If medullary thyroid cancer occurs, it may lead to death if not detected and treated early. If you develop tumors or cancer of the thyroid, your thyroid may have to be surgically removed.

   - Before you start taking Victoza, tell your healthcare provider if you or any of your family members have had thyroid cancer, especially medullary thyroid cancer, or Multiple Endocrine Neoplasia syndrome type 2. Do not take Victoza if you or any of your family members have medullary thyroid cancer, or if you have Multiple Endocrine Neoplasia syndrome type 2. People with these conditions already have a higher chance of developing medullary thyroid cancer in general and should not take Victoza.

   - While taking Victoza, tell your healthcare provider if you get a lump or swelling in your neck, hoarseness, trouble swallowing, or shortness of breath. These may be symptoms of thyroid cancer.

2. **Inflammation of the pancreas (pancreatitis),** which may be severe and lead to death.

   **Before taking Victoza, tell your healthcare provider if you have had:**

   - pancreatitis
   - stones in your gallbladder (gallstones)
   - a history of alcoholism
   - high blood triglyceride levels

   These medical conditions can make you more likely to get pancreatitis in general.  It is not known if having these conditions will lead to a higher chance of getting pancreatitis while taking Victoza.

**While taking Victoza:**

Stop taking Victoza and call your healthcare provider right away if you have pain in your stomach area (abdomen) that is severe and will not go away.  The pain may happen with or without vomiting.  The pain may be felt going from your abdomen through to your back. This type of pain may be a symptom of pancreatitis.

**What is Victoza?**

- Victoza is an injectable prescription medicine that may improve blood sugar (glucose) in adults with type 2 diabetes mellitus, and should be used along with diet and exercise.

- Victoza is not recommended as the first choice of medication for treating diabetes.

- Victoza is not insulin.

- It is not known if Victoza is safe and effective when used with insulin.

- Victoza is not for use in people with type 1 diabetes or people with diabetic ketoacidosis.

- It is not known if Victoza is safe and effective in children.  Victoza is not recommended for use in children.

**Who should not use Victoza?**

Do not use Victoza if:

- you or any of your family members have a history of medullary thyroid cancer.

- you have Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).  This is a disease where people have tumors in more than one gland in their body.

Talk with your healthcare provider if you are not sure if you have any of these conditions.

**What should I tell my healthcare provider before using Victoza?**

Before taking Victoza, tell your healthcare provider if you:

- have any of the conditions listed in the section "What is the most important information I should know about Victoza?"

- are allergic to liraglutide or any of the other ingredients in Victoza. See the end of this Medication Guide for a list of ingredients in Victoza.

- have severe problems with your stomach, such as slowed emptying of your stomach (gastroparesis) or problems with digesting food.

- have or have had kidney or liver problems.

- have any other medical conditions.

- are pregnant or plan to become pregnant. It is not known if Victoza will harm your unborn baby. Tell your healthcare provider if you become pregnant while taking Victoza.

- are breastfeeding or plan to breastfeed.  It is not known if Victoza passes into your breast milk.  You and your healthcare provider should decide if you will take Victoza or breastfeed.  You should not do both without talking with your healthcare provider first.

Tell your healthcare provider about all the medicines you take including prescription and non-prescription medicines, vitamins, and herbal supplements. Victoza slows stomach emptying and can affect medicines that need to pass through the stomach quickly.  Victoza may affect the way some medicines work and some other medicines may affect the way Victoza works.  Tell your healthcare provider if you take other diabetes medicines, especially sulfonylurea medicines or insulin.

Know the medicines you take.  Keep a list of them with you to show your healthcare provider and pharmacist each time you get a new medicine.

**How should I use Victoza?**

- Use Victoza exactly as prescribed by your healthcare provider.  Your dose should be increased after using Victoza for one week.  After that, do not change your dose unless your healthcare provider tells you to.

- Victoza is injected 1 time each day, at any time during the day.

- You can take Victoza with or without food.

- Victoza comes in a prefilled pen.

- Your healthcare provider must teach you how to inject Victoza before you use it for the first time.  If you have questions or do not understand the instructions, talk to your healthcare provider or pharmacist.  See the Patient Instructions for Use that come with this Medication Guide for detailed information about the right way to use your Victoza pen.

- Pen needles are not included.  You may need a prescription to get pen needles from your pharmacist.  Ask your healthcare provider which needle size is best for you.

- When starting a new prefilled Victoza pen, you must follow the "First Time Use for Each New Pen" (see the detailed Patient Instructions for Use that comes with this Medication Guide).  You only need to do this 1 time with each new pen. You should also do this if you drop your pen.  If you do the "First Time Use for Each New Pen" before each injection, you will run out of medicine too soon.

- Inject your dose of Victoza under the skin (subcutaneous injection) in your stomach area (abdomen), upper leg (thigh), or upper arm, as instructed by your healthcare provider.  **Do not inject into a vein or muscle.**

- If you take too much Victoza, call your healthcare provider right away.  Too much Victoza may cause severe nausea and vomiting.

- Follow your healthcare provider's instructions for diet, exercise, how often to test your blood sugar, and when to get your HbA$_{1c}$ checked.  If you stop using Victoza your blood sugar levels may increase.  First talk to your healthcare provider if you want to stop taking Victoza.

- Your dose of diabetes medicines may need to be changed if your body is under certain types of stress.  Tell your healthcare provider if you:
  - have fever
  - have trauma
  - have an infection
  - plan to have or have had surgery

- Never share your Victoza pen or needles with another person.  You may give an infection to them, or get an infection from them.

**What are the possible side effects of Victoza?**

**Victoza may cause serious side effects, including:**

- See "What is the most important information I should know about Victoza?"

- **Low blood sugar (hypoglycemia).**  Your risk for getting low blood sugar is higher if you take Victoza with another medicine that can cause low blood sugar, such as a sulfonylurea.  In some people, the blood sugar may get so low that they need another person to help them.  The dose of your sulfonylurea medicine may need to be lowered while you use Victoza.  Signs and symptoms of low blood sugar may include:
  - shakiness
  - sweating
  - headache
  - drowsiness
  - weakness
  - dizziness
  - confusion
  - irritability
  - hunger
  - fast heartbeat
  - feeling jittery

Talk to your healthcare provider about how to recognize and treat low blood sugar.  Make sure that your family and other people who are around you a lot know how to recognize and treat low blood sugar.

Common side effects of Victoza include:
- headache
- nausea
- diarrhea

Nausea is most common when first starting Victoza, but decreases over time in most people as their body gets used to the medicine.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

These are not all the side effects with Victoza.  For more information, ask your healthcare provider or pharmacist.

Call your doctor for medical advice about side effects.  You may report side effects to FDA at 1-800-FDA-1088.

**How should I store Victoza?**
> <u>Before use:</u>

- Store your new, unused Victoza pen in the refrigerator at 36ºF to 46ºF (2ºC to 8ºC).

- Do not freeze Victoza or use Victoza if it has been frozen.  Do not store Victoza near the refrigerator cooling element.

> <u>Pen in use:</u>

- Store your Victoza pen for 30 days either at 59ºF to 86ºF (15ºC to 30ºC), or in a refrigerator at 36ºF to 46ºF (2°C to 8°C).

- When carrying the pen away from home, store the pen at a temperature between 59ºF to 86ºF (15ºC to 30ºC) and keep it dry.

- If Victoza has been exposed to temperatures above 86ºF (30ºC), it should be thrown away.

- Protect your Victoza pen from heat and sunlight.

- Keep the pen cap on when your Victoza pen is not in use.

- Use your Victoza pen within 30 days after the first day it is stored outside the refrigerator. After these 30 days, throw away your Victoza pen even if some medicine is left in the pen.

- Do not use Victoza after the expiration date printed on the carton.

> **Do not store the Victoza pen with the needle attached.**  Always safely remove and safely throw away the needle after each injection.  This may help prevent contamination, infection and leakage.  It also helps to make sure that you get the correct dose of Victoza.  See the Patient Instructions for Use for information about how to dispose of used pen needles and used Victoza pens.

**Keep your Victoza pen, pen needles, and all medicines out of the reach of children.**

**General information about Victoza**
Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide.  Do not use Victoza for a condition for which it was not prescribed.  Do not give Victoza to other people, even if they have the same symptoms you have. It may harm them.

This Medication Guide summarizes the most important information you should know about using Victoza.  If you would like more information, talk with your healthcare provider.  You can ask your pharmacist or healthcare provider for information about Victoza that is written for health professionals.

For more information, go to victoza.com or call 1-877-484-2869.

**What are the ingredients in Victoza?**

**Active Ingredient:** liraglutide
**Inactive Ingredients:** disodium phosphate dihydrate, propylene glycol, phenol and water for injection

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark

For information about Victoza contact:
Novo Nordisk Inc.
100 College Road West
Princeton, NJ 08540
1-877-484-2869

Issued: January 2010
Version: 1

This Medication Guide has been approved by the U.S. Food and Drug Administration.

Victoza® is a registered trademark of Novo Nordisk A/S.

Victoza® is covered by US Patent Nos. 6,268,343, 6,458,924 and 7,235,627 and other patents pending.

Victoza® pen is covered by US Patent Nos. 6,004,297, 6,235,004, 6,582,404 and other patents pending.

© 2010 Novo Nordisk A/S

**Exhibit C**

VICTOZA TEXAS MEDICAID FORMULARY - " TEXAS PRIOR AUTHORIZATION
PROGRAM CLINICAL EDIT CRITERIA"

**Exhibit C**





**Texas Prior Authorization Program**
**Clinical Edit Criteria**

**Drug/Drug Class**

# Victoza (Liraglutide) Solution for Injection

## Clinical Edit Information Included in this Document

- **Drugs requiring prior authorization**: the list of drugs requiring prior authorization for this clinical edit

- **Prior authorization criteria logic**: a description of how the prior authorization request will be evaluated against the clinical edit criteria rules

- **Logic diagram**: a visual depiction of the clinical edit criteria logic

- **Supporting tables**: a collection of information associated with the steps within the criteria (diagnosis codes, procedure codes, and therapy codes); provided when applicable

- **References**: clinical publications and sources relevant to this clinical edit

**Note**: Click the hyperlink to navigate directly to that section.

## Revision Notes

- Initial publication and posting to website

- Updated to include ICD-10s



# Victoza (Liraglutide) Solution for Injection

## Drugs Requiring Prior Authorization

| Drugs Requiring Prior Authorization | |
| --- | --- |
| **Label Name** | **GCN** |
| VICTOZA 2-PAK 18MG/3ML PEN | 26189 |
| VICTOZA 3-PAK 18MG/3ML PEN | 26189 |



# Victoza (Liraglutide) Solution for Injection

## Clinical Edit Criteria Logic

1. Is the client greater than or equal to (≥) 18 years of age?
   [ ] Yes (Go to #2)
   [ ] No  (Deny)

2. Does the client have a diagnosis of type II diabetes in the last 365 days?
   [ ] Yes (Go to #3)
   [ ] No  (Deny)

3. Does the client have a history of an oral antidiabetic agent for at least 14 days in the last 365 days?
   [ ] Yes (Go to #4)
   [ ] No  (Deny)

4. Does the client have a diagnosis of thyroid cancer in the last 730 days?
   [ ] Yes (Deny)
   [ ] No (Go to #5)

5. Does the client have a diagnosis of type II multiple endocrine neoplasia in the last 730 days?
   [ ] Yes (Deny)
   [ ] No (Go to #6)

6. Does the client have a history of an HbA1c test in the last 180 days?
   [ ] Yes (Go to #7)
   [ ] No (Deny)

7. Are the requested units per day less than or equal to (≤) 0.3mL, 1.8mg, or 0.1 pens?
   [ ] Yes (Approve – 365 days)
   [ ] No (Deny)



# Victoza (Liraglutide) Solution for Injection

## Clinical Edit Criteria Logic Diagram



**Step 1**
Is the client ≥ 18 years of age?
— Yes → **Step 2**
— No → Deny Request

**Step 2**
Does the client have a diagnosis of type II diabetes in the last 365 days?
— Yes → **Step 3**
— No → Deny Request

**Step 3**
Does the client have a history of an oral antidiabetic agent in 14 of the last 365 days?
— No → Deny Request
— Yes → **Step 4**

**Step 4**
Does the client have a diagnosis of thyroid cancer in the last 730 days?
— Yes → Deny Request
— No → **Step 5**

**Step 5**
Does the client have a diagnosis of type II multiple endocrine neoplasia in the last 730 days?
— Yes → Deny Request
— No → **Step 6**

**Step 6**
Does the client have a history of an HbA1c test in the last 180 days?
— No → Deny Request
— Yes → **Step 7**

**Step 7**
Are the requested units per day ≤ 0.3mL,1.8mg, or 0.1 pens?
— Yes → Approve Request (365 days)
— No → Deny Request



# Victoza (Liraglutide) Solution for Injection

## Clinical Edit Criteria Supporting Tables

| Step 2 (diagnosis of type II diabetes) Required diagnosis: *1* Look back timeframe: *365 days* | |
|---|---|
| **ICD-9 Code** | **Description** |
| 25000 | DIABETES MELLITUS WITHOUT MENTION OF COMPLICATION, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25002 | DIABETES MELLITUS WITHOUT MENTION OF COMPLICATION, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25010 | DIABETES WITH KETOACIDOSIS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25012 | DIABETES WITH KETOACIDOSIS, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25020 | DIABETES WITH HYPEROSMOLARITY, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25022 | DIABETES WITH HYPEROSMOLARITY, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25030 | DIABETES WITH OTHER COMA, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25032 | DIABETES WITH OTHER COMA, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25040 | DIABETES WITH RENAL MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25042 | DIABETES WITH RENAL MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25050 | DIABETES WITH OPHTHALMIC MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25052 | DIABETES WITH OPHTHALMIC MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE UNCONTROLLED |
| 25060 | DIABETES WITH NEUROLOGICAL MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25062 | DIABETES WITH NEUROLOGICAL MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25070 | DIABETES WITH PERIPHERAL CIRCULATORY DISORDERS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25072 | DIABETES WITH PERIPHERAL CIRCULATORY DISORDERS, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| 25080 | DIABETES WITH OTHER SPECIFIED MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25082 | DIABETES WITH OTHER SPECIFIED MANIFESTATIONS, TYPE II OR UNSPECIFIED TYPE UNCONTROLLED |

 Copyright © 2012 Health Information Designs, LLC

| Step 2 (diagnosis of type II diabetes) Required diagnosis: *1* Look back timeframe: *365 days* | |
|---|---|
| 25090 | DIABETES WITH UNSPECIFIED COMPLICATION, TYPE II OR UNSPECIFIED TYPE, NOT STATED AS UNCONTROLLED |
| 25092 | DIABETES WITH  UNSPECIFIED COMPLICATION, TYPE II OR UNSPECIFIED TYPE, UNCONTROLLED |
| **ICD-10 Code** | **Description** |
| E1100 | TYPE 2 DIABETES MELLITUS WITH HYPEROSMOLARITY WITHOUT NONKETOTIC HYPERGLYCEMIC-HYPEROSMOLAR COMA (NKHHC) |
| E1101 | TYPE 2 DIABETES MELLITUS WITH HYPEROSMOLARITY WITH COMA |
| E1121 | TYPE 2 DIABETES MELLITUS WITH DIABETIC NEPHROPATHY |
| E1122 | TYPE 2 DIABETES MELLITUS WITH DIABETIC CHRONIC KIDNEY DISEASE |
| E1129 | TYPE 2 DIABETES MELLITUS WITH OTHER DIABETIC KIDNEY COMPLICATION |
| E11311 | TYPE 2 DIABETES MELLITUS WITH UNSPECIFIED DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E11319 | TYPE 2 DIABETES MELLITUS WITH UNSPECIFIED DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E11321 | TYPE 2 DIABETES MELLITUS WITH MILD NONPROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E11329 | TYPE 2 DIABETES MELLITUS WITH MILD NONPROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E11331 | TYPE 2 DIABETES MELLITUS WITH MODERATE NONPROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E11339 | TYPE 2 DIABETES MELLITUS WITH MODERATE NONPROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E11341 | TYPE 2 DIABETES MELLITUS WITH SEVERE NONPROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E11349 | TYPE 2 DIABETES MELLITUS WITH SEVERE NONPROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E11351 | TYPE 2 DIABETES MELLITUS WITH PROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E11359 | TYPE 2 DIABETES MELLITUS WITH PROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E1136 | TYPE 2 DIABETES MELLITUS WITH DIABETIC CATARACT |
| E1139 | TYPE 2 DIABETES MELLITUS WITH OTHER DIABETIC OPHTHALMIC COMPLICATION |
| E1140 | TYPE 2 DIABETES MELLITUS WITH DIABETIC NEUROPATHY, UNSPECIFIED |
| E1141 | TYPE 2 DIABETES MELLITUS WITH DIABETIC MONONEUROPATHY |
| E1142 | TYPE 2 DIABETES MELLITUS WITH DIABETIC POLYNEUROPATHY |
| E1143 | TYPE 2 DIABETES MELLITUS WITH DIABETIC AUTONOMIC (POLY)NEUROPATHY |
| E1144 | TYPE 2 DIABETES MELLITUS WITH DIABETIC AMYOTROPHY |

| **Step 2 (diagnosis of type II diabetes)**<br>**Required diagnosis:** *1*<br>**Look back timeframe:** *365 days* | |
|---|---|
| E1149 | TYPE 2 DIABETES MELLITUS WITH OTHER DIABETIC NEUROLOGICAL COMPLICATION |
| E1151 | TYPE 2 DIABETES MELLITUS WITH DIABETIC PERIPHERAL ANGIOPATHY WITHOUT GANGRENE |
| E1152 | TYPE 2 DIABETES MELLITUS WITH DIABETIC PERIPHERAL ANGIOPATHY WITH GANGRENE |
| E1159 | TYPE 2 DIABETES MELLITUS WITH OTHER CIRCULATORY COMPLICATIONS |
| E11610 | TYPE 2 DIABETES MELLITUS WITH DIABETIC NEUROPATHIC ARTHROPATHY |
| E11618 | TYPE 2 DIABETES MELLITUS WITH OTHER DIABETIC ARTHROPATHY |
| E11620 | TYPE 2 DIABETES MELLITUS WITH DIABETIC DERMATITIS |
| E11621 | TYPE 2 DIABETES MELLITUS WITH FOOT ULCER |
| E11622 | TYPE 2 DIABETES MELLITUS WITH OTHER SKIN ULCER |
| E11628 | TYPE 2 DIABETES MELLITUS WITH OTHER SKIN COMPLICATIONS |
| E11630 | TYPE 2 DIABETES MELLITUS WITH PERIODONTAL DISEASE |
| E11638 | TYPE 2 DIABETES MELLITUS WITH OTHER ORAL COMPLICATIONS |
| E11641 | TYPE 2 DIABETES MELLITUS WITH HYPOGLYCEMIA WITH COMA |
| E11649 | TYPE 2 DIABETES MELLITUS WITH HYPOGLYCEMIA WITHOUT COMA |
| E1165 | TYPE 2 DIABETES MELLITUS WITH HYPERGLYCEMIA |
| E1169 | TYPE 2 DIABETES MELLITUS WITH OTHER SPECIFIED COMPLICATION |
| E118 | TYPE 2 DIABETES MELLITUS WITH UNSPECIFIED COMPLICATIONS |
| E119 | TYPE 2 DIABETES MELLITUS WITHOUT COMPLICATIONS |
| E1300 | OTHER SPECIFIED DIABETES MELLITUS WITH HYPEROSMOLARITY WITHOUT NONKETOTIC HYPERGLYCEMIC-HYPEROSMOLAR COMA (NKHHC) |
| E1301 | OTHER SPECIFIED DIABETES MELLITUS WITH HYPEROSMOLARITY WITH COMA |
| E1310 | OTHER SPECIFIED DIABETES MELLITUS WITH KETOACIDOSIS WITHOUT COMA |
| E1311 | OTHER SPECIFIED DIABETES MELLITUS WITH KETOACIDOSIS WITH COMA |
| E1321 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC NEPHROPATHY |
| E1322 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC CHRONIC KIDNEY DISEASE |
| E1329 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER DIABETIC KIDNEY COMPLICATION |
| E13311 | OTHER SPECIFIED DIABETES MELLITUS WITH UNSPECIFIED DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E13319 | OTHER SPECIFIED DIABETES MELLITUS WITH UNSPECIFIED DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |

| **Step 2 (diagnosis of type II diabetes)** | |
| --- | --- |
| **Required diagnosis:** *1* | |
| **Look back timeframe:** *365 days* | |
| E13321 | OTHER SPECIFIED DIABETES MELLITUS WITH MILD NONPROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E13329 | OTHER SPECIFIED DIABETES MELLITUS WITH MILD NONPROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E13331 | OTHER SPECIFIED DIABETES MELLITUS WITH MODERATE NONPROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E13339 | OTHER SPECIFIED DIABETES MELLITUS WITH MODERATE NONPROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E13341 | OTHER SPECIFIED DIABETES MELLITUS WITH SEVERE NONPROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E13349 | OTHER SPECIFIED DIABETES MELLITUS WITH SEVERE NONPROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E13351 | OTHER SPECIFIED DIABETES MELLITUS WITH PROLIFERATIVE DIABETIC RETINOPATHY WITH MACULAR EDEMA |
| E13359 | OTHER SPECIFIED DIABETES MELLITUS WITH PROLIFERATIVE DIABETIC RETINOPATHY WITHOUT MACULAR EDEMA |
| E1336 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC CATARACT |
| E1339 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER DIABETIC OPHTHALMIC COMPLICATION |
| E1340 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC NEUROPATHY, UNSPECIFIED |
| E1341 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC MONONEUROPATHY |
| E1342 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC POLYNEUROPATHY |
| E1343 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC AUTONOMIC (POLY)NEUROPATHY |
| E1344 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC AMYOTROPHY |
| E1349 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER DIABETIC NEUROLOGICAL COMPLICATION |
| E1351 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC PERIPHERAL ANGIOPATHY WITHOUT GANGRENE |
| E1352 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC PERIPHERAL ANGIOPATHY WITH GANGRENE |
| E1359 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER CIRCULATORY COMPLICATIONS |
| E13610 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC NEUROPATHIC ARTHROPATHY |
| E13618 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER DIABETIC ARTHROPATHY |
| E13620 | OTHER SPECIFIED DIABETES MELLITUS WITH DIABETIC DERMATITIS |
| E13621 | OTHER SPECIFIED DIABETES MELLITUS WITH FOOT ULCER |
| E13622 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER SKIN ULCER |

| Step 2 (diagnosis of type II diabetes) Required diagnosis: *1* Look back timeframe: *365 days* | |
|---|---|
| E13628 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER SKIN COMPLICATIONS |
| E13630 | OTHER SPECIFIED DIABETES MELLITUS WITH PERIODONTAL DISEASE |
| E13638 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER ORAL COMPLICATIONS |
| E13641 | OTHER SPECIFIED DIABETES MELLITUS WITH HYPOGLYCEMIA WITH COMA |
| E13649 | OTHER SPECIFIED DIABETES MELLITUS WITH HYPOGLYCEMIA WITHOUT COMA |
| E1365 | OTHER SPECIFIED DIABETES MELLITUS WITH HYPERGLYCEMIA |
| E1369 | OTHER SPECIFIED DIABETES MELLITUS WITH OTHER SPECIFIED COMPLICATION |
| E138 | OTHER SPECIFIED DIABETES MELLITUS WITH UNSPECIFIED COMPLICATIONS |
| E139 | OTHER SPECIFIED DIABETES MELLITUS WITHOUT COMPLICATIONS |

| Step 3 (history of oral anti-diabetic agent) Number of claims: *1* Look back timeframe: *365 days* | |
|---|---|
| **Description** | **GCN** |
| ACARBOSE 25 MG TABLET | 08070 |
| ACARBOSE 50 MG TABLET | 02319 |
| ACARBOSE 100 MG TABLET | 02318 |
| ACTOPLUS MET 15 MG-500 MG TAB | 25444 |
| ACTOPLUS MET 15 MG-850 MG TAB | 25445 |
| ACTOPLUS MET XR 15-1,000 MG TB | 28620 |
| ACTOPLUS MET XR 30-1,000 MG TB | 28622 |
| ACTOS 15 MG TABLET | 92991 |
| ACTOS 30 MG TABLET | 93001 |
| ACTOS 45 MG TABLET | 93011 |
| AMARYL 1 MG TABLET | 05830 |
| AMARYL 2 MG TABLET | 05832 |
| AMARYL 4 MG TABLET | 05833 |
| AVANDAMET 2 MG-500 MG TABLET | 91742 |
| AVANDAMET 2 MG-1,000 MG TAB | 20313 |
| AVANDAMET 4 MG-500 MG TABLET | 91743 |
| AVANDAMET 4 MG-1,000 MG TABLET | 20314 |
| AVANDARYL 4 MG-1 MG TABLET | 26125 |

| Step 3 (history of oral anti-diabetic agent) Number of claims: *1* Look back timeframe: *365 days* | |
|---|---|
| **Description** | **GCN** |
| AVANDARYL 4 MG-2 MG TABLET | 26126 |
| AVANDARYL 4 MG-4 MG TABLET | 26127 |
| AVANDARYL 8 MG-2 MG TABLET | 98489 |
| AVANDARYL 8 MG-4 MG TABLET | 97648 |
| AVANDIA 2 MG TABLET | 93193 |
| AVANDIA 4 MG TABLET | 93203 |
| AVANDIA 8 MG TABLET | 93363 |
| CHLORPROPAMIDE 100 MG TABLET | 05731 |
| CHLORPROPAMIDE 250 MG TABLET | 05732 |
| DIABETA 1.25 MG TABLET | 05710 |
| DIABETA 2.5 MG TABLET | 05711 |
| DIABETA 5 MG TABLET | 05712 |
| DUETACT 30-2 MG TABLET | 97181 |
| DUETACT 30-4 MG TABLET | 97180 |
| FORTAMET ER 500 MG TABLET | 21832 |
| FORTAMET ER 1,000 MG TABLET | 21831 |
| GLIMEPIRIDE 1 MG TABLET | 05830 |
| GLIMEPIRIDE 2 MG TABLET | 05832 |
| GLIMEPIRIDE 4 MG TABLET | 05833 |
| GLIPIZIDE 5 MG TABLET | 10840 |
| GLIPIZIDE 10 MG TABLET | 10841 |
| GLIPIZIDE ER 2.5 MG TABLET | 50638 |
| GLIPIZIDE ER 5 MG TABLET | 10844 |
| GLIPIZIDE ER 10 MG TABLET | 10843 |
| GLIPIZIDE XL 2.5 MG TABLET | 50638 |
| GLIPIZIDE XL 5 MG TABLET | 10844 |
| GLIPIZIDE XL 10 MG TABLET | 10843 |
| GLIPIZIDE-METFORMIN 2.5-250 MG | 18366 |
| GLIPIZIDE-METFORMIN 2.5-500 MG | 18367 |
| GLIPIZIDE-METFORMIN 5-500 MG | 18368 |
| GLUCOPHAGE 500 MG TABLET | 10810 |
| GLUCOPHAGE 850 MG TABLET | 10811 |
| GLUCOPHAGE 1,000 MG TABLET | 10857 |
| GLUCOPHAGE XR 500 MG TAB | 89863 |
| GLUCOPHAGE XR 750 MG TAB | 19578 |
| GLUCOTROL 5 MG TABLET | 10840 |

| **Step 3 (history of oral anti-diabetic agent)** <br> **Number of claims:** *1* <br> **Look back timeframe:** *365 days* | |
|---|---|
| **Description** | **GCN** |
| GLUCOTROL 10 MG TABLET | 10841 |
| GLUCOTROL XL 2.5 MG TABLET | 50638 |
| GLUCOTROL XL 5 MG TABLET | 10844 |
| GLUCOTROL XL 10 MG TABLET | 10843 |
| GLUCOVANCE 2.5-500 MG TABLET | 92889 |
| GLUCOVANCE 5-500 MG TABLET | 89879 |
| GLUMETZA ER 500 MG TABLET | 97061 |
| GLUMETZA ER 1,000 MG TABLET | 97067 |
| GLYBURIDE 1.25 MG TABLET | 05710 |
| GLYBURIDE 2.5 MG TABLET | 05711 |
| GLYBURIDE 5 MG TABLET | 05712 |
| GLYBURIDE MICRO 1.5 MG TAB | 05713 |
| GLYBURIDE MICRO 3 MG TABLET | 05714 |
| GLYBURIDE MICRO 6 MG TABLET | 05715 |
| GLYBURIDE-METFORMIN 2.5-500 MG | 92889 |
| GLYBURIDE-METFORMIN 5-500 MG | 89879 |
| GLYBURID-METFORMIN 1.25-250 MG | 89878 |
| GLYNASE 1.5 MG PRESTAB | 05713 |
| GLYNASE 3 MG PRESTAB | 05714 |
| GLYNASE 6 MG PRESTAB | 05715 |
| GLYSET 25 MG TABLET | 95252 |
| GLYSET 50 MG TABLET | 95253 |
| GLYSET 100 MG TABLET | 95254 |
| JANUMET 50-500 MG TABLET | 98306 |
| JANUMET 50-1,000 MG TABLET | 98307 |
| JANUVIA 25 MG TABLET | 97398 |
| JANUVIA 50 MG TABLET | 97399 |
| JANUVIA 100 MG TABLET | 97400 |
| KOMBIGLYZE XR 2.5-1,000 MG TAB | 29225 |
| KOMBIGLYZE XR 5-500 MG TABLET | 29118 |
| KOMBIGLYZE XR 5-1,000 MG TAB | 29224 |
| METAGLIP 2.5-250 MG TABLET | 18366 |
| METFORMIN HCL 500 MG TABLET | 10810 |
| METFORMIN HCL 850 MG TABLET | 10811 |
| METFORMIN HCL 1,000 MG TABLET | 10857 |
| METFORMIN HCL ER 500 MG TABLET | 21832 |

| **Step 3 (history of oral anti-diabetic agent)** **Number of claims:** *1* **Look back timeframe:** *365 days* | |
| --- | --- |
| **Description** | **GCN** |
| METFORMIN HCL ER 500 MG TABLET | 89863 |
| METFORMIN HCL ER 750 MG TABLET | 19578 |
| METFORMIN HCL ER 1,000 MG TAB | 21831 |
| NATEGLINIDE 60 MG TABLET | 12277 |
| NATEGLINIDE 120 MG TABLET | 34027 |
| ONGLYZA 2.5 MG TABLET | 27393 |
| ONGLYZA 5 MG TABLET | 27394 |
| PRANDIMET 1 MG-500 MG TABLET | 16084 |
| PRANDIMET 2 MG-500 MG TABLET | 16085 |
| PRANDIN 0.5 MG TABLET | 26311 |
| PRANDIN 1 MG TABLET | 26312 |
| PRANDIN 2 MG TABLET | 26313 |
| PRECOSE 25 MG TABLET | 08070 |
| PRECOSE 50 MG TABLET | 02319 |
| PRECOSE 100 MG TABLET | 02318 |
| RIOMET 500 MG/5 ML SOLUTION | 20808 |
| STARLIX 60 MG TABLET | 12277 |
| STARLIX 120 MG TABLET | 34027 |
| TOLAZAMIDE 250 MG TABLET | 05741 |
| TOLAZAMIDE 500 MG TABLET | 05742 |
| TOLBUTAMIDE 500 MG TABLET | 05724 |
| TRADJENTA 5 MG TABLET | 29890 |

| **Step 4 (diagnosis of thyroid cancer)** **Required diagnosis:** *1* **Look back timeframe:** *730 days* | |
| --- | --- |
| **ICD-9 Code** | **Description** |
| 193 | MALIGN NEOPL THYROID |
| **ICD-10 Code** | **Description** |
| C73 | MALIGNANT NEOPLASM OF THYROID GLAND |

| Step 5 (diagnosis of type II multiple endocrine neoplasia) Required diagnosis: *1* Look back timeframe: *730 days* | |
| --- | --- |
| **ICD-9 Code** | **Description** |
| 25802 | MULTIPLE ENDOCRINE NEOPLASIA [MEN] TYPE IIA |
| **ICD-10 Code** | **Description** |
| E3122 | MULTIPLE ENDOCRINE NEOPLASIA [MEN] TYPE IIA |

| Step 6 (history of an HbA1c test) Number of claims: *1* Look back timeframe: *180 days* | |
| --- | --- |
| **CPT** | **Description** |
| 83036 | GLYCOSYLATED HEMOGLOBIN TEST |



# Victoza (Liraglutide) Solution for Injection

## Clinical Edit Criteria References

1. Victoza™ [package insert]. Princeton, NJ: Novo Nordisk, Inc. Available at http://www.novo-pi.com/victoza.pdf. Accessed on August 30, 2011.

2. Clinical Pharmacology [database online]. Tampa, FL: Gold Standard, Inc., 2011, updated April 2010. Available at http://clinicalpharmacology.com/Forms/Monograph/monograph.aspx?cpnum=3496&sec=monindi.

3. 2015 ICD-9-CM Diagnosis Codes. 2015. Available at www.icd9data.com. Accessed on April 3, 2015.

4. 2015 ICD-10-CM Diagnosis Codes. 2015. Available at www.icd10data.com. Accessed on April 3, 2015.

5. American Medical Association data files. 2015 ICD-9-CM Diagnosis Codes. Available at **www.commerce.ama-assn.org**.

6. American Medical Association data files. 2015 ICD-10-CM Diagnosis Codes. Available at **www.commerce.ama-assn.org**.

## Publication History

The Publication History records the publication iterations and revisions to this document. Notes for the *most current revision* are also provided in the **Revision Notes** on the first page of this document.

| Publication Date | Notes |
|---|---|
| 07/18/2012 | Initial publication and posting to website |
| 04/03/2015 | Updated to include ICD-10s |

**Exhibit D**


TABLE OF VICTOZA  & SEXENDA SALES VOLUME BY YEAR

**Exhibit D**



**Exhibit E**

LIST OF MEDICAL DEPARTMENT REPRESENTATIVES WHO INFORMED RELATOR
HOUCK

**Exhibit E**

| | |
|---|---|
| 1. Sales Manager Chuck Dent | 2009-2012 |
| 2. Regional Sales Manager Trevor Landry | 2009-2012 |
| 3. Sales Manager Shawnee Lewis | 2013-2015 |
| 4. Regional Sales Manager Greg Reilly | 2013-2015 |
| 5. Regional Sales Manager Mike Powell | 2013-2015 |

**Exhibit F**

RELATOR SMITH'S 2013 NOVO NORDISK EMPLOYMENT REVIEW ACE YEAR END
2013 GSMI FINAL

 

**accountability collaboration execution (ace)**
**Endocrinologist Diabetes Care Specialist (EDCS)**
2013 End-Year Review

SMITH,GREGORY - 00642404 | GSMI | SR EDCS | D1EA0F51 - VIRGINIA BEACH, VA

| Customer & Society (70%) **AE** | + | Business Processes (10%) **EE** | + | People & Organization (20%) **AE** | = | Overall Performance **AE** |
|---|---|---|---|---|---|---|

## Customer & Society (70%)*   **AE**

| ACE Component | POA1 A | POA1 B | POA2 | YTD Attain. | Rating |
|---|---|---|---|---|---|
| IC % Attainment | 99.75% | 90.62% | 94.21% | 94.86% | AE |
| Percent in Nation | 79.74% | 97.39% | 89.54% | 96.08% | |

## Business Processes (10%)**   **EE**

| ACE Component | | Weight | Goal | YTD Attain. | Rating |
|---|---|---|---|---|---|
| Call Plan Compliance | | 100.0% | 80% - 81.9% | 82.39% | EE |

## People & Organization (20%)   **AE**

| ACE Component | Rating |
|---|---|
| Ensure Corporate Compliance (0%) | ME |
| **Leadership** | |
| Collaborates Across Boundaries | EE |
| Drives Performance | AE |
| Lives the Novo Nordisk Way | ME |
| **Functional** | |
| Masters Product & Disease State Knowledge | AE |
| Understands the Market | ME |
| Builds Business Relevant Relationships | ME |
| Sells the Novo Nordisk Way | AE |
| Manages Territory/Account Plans | NM |

### P&O Comments

Collaborates Across Boundaries: DE communication & collaboration is consistent as it has been in previous years - working with some of the highest impact customers & overcoming office challenges in the Richmond area as well as working through challenges in the VA Beach territory; partner communication is consistent; Greg is diligent in his follow up with business partners & supports any/all opportunities to share his knowledge of the market with his territory colleagues; Opportunity = higher quality communication between Greg & partner to ensure better call continuity; AE collaboration in order to stay ahead of MHC situations; work with DCS teams to come together with a cohesive plan

Drives Performance: This is an area of opportunity & focus for Greg which we discussed in great detail through the first half of the year specifically focused on setting ambitious goals for the territory & ensuring accountability toward meeting/exceeding those goals. It is important for Greg to look ahead of current trends & continually identify ways to grow. Aligning strategy & tactics within the territory to achieve self & company set goals. Leveraging additional people resources to assist within the areas of their expertise (ie AEs with any managed care challenges)

Lives the Novo Nordisk Way: Greg works with an ethical behavior & treats others with respect; at the beging of the Sunshine Act changes we reviewed new Sunshine Act Policy to ensure 100% knowledge on the specific NNI policies

Masters Product & Disease State Knowledge: Greg understands the disease state & NNI products through his tenure at the company; Opportunity = incorporating knowledge into sales calls with his Endos & diving deeper into the patient impact & building on the impact from call to call (for example, when discussing the importance of behavior modification, dig into what this means and what happens when patients don't take this part of their disease management seriously)

Understands the Market: Greg has a thorough understanding of the market and continually learns through his customers what's changing in their environment & stays on top of what's happening to local market changes - managed care, hospital changes, etc; Opportunity = while Greg is on top of what's changing in the current market it is important for him to pro-actively adapt his approach & use company approved tools to overcome any changes or challenges either before or upon receiving company or manager direction

Builds Business Relevant Relationships: actively listens to customers & tries to help them overcome challenges; Opportunity = setting up unique selling proposition that is in line with customer needs & respectfully challenging them to think outside their current treatment process

Selling the Novo Nordisk Way: Consistently pre-call plans prior to each call, two way dialogue, actively listens; Opportunity = adapting approach to adjust in time sensitive situations & being confident in clinical selling using the patient focused approach to open discussions & ask questions to further uncover needs of customers; post-call analysis to revise  approach on the next call

Manages Territory & Account Plans: This is a significant area of opportunity for Greg as there is little to no pro-active territory planning; Expectation moving forward will be to evaluate & prioritize each customer, develop patient- & physician-centric strategies & solutions to meet the needs of each customer and utilize appropriate data tools to measure results & adjust

* Source: Jan - Nov'13 Composite IC Attainment
** Measures: Jan - Nov'13 OSS, SAP/AHM

| Manager Name: | Employee Name: |
|---|---|
| Manager Signature: | Employee Signature: |
| Date: | Date: |

© 2013 Novo Nordisk Inc.   Confidential - do not share internally or externally



accountability collaboration execution (ace)
**Endocrinologist Diabetes Care Specialist (EDCS)**
2013 End-Year Review

SMITH,GREGORY - 00642404 | GSMI | SR EDCS | D1EA0F51 - VIRGINIA BEACH, VA

| Customer & Society (70%) | | Business Processes (10%) | | People & Organization (20%) | | Overall Performance |
|---|---|---|---|---|---|---|
| **AE** | + | **EE** | + | **AE** | = | **AE** |



**accountability collaboration execution (ace)**
**Endocrinologist Diabetes Care Specialist (EDCS)**
2013 End-Year Review



SMITH,GREGORY - 00642404 | GSMI | SR EDCS | D1EA0F51 - VIRGINIA BEACH, VA

| Customer & Society (70%) | | Business Processes (10%) | | People & Organization (20%) | | Overall Performance |
|---|---|---|---|---|---|---|
| **AE** | + | **EE** | + | **AE** | = | **AE** |

**Performance Summary and Recommended Action Steps**

Performance Overview: Through Mid-Year, performance in the VA Beach territory has been on the decline with Victoza volume & market share, NovoLog market share and flat with Levemir. There is a definite need for a focused & aligned approach (between Greg & his partner) with each customer based on their current needs & thoughts of treating diabetes. We have met several times as a territory team to discuss what the focus must be for the Top potential customers within the territory & the need to measure progress & make adjustments where necessary.

Mid-Year Action Steps: All actions moving forward must be focused on Driving Performance - not only delivering on goals set by the company but also being accountable & making adjustments where necessary to make a bigger impact within the territory

1. Building Business Relevant Relationships – focusing on the patient & clinical discussions in order to generate unique insights by your customers toward treating their patients differently - clinical first, managed care & cost 2nd

2. Mastering Product & Disease State Knowledge – application of product & disease state in your openings of the Clinical Story in order to generate more relevance of our products & in turn greater utilization across more patient types

Year-End Overview: 2013 performance within the VA Beach Territory fell below expectations of the company with contributing factors such as limited territory planning, not adapting to a changing environment and not pro-actively taking ownership of the business dynamics across the territory. The territory ended the year ranked #38/38 in the East Area & #85/87 in the Nation. Moving forward heightened focus on a customized strategy of the different geographies & customers will be important with emphasis on execution of Endo Excellence with a 3P approach and balancing the needs of the customers & selling the value of our products to meet their needs.

**Employee Comments**

ACE Review employee comments:

The Virginia Beach territory is a unique territory having two very different markets. The Richmond area were no real Managed care challenges exist, represents half of the total territories volume.   The Tidewater area is predominately run by a Health Care System and a heavy population of Military/Tricare. Sentara Health System is similar to the Kaiser Health System were the doctors, hospitals, long-term care facilities, health plan, etc. are all owned and operated by the system.  Novo Nordisk products continue to be disadvantaged on this plan.  All of our insulin's and Victoza are on a non- formulary higher cost to the patient.  April 2013 Sentara added a PA to Victoza as well to try and slow the growth of this product. The company also faced in 2013 a big challenge were the safety of Victoza was in question.  It is very hard to look at this territory and determine if it is preforming or underperforming due to its extreme differences between the two markets.  For example 2012 the Virginia Beach territory Exceeded Expectations for performance and all other competencies.  During that year Victoza did not have a PA and Endocrinologist prescribed even though it had a higher cost to the patient.  This was achieved by selling clinically in a challenged market.  Victoza market shares and breadth were some of the highest in the country and continue to be as well.

DeEtte and I have always had a focused plan and sell clinically year after year.  Due to the complexities in this territory you cannot sit back and let the territory run on auto pilot.  We did adapt our approach throughout the year meeting with our manager and at POA coming up with a focused message. Together we all thought we had the right message.  If you look at the numbers for the different POA's you can see were the business fell off due to the PA of Victoza, not because of the message.  POA1 A 99.75 composite, POA2 B 90.62 (PA Victoza April), POA 2 94.21 and YTD 94.86 (.14 from a 95 composite which ME of the company).  We did manage our territory and nothing has changed with our competencies from 2012 to 2013.  Unfortunately through all the hard work we did not meet the company's goals for 2013.

 I do not agree with the current competency ratings for 2013.  We look at 2013 as a bad year for us as far as performance. However we are refocused on 2014.  The trends for our business are improving and we believe that with our positive attitudes, hard work, knowledge of the business, and new focus we will move us back to Exceeding Expectations with the company.

**Exhibit G**

EMAIL CONFIRMING SALES PROGRAM FOR PEDIATRIC PROMOTION OF NOVOLOG MIX 70/30.

-----Original Message-----
From:       GSMI (Greg Smith)
Sent:       Friday, July 09, 2004 9:04 AM
To:         THCU (Tom Cusick)
Subject:    VA/DOD Conversions

Tom,

I wanted to share with you some success we have had at the VA's and DOD's. Both Richmond and Hampton VA's have implemented automatic switches from Humalog to NovoLog®. Even though NovoLog® Mix is not on formulary (but can still be written) the pharmacy at the Richmond VA agreed to do a 100% conversion of patients on Humalog 75/25 to NovoLog® Mix 70/30 because of the savings.  We are currently working with some advocates to help us secure the NovoLog® Mix 70/30 on formulary at both VA's.  More recently by working with the providers at Ft. Eustis McDonald Hospital we have implemented a program that switches patients to NovoLog®.  Our biggest win thus far is Portsmouth Naval Hospital which is the largest military hospital in the world has completed their patient conversions to NovoLog®.  Both the Adult and Pediatric Endocrinology groups have helped us make this a big win.  More to come!!!!

**Greg Smith**
Institutional Diabetes Care Specialist
Diabetes Sales

Novo Nordisk Pharmaceuticals, Inc.
100 College Road West
Princeton, New Jersey 08540
USA
1 800-745-6686 ext. 1533 (direct)
804-938-2917 (mobile)
gsmi@nnpi.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

Pediatric promotion
Novolog mix 70/30

**Exhibit H**

LIST OF THE SALES MANAGERS WHO INSTRUCTED RELATOR SHIRKEY.

**Exhibit H**

1. Sales Manager Chuck Dent                    2009-2012
2. Regional Sales Manager Trevor Landry    2009-2012
3. Sales Manager Shawnee Lewis               2013-2015
4. Regional Sales Manager Greg Reilly         2013-2015
5. Regional Sales Manager Mike Powell        2013-2015

**Exhibit I**

MODEL OF FIVE POUNDS OF FAT

**Exhibit I**



**Exhibit J**

VICTOZA EXECUTIVE TRAINING CAMP

# Victoza® Standard Presentation

## [Insert Name of Presenter, Title Occasion]





liraglutide injection

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 262 of 482

# Agenda of today

| 1 | Why Victoza® is a significant opportunity |
|---|---|
| 2 | Why Victoza® is a different challenge |
| 3 | What we need to do to be successful |



… our beautiful molecule





# The unmet needs in type 2 diabetes

As type 2 diabetes progresses:

HbA$_{1c}$, PPG and FPG deteriorate

Beta-cell function declines

Treatments increase risk of hypoglycaemia

Patients gain weight



Is there a solution?



novo nordisk®



liraglutide injection

# FAQs on Victoza® and GLP-1

- What is Victoza®?
  - Victoza® is a glucagon-like peptide 1 (GLP-1) analogue, a naturally-occurring hormone in the human gut
- How does Victoza® compare to native GLP-1?
  - Victoza® is the first human GLP-1 analogue (97% homology to native GLP-1) developed for the treatment of type 2 diabetes and to resist enzymatic breakdown. It therefore provides full-day therapeutic levels of GLP-1 to people with type 2 diabetes
- Why not treat type 2 diabetes with native GLP-1?
  - Native GLP-1 is degraded too quickly in the body by enzymes





liraglutide injection

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 265 of 482

# Victoza® has many direct effects on human physiology

## Victoza® effects on human physiology

**Pancreas**

⬆ Insulin secretion (glucose-dependent)

⬆ Insulin synthesis

⬇ Glucagon secretion (glucose-dependent)

⬆ Improvement in beta-cell function

**Brain**

⬇ Energy intake

**Liver**

⬇ Hepatic glucose output

**GI tract**

⬇ Decreased motility

## Victoza® clinical summary*

- Decrease in HbA1c blood sugar levels
- Weight loss
- Low risk of hypoglycaemia
- 24-hour glucose coverage
- Low adverse event rate
- Potential to modify disease progression



**\* LEAD 2**



liraglutide injection

Victoza® update        August 2009        Slide no 6

# Victoza® monotherapy shows immediate, substantial and sustained glycaemic control



LEAD 3, previous diet and exercise*

*Change in HbA1c from baseline for add-on population: diet and exercise failure or up to half of maximum dose of 1 OAD; mean (SD); *sulfonylurea   LEAD 3; data on file

Victoza® update          August 2009          Slide no 7

# The clinical programme: reductions in HbA$_{1c}$ when adding Victoza®



Change in HbA$_{1c}$ from baseline for: overall population (LEAD-4,5); add-on to diet and exercise failure (LEAD-3); add-on to previous OAD monotherapy (LEAD-2,1); or add-on to met and/or SU (LEAD-6). *Significant vs. comparator.

Marre M, et al. Diabetic Medicine 2009; 10.1111/j.1464-5491.2009.02666.x (LEAD-1); Nauck MA, et al. *Diabetes Care* 2009; 32; 84–90 (LEAD-2); Garber A, et al. *Lancet* 2009; 373 (9662): 473–481 (LEAD-3); Zinman B, et al. *Diabetologia* 2008; 51 (Suppl. 1): S359 (Abstract 898) (LEAD-4); Russell-Jones et al. *Diabetes* 2008;57(Suppl. 1):A159 (LEAD 5); Blonde *et al. Can J Diabetes* 2008; 32 (Suppl.): Abstract 107 (LEAD-6); ** Preliminary, topline data from Novo Nordisk Interim financial report, 6 Aug 2009



**Reductions in weight**

**Reductions in blood pressure**

**Grab diabetes by the roots with Victoza®**

**Reductions in blood sugar levels**

**Improvements in beta-cell function**

**For patients with type 2 diabetes who need more than metformin, early treatment with Victoza® provides significant and sustained benefits**







# Driving early usage of Victoza® is key

| POSITIONING | Victoza® provides both excellent glycaemic control and delays disease progression in type 2 diabetes for patients uncontrolled on metformin monotherapy |
|---|---|

| BRAND STRATEGY | Drive early use of Victoza |
|---|---|

| Redefine and grow the GLP-1 class | Differentiate the brand |
|---|---|





# Victoza® expands Novo Nordisk leadership in diabetes



Obesity    Pre-diabetes    Diabetes

Diet and exercise    OADs    Insulin

**Victoza®** liraglutide injection

**Early use** based on ... **clinical evidence** for better **diabetes outcomes**

Levemir® *(insulin detemir)*

NovoRapid® *(insulin aspart)*

NovoMix® *(biphasic insulin aspart)*

Victoza®, if approved by the regulatory authorities, will serve as the brand name for Victoza®.
Until that time, the name is for internal use only.



Victoza® update        August 2009        Slide no 12

# We have a strong foundation in the treatment algorithm from ADA and EASD



At diagnosis:
Lifestyle + metformin

Oral antidiabetic agents that
help control blood sugar
(tablet form)

Tier 1: Well-validated core therapies

+ basal insulin — Basal = long-acting insulin (Levemir®)

+ sulphonylurea — Stimulate the insulin producing cells in the pancreas (tablet form)

Tier 2: Less well-validated therapies

+ pioglitazone — Helps control blood sugar levels by reducing insulin resistance (tablet form)

+ GLP-1 agonist — GLP-1 = Glucagon Like Peptide that stimulates insulin secretion and inhibits glucagon secretion in a glucose-dependent manner (Victoza® and Byetta®)

VICTOZA®
Liraglutide injection

Reinforce lifestyle interventions at every visit and check HbA1C every 3 months until HbA1C is <7% and then at least e
months. The interventions should be changed if HbA1C is ≥ 7%.

Adapted from Nathan et al., *Diabetes Care* 2008;31:1-11.

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 273 of 482

# Agenda of today

| 1 | Why Victoza® is a significant opportunity |
| 2 | Why Victoza® is a different challenge |
| 3 | What we need to do to be successful |



… our beautiful molecule





Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 274 of 482

# Launching Victoza® presents new challenges for Novo Nordisk



- First **truly global launch** in Novo Nordisk



- Most value is in **few top markets**



- Directly into **primary care** market



- **Head on** versus Byetta with good data – short window to Byetta LAR - and versus other alternative type 2 treatments



- Generate access and reimbursement for a **new emerging treatment class** (GLP-1)





liraglutide injection

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 275 of 482

# Agenda of today

| 1 | Why Victoza® is a significant opportunity |
| 2 | Why Victoza® is a different challenge |
| 3 | What we need to do to be successful |



… our beautiful molecule





# Significant cross-functional efforts behind the launch are key to success

| 1 | Obtain label, supporting maximum value capture |
| 2 | Accelerate launch timing and allow for simultaneous multi-country launches |
| 3 | Prepare the organisation for blockbuster launch |
| 4 | Build superior brand value |
| 5 | Create strong advocacy |
| 6 | Optimise market access |
| 7 | Prepare the sales force |





**The Seven Tracks Movie**

**Download from the Brand Manual Download Centre:**
**Media Bin: DiabetesCare\GLP-1\liraglutide\Videos\internal\**

novo nordisk

# 1 Obtain label, supporting maximum value capture



**Our ambition**
- **Achieve strongly competitive label expressing the full potential of Victoza®**

**2008 achievements**
✓ **US and EU filing 23 May; Japan 14 July; several other countries filed – representing +95% of Victoza® sales**

**2009 priorities**
✓ **Market authorisation in Europe, announced 3 July**
- **Continue to build clinical data**
- **Prepare for cardiovascular outcome study**
- **Market authorisation in US**





# 2          Accelerate launch timing and allow for simultaneous multi-country launches

**Our ambition**
- Set a new standard for launch speed and reliability

**2008 achievements**
- ✓ Significant production ramp-up on track
- ✓ Launch acceleration planned for key markets
- ✓ Packaging line ready
- ✓ First marketed Victoza® pen batches produced

**2009 priorities**
- ✓ Deliver and launch product in UK and Germany
- Launch from mid 2009 in selected countries







Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 280 of 482

# 3 Prepare the organisation for blockbuster launch

**Our ambition**
- **Build a shared sense of ambition, purpose and urgency... with capabilities and resources to execute**

**2008 achievements**
- ✓ **Launch business plans, sales force sizing and forecasts prepared in key markets**

**2009 priorities**
- ✓ **Onboard sales force expansions in UK and Germany**
- • **Launch Business plans for 2010 countries**







Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 281 of 482

# 4      Build superior brand value



**Our ambition**
- Build a competitive and differentiated brand with high awareness at launch

**2008 achievements**
- ✓ Selling messages, creative and Victoza® brand name decided
- ✓ Global portfolio messaging guidance established

**2009 priorities**
- ✓ Local sales aid produced, UK, DE, DK based on shared global standard
- Continue disease awareness program
- Execute global campaign in launch markets
- Launch Victoza at international congresses
- Initiate lifecycle management

# One world, one voice, one brand

- Global brands connect with customers across continents, countries, and cultures
- Novo Nordisk is committed to building the Victoza**®** brand on a global scale with a singular identity
- To build this singular brand we have uncovered insights, validated messages and tested brand concepts that resonate around the world
- As a result, we have one shared standard for global brand implementation





## 5      Create strong advocacy

**Our ambition**
- Achieve strong advocacy in the medical community through interactions and KOL advocates

**2008 achievements**
- ✓ 170 abstracts and 63 publications completed
- ✓ 100 global KOL speakers
- ✓ 17,000+ HCPs reached in the US; 46,000+ in EU

**2009 priorities**
- ✓ World class conferences and publications; All 6 LEAD trials published/in print in leading journals*
- Ramp-up HCP interactions to include GP scope
- Reach unaided awareness of 70% for specialists at launch and 60% for GPs 3 months after launch



*Lancet (LEAD-3, LEAD-6), Diabetes Care (LEAD-2, LEAD-4), Diabetologia (LEAD-5), Diabetic Medicine (LEAD-1)



liraglutide injection

# Specialists unaided awareness increased in all countries significantly



**Main findings:**

- High increase in awareness levels across all countries

- Spain and UK reaching 70% benchmark

- UK reached launch target

- Spain and Italy above year-end target

- Canada – included for the first time – reaches 40%

**Liraglutide specialists' unaided awareness (%), June/July 2009**

*Blockbuster benchmark –: 70% target: US/UK/DE/CA/NL at launch & SP year-end*

*45% IT, FR year-end*

*30% JP mid-year*

US: 61%
UK: 70%
DE: 47%
FR: 41%
ES*: 72%
IT*: 53%
NL: 54%
JP: 36%
Can: 40%

**Country**

Legend: June 2008 | November 2008 | July 2009 | JP target


novo nordisk®

\* In wave 6 specialists in Spain and Italy comprise endocrinologists and diabetologists only. IMs were treated as a separate group.

   Results for W5 had to be adjusted accordingly (minor adjustment).

Note: sample size - US 107, UK 80, DE 78, FR 80, ES 60, IT 64, NL 21

Source: Victoza® – Awareness Tracker Wave 6, awareness levels. ZS Associates. August 2009.


VICTOZA®
liraglutide injection

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 285 of 482

# 6     Optimise market access

**Our ambition**
- **Achieve strong market access and reimbursement in key markets matching the pricing strategy**

**Achievements**
- ✓ **Core Value Dossier launched and continuously updated**
- ✓ **Health economic toolbox developed**
- ✓ **Market access plans prepared in key markets**
- ✓ **Training provided**
- ✓ **Payer dialogue initiated**

**2009 priorities**
- ✓ **Submit pricing and reimbursement dossiers in key markets**
- ✓ **Market access plans and tools implemented in key markets; communication training implemented**
- • **Achieve favourable market access conditions**
- • **Prepare for market access life cycle management**







## 7     Prepare the sales force

**Our ambition**
- **Ensure that expanded sales force is optimally prepared**

**2008 achievements**
- ✓ **First modules of global training program developed**
- ✓ **Sales force training plan in place in most key markets**

**2009 priorities**
- ✓ **Complete global training modules**
- ✓ **Victoza® Launch Meetings held in DE and UK**
- ✓ **Sales force trained for Victoza® messaging in Wave 1 countries**
- ✓ **Finalise incentive plans**





**Victoza®**
liraglutide injection

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 287 of 482

# Victoza success is dependent on all of us

| 1 | Obtain label, supporting maximum value capture |
| 2 | Accelerate launch timing and allow for simultaneous multi-country launches |
| 3 | Prepare the organisation for blockbuster launch |
| 4 | Build superior brand value |
| 5 | Create strong advocacy |
| 6 | Optimise market access |
| 7 | Prepare the sales force |





# We all have a role to lead the launch







# Back-up slides





# Victoza® phase 3 programme — LEAD: *Victoza® Effect and Action in Diabetes*



Diet & exercise → 1 OAD → 2 OAD → OADs and/or insulin

**LEAD 3** Mono-therapy **62%**

**LEAD 2** Metformin combination **66%**

**LEAD 4** Met + TZD combination **54%**

**% reaching ADA targets***

SU **31%**

SU **56%**

**LEAD 1** SU combination **56%**

**LEAD 5** Met + SU combination **52%**

TZD **36%**

**LEAD 6** Met, SU, met+SU combination ongoing

exenatide

glargine **44%**

*LEAD 1, 2: numbers reflect previous monotherapy groups;
LEAD 3: numbers reflect previous diet and exercise group

novo nordisk®

**Victoza®** liraglutide injection

# A quarter of patients lose more than 7.5 kg with Victoza®



Victoza® 1.8 mg + met + SU

0–Q1: mean weight change for the 25% of subjects who had the largest weight loss
Q1–Q2: mean weight change for the 25–50% weight loss quartile
Q2–Q3: mean weight change for the 50–75% weight loss quartile
Q3–Q4: mean weight change for the 75–100% weight loss quartile, that is, the 25% who had the smallest weight loss



Russell-Jones *et al. Diabetes* 2008; 57 (Suppl. 1): Abstract 2147-PO



liraglutide injection

Case 1:16-cv-01605-RBW   Document 5   Filed 10/12/16   Page 292 of 482

# Effect of Victoza® on body weight



- Waist circumference was *reduced* from baseline by 2.7 cm (1.06 inches) with Victoza® ($p<0.0001$)

- Waist circumference *increased* by 0.3 cm (0.12 inches) with glimepiride



*$p$≤0.01 vs glimepiride + metformin
** sulfonylurea

Nauck *et al. Diabetes* 2008; 57 (Suppl. 1): Abstract 504-P;



**Exhibit K**

VICTOZA USB DRIVE MEDICAL SLIDE DECK CONTAINING OFF-LABEL WEIGHT LOSS
PROMOTION INFORMATION.

# Liraglutide

A once-daily human GLP-1 analogue for the treatment of type 2 diabetes





# Presentation outline

- Key challenges of type 2 diabetes
- The incretin effect and liraglutide
- Liraglutide: mechanism of glucose-lowering action
- The LEAD programme
- Comparison to other incretin-based therapies



# Presentation outline

- Key challenges of type 2 diabetes
- The incretin effect and liraglutide
- Liraglutide: mechanism of glucose-lowering action
- The LEAD programme
- Comparison to other incretin-based therapies



# Key challenges of type 2 diabetes

1. Diabetes is a progressive disease characterised by:
   - Declining beta-cell function
   - Deterioration of glycaemic control
   - Increased risk of cardiovascular disease
2. As diabetes treatments are added to control glucose, physicians and patients face trade-offs such as:
   - Hypoglycaemia
   - Weight gain
   - Complex treatment regimens (multiple daily dosing and need for self-monitoring of blood glucose)



# Key challenges of type 2 diabetes: outcome



43% of patients
do not
achieve glycaemic targets
(HbA$_{1c}$<7%)

Ford *et al* (NHANES). *Diabetes Care* 2008;31:102–4



# Beta-cell function progressively declines



HOMA: homeostasis model assessment
Lebovitz. *Diabetes Reviews* 1999;7:139–53 (data are from the UKPDS population: UKPDS 16.
*Diabetes* 1995;44:1249–58)



# Over time, glycaemic control deteriorates





*Diet initially then sulphonylureas, insulin and/or metformin if FPG>15 mmol/L; †ADA clinical practice recommendations. UKPDS 34, n=1704

UKPDS 34. *Lancet* 1998:352:854–65; Kahn *et al.* (ADOPT). *NEJM* 2006;355:2427–43



# Systolic blood pressure and mortality from heart disease increase



Mean (bars) and 99% CIs (vertical lines) for cross-sectional changes

10-year age-adjusted mortality from coronary heart disease (CHD) according to blood glucose at baseline



Davis *et al. Diabetes Care* 2001;24:1167–74; Jarrett *et al. Diabetologia* 1982;22:79–84


novo nordisk®

# Current treatments increase risk of hypoglycaemia



Glargine    NPH

*All symptomatic hypoglycaemic events



$p<0.05$ glibenclamide vs. rosiglitazone

Rosiglitazone  Metformin  Glibenclamide

** Patients self-reporting (unconfirmed) hypoglycaemia

Riddle *et al. Diabetes Care* 2003;26:3080; Kahn *et al.* (ADOPT). *NEJM* 2006;355:2427–43



# Most therapies result in weight gain over time



UKPDS: up to 8 kg in 12 years

- Insulin (n=409)
- Glibenclamide (n=277)
- Metformin (n=342)

Change in weight (kg)

Years from randomisation

- Conventional treatment (n=411); diet initially then sulphonylureas, insulin and/or metformin if FPG >15 mmol/L



ADOPT: up to 4.8 kg in 5 years

Weight (kg)

Years

- Rosiglitazone
- Metformin
- Glibenclamide

UKPDS 34. *Lancet* 1998:352:854–65. n=at baseline; Kahn *et al.* (ADOPT). *NEJM* 2006;355:2427–43



novo nordisk®

# The unmet need in type 2 diabetes

As type 2 diabetes progresses:

Beta-cell function declines

HbA$_{1c}$, FPG and PPG deteriorate

Current therapies are associated with weight gain and/or hypoglycaemia

Systolic blood pressure increases



# Is there a solution?



# Presentation outline

- Key challenges of type 2 diabetes
- The incretin effect and liraglutide
- Liraglutide: mechanism of glucose-lowering action
- The LEAD programme
- Comparison to other incretin-based therapies



# The incretin hormones play a crucial role in a healthy insulin response



Plasma glucose

Insulin response

● Oral glucose load (50 g)   ● iv glucose infusion

- Insulin response is greater following oral glucose than iv glucose, despite similar plasma glucose concentration

Nauck *et al. Diabetologia* 1986;29:46–52, healthy volunteers (n=8)

novo nordisk®

# In type 2 diabetes, GLP-1 infusion markedly increases insulin secretion

GLP-1 (but not GIP) increases *both* early and late-stage insulin secretion



Data are mean±SEM
Vilsbøll *et al. Diabetologia* 2002:45:1111–9



# Insulin responses to *physiological* levels of GLP-1 are severely impaired in T2D but are restored by *pharmacological* doses





1. Højberg *et al*. *Diabetologia* 2008 [Epub ahead of print].   2. Vilsbøll *et al*. *Diabetologia* 2002;45:1111–9

# GLP-1 increases insulin, and reduces glucagon; lowering glucose levels



Mean (SE); n=10; *$p$<0.05; type 2 diabetes patients (n=10)
Nauck *et al. Diabetologi*a 1993;36:741–4



# 24-hour GLP-1 presence is required for 24-hour glucose control



Larsen *et al. Diabetes Care* 2001;24:1416–21 (n=8)



# The family of incretin-based therapies





# Liraglutide is a once-daily, human GLP-1 analogue

**Native human GLP-1**



Enzymatic degradation by
DPP-4

$T_{1/2}$=1.5–2.1 min

**Liraglutide**



97% amino acid homology to human GLP-1; improved PK: albumin binding through acylation; self-association

- Slow absorption from subcutis
- Resistant to DPP-4
- Long plasma half-life ($T_{1/2}$=13 h)

Knudsen *et al. J Med Chem* 2000;43:1664–9; Degn *et al. Diabetes* 2004;53:1187–94



# Once-daily liraglutide produces
# high pharmacological levels of GLP-1



Single individual profile: steady-state reached after three doses

Model curve fitted to 30 data points

Agersø *et al. Diabetologia* 2002;45:195–202



# Presentation outline

- Key challenges of type 2 diabetes
- The incretin effect and liraglutide
- **Liraglutide: mechanism of glucose-lowering action**
- The LEAD programme
- Comparison to other incretin-based therapies



# A single dose of liraglutide restores beta-cell glucose sensitivity

- Type 2 diabetes patients received a single liraglutide or placebo injection 9 h before (crossover) trial

- Insulin secretion was measured

- Liraglutide restored beta-cell responsiveness to elevated glucose to the level of healthy volunteers



Data are mean±SEM; type 2 diabetes patients (n=10).
Chang *et al. Diabetes* 2003;52:1786–91



# Liraglutide improves first-phase insulin secretion and maximal beta-cell insulin secretory capacity



As measured by first-phase insulin response and maximal beta-cell secretory capacity. Mean insulin profiles during glucose bolus (insert), hyperglycaemic clamp and arginine stimulation test; type 2 diabetes patients (n=39); Vilsbøll *et al. Diabet Med* 2008;25:152–6



# Liraglutide does not induce insulin secretion at low glucose levels



Data are mean±SEM.
Nauck *et al. Diabetes* 2003;52(Suppl. 1):A128



# Effect on alpha cells: liraglutide suppresses glucagon secretion



24-h glucagon AUC after 5 days (ng/L/h)

■ 2371±135
● 2179±118
($p$=0.04)

- In addition, there is no suppression of glucagon secretion during hypoglycaemia

Data are mean±SEM; type 2 diabetes patients (n=13)
Degn *et al. Diabetes* 2004;53:1187−94



# Liraglutide has multiple direct effects on human physiology



**Pancreas**

↑ Insulin secretion (glucose-dependent) and beta-cell sensitivity

↑ Insulin synthesis

↓ Glucagon secretion (glucose-dependent)

↑ Beta-cell mass*

**Brain**

↓ Energy intake*

**Liver**

↓ Hepatic glucose output

**GI tract**

↓ Decreased motility

*in animal studies

novo nordisk®

# Presentation outline

- Key challenges of type 2 diabetes
- The incretin effect and liraglutide
- Liraglutide: mechanism of glucose-lowering action
- The LEAD programme
- Comparison to other incretin-based therapies



# LEAD covers the continuum of T2D care, compared with standard treatments



Liraglutide monotherapy vs. SU
LEAD-3

Liraglutide+MET vs. SU+MET
LEAD-2

Liraglutide+SU vs. TZD+ SU
LEAD-1

Add a third oral or start insulin

Add another oral agent

Liraglutide+MET+TZD vs. MET+TZD
LEAD-4

Liraglutide+MET+SU vs. glargine+MET+SU
LEAD-5

Start an oral agent

Liraglutide+MET and/or SU vs. exenatide+MET and/or SU
LEAD-6

Diet/exercise

LEAD: Liraglutide Effect and Action in Diabetes. All studies 26 weeks' duration (LEAD 3=52 weeks); all RCT; Marre *et al.* *Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al.* *Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al.* *Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al.* *Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5); Buse *et al.* *Lancet* 2009; in press (LEAD-6).



novo nordisk®

# LEAD: demographics

|  | LEAD-3 Mono-therapy | LEAD-2 Met combi-nation | LEAD-1 SU combi-nation | LEAD-4 Met + TZD combi-nation | LEAD-5 Met + SU combi-nation | LEAD-6 Met +/or SU combi-nation |
|---|---|---|---|---|---|---|
| **Patients randomised** | 746 | 1091 | 1041 | 533 | 581 | 464 |
| **Study duration (weeks)** | 52 | 26 | 26 | 26 | 26 | 26 |
| **Age (yrs)** | 53.0 | 56.8 | 56.1 | 55.1 | 57.5 | 56.7 |
| **Duration of diabetes (yrs)** | 5.4 | 7.4 | 7.9 | 9.2 | 9.4 | 8.2 |
| **FPG (mM)** | 9.5 | 10.0 | 9.8 | 10.1 | 9.2 | 9.6 |
| **HbA$_{1c}$ (%)** | 8.3 | 8.4 | 8.4 | 8.3 | 8.2 | 8.2 |
| **BMI (kg/m$^2$)** | 33.1 | 31.0 | 30.0 | 33.5 | 30.5 | 32.9 |
| **Weight (kg)** | 98.8 | 88.6 | 81.6 | 96.3 | 85.4 | 93.1 |

LEAD: Liraglutide Effect and Action in Diabetes. All studies 26 weeks' duration (LEAD 3=52 weeks); all RCT; Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5); Buse *et al. Lancet* 2009; in press (LEAD-6).



novo nordisk®

# Sustained HbA$_{1c}$ <7.0% for 52 weeks with liraglutide monotherapy



LEAD-3, previous diet and exercise-treated patients

● Glimepiride 8 mg
▲ Liraglutide 1.2 mg monotherapy
■ Liraglutide 1.8 mg monotherapy

Garber *et al. Lancet* 2009;373:473–81 (LEAD-3). Data are mean (SD)



# LEAD programme: reductions in HbA$_{1c}$ with liraglutide



Significant *vs. comparator; #Change in HbA$_{1c}$ from baseline for overall population (LEAD-4,-5) add-on to diet and exercise failure (LEAD-3); or add-on to previous OAD monotherapy (LEAD-2,-1).

Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)



# Liraglutide reduces HbA$_{1c}$ further in very poorly controlled patients



Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)



# Percentage of patients reaching ADA targets when adding liraglutide



***$p<0.0001$ **$p<0.001$ vs. comparator; Patients reaching HbA$_{1c}$ ADA targets for overall population (LEAD 4,5) add-on to diet and exercise failure (LEAD-3); or add-on to monotherapy (LEAD-2,-1).

Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Liraglutide reduces both FPG and PPG



### Liraglutide reduces FPG (before 2 weeks)

- Liraglutide 1.8 mg + met + SU
- Insulin glargine + met + SU

FPG (mmol/L)

Week

LEAD-5

### Mean PPG reduction over 3 meals

Mono LEAD-3   Met combi LEAD-2   SU combi LEAD-1   Met + TZD combi LEAD-4   Met + SU combi LEAD-5

PPG reduction (mmol/L)

- Liraglutide 1.2 mg
- Liraglutide 1.8 mg

Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)



novo nordisk®

# Liraglutide improves beta-cell function as measured by HOMA-B and pro-insulin:insulin ratio

Treatment differences in changes:
*$p<0.05$, ***$p<0.0001$ vs. placebo;
†$p<0.05$, †††$p<0.01$ vs. rosiglitazone; NS for all other treatment comparisons



Darker bars = baseline values
Lighter bars = 26 weeks (LOCF)
(Statistical analysis [ANCOVA] performed on change in beta-cell function)

Data are mean±2SE
Marre *et al. Diabetic Medicine* 2009;26:268–78 (LEAD-1)



# Liraglutide in combination with metformin presents a low risk of hypoglycaemia



***p<0.0001 for treatment differences in changes versus glimepiride

- Minor hypoglycaemic events are at the placebo level (LEAD-2, above)
- There is a small but increased risk of minor hypoglycaemia when combined with SUs (1.0 events per subject every second year; LEAD-1)

Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009; 32; 84–90 (LEAD-2)



# When used to treat T2D, liraglutide consistently reduces systolic blood pressure



***p<0.0001 **p<0.001 *p<0.05 vs. baseline
Data originally presented as Colagiuri *et al. Diabetes* 2008;57(Suppl. 1):A16



# When used to treat T2D, liraglutide reduces SBP before any major effect on weight occurs

**p<0.001  and ***p<0.0001 for change from baseline





Mean±2SE
Zinman *et al. Diabetes Care* 2009;DOI:10.2337/dc08-2124 (LEAD-4)

# Sustained weight reduction over 52 weeks with liraglutide



***p<0.0001 for change from baseline

- Waist circumference was reduced from baseline by 3.0 cm with liraglutide 1.8 mg
- Waist circumference increased by 0.4 cm with glimepiride (*p*<0.0001)

■ Glimepiride 8 mg/day
■ Liraglutide 1.2 mg/day
■ Liraglutide 1.8 mg/day

Change in body weight (kg)

Time (weeks)

Garber *et al. Lancet* 2009;373:473–81 (LEAD-3)



# Weight loss with liraglutide increases with higher baseline BMI



Statistical analysis not performed

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)



# A quarter of patients lose an average of 7.7 kg with liraglutide



Liraglutide 1.8 mg + met + SU

0–Q1: mean weight change for the 25% of subjects who had the largest weight loss
Q1–Q2: mean weight change for the 25–50% weight loss quartile
Q2–Q3: mean weight change for the 50–75% weight loss quartile
Q3–Q4: mean weight change for the 75–100% weight loss quartile, that is, the 25% who had the smallest weight loss

Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2)



# Liraglutide reduces visceral body fat



- Two thirds of weight lost was fat tissue (liraglutide 1.8 mg)

Data are mean±SEM; *p<0.05 vs. glim+met; n=160.
LEAD-2 substudy, originally presented as Jendle *et al. Diabetes* 2008;57(Suppl. 1):A32



# Nausea with liraglutide is transient

Proportion of subjects with nausea by week and treatment – safety population



- Five withdrawals due to nausea

Garber et al. *Lancet* 2009;373:473–81 (LEAD-3)



# Few patients withdrew due to nausea

| | | Nausea (%) | Withdrawals due to nausea (n/total patients) |
|---|---|---|---|
| **LEAD-3 Mono** | **Liraglutide 1.8 mg** | **29** | **5/246** |
| | **Glimepiride** | **9** | **0/248** |
| **LEAD-2 Metformin combination** | **Liraglutide 1.8 mg** | **19** | **15/242** |
| | **Glimepiride** | **3** | **0/242** |
| **LEAD-1 SU combination** | **Liraglutide 1.8 mg** | **7** | **2/234** |
| | **Rosiglitazone** | **3** | **0/231** |
| **LEAD-4 Met +TZD combination** | **Liraglutide 1.8 mg** | **40** | **16/178** |
| | **Placebo** | **9** | **0/175** |
| **LEAD-5 Met + SU combination** | **Liraglutide 1.8 mg** | **14** | **2/230** |
| | **Glargine** | **1** | **0/232** |

Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5). Studies 26 weeks (LEAD 3=52 weeks)



novo nordisk®

# Presentation outline

- Key challenges of type 2 diabetes
- The incretin effect and liraglutide
- Liraglutide: mechanism of glucose-lowering action
- The LEAD programme
- **Comparison to other incretin-based therapies**



# Concentration of active liraglutide is higher than GLP-1 concentration with a DPP-4 inhibitor



GLP-1 levels after 7 days' liraglutide 6 µg/kg OD* (n=13)



GLP-1 levels after 28 days' vildagliptin 100 mg BD (n=9)

*GLP-1 levels for liraglutide calculated as 1.5% free liraglutide

Degn *et al. Diabetes* 2004;53:1187–94. Mari *et al. J Clin Endocrinol Metab* 2005;90:4888–94



# Liraglutide: greater homology to native human GLP-1, less antibody formation



Native human GLP-1

Liraglutide

**97%** amino acid homology to human GLP-1

C-16 fatty acid

Exenatide

**53%** amino acid homology to human GLP-1



Percentage of patients with increase in antibodies

100
80
60
40
20
0

**8.6%**

**43%**

Liraglutide[1]

Exenatide + metformin[2]

• There was no blunting of efficacy by liraglutide antibodies

Study duration: Liraglutide 26 weeks; exenatide 30 weeks.
[1]Data on file; [2]DeFronzo *et al. Diabetes Care* 2005;28:1092


novo nordisk®

# Steady state levels of liraglutide and exenatide



Modelling of plasma concentration of active drug vs. maximal concentration at steady state achieved following clinically relevant doses OD or BD. Based on published exenatide data and modelled liraglutide data. Jonker *et al. Diabetes* 56(Suppl. 1):A160



# Liraglutide in direct comparison with exenatide: significantly greater reduction in HbA$_{1c}$



Both liraglutide and exenatide was combined with met and/or SU

Mean (2SE)

Buse *et al. Lancet* 2009; in press (LEAD-6)



# Liraglutide improves beta-cell function more than exenatide



Darker bars = baseline values
Lighter bars = change from baseline

- HOMA-B cannot be assessed in patients on insulin

Data are mean (2SE)

Buse *et al. Lancet* 2009; in press (LEAD-6)



# Liraglutide and exenatide both reduce body weight (subjects receiving metformin only)

Treatment difference in changes NS





Mean (2SE)

Buse *et al. Lancet* 2009; in press (LEAD-6)

# Nausea with liraglutide is transient

Proportion of subjects with nausea by week and treatment





# Addressing unmet needs in type 2 diabetes: summary

When used to treat T2D, liraglutide **improves**:

Beta-cell function

All glucose parameters, with a sustained effect on HbA$_{1c}$ and a low risk of hypoglycaemia

Body weight

Systolic blood pressure



# ADA and EASD algorithm for the management of type 2 diabetes

- *Reinforce lifestyle interventions at every visit and check HbA$_{1C}$ every 3 months until HbA$_{1C}$ is <7% and then at least every 6 months. The interventions should be changed if HbA$_{1C}$ is ≥7%.*





[a]*Sulfonylureas other than glybenclamide (glyburide) or chlorpropamide.*
[b]*Insufficient clinical use to be confident regarding safety.*
Nathan *et al. Diabetes Care* 2008;31:1–11



# Liraglutide

A once-daily human
GLP-1 analogue for the treatment of
type 2 diabetes



**Exhibit L**

FOUR FREE STANDING WEIGHT LOSS SLIDES WHICH DEALT SOLELY WITH THE OFF-LABEL WEIGHT LOSS FOR VICTOZA.

**Exhibit L**

# Sustained weight reduction over 52 weeks with liraglutide

***p<0.0001 for change from baseline



- Waist circumference was reduced from baseline by 3.0 cm with liraglutide 1.8 mg

- Waist circumference increased by 0.4 cm with glimepiride (p<0.0001)

Glimepiride 8 mg/day
Liraglutide 1.2 mg/day
Liraglutide 1.8 mg/day

Garber *et al. Lancet* 2009;373:473–81 (LEAD-3)



# Weight loss with liraglutide increases with higher baseline BMI



Statistical analysis not performed

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)



# A quarter of patients lose an average of 7.7 kg with liraglutide



0–Q1: mean weight change for the 25% of subjects who had the largest weight loss
Q1–Q2: mean weight change for the 25–50% weight loss quartile
Q2–Q3: mean weight change for the 50–75% weight loss quartile
Q3–Q4: mean weight change for the 75–100% weight loss quartile, that is, the 25% who had the smallest weight loss

Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2)



# Liraglutide reduces visceral body fat



Change in body fat
DEXA scan

Visceral vs. subcutaneous fat
CT scan

- Two thirds of weight lost was fat tissue (liraglutide 1.8 mg)

Data are mean±SEM; *$p$<0.05 vs. glim+met; n=160.
LEAD-2 substudy, originally presented as Jendle *et al. Diabetes* 2008;57(Suppl. 1):A32



**Exhibit M**

Lead 4/5 MEDICAL SLIDES CONTAIN OFF-LABEL WEIGHT LOSS PROMOTIONAL INFORMATION.

# LEAD-4

Liraglutide plus metformin and rosiglitazone versus placebo plus rosiglitazone and metformin in patients with type 2 diabetes



# LEAD covers the continuum of T2D care, compared with standard treatments



LEAD: Liraglutide Effect and Action in Diabetes. All studies 26 weeks' duration (LEAD 3=52 weeks); all RCT; Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5); Buse *et al. Lancet* 2009; in press (LEAD-6).

# LEAD-4: Design

Adults 18–80 years with   type 2 diabetes

OAD therapy

HbA$_{1c}$
>7.0%
≤10.0% (two OADs)
≤11.0% (one OAD)

FPG
7.5–12.8 mmol/L

BMI ≤45 kg/m$^2$

Randomised, double-blind, parallel-group study at 96 sites in Canada and the USA



Liraglutide 1.2 mg once daily (n=178)

Liraglutide 1.8 mg once daily (n=178)

Placebo once daily (n=177)

–12  –9  –7  –6   0   2                                          26

Time (weeks)

Rosiglitazone titration (4 mg)

Liraglutide dose escalation

Metformin titration (2000 mg)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Endpoints

- Primary:
  - HbA$_{1c}$ change after 26 weeks
- Key secondary:
  - Plasma glucose profile
  - Body weight change
  - Beta-cell function
  - Blood pressure
  - Hypoglycaemia
  - Adverse events

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Demographics and baseline characteristics

|  | Liraglutide 1.2 mg | Liraglutide 1.8 mg | Placebo |
|---|---|---|---|
| Patients randomised, number | 178 | 178 | 177 |
| Sex: male/female, number | 102/76 | 87/91 | 109/68 |
| Age, years | 55.2 (10.2) | 55.1 (10.7) | 54.9 (9.8) |
| BMI, kg/m$^2$ | 33.2 (5.4) | 33.5 (5.1) | 33.9 (5.2) |
| Duration of diabetes, years | 8.9 (5.5) | 9.1 (5.6) | 8.9 (5.5) |
| Previous treatment, number (%): Monotherapy Combination therapy | 29 (16) 149 (84) | 29 (16) 149 (84) | 32 (18) 145 (82) |
| HbA$_{1c}$ % | 8.5 (1.2) | 8.6 (1.2) | 8.4 (1.2) |
| FPG, mmol/L | 10.1 (2.4) | 10.3 (2.4) | 10.0 (2.6) |
| Blood pressure, mmHg: Systolic Diastolic | 129 (14.8) 76 (9.0) | 126 (14.2) 75 (8.4) | 128 (14.5) 76 (9.2) |

Data are mean (SD) unless stated otherwise

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Participant flow



Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# HbA$_{1c}$ change over 26 weeks



*p*-values relate to estimated treatment difference for changes from baseline.
***p*<0.0001

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# HbA$_{1c}$ change from baseline



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Subjects achieving HbA$_{1c}$ targets





Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# FPG change over 26 weeks



***$p<0.0001$ for change from baseline



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# FPG change from baseline



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Subjects achieving FPG ≤7.2 mmol/L



Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Seven-point glucose profiles

*p*<0.05  for treatment differences in changes after breakfast.
*p*=NS for lunch and dinner



Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# PPG change from baseline



PPG is mean across three meals

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Subjects achieving PPG <7.8 mmol/L



Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Hypoglycaemia definitions

**Classification**



*If food, glucagon or iv glucose needed to be administered by another person

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Minor hypoglycaemia (confirmed <3.1 mmol/L)



- No major hypoglycaemic events

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Body weight change from baseline over 26 weeks



*p*-values relate to estimated treatment difference for changes from baseline:
***p<0.0001; **p=0.011

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Body weight change from baseline



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Body weight change by BMI baseline subgroup



Statistical analysis not performed

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Body weight change by quartile of weight loss (liraglutide 1.8 mg)



Statistical analysis not performed

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# HbA$_{1c}$ change by quartile of weight loss (liraglutide 1.8 mg)



Statistical analysis not performed

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Liraglutide and beta-cell function as measured by HOMA-B and pro-insulin:insulin ratio (LEAD-4)



Darker bars = baseline values
Lighter bars = change from baseline

Data are mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# SBP change over 26 weeks



*p*-values relate to estimated treatment difference for changes from baseline:
***p<0.0001; **p<0.001

Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# SBP change from baseline



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# DBP change over 26 weeks

Changes from baseline NS



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# DBP change from baseline

Changes from baseline NS



Mean (SE)

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Efficacy summary

- Significant $HbA_{1c}$ reduction compared with placebo
  - 54–58% of patients receiving liraglutide achieved $HbA_{1c}$ <7.0%
- Sustained $HbA_{1c}$ reduction over 26 weeks
- Significant FPG reduction compared with placebo
- FPG reduction evident after only 2 weeks and sustained for 26 weeks
- Clinically-relevant weight reduction
  - >3 kg weight reduction in subjects with highest BMI
- Significant reduction in SBP compared with placebo
- SBP reduction sustained over 26 weeks
  - SBP effect precedes changes in body weight

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Withdrawals

| | Liraglutide 1.2 mg/day (n=178) | Liraglutide 1.8 mg/day (n=178) | Placebo (n=177) | Total (n=533) |
|---|---|---|---|---|
| **Adverse events** | 11 (6.2) | 27 (15.2) | 6 (3.4) | 44 (8.3) |
| **Ineffective therapy** | 3 (1.7) | 3 (1.7) | 29 (16.4) | 35 (6.6) |
| **Noncompliance with protocol** | 4 (2.2) | 4 (2.2) | 5 (2.8) | 13 (2.4) |
| **Other** | 7 (3.9) | 11 (6.2) | 16 (9.0) | 34 (6.4) |
| **Total** | 25 (14.0) | 45 (25.3) | 56 (31.6) | 126 (23.6) |

Data are number (%) of patients randomised

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Subjects with treatment-emergent adverse events leading to withdrawal

|  | Liraglutide 1.2 mg/day (n=177) | Liraglutide 1.8 mg/day (n=178) | Placebo (n=175) |
|---|---|---|---|
| Overall | 14 | 27 | 7 |
| Gastrointestinal disorders<br>Nausea | 6<br>3 | 22<br>16 | 1<br>0 |
| Metabolism and nutrition disorders | 4 | 4 | 1 |
| Investigations | 4 | 2 | 1 |
| Nervous system disorders | 3 | 1 | 2 |
| Renal and urinary disorders | 3 | 0 | 3 |
| Skin and subcutaneous tissue disorders | 1 | 4 | 0 |
| Infections and infestations | 3 | 0 | 0 |
| Cardiac disorders | 2 | 0 | 1 |
| Respiratory, thoracic and mediastinal disorders | 2 | 0 | 1 |
| General and administration-site disorders | 0 | 1 | 1 |
| Neoplasm | 0 | 0 | 2 |
| Hepatobiliary disorders | 0 | 1 | 0 |
| Psychiatric disorders | 0 | 1 | 0 |
| Blood and lymphatic disorders | 0 | 0 | 1 |
| Immune/allergy to metals | 0 | 1 | 0 |
| Injury, poisoning and procedural complications | 0 | 1 | 0 |

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# All adverse events occurring in >5% of subjects

| | Liraglutide 1.2 mg/day (n=177) | Liraglutide 1.8 mg/day (n=178) | Placebo (n=175) |
|---|---|---|---|
| **Overall** | 149 (84.2) | 148 (83.1) | 123 (70.3) |
| **Gastrointestinal disorders** | | | |
| Constipation | 9 (5.1) | 9 (5.1) | 2 (1.1) |
| Diarrhoea | 18 (10.2) | 32 (18.0) | 11 (6.3) |
| Dyspepsia | 8 (4.5) | 9 (5.1) | 4 (2.3) |
| Nausea | 52 (29.4) | 71 (39.9) | 15 ( 8.6) |
| Vomiting | 13 (7.3) | 31 (17.4) | 5 (2.9) |
| **Infections and infestations** | 62 (35.0) | 60 (33.7) | 64 (36.6) |
| **Metabolism and nutrition disorders** | 33 (18.6) | 38 (21.3) | 12 (6.9) |
| **General and administration-site disorders** | 29 (16.4) | 32 (18.0) | 28 (16.0) |
| **Nervous system disorders** | 26 (14.7) | 32 (18.0) | 21 (12.0) |
| **Musculoskeletal and connective tissue disorders** | 21 (11.9) | 29 (16.3) | 23 (13.1) |
| **Respiratory, thoracic and mediastinal disorders** | 18 (10.2) | 15 (8.4) | 21 (12.0) |
| **Skin and subcutaneous tissue disorders** | 14 (7.9) | 13 (7.3) | 13 (7.4) |
| **Eye disorders** | 13 (7.3) | 7 (3.9) | 5 (2.9) |

| | | | |
|---|---|---|---|
| **Subjects with serious adverse events** | 8/177 (4.5) | 7/178 (3.9) | 12/175 (6.9) |

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Frequency of nausea

Proportion of subjects with nausea by week and treatment – safety population.
Statistical analysis not performed.



Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Liraglutide antibodies

| | Liraglutide 1.2 mg/day | Liraglutide 1.8 mg/day |
|---|---|---|
| **Subjects with antibodies, number (%)** | **6/147 (4.1)** | **9/135 (6.7)** |

Presence of antibodies did not neutralise efficacy of $HbA_{1c}$ reduction

Data are number (%) of patients with antibody data

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Safety summary

- No major hypoglycaemia

- Nausea is the most frequent adverse event

  - Incidence declines with treatment duration

  - Few discontinuations due to nausea

- Very few subjects developed liraglutide antibodies

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# Overall summary

In patients previously treated with OAD monotherapy or OAD combination therapy, liraglutide achieved:

- Sustained HbA$_{1c}$ reductions of up to 1.5%
- Sustained reductions in fasting and postprandial plasma glucose
- Sustained weight reduction: >3 kg in high-BMI subjects
- No major hypoglycaemia
- Sustained reductions in SBP
- Incidence of nausea low and transient
- Negligible antibody formation

Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4)

# LEAD-5

Liraglutide plus glimepiride versus insulin glargine plus metformin plus sulphonylurea in patients with type 2 diabetes



# LEAD covers the continuum of T2D care, compared with standard treatments



Liraglutide monotherapy vs. SU
LEAD-3

Liraglutide+MET vs. SU+MET
LEAD-2

Liraglutide+SU vs. TZD+ SU
LEAD-1

Add a third oral or start insulin

Add another oral agent

Liraglutide+MET+TZD vs. MET+TZD
LEAD-4

Liraglutide+MET+SU vs. glargine+MET+SU
LEAD-5

Start an oral agent

Liraglutide+MET and/or SU vs. exenatide+MET and/or SU
LEAD-6

Diet/exercise

LEAD: Liraglutide Effect and Action in Diabetes. All studies 26 weeks' duration (LEAD 3=52 weeks); all RCT; Marre *et al. Diabetic Medicine* 2009;26;268–78 (LEAD-1); Nauck *et al. Diabetes Care* 2009;32;84–90 (LEAD-2); Garber et al. *Lancet* 2009;373:473–81 (LEAD-3); Zinman *et al. Diabetes Care* 2009; DOI:10.2337/dc08-2124 (LEAD-4); Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5); Buse *et al. Lancet* 2009; in press (LEAD-6).

# LEAD-5: Design

Adults 18–80 years with type 2 diabetes

≥3 months OAD therapy

$HbA_{1c}$
>7.0% (two OADs)
≥7.5% (one OAD)
≤10.0%

FPG
7.5–12.8 mmol/L

BMI ≤45 kg/m$^2$



Liraglutide 1.8 mg once daily (n=232)[†]

Placebo (n=115)[†]

Insulin glargine once-daily (n=234)

−6  −4  −2  0  2  4  6  8  10  12  14  16  18  20  22  24  26
Time (weeks)

Dose escalation of liraglutide

Dose titration of glargine

Discontinue OADs, start and titrate metformin (2000 mg) and glimepiride (4 mg)

Study conducted at 107 sites in 17 countries

[†]Double-blind treatments

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Insulin glargine titration

- Starting dose equivalent to FPG value (in mmol/L) to nearest 2U
- Dose titrated twice-weekly based on FPG (protocol adapted from Davies et al):

    ≤5.5mmol/L: no adjustment

    >5.5 and ≤6.7 mmol/L: add 0-2U

    ≥6.7 mmol/L: add 2U

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)
Davies *et al. Diabetes Care* 2005;28:1282-8.

# Endpoints

- Primary:
  - HbA$_{1c}$ change after 26 weeks
- Key secondary:
  - Plasma glucose profile
  - Body weight change
  - Body composition
  - Beta-cell function
  - Blood pressure
  - Hypoglycaemia
  - Adverse events

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Demographics and baseline characteristics

|  | Liraglutide 1.8 mg | Placebo | Insulin glargine |
|---|---|---|---|
| **Number randomised** | **232** | **115** | **234** |
| **Sex, male/female** | **132/100** | **56/59** | **140/94** |
| **Age, years** | **57.6 (9.5)** | **57.5 (9.6)** | **57.5 (10.5)** |
| **BMI, kg/m$^2$** | **30.4 (5.3)** | **31.3 (5.0)** | **30.3 (5.3)** |
| **Duration of diabetes, years** | **9.2 (5.8)** | **9.4 (6.2)** | **9.7 (6.4)** |
| **Previous treatment:** <br> **One OAD** <br> **Two OADs** | **15 (7%)** <br> **217 (94%)** | **6 (5%)** <br> **109 (95%)** | **12 (5%)** <br> **212 (95%)** |
| **HbA$_{1c}$, %** | **8.3 (0.9)** | **8.3 (0.9)** | **8.2 (0.6)** |
| **FPG, mmol/L** | **9.1 (2.1)** | **9.4 (2.0)** | **9.1 (2.0)** |
| **Blood pressure, mmHg:** <br> **Systolic** <br> **Diastolic** | **135 (15.0)** <br> **81 (9.1)** | **133 (14.0)** <br> **80 (9.3)** | **133 (14.7)** <br> **81 (8.0)** |

Data are mean (SD) unless stated otherwise

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Participant flow

**Liraglutide 1.8 mg**



**Placebo**



**Insulin glargine**



Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# HbA$_{1c}$ change over 26 weeks



Mean±2SE; p values relate to estimated treatment difference for changes from baseline.
*$p<0.05$ ***$p<0.0001$

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# HbA$_{1c}$ change from baseline



Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Subjects achieving HbA$_{1c}$ targets



Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# FPG change over 26 weeks



Mean±2SE; p values relate to estimated treatment difference for changes from baseline.
***p<0.0001

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Fasting glucose change from baseline



Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Subjects achieving FPG ≤7.2 mmol/L



Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Eight-point glucose profiles



Statistical analysis not performed

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# PPG change from baseline



Baseline 11.21 mmol/L  Baseline 11.29 mmol/L  Baseline 11.32 mmol/L

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Hypoglycaemia definitions



**Classification**

*If food, glucagon or iv glucose needed to be administered by another person

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Minor hypoglycaemia (confirmed <3.1 mmol/L)



- Five subjects had six major hypoglycaemic events
- No coma or seizure

Treatment difference in changes: *p*=NS for all comparisons

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Body weight change over 26 weeks



Mean±2SE; P values relate to estimated treatment difference for changes from baseline: ** *p*<0.01 ****p*<0.0001

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Body weight change from baseline



Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Body weight change by BMI baseline subgroup



Statistical analysis not performed

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Body weight change by quartile of weight loss (liraglutide 1.8 mg)



Statistical analysis not performed

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# HbA$_{1c}$ change by quartile of weight loss (liraglutide 1.8 mg)



Quartile 1: most weight loss
Quartile 4: least weight loss

Statistical analysis not performed

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Liraglutide and beta-cell function as measured by HOMA-B and pro-insulin:insulin ratio (LEAD-5)



Darker bars = baseline values
Lighter bars = change from baseline

- HOMA-B cannot be assessed in patients on insulin

Data are mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Pro-insulin:C-peptide change from baseline



Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# SBP change over 26 weeks



***p*<0.001 for change from baseline

*p*-values relate to estimated treatment difference for changes from baseline. ***p*<0.0001

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# SBP change from baseline



Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# DBP change over 26 weeks



Treatment difference in changes: *p*=NS for all comparisons

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# DBP change from baseline



Treatment difference in changes: *p*=NS for all comparisons

Mean±2SE

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Efficacy summary

- Significant and sustained $HbA_{1c}$ reduction
  - Reduction significantly greater than insulin glargine
  - Subjects significantly more likely to achieve glycaemia targets than with insulin glargine
  - More than 80% of monotherapy-treated subjects achieved HbA <7.0%
- Rapid, sustained FPG reduction
- Clinically-relevant weight reduction
  - Mean 5.8 kg weight loss in highest quartile of weight loss
  - Significant difference *versus* weight increase with insulin glargine
- Significant reduction in systolic blood pressure
  - Sustained 3.4 mmHg reduction with 1.8 mg/day liraglutide
  - SBP effect precedes changes in body weight

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Withdrawals

## Number of patients (%)

|  | Liraglutide 1.8 mg/day | Placebo | Insulin glargine | Total |
|---|---|---|---|---|
| **Adverse events** | 11 (4.7%) | 1 (0.9%) | 5 (2.1%) | 17 (2.9%) |
| **Ineffective therapy** | 2 (0.9%) | 13 (11.3%) | 1 (0.4%) | 16 (2.8%) |
| **Noncompliance with protocol** | 1 (0.4%) | 1 (0.9%) | 5 (2.1%) | 7 (1.2%) |
| **Other** | 11 (4.7%) | 4 (3.5%) | 4 (1.7%) | 19 (3.3%) |
| **Total** | 25 (10.8%) | 19 (16.5%) | 15 (6.4%) | 59 (10.2%) |

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# All adverse events occurring in >5% of subjects

|  | Liraglutide 1.8 mg | Placebo | Insulin glargine |
|---|---|---|---|
| **Overall** | **151 (66%)** | **64 (56%)** | **127 (55%)** |
| **Gastrointestinal disorders** | | | |
| **Diarrhoea** | **23 (10%)** | **6 (5%)** | **3 (1%)** |
| **Dyspepsia** | **15 (7%)** | **1 (1%)** | **4 (2%)** |
| **Nausea** | **32 (14%)** | **4 (4%)** | **3 (1%)** |
| **Vomiting** | **15 (7%)** | **4 (4%)** | **1 (0%)** |
| **Infection and infestation** | **51 (22%)** | **36 (32%)** | **63 (27%)** |
| **Nervous system disorders** | **29 (13%)** | **11 (10%)** | **24 (10%)** |
| **General and administration site disorders** | **13 (6%)** | **4 (4%)** | **10 (4%)** |
| **Musculoskeletal, conn. tissue disorders** | **22 (10%)** | **15 (13%)** | **34 (15%)** |
| **Metabolism and nutrition disorders** | **20 (9%)** | **7 (6%)** | **5 (2%)** |
| **Psychiatric disorders** | **4 (2%)** | **7 (6%)** | |
| **Respiratory disorders** | **7 (3%)** | **6 (5%)** | **10 (4%)** |

| **Number of subjects with SAE (%)** | **8/230 (3.5%)** | **7/114 (6.1%)** | **18/232 (7.8%)** |
|---|---|---|---|

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Frequency of nausea

Proportion of subjects with nausea by week and treatment – safety population



Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Liraglutide antibodies

| | Liraglutide 1.8 mg/day |
|---|---|
| **Number of subjects with antibodies** | **20/204 (9.8%)** |

Presence of antibodies did not neutralise efficacy of $HbA_{1c}$ reduction

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Safety summary

- Low rate of serious adverse events (3.5%)

- Nausea is the most frequent adverse event

  - Low incidence declines with treatment duration

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

# Overall summary

In comparison to insulin glargine, liraglutide achieved:

- Significantly greater $HbA_{1c}$ reduction without increased minor hypoglycaemia
- Significant  and substantial weight reduction
- Reduction of more than 3 mmHg in systolic blood pressure

Liraglutide was well tolerated with:

- Low rate of SAEs
- Declining incidence of nausea

Russell-Jones *et al. Diabetes* 2008;57(Suppl. 1):A159 (LEAD-5)

**Exhibit N**

EARLY DECK OF MEDICAL SLIDES EMPHASIZING WEIGHT QUESTION

# Diabetes Management

# In the Hospital

Harold I. Daniel, MD, MSc, PhD
Medical Scientific Director
Novo Nordisk, Inc

Please see prescribing information.





# **Henry R Has a Question**

Will I gain weight?



# Comparison of Once-Daily Insulin Detemir With Once-Daily NPH in Poorly Controlled Patients on OAD Therapy

Type 2

- **504 insulin-naive patients uncontrolled on OAD therapy**
- **91 centers, Europe and the United States**
- **Multicenter, randomized, open-label, 3-arm, parallel-group trial**



**Insulin detemir PM, n=170**

**NPH PM, n=166**

**Insulin detemir AM, n=168**

Existing OADs continued

0

20

**Weeks**

Insulin titrated to target:
predinner PG $\leq$108 mg/dL*

OADs=oral antidiabetic drugs.
* Patients taking insulin detemir in the morning titrated to target prebreakfast PG <108 mg/dL.
Philis-Tsimikas A et al. *Clin Ther*. 2006;28:1569-1581.

Please see prescribing information.



**Type 2**

# Once-Daily Insulin Detemir With OAD Therapy: Improved Glycemic Control With Less Weight Gain



**57% less weight gain was observed in patients taking insulin detemir in the evening than in patients taking NPH insulin[1]***

Whether these observed differences represent true differences in the effects of insulin detemir and NPH insulin is not known, since these trials were not blinded and the protocols (eg, diet and exercise instructions and monitoring) were not specifically directed at exploring hypotheses related to weight effects of the treatments compared.

The clinical significance of the observed differences in weight has not been established.

*P=.005 vs NPH.

Philis-Tsimikas A et al. *Clin Ther*. 2006;28:1569-1581.

Please see prescribing information.





# Henry R Has a Question

What about hypoglycemia?



Please see prescribing information.

**Type 2**

# Once-Daily Insulin Detemir With OAD Therapy: A Low Rate of Hypoglycemia



The rates of overall hypoglycemia and major hypoglycemia were comparable with those for NPH insulin.

Philis-Tsimikas A et al. *Clin Ther*. 2006;28:1569-1581. Data on file, Novo Nordisk, Inc.

Please see prescribing information.



**Type 2**

# Treating to Target: Insulin Detemir in Addition to OADs in Patients With Type 2 Diabetes

- 475 insulin-naïve patients
- 58 centers, 10 countries



**2-week run-in**

**Insulin detemir twice daily, n=237**

**NPH twice daily, n=238**

**Existing OADs continued (both groups)**

-2    0                    12                        24

**Weeks**

**Insulin titrated to target: prebreakfast and predinner PG ≤108 mg/dL**

OADs=oral antidiabetic drugs; PG=plasma glucose.
Hermansen K et al. *Diabetes Care.* 2006;29:1269-1274.
NPH insulin, Novo Nordisk Inc., Bagsvaerd, Denmark.

Please see prescribing information.



novo nordisk®

# Glycemic Control With Less Weight Gain vs. NPH

**Type 2**



**At least 70% of subjects in each group achieved A1C ≤7%**

*$P<.001$.

The clinical significance of the observed differences has not been established. Whether these observed differences represent true differences in the effects of insulin detemir and NPH insulin is not known since these trials were not blinded and the protocols (eg, diet and exercise instructions and monitoring) were not specifically directed at exploring hypotheses related to weight effects of the treatments compared.

Hermansen K et al. *Diabetes Care*. 2006;29:1269-1274.

NPH insulin, Novo Nordisk Inc., Bagsvaerd, Denmark.

Please see prescribing information.

novo nordisk®

**Type 2**

# Treatment With Insulin Detemir Is Associated With a Low Rate of Hypoglycemia



N=476 patients with type 2 diabetes.
Adapted from Hermansen K et al. *Diabetes Care.* 2006;29:1269-1274.
Levemir [package insert]. Princeton, NJ: Novo Nordisk Inc.; 2005.

Please see prescribing information.



**Type 1**

# Efficacy of Once-Daily Insulin Detemir in Basal-Bolus Therapy

- 747 patients with type 1 diabetes
- 92 sites



**Detemir at bedtime
+ regular human insulin (n=491)**

3-week
screening

**NPH at bedtime
+ regular human insulin (n=256)**

1-month
titration

6 months

NPH insulin, Novo Nordisk Inc., Bagsvaerd, Denmark.
Levemir [package insert]. Princeton, NJ: Novo Nordisk Inc.; 2005.
Russell-Jones D et al. *Clin Ther*. 2004;26:724-736.

Please see prescribing information.


novo nordisk®

# Less Weight Gain Associated With Once-Daily Insulin Detemir

Type 1



The clinical significance of the observed differences has not been established. Whether these observed differences represent true differences in the effects of insulin detemir and NPH insulin is not known, since these trials were not blinded and the protocols (eg, diet and exercise instructions and monitoring) were not specifically directed at exploring hypotheses related to weight effects of the treatments compared.

Russell-Jones D et al. *Clin Ther.* 2004;26:724-736.

Please see prescribing information.

Type 2

# Consistent Weight Results With Insulin Detemir in Patients With Type 2 Diabetes



The clinical significance of the observed differences has not been established. Whether these observed differences represent true differences in the effects of insulin detemir and NPH insulin is not known because these trials were not blinded and the protocols were not specifically directed at exploring hypotheses related to weight effects of the treatments compared.

1. Philis-Tsimikas A et al. *Clin Ther*. 2006;28:1569-1581.
2. Hermansen K et al. Diabetes Care. 2006;29:1269-1274.
3. Rašlová K et al. Diabetes Res Clin Pract. 2004;66:193-201.
4. Haak T et al. Diabetes Obes Metab. 2005;7:56-64.

Please see prescribing information.



# Consistent Weight Results With Insulin Detemir in Patients With Type 1 Diabetes



The clinical significance of the observed differences has not been established. Whether these observed differences represent true differences in the effects of insulin detemir and NPH insulin is not known because these trials were not blinded and the protocols were not specifically directed at exploring hypotheses related to weight effects of the treatments compared.

Please see prescribing information.

novo nordisk®

# The US PREDICTIVE™ 303 Study: Trial Design



**N=5619 patients with type 2 diabetes**

**Main Inclusion Criteria:**
- **Type 2 diabetes**
- **Variety of treatment backgrounds**
- **A1C ≤12%**
- **BMI ≤45 kg/m²**
- **Age ≥18 y**

**303 Algorithm group**
n=2794 (542 sites)

**Standard-of-Care group**
n=2825 (541 sites)

**Week 0                    12**
**26**

**Visit 1                    2**
**3**

**Insulin Dose Titration:**
Week 0–12:    Only basal can be titrated
Week 12–26:   Any glucose-lowering medication can be adjusted

Data on file.
Meneghini L et al. Presented at: 67th Scientific Session of ADA; June 22-26, 2007; Chicago, IL.

Please see prescribing information.



# The US PREDICTIVE™ 303 Study: Simplified Insuiln Detemir Dose Titration Guidelines for 303 Algorithm Arm

**Type 2**

- Dose adjustments made every third day based on an average of 3 consecutive FPG levels

| FPG (mg/dL) | Dose Titration |
|---|---|
| <80 | Reduce insulin detemir dose by 3 units |
| 80–110 | No change |
| >110 | Increase insulin detemir dose by 3 units |

**3**
**0**
**3**

Data on file.

Meneghini L et al. Presented at: 67th Scientific Session of ADA; June 22-26, 2007; Chicago, IL.

Please see prescribing information.



# The US PREDICTIVE™ 303 Study: Analysis Sets

Type 2



Data on file.
Meneghini L et al. Presented at: 67th Scientific Session of ADA; June 22-26, 2007; Chicago, IL.
Please see prescribing information.

novo nordisk®

# The US PREDICTIVE™ 303 Study Insulin-Naïve Subgroup Analysis: Insulin Detemir Significantly Reduced A1C and FPG When Added to OAD Therapy



*$P$<.0001.
†$P$=.0001.
Data on file.
Selam JL et al. Abstract presented at: 67th Scientific Session of ADA; June 22-26, 2007; Chicago, IL.

Please see prescribing information.



Type 2

# The US PREDICTIVE™ 303 Study Insulin-Naïve Subgroup Analysis: Change in Rate of Hypoglycemia in Patients Who Added Insulin Detemir to OAD Therapy



Data on file.
Selam JL et al. Abstract presented at: 67th Scientific Session of ADA; June 22-26, 2007; Chicago, IL.

Please see prescribing information.



# The US PREDICTIVE™ 303 Study Insulin-Naïve Subgroup Analysis: 93% of Patients Remained on Once-Daily Dosing With Insulin Detemir When Added to OAD Therapy

**Type 2**



**Insulin detemir more than once daily**

**Once-daily Insulin detemir**

**93%**

**7%**

**Total sample (n=1526)**



**Insulin detemir more than once daily**

**Once-daily insulin detemir**

**5%**

**95%**

**303 Algorithm n=757**

**Insulin detemir more than once daily**

**Once-daily Insulin detemir**

**8%**

**92%**

**Standard-of-Care (n=769)**

Data on file.
Selam JL et al. Abstract presented at: 67th Scientific Session of ADA; June 22-26, 2007; Chicago, IL.

Please see prescribing information.



novo nordisk®

# Getting Started With Insulin Detemir Is Easy

Patients with type 2 diabetes uncontrolled on OAD therapy.

| When to dose | Once daily in the evening or at bedtime |
|---|---|
| How to dose | Start at 10 units* or 0.1-0.2 units/kg |
| How to titrate | Adjust the dosage according to the needs of the patient until desired FPG has been achieved |
| Blood glucose goal | FPG <110 mg/dL[1-3] |

Unit-to-unit conversion in patients currently taking basal insulin.[†]

*Once or twice daily; 1 kg=2.2 lb.
[†]The dose of insulin detemir should then be adjusted to achieve glycemic targets.
Any change of insulin should be made cautiously and only under medical supervision. Concomitant oral antidiabetes treatment may require adjustment.

1. Lebovitz HE et al. *Endocr Pract.* 2006;12(suppl 1):6-12.
2. Philis-Tsimikas A et al. *Clin Ther.* 2006;28:1569-1581.
3. Selam JL et al. Abstract presented at: 67th Scientific Session of ADA; June 22-26; 2007. Chicago, IL.
   Levemir [package insert]. Princeton, NJ: Novo Nordisk Inc.; 2005.

Please see prescribing information.


novo nordisk®

**Exhibit O**

RELATOR SMITH 2011-YEAR END ACE REVIEW

accountability collaboration execution (ace)

## Endocrinologist Diabetes Care Specialist (EDCS)



*2011 End-Year Review*

| Complete at beginning of review period | | |
|---|---|---|
| **Name:**<br><br>GREG SMITH | **Overall Performance rating:** | **ME** |
| **Position:**<br><br>Sr EDCS | **Employee's Signature** | **Date:** |
| **Time In Position / Date of Hire:** | **Manager's Signature** | **Date:** |
| **Manager's Name:**<br><br>ANGIE SMITH | **2nd Level Sign-off** | **Date:** |

---

| Customer & Society - Weight: 60% of overall ACE rating | | Rating: | ME |
|---|---|---|---|

**IC Scorecard: % Attainment**

| | Year to Date (End-Year) | |
|---|---|---|
| | Measure | Rating |
| IC % attainment (COE weighting, Share) | 95.3% | ME |

Measures: Jan - Nov'11 YTD Composite IC Attainment

**End-Year review:** Greg & his territory partner were focused on increasing the performance of the VA Beach Territory. Performance includes: Finished POA 1A (Jan-Mar) with 89.3% composite goal attainment; POA 1B (Apr-June) increased his performance & finished with 95.0% composite goal attainment; POA 2A achieved 100.0% goal attainment & finished the year 71 of 89 in the nation of EDCS teams

---

| Business Processes - Weight: 10% of overall ACE rating | | | Rating: | EE |
|---|---|---|---|---|

| | | Year to Date (End-Year) | |
|---|---|---|---|
| | Goal | Measure | Rating |
| Call Plan Compliance | 65%-70% | 76.8% | EE |

Measures: Jan - Nov'11 OSS

**End-Year review:** Greg ended the year above goal for call plan compliance. He & his territory partner work synergistically to ensure maximum reach & frequency to their call plan targets.

| People & Organization - Weight: 30% of overall ACE rating | | | Rating: | ME |
|---|---|---|---|---|

**Goal: Drives performance**

| | Competency | SubRating | Comments |
|---|---|---|---|
| Functional | Strategic Planning | ME | Greg consistently uses OSS data to plan his call objective & strategy. One area of increased opportunity for Greg is to analyze his territory on a more macro level to set strategy & direction in order to pull through managed care opportunities & drive performance through each brand. |
| | Call to Action | AE | Greg has been working toward incorporating a clear & direct call to action for each of his physicians before leaving the call. It will be important for Greg to find a way to close that fits his style and hold himself accountable to closing on a majority of calls. |
| | Adapts Approach | ME | Greg understands the style of his customers and adapts his approach to match their style. |
| | Builds Business Relevant Relationships | ME | Greg has established solid rapport & access within his territory having been there for many years. It's important for Greg to leverage his relationships in order to ask for more business. |
| | Creates Customer Engagement | ME | Because of Greg's long term relationships with many of his customers, he is able to consistently create customer engagement within his calls. He meshes both a personal & professional approach within his calls to ensure continuous rapport building & business focus. |
| | Understands the Market | EE | Greg has been with Novo Nordisk for over 10 years and within the geography for a majority of that time which has allowed him to establish in depth knowledge of his customers and the environment around him (ie hospitals, Endos, PCPs, pharmacy, managed care, etc.) |
| | Masters Product & Disease State Knowledge | ME | Greg has a thorough understanding of the products he promotes and would benefit from keeping himself up to date on all clinical data for NNI products & consistently using them to further strengthen his sales calls. |
| Leadership | Drives Performance | ME | Greg & his partner have been focused on elevating their performance within the territory. It will be important for Greg to identify the opportunities for growth & work toward growing business within those opportunities. |
| | Collaborates Across Boundaries | ME | Greg works collaboratively with overlapping DCS, IDCS, DE, Medical & Managed Mkts partners. He always makes himself available to his business partners when they reach out for his assistance. |

metric driven

**Exhibit P**

EMAILS   DOCUMENTING   RELATOR   SMITH'S   WORK   TO   BRING   MEDICAL
DEPARTMENT PERSONNEL ON RIDE ALONG PROGRAMS

## Heidi Smith

From:    "GSMI (Greg Smith)" <gsmi@novonordisk.com>
To:      <smittygh@verizon.net>
Sent:    Monday, June 11, 2007 8:15 AM
Subject: FW: Richmond

— Medical

From:  SORS (Soraly Servera)
Sent:  Wednesday, May 30, 2007 5:13 PM
To:    GTOB (Gary Tolbert)
Subject: Richmond

Hi Gary,

hope you are doing well.

I worked with Greg in Richmond today. Greg is very organized and coordinated the meetings. We were àble to met with the main KOLs and visited the Medical College of VA. The KOLs spoke very highly of Greg and it is obvious that he has good relationships with them. They wanted me to pass this message along to Greg's manager.

Soraly

_____

**Soraly Servera, MD**

Novo Nordisk Inc.
100 College Road West
Princeton, New Jersey 08540
USA
703-683-2497 (phone)
504-909-9585 (mobile)
sors@novonordisk.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

From:           ACNO (Anne Cannon)  — medical
Sent:           Wednesday, December 10, 2008 9:23 PM
To:             GSMI (Greg Smith)
Cc:             GTOB (Gary Tolbert)
Subject:        RE: Richmond

THANK You Greg  I  truly appreciate ALL your help and support .  You are  a
wonderful resource. Your  physicians  appreciate   all you do  and  truly you are the
ambassador   Novo should be proud to have
I cant thank you enough  and look forward to working with you again next year

Have a  wonderful Christmas with your beautiful family!!
Anne

---

**From:** GSMI (Greg Smith)
**Sent:** Wednesday, December 10, 2008 9:03 PM
**To:** ACNO (Anne Cannon)
**Subject:** Richmond


Anne,

Thanks for your help today!  Dr. Castellucci, Burris and Tyson I know appreciated
you keeping them updated with Novo Nordisk, and how our partnership with them
will grow into the future.  It's always nice to have our ambassadors from Medical
come and reinforce our message.

---

**Greg Smith**

Novo Nordisk Inc.
100 College Road West
Princeton, New Jersey 08540
USA
(804) 938-2917 (direct)
GSMI@novonordisk.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may
contain confidential information protected by law. You are hereby notified that any unauthorised reading,
disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited
and may violate rights to proprietary information. If you are not an intended recipient, please return this
e-mail to the sender and delete it immediately hereafter. Thank you.

**GSMI (Greg Smith)**

| From: | GCA (George Casimates) |
|---|---|
| Sent: | Tuesday, July 13, 2004 11:15 PM |
| To: | GSMI (Greg Smith) |
| Cc: | Tom Cusick (thcu@nnpi.com); VIKT (Vikki Tolbert); JOTA (Joanne St. John); LARI (Laura Riedy); Lee Sahene; Mike Bond; Scott Coleman; Steven Adkins; Teresa Shaffer; THCU (Tom Cusick) |
| Subject: | FW: VA/DOD Conversions |

Good job Greg:
Nice to see this from our IDCS team in the Mid-Atlantic.

**George Casimates**
Regional Business Director
Mid-Atlantic Region

Novo Nordisk Pharmaceuticals, Inc.
100 College Road West
Princeton, New Jersey 08540
USA
301-774-2160 (direct)
301-775-1257 (mobile)

This e-mail (including any attachments) is intended for the addressee(s) stated above only and may contain confidential information protected by law. You are hereby notified that any unauthorised reading, disclosure, copying or distribution of this e-mail or use of information contained herein is strictly prohibited and may violate rights to proprietary information. If you are not an intended recipient, please return this e-mail to the sender and delete it immediately hereafter. Thank you.

-----Original Message-----       ~Training Dept.~

| From: | TARH (Tara Hand) |
|---|---|
| Sent: | Tuesday, July 13, 2004 11:22 AM |
| To: | NNPI SLS_IDCS Only |
| Cc: | NNPI SLS_RBD/DBM; JOER (Joe Romano); TABL (Tabitha Lay) |
| Subject: | FW: VA/DOD Conversions |

Dear IDCS Team:

There are a lot of successes to tell everyone about. These few from Greg Smith out of Virginia. In 2 of these situations Greg was able to implement automatic substitutions. This topic to be discussed further at training.

I wanted to reemphasize to continue to support these facitlities even though they have verbalized the conversion. As we all know the process does not stop here.

Keep up all the efforts.

Tara hand

-----Original Message-----

| From: | THCU (Tom Cusick) |
|---|---|
| Sent: | Friday, July 09, 2004 5:10 PM |
| To: | TARH (Tara Hand) |
| Cc: | GCA (George Casimates) |
| Subject: | FW: VA/DOD Conversions |

Tara,

Some of Greg's success with VA's and DOD.

Regards,

Tom Cusick

1

**Exhibit Q**

VICTOZA FDA FULL PRESCRIBING INFORMATION

**EXHIBIT Q**

# VICTOZA

## liraglutide injection | 1.2 mg | 1.8 mg

---

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use VICTOZA® safely and effectively. See full prescribing information for VICTOZA®.
**VICTOZA® (liraglutide) injection, for subcutaneous use**
**Initial U.S. Approval: 2010**

---

| WARNING: RISK OF THYROID C–CELL TUMORS |
| --- |
| *See full prescribing information for complete boxed warning.* |
| • **Liraglutide causes thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether VICTOZA® causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined (5.1, 13.1).** |
| • **VICTOZA® is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the potential risk of MTC and the symptoms of thyroid tumors (4, 5.1).** |

---

### ——— INDICATIONS AND USAGE ———

VICTOZA® is a glucagon–like peptide–1 (GLP–1) receptor agonist indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus (1).

**Important Limitations of Use (1.1):**
• Not recommended as first-line therapy for patients inadequately controlled on diet and exercise (5.1).
• Has not been studied in patients with a history of pancreatitis. Consider other antidiabetic therapies in patients with a history of pancreatitis (5.2).
• Not for treatment of type 1 diabetes mellitus or diabetic ketoacidosis.
• Has not been studied in combination with prandial insulin.

### ——— DOSAGE AND ADMINISTRATION ———

• Inject subcutaneously in the abdomen, thigh or upper arm (2.1).
• Administer once daily at any time of day, independently of meals (2.2).
• Initiate at 0.6 mg per day for one week then increase to 1.2 mg. Dose can be increased to 1.8 mg for additional glycemic control (2.2).

### ——— DOSAGE FORMS AND STRENGTHS ———

• Injection: 6 mg/mL solution in a pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg (3).

### ——— CONTRAINDICATIONS ———

VICTOZA® is contraindicated in patients with a personal or family history of medullary thyroid carcinoma or in patients with Multiple Endocrine Neoplasia syndrome type 2 (4).
VICTOZA® is contraindicated in patients with a prior serious hypersensitivity reaction to VICTOZA® or any of the product components (4).

### ——— WARNINGS AND PRECAUTIONS ———

• Thyroid C-cell Tumors: See Boxed Warning (5.1).
• Pancreatitis: Postmarketing reports, including fatal and non-fatal hemorrhagic or necrotizing pancreatitis. Discontinue promptly if pancreatitis is suspected. Do not restart if pancreatitis is confirmed. Consider other antidiabetic therapies in patients with a history of pancreatitis (5.2).
• Never share a VICTOZA® pen between patients, even if the needle is changed (5.3).
• Serious Hypoglycemia: When VICTOZA® is used with an insulin secretagogue (e.g. a sulfonylurea) or insulin, consider lowering the dose of the insulin secretagogue or insulin to reduce the risk of hypoglycemia (5.4).
• Renal Impairment: Postmarketing, usually in association with nausea, vomiting, diarrhea, or dehydration which may sometimes require hemodialysis. Use caution when initiating or escalating doses of VICTOZA® in patients with renal impairment (5.5).
• Hypersensitivity: Postmarketing reports of serious hypersensitivity reactions (e.g., anaphylactic reactions and angioedema). Discontinue VICTOZA® and other suspect medications and promptly seek medical advice (5.6).
• Macrovascular Outcomes: There have been no studies establishing conclusive evidence of macrovascular risk reduction with VICTOZA® or any other antidiabetic drug (5.7).

### ——— ADVERSE REACTIONS ———

• The most common adverse reactions, reported in ≥5% of patients treated with VICTOZA® are: nausea, diarrhea, headache and vomiting (6.1).
• Immunogenicity-related events, including urticaria, were more common among VICTOZA®-treated patients (0.8%) than among comparator-treated patients (0.4%) in clinical trials (6.2).
**To report SUSPECTED ADVERSE REACTIONS, contact Novo Nordisk Inc. at 1–877–484–2869 or FDA at 1–800–FDA–1088 or www.fda.gov/medwatch.**

### ——— DRUG INTERACTIONS ———

• VICTOZA® delays gastric emptying. May impact absorption of concomitantly administered oral medications. (7).

### ——— USE IN SPECIFIC POPULATIONS ———

• Renal Impairment: No dose adjustment recommended (2.3, 8.6, 12.3).

**See 17 for PATIENT COUNSELING INFORMATION and FDA-Approved Medication Guide.**

**Revised: 04/2016**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***
**WARNING: RISK OF THYROID C–CELL TUMORS**
**1   INDICATIONS AND USAGE**
1.1   Important Limitations of Use
**2   DOSAGE AND ADMINISTRATION**
2.1   Important Administration Instructions
2.2   General Dosing and Administration
2.3   Concomitant Use with an Insulin Secretagogue (e.g. Sulfonylurea) or with Insulin
2.4   Dosage in Patients with Renal Impairment
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
5.1   Risk of Thyroid C-cell Tumors
5.2   Pancreatitis
5.3   Never Share a VICTOZA® Pen Between Patients
5.4   Use with Medications Known to Cause Hypoglycemia
5.5   Renal Impairment
5.6   Hypersensitivity Reactions
5.7   Macrovascular Outcomes

**6   ADVERSE REACTIONS**
6.1   Clinical Trials Experience
6.2   Immunogenicity
6.3   Post-Marketing Experience
**7   DRUG INTERACTIONS**
7.1   Oral Medications
**8   USE IN SPECIFIC POPULATIONS**
8.1   Pregnancy
8.3   Nursing Mothers
8.4   Pediatric Use
8.5   Geriatric Use
8.6   Renal Impairment
8.7   Hepatic Impairment
8.8   Gastroparesis
**10   OVERDOSAGE**
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
12.1   Mechanism of Action
12.2   Pharmacodynamics
12.3   Pharmacokinetics

**13   NONCLINICAL TOXICOLOGY**
13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
**14   CLINICAL STUDIES**
14.1   Monotherapy
14.2   Combination Therapy
14.3   Patients with Moderate Renal Impairment
**16   HOW SUPPLIED/STORAGE AND HANDLING**
16.1   How Supplied
16.2   Recommended Storage
**17   PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

---

**WARNING: RISK OF THYROID C–CELL TUMORS**

- **Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether VICTOZA® causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined *[see Warnings and Precautions (5.1) and Nonclinical Toxicology (13.1)]*.**

- **VICTOZA® is contraindicated in patients with a personal or family history of MTC and in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the potential risk for MTC with the use of VICTOZA® and inform them of symptoms of thyroid tumors (e.g. a mass in the neck, dysphagia, dyspnea, persistent hoarseness). Routine monitoring of serum calcitonin or using thyroid ultrasound is of uncertain value for early detection of MTC in patients treated with VICTOZA® *[see Contraindications (4) and Warnings and Precautions (5.1)]*.**

---

## 1   INDICATIONS AND USAGE

VICTOZA® is indicated as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

### 1.1   Important Limitations of Use

- VICTOZA® is not recommended as first-line therapy for patients who have inadequate glycemic control on diet and exercise because of the uncertain relevance of the rodent C-cell tumor findings to humans. Prescribe VICTOZA® only to patients for whom the potential benefits are considered to outweigh the potential risk *[see Warnings and Precautions (5.1)]*.

- Based on spontaneous postmarketing reports, acute pancreatitis, including fatal and non-fatal hemorrhagic or necrotizing pancreatitis has been observed in patients treated with VICTOZA®. VICTOZA® has not been studied in patients with a history of pancreatitis. It is unknown whether patients with a history of pancreatitis are at increased risk for pancreatitis while using VICTOZA®. Other antidiabetic therapies should be considered in patients with a history of pancreatitis.

- VICTOZA® is not a substitute for insulin. VICTOZA® should not be used in patients with type 1 diabetes mellitus or for the treatment of diabetic ketoacidosis, as it would not be effective in these settings.

- The concurrent use of VICTOZA® and prandial insulin has not been studied.

## 2   DOSAGE AND ADMINISTRATION

### 2.1   Important Administration Instructions

- Inspect visually prior to each injection. Only use if solution is clear, colorless, and contains no particles.

- Inject VICTOZA® subcutaneously in the abdomen, thigh or upper arm. No dose adjustment is needed if changing the injection site and/or timing.

- When using VICTOZA® with insulin, administer as separate injections. Never mix.

- It is acceptable to inject VICTOZA® and insulin in the same body region but the injections should not be adjacent to each other.

### 2.2   General Dosing and Administration

- Inject VICTOZA® subcutaneously once-daily at any time of day, independently of meals.

- Initiate VICTOZA® with a dose of 0.6 mg per day for one week. The 0.6 mg dose is a starting dose intended to reduce gastrointestinal symptoms during initial titration, and is not effective for glycemic control. After one week at 0.6 mg per day, the dose should be increased to 1.2 mg. If the 1.2 mg dose does not result in acceptable glycemic control, the dose can be increased to 1.8 mg. If a dose is missed, resume the once-daily regimen as prescribed with the next scheduled dose. Do not administer an extra dose or increase in dose to make up for the missed dose.

- If more than 3 days have elapsed since the last VICTOZA® dose, reinitiate VICTOZA® at 0.6 mg to mitigate any gastrointestinal symptoms associated with reinitiation of treatment. Upon reinitiation, VICTOZA® should be titrated at the discretion of the prescriber.

### 2.3   Concomitant Use with an Insulin Secretagogue (e.g., Sulfonylurea) or with Insulin

When initiating VICTOZA®, consider reducing the dose of concomitantly administered insulin secretagogues (such as sulfonylureas) to reduce the risk of hypoglycemia *[see Warnings and Precautions (5.4) and Adverse Reactions (6)]*.

### 2.4   Dosage in Patients with Renal Impairment

No dose adjustment is recommended for patients with renal impairment.

## 3   DOSAGE FORMS AND STRENGTHS

Injection: 6 mg/mL solution in a pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg.

## 4   CONTRAINDICATIONS

- **Medullary Thyroid Carcinoma**
  VICTOZA® is contraindicated in patients with a personal or family history of medullary thyroid carcinoma (MTC) or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).

- **Hypersensitivity**
  VICTOZA® is contraindicated in patients with a prior serious hypersensitivity reaction to VICTOZA® or to any of the product components.

## 5   WARNINGS AND PRECAUTIONS

### 5.1   Risk of Thyroid C-cell Tumors

Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors (adenomas and/or carcinomas) at clinically relevant exposures in both genders of rats and mice *[see Nonclinical Toxicology (13.1)]*. Malignant thyroid C-cell carcinomas were detected in rats and mice. It is unknown

in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined.

Cases of MTC in patients treated with VICTOZA® have been reported in the postmarketing period; the data in these reports are insufficient to establish or exclude a causal relationship between MTC and VICTOZA® use in humans.

VICTOZA® is contraindicated in patients with a personal or family history of MTC or in patients with MEN 2. Counsel patients regarding the potential risk for MTC with the use of VICTOZA® and inform them of symptoms of thyroid tumors (e.g. a mass in the neck, dysphagia, dyspnea, persistent hoarseness). Routine monitoring of serum calcitonin or using thyroid ultrasound is of uncertain value for early detection of MTC in patients treated with VICTOZA®. Such monitoring may increase the risk of unnecessary procedures, due to low test specificity for serum calcitonin and a high background incidence of thyroid disease. Significantly elevated serum calcitonin may indicate MTC and patients with MTC usually have calcitonin values >50 ng/L. If serum calcitonin is measured and found to be elevated, the patient should be further evaluated. Patients with thyroid nodules noted on physical examination or neck imaging should also be further evaluated.

### 5.2   Pancreatitis

Based on spontaneous postmarketing reports, acute pancreatitis, including fatal and non-fatal hemorrhagic or necrotizing pancreatitis, has been observed in patients treated with VICTOZA®. After initiation of VICTOZA®, observe patients carefully for signs and symptoms of pancreatitis (including persistent severe abdominal pain, sometimes radiating to the back and which may or may not be accompanied by vomiting). If pancreatitis is suspected, VICTOZA® should promptly be discontinued and appropriate management should be initiated. If pancreatitis is confirmed, VICTOZA® should not be restarted. Consider antidiabetic therapies other than VICTOZA® in patients with a history of pancreatitis.

In clinical trials of VICTOZA®, there have been 13 cases of pancreatitis among VICTOZA®-treated patients and 1 case in a comparator (glimepiride) treated patient (2.7 vs. 0.5 cases per 1000 patient-years). Nine of the 13 cases with VICTOZA® were reported as acute pancreatitis and four were reported as chronic pancreatitis. In one case in a VICTOZA®-treated patient, pancreatitis, with necrosis, was observed and led to death; however clinical causality could not be established. Some patients had other risk factors for pancreatitis, such as a history of cholelithiasis or alcohol abuse.

### 5.3   Never Share a VICTOZA® Pen Between Patients

VICTOZA® pens must never be shared between patients, even if the needle is changed. Pen-sharing poses a risk for transmission of blood-borne pathogens.

### 5.4   Use with Medications Known to Cause Hypoglycemia

Patients receiving VICTOZA® in combination with an insulin secretagogue (e.g., sulfonylurea) or insulin may have an increased risk of hypoglycemia. The risk of hypoglycemia may be lowered by a reduction in the dose of sulfonylurea (or other concomitantly administered insulin secretagogues) or insulin *[see Dosage and Administration (2.2), Adverse Reactions (6.1)]*.

### 5.5   Renal Impairment

VICTOZA® has not been found to be directly nephrotoxic in animal studies or clinical trials. There have been postmarketing reports of acute renal failure and worsening of chronic renal failure, which may sometimes require hemodialysis in VICTOZA®-treated patients *[see Adverse Reactions (6.2)]*. Some of these events were reported in patients without known underlying renal disease. A majority of the reported events occurred in patients who had experienced nausea, vomiting, diarrhea, or dehydration *[see Adverse Reactions (6.1)]*. Some of the reported events occurred in patients receiving one or more medications known to affect renal function or hydration status. Altered renal function has been reversed in many of the reported cases with supportive treatment and discontinuation of potentially causative agents, including VICTOZA®. Use caution when initiating or escalating doses of VICTOZA® in patients with renal impairment *[see Use in Specific Populations (8.6)]*.

### 5.6   Hypersensitivity Reactions

There have been postmarketing reports of serious hypersensitivity reactions (e.g., anaphylactic reactions and angioedema) in patients treated with VICTOZA®. If a hypersensitivity reaction occurs, the patient should discontinue VICTOZA® and other suspect medications and promptly seek medical advice.

Angioedema has also been reported with other GLP-1 receptor agonists. Use caution in a patient with a history of angioedema with another GLP-1 receptor agonist because it is unknown whether such patients will be predisposed to angioedema with VICTOZA®.

### 5.7   Macrovascular Outcomes

There have been no clinical studies establishing conclusive evidence of macrovascular risk reduction with VICTOZA® or any other antidiabetic drug.

## 6   ADVERSE REACTIONS

The following serious adverse reactions are described below or elsewhere in the prescribing information:

- Risk of Thyroid C-cell Tumors *[see Warnings and Precautions (5.1)]*
- Pancreatitis *[see Warnings and Precautions (5.2)]*
- Use with Medications Known to Cause Hypoglycemia *[see Warnings and Precautions (5.4)]*
- Renal Impairment *[see Warnings and Precautions (5.5)]*
- Hypersensitivity Reactions *[see Warnings and Precautions (5.6)]*

### 6.1   Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

**Common Adverse Reactions**

The data in Table 1 are derived from 5 placebo-controlled clinical trials *[see Clinical Studies (14)]*. These data reflect exposure of 1673 patients to VICTOZA® and a mean duration of exposure to VICTOZA® of 37.3 weeks. The mean age of patients was 58 years, 4% were 75 years or older and 54% were male. The population was 79% White, 6% Black or African American, 13% Asian; 4% were of Hispanic or Latino ethnicity. At baseline the population had diabetes for an average of 9.1 years and a mean $HbA_{1c}$ of 8.4%. Baseline estimated renal function was normal or mildly impaired in 88.1% and moderately

Table 1 shows common adverse reactions, excluding hypoglycemia, associated with the use of VICTOZA®. These adverse reactions occurred more commonly on VICTOZA® than on placebo and occurred in at least 5% of patients treated with VICTOZA®.

**Table 1  Adverse reactions reported in ≥ 5% of VICTOZA®-treated patients**

| Adverse Reaction | Placebo<br>N = 661 | Liraglutide 1.2 mg<br>N = 645 | Liraglutide 1.8 mg<br>N = 1024 |
|---|---|---|---|
| | (%) | (%) | (%) |
| Nausea | 5 | 18 | 20 |
| Diarrhea | 4 | 10 | 12 |
| Headache | 7 | 11 | 10 |
| Nasopharyngitis | 8 | 9 | 10 |
| Vomiting | 2 | 6 | 9 |
| Decreased appetite | 1 | 10 | 9 |
| Dyspepsia | 1 | 4 | 7 |
| Upper Respiratory Tract Infection | 6 | 7 | 6 |
| Constipation | 1 | 5 | 5 |
| Back Pain | 3 | 4 | 5 |

Cumulative proportions were calculated combining studies using Cochran-Mantel-Haenszel weights

In an analysis of placebo- and active-controlled trials, the types and frequency of common adverse reactions, excluding hypoglycemia, were similar to those listed in Table 1.

Other Adverse Reactions

*Gastrointestinal Adverse Reactions*

In the pool of 5 placebo-controlled clinical trials, withdrawals due to gastrointestinal adverse reactions, occurred in 4.3% of VICTOZA®-treated patients and 0.5% of placebo-treated patients. Withdrawal due to gastrointestinal adverse events mainly occurred during the first 2-3 months of the trials.

*Injection site reactions*

Injection site reactions (e.g., injection site rash, erythema) were reported in approximately 2% of VICTOZA®-treated patients in the five double-blind clinical trials of at least 26 weeks duration. Less than 0.2% of VICTOZA®-treated patients discontinued due to injection site reactions.

*Hypoglycemia*

Hypoglycemia requiring the assistance of another person in placebo-controlled trials

In 5 placebo-controlled clinical trials of at least 26 weeks duration, hypoglycemia requiring the assistance of another person for treatment occurred in 8 VICTOZA®-treated patients (7.5 events per 1000 patient-years). Of these 8 VICTOZA®-treated patients, 7 patients were concomitantly using a sulfonylurea.

**Table 2  Incidence (%) and Rate (episodes/patient year) of Hypoglycemia in 26-Week Combination Therapy Placebo-controlled Trials**

| | Placebo Comparator | VICTOZA® Treatment |
|---|---|---|
| **Add-on to Metformin** | **Placebo + Metformin**<br>(N = 121) | **VICTOZA® + Metformin**<br>(N = 724) |
| Patient not able to self-treat | 0 | 0.1 (0.001) |
| Patient able to self-treat | 2.5 (0.06) | 3.6 (0.05) |
| **Add-on to Glimepiride** | **Placebo + Glimepiride**<br>(N = 114) | **VICTOZA® + Glimepiride**<br>(N = 695) |
| Patient not able to self-treat | 0 | 0.1 (0.003) |
| Patient able to self-treat | 2.6 (0.17) | 7.5 (0.38) |
| Not classified | 0 | 0.9 (0.05) |
| **Add-on to Metformin + Rosiglitazone** | **Placebo + Metformin + Rosiglitazone**<br>(N = 175) | **VICTOZA® + Metformin + Rosiglitazone**<br>(N = 355) |
| Patient not able to self-treat | 0 | 0 |
| Patient able to self-treat | 4.6 (0.15) | 7.9 (0.49) |
| Not classified | 1.1 (0.03) | 0.6 (0.01) |
| **Add-on to Metformin + Glimepiride** | **Placebo + Metformin + Glimepiride**<br>(N = 114) | **VICTOZA® + Metformin + Glimepiride**<br>(N = 230) |
| Patient not able to self-treat | 0 | 2.2 (0.06) |
| Patient able to self-treat | 16.7 (0.95) | 27.4 (1.16) |
| Not classified | 0 | 0 |

"Patient not able to self-treat" is defined as an event requiring the assistance of another person for treatment

*Malignancy*

In a pooled analysis of clinical trials, the incidence rate (per 1,000 patient-years) for malignant neoplasms (based on investigator-reported events, medical history, pathology reports, and surgical reports from both blinded and open-label study periods) was 10.9 for VICTOZA®, 6.3 for placebo, and 7.2 for active comparator. After excluding papillary thyroid carcinoma events *[see Adverse Reactions (6.1)]*, no particular cancer cell type predominated. Seven malignant neoplasm events were reported beyond 1 year of exposure to study medication, six events among VICTOZA®-treated patients (4 colon, 1 prostate and 1 nasopharyngeal), no events with placebo and one event with active comparator (colon). Causality has not been established.

*Papillary thyroid carcinoma*

In clinical trials of VICTOZA®, there were 7 reported cases of papillary thyroid carcinoma in patients treated with VICTOZA® and 1 case in a comparator-treated patient (1.5 vs. 0.5 cases per 1000 patient-

*Cholelithiasis and cholecystitis*

In clinical trials of Saxenda® (liraglutide at doses up to 3 mg), 1.5% and 0.6% of Saxenda®-treated patients reported adverse events of cholelithiasis and cholecystitis versus 0.5% and 0.2% of placebo-treated patients. The majority of Saxenda®-treated patients with adverse events of cholelithiasis and cholecystitis required cholecystectomy. In clinical trials of VICTOZA®, the incidence of cholelithiasis was 0.3% in both VICTOZA®-treated and placebo-treated patients. The incidence of cholecystitis was 0.2% in both VICTOZA®-treated and placebo-treated patients.

**Laboratory Tests**

*Bilirubin*

In the five clinical trials of at least 26 weeks duration, mildly elevated serum bilirubin concentrations (elevations to no more than twice the upper limit of the reference range) occurred in 4.0% of VICTOZA®-treated patients, 2.1% of placebo-treated patients and 3.5% of active-comparator-treated patients. This finding was not accompanied by abnormalities in other liver tests. The significance of this isolated finding is unknown.

*Calcitonin*

Calcitonin, a biological marker of MTC, was measured throughout the clinical development program. At the end of the clinical trials, adjusted mean serum calcitonin concentrations were higher in VICTOZA®-treated patients compared to placebo-treated patients but not compared to patients receiving active comparator. Between group differences in adjusted mean serum calcitonin values were approximately 0.1 ng/L or less. Among patients with pretreatment calcitonin <20 ng/L, calcitonin elevations to >20 ng/L occurred in 0.7% of VICTOZA®-treated patients, 0.3% of placebo-treated patients, and 0.5% of active-comparator-treated patients. The clinical significance of these findings is unknown.

*Lipase and Amylase*

In one placebo-controlled trial in renal impairment patients, a mean increase of 33% for lipase and 15% for amylase from baseline was observed for VICTOZA®-treated patients while placebo-treated patients had a mean decrease in lipase of 3% and a mean increase in amylase of 1%.The clinical significance of these changes is unknown.

**Vital signs**

VICTOZA® did not have adverse effects on blood pressure. Mean increases from baseline in heart rate of 2 to 3 beats per minute have been observed with VICTOZA® compared to placebo. The long-term clinical effects of the increase in pulse rate have not been established *[see Warnings and Precautions (5.7)].*

**6.2   Immunogenicity**

Consistent with the potentially immunogenic properties of protein and peptide pharmaceuticals, patients treated with VICTOZA® may develop anti-liraglutide antibodies. Approximately 50-70% of VICTOZA®-treated patients in five double-blind clinical trials of 26 weeks duration or longer were tested for the presence of anti-liraglutide antibodies at the end of treatment. Low titers (concentrations not requiring dilution of serum) of anti-liraglutide antibodies were detected in 8.6% of these VICTOZA®-treated patients. Sampling was not performed uniformly across all patients in the clinical trials, and this may have resulted in an underestimate of the actual percentage of patients who developed antibodies. Cross-reacting anti-liraglutide antibodies to native glucagon-like peptide-1 (GLP-1) occurred in 6.9% of the VICTOZA®-treated patients in the double-blind 52-week monotherapy trial and in 4.8% of the VICTOZA®-treated patients in the double-blind 26-week add-on combination therapy trials. These cross-reacting anti-liraglutide antibodies were not tested for neutralizing effect against native GLP-1, and thus the potential for clinically significant neutralization of native GLP-1 was not assessed. Antibodies that had a neutralizing effect on liraglutide in an *in vitro* assay occurred in 2.3% of the VICTOZA®-treated patients in the double-blind 52-week monotherapy trial and in 1.0% of the VICTOZA®-treated patients in the double-blind 26-week add-on combination therapy trials.

Among VICTOZA®-treated patients who developed anti-liraglutide antibodies, the most common category of adverse events was that of infections, which occurred among 40% of these patients compared to 36%, 34% and 35% of antibody-negative VICTOZA®-treated, placebo-treated and active-control-treated patients, respectively. The specific infections which occurred with greater frequency among VICTOZA®-treated antibody-positive patients were primarily nonserious upper respiratory tract infections, which occurred among 11% of VICTOZA®-treated antibody-positive patients; and among 7%, 7% and 5% of antibody-negative VICTOZA®-treated, placebo-treated and active-control-treated patients, respectively. Among VICTOZA®-treated antibody-negative patients, the most common category of adverse events was that of gastrointestinal events, which occurred in 43%, 18% and 19% of antibody-negative VICTOZA®-treated, placebo-treated and active-control-treated patients, respectively. Antibody formation was not associated with reduced efficacy of VICTOZA® when comparing mean HbA$_{1c}$ of all antibody-positive and all antibody-negative patients. However, the 3 patients with the highest titers of anti-liraglutide antibodies had no reduction in HbA$_{1c}$ with VICTOZA® treatment.

In five double-blind clinical trials of VICTOZA®, events from a composite of adverse events potentially related to immunogenicity (e.g. urticaria, angioedema) occurred among 0.8% of VICTOZA®-treated patients and among 0.4% of comparator-treated patients. Urticaria accounted for approximately one-half of the events in this composite for VICTOZA®-treated patients. Patients who developed anti-liraglutide antibodies were not more likely to develop events from the immunogenicity events composite than were patients who did not develop anti-liraglutide antibodies.

**6.3   Post-Marketing Experience**

The following additional adverse reactions have been reported during post-approval use of VICTOZA®. Because these events are reported voluntarily from a population of uncertain size, it is generally not possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

- Medullary thyroid carcinoma *[see Warnings and Precautions (5.1)]*
- Dehydration resulting from nausea, vomiting and diarrhea. *[see Warnings and Precautions (5.5) and Patient Counseling Information (17)]*
- Increased serum creatinine, acute renal failure or worsening of chronic renal failure, sometimes requiring hemodialysis. *[see Warnings and Precautions (5.5) and Patient Counseling Information (17)]*
- Angioedema and anaphylactic reactions. *[see Contraindications (4), Warnings and Precautions*

- Allergic reactions: rash and pruritus
- Acute pancreatitis, hemorrhagic and necrotizing pancreatitis sometimes resulting in death *[see Warnings and Precautions (5.2)]*
- Hepatobiliary disorders: elevations of liver enzymes, hyperbilirubinemia, cholestasis, hepatitis *[see Adverse Reactions (6.1)]*

## 7   DRUG INTERACTIONS

### 7.1   Oral Medications

VICTOZA® causes a delay of gastric emptying, and thereby has the potential to impact the absorption of concomitantly administered oral medications. In clinical pharmacology trials, VICTOZA® did not affect the absorption of the tested orally administered medications to any clinically relevant degree. Nonetheless, caution should be exercised when oral medications are concomitantly administered with VICTOZA®.

## 8   USE IN SPECIFIC POPULATIONS

### 8.1   Pregnancy

Pregnancy Category C.
There are no adequate and well-controlled studies of VICTOZA® in pregnant women. VICTOZA® should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. Liraglutide has been shown to be teratogenic in rats at or above 0.8 times the human systemic exposures resulting from the maximum recommended human dose (MRHD) of 1.8 mg/day based on plasma area under the time-concentration curve (AUC). Liraglutide has been shown to cause reduced growth and increased total major abnormalities in rabbits at systemic exposures below human exposure at the MRHD based on plasma AUC.

Female rats given subcutaneous doses of 0.1, 0.25 and 1.0 mg/kg/day liraglutide beginning 2 weeks before mating through gestation day 17 had estimated systemic exposures 0.8–, 3–, and 11–times the human exposure at the MRHD based on plasma AUC comparison. The number of early embryonic deaths in the 1 mg/kg/day group increased slightly. Fetal abnormalities and variations in kidneys and blood vessels, irregular ossification of the skull, and a more complete state of ossification occurred at all doses. Mottled liver and minimally kinked ribs occurred at the highest dose. The incidence of fetal malformations in liraglutide-treated groups exceeding concurrent and historical controls were misshapen oropharynx and/or narrowed opening into larynx at 0.1 mg/kg/day and umbilical hernia at 0.1 and 0.25 mg/kg/day.

Pregnant rabbits given subcutaneous doses of 0.01, 0.025 and 0.05 mg/kg/day liraglutide from gestation day 6 through day 18 inclusive, had estimated systemic exposures less than the human exposure at the MRHD of 1.8 mg/day at all doses, based on plasma AUC. Liraglutide decreased fetal weight and dose-dependently increased the incidence of total major fetal abnormalities at all doses. The incidence of malformations exceeded concurrent and historical controls at 0.01 mg/kg/day (kidneys, scapula), ≥ 0.01 mg/kg/day (eyes, forelimb), 0.025 mg/kg/day (brain, tail and sacral vertebrae, major blood vessels and heart, umbilicus), ≥ 0.025 mg/kg/day (sternum) and at 0.05 mg/kg/day (parietal bones, major blood vessels). Irregular ossification and/or skeletal abnormalities occurred in the skull and jaw, vertebrae and ribs, sternum, pelvis, tail, and scapula; and dose-dependent minor skeletal variations were observed. Visceral abnormalities occurred in blood vessels, lung, liver, and esophagus. Bilobed or bifurcated gallbladder was seen in all treatment groups, but not in the control group.

In pregnant female rats given subcutaneous doses of 0.1, 0.25 and 1.0 mg/kg/day liraglutide from gestation day 6 through weaning or termination of nursing on lactation day 24, estimated systemic exposures were 0.8–, 3–, and 11–times human exposure at the MRHD of 1.8 mg/day, based on plasma AUC. A slight delay in parturition was observed in the majority of treated rats. Group mean body weight of neonatal rats from liraglutide-treated dams was lower than neonatal rats from control group dams. Bloody scabs and agitated behavior occurred in male rats descended from dams treated with 1 mg/kg/day liraglutide. Group mean body weight from birth to postpartum day 14 trended lower in $F_2$ generation rats descended from liraglutide-treated rats compared to $F_2$ generation rats descended from controls, but differences did not reach statistical significance for any group.

### 8.3   Nursing Mothers

It is not known whether VICTOZA® is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for tumorigenicity shown for liraglutide in animal studies, a decision should be made whether to discontinue nursing or to discontinue VICTOZA®, taking into account the importance of the drug to the mother. In lactating rats, liraglutide was excreted unchanged in milk at concentrations approximately 50% of maternal plasma concentrations.

### 8.4   Pediatric Use

Safety and effectiveness of VICTOZA® have not been established in pediatric patients. VICTOZA® is not recommended for use in pediatric patients.

### 8.5   Geriatric Use

In the VICTOZA® clinical trials, a total of 797 (20%) of the patients were 65 years of age and over and 113 (2.8%) were 75 years of age and over. No overall differences in safety or effectiveness were observed between these patients and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

### 8.6   Renal Impairment

No dose adjustment of VICTOZA® is recommended for patients with renal impairment *[see Clinical Pharmacology (12.3)]*. The safety and efficacy of VICTOZA® was evaluated in a 26-week clinical study that included patients with moderate renal impairment (eGFR 30 to 60 mL/min/1.73 m²) *[see Clinical Studies (14.3)]*. There is limited experience with VICTOZA® in patients with severe renal impairment including end stage renal disease. There have been postmarketing reports of acute renal failure and worsening of chronic renal failure, which may sometimes require hemodialysis *[see Warnings and Precautions (5.5) and Adverse Reactions (6.2)]*. Use caution in patients who experience dehydration.

### 8.7   Hepatic Impairment

There is limited experience in patients with mild, moderate or severe hepatic impairment. Therefore, VICTOZA® should be used with caution in this patient population. No dose adjustment of VICTOZA® is

### 8.8   Gastroparesis

VICTOZA® slows gastric emptying. VICTOZA® has not been studied in patients with pre-existing gastroparesis.

## 10   OVERDOSAGE

Overdoses have been reported in clinical trials and post-marketing use of VICTOZA®. Effects have included severe nausea and severe vomiting. In the event of overdosage, appropriate supportive treatment should be initiated according to the patient's clinical signs and symptoms.

## 11   DESCRIPTION

VICTOZA® contains liraglutide, an analog of human GLP-1 and acts as a GLP-1 receptor agonist. The peptide precursor of liraglutide, produced by a process that includes expression of recombinant DNA in *Saccharomyces cerevisiae*, has been engineered to be 97% homologous to native human GLP-1 by substituting arginine for lysine at position 34. Liraglutide is made by attaching a C-16 fatty acid (palmitic acid) with a glutamic acid spacer on the remaining lysine residue at position 26 of the peptide precursor. The molecular formula of liraglutide is $C_{172}H_{265}N_{43}O_{51}$ and the molecular weight is 3751.2 Daltons. The structural formula (Figure 1) is:



**Figure 1  Structural Formula of liraglutide**

VICTOZA® is a clear, colorless or almost colorless solution. Each 1 mL of VICTOZA® solution contains 6 mg of liraglutide and the following inactive ingredients: disodium phosphate dihydrate, 1.42 mg; propylene glycol, 14 mg; phenol, 5.5 mg; and water for injection. Each pre-filled pen contains a 3 mL solution of VICTOZA® equivalent to 18 mg liraglutide (free-base, anhydrous).

## 12   CLINICAL PHARMACOLOGY

### 12.1   Mechanism of Action

Liraglutide is an activated human Glucagon-Like Peptide-1 (GLP-1) receptor agonist with 97% amino acid sequence homology to endogenous human GLP-1(7-37). GLP-1(7-37) represents <20% of total circulating endogenous GLP-1. Like GLP-1(7-37), liraglutide activates the GLP-1 receptor, a membrane-bound cell-surface receptor coupled to adenylyl cyclase by the stimulatory G-protein, Gs, in pancreatic beta cells. Liraglutide increases intracellular cyclic AMP (cAMP) leading to insulin release in the presence of elevated glucose concentrations. This insulin secretion subsides as blood glucose concentrations decrease and approach euglycemia. Liraglutide also decreases glucagon secretion in a glucose-dependent manner. The mechanism of blood glucose lowering also involves a delay in gastric emptying.

GLP-1(7-37) has a half-life of 1.5-2 minutes due to degradation by the ubiquitous endogenous enzymes, dipeptidyl peptidase IV (DPP-IV) and neutral endopeptidases (NEP). Unlike native GLP-1, liraglutide is stable against metabolic degradation by both peptidases and has a plasma half-life of 13 hours after subcutaneous administration. The pharmacokinetic profile of liraglutide, which makes it suitable for once daily administration, is a result of self-association that delays absorption, plasma protein binding and stability against metabolic degradation by DPP-IV and NEP.

### 12.2   Pharmacodynamics

VICTOZA®'s pharmacodynamic profile is consistent with its pharmacokinetic profile observed after single subcutaneous administration as VICTOZA® lowered fasting, premeal and postprandial glucose throughout the day *[see Clinical Pharmacology (12.3)]*.

Fasting and postprandial glucose was measured before and up to 5 hours after a standardized meal after treatment to steady state with 0.6, 1.2 and 1.8 mg VICTOZA® or placebo. Compared to placebo, the postprandial plasma glucose $AUC_{0-300min}$ was 35% lower after VICTOZA® 1.2 mg and 38% lower after VICTOZA® 1.8 mg.

*Glucose-dependent insulin secretion*

The effect of a single dose of 7.5 mcg/kg (~ 0.7 mg) VICTOZA® on insulin secretion rates (ISR) was investigated in 10 patients with type 2 diabetes during graded glucose infusion. In these patients, on average, the ISR response was increased in a glucose-dependent manner (Figure 2).



**Figure 2  Mean Insulin Secretion Rate (ISR) versus Glucose Concentration Following Single-Dose VICTOZA® 7.5 mcg/kg (~ 0.7 mg) or Placebo in Patients with Type 2**

*Glucagon secretion*

VICTOZA® lowered blood glucose by stimulating insulin secretion and lowering glucagon secretion. A single dose of VICTOZA® 7.5 mcg/kg (~ 0.7 mg) did not impair glucagon response to low glucose concentrations.

*Gastric emptying*

VICTOZA® causes a delay of gastric emptying, thereby reducing the rate at which postprandial glucose appears in the circulation.

*Cardiac Electrophysiology (QTc)*

The effect of VICTOZA® on cardiac repolarization was tested in a QTc study. VICTOZA® at steady state concentrations with daily doses up to 1.8 mg did not produce QTc prolongation.

**12.3 Pharmacokinetics**

*Absorption* - Following subcutaneous administration, maximum concentrations of liraglutide are achieved at 8-12 hours post dosing. The mean peak ($C_{max}$) and total (AUC) exposures of liraglutide were 35 ng/mL and 960 ng·h/mL, respectively, for a subcutaneous single dose of 0.6 mg. After subcutaneous single dose administrations, $C_{max}$ and AUC of liraglutide increased proportionally over the therapeutic dose range of 0.6 mg to 1.8 mg. At 1.8 mg VICTOZA®, the average steady state concentration of liraglutide over 24 hours was approximately 128 ng/mL. AUC$_{0-\infty}$ was equivalent between upper arm and abdomen, and between upper arm and thigh. AUC$_{0-\infty}$ from thigh was 22% lower than that from abdomen. However, liraglutide exposures were considered comparable among these three subcutaneous injection sites. Absolute bioavailability of liraglutide following subcutaneous administration is approximately 55%.

*Distribution* - The mean apparent volume of distribution after subcutaneous administration of VICTOZA® 0.6 mg is approximately 13 L. The mean volume of distribution after intravenous administration of VICTOZA® is 0.07 L/kg. Liraglutide is extensively bound to plasma protein (>98%).

*Metabolism* - During the initial 24 hours following administration of a single [³H]-liraglutide dose to healthy subjects, the major component in plasma was intact liraglutide. Liraglutide is endogenously metabolized in a similar manner to large proteins without a specific organ as a major route of elimination.

*Elimination* - Following a [³H]-liraglutide dose, intact liraglutide was not detected in urine or feces. Only a minor part of the administered radioactivity was excreted as liraglutide-related metabolites in urine or feces (6% and 5%, respectively). The majority of urine and feces radioactivity was excreted during the first 6-8 days. The mean apparent clearance following subcutaneous administration of a single dose of liraglutide is approximately 1.2 L/h with an elimination half-life of approximately 13 hours, making VICTOZA® suitable for once daily administration.

**Specific Populations**

*Elderly* - Age had no effect on the pharmacokinetics of VICTOZA® based on a pharmacokinetic study in healthy elderly subjects (65 to 83 years) and population pharmacokinetic analyses of patients 18 to 80 years of age *[see Use in Specific Populations (8.5)].*

*Gender* - Based on the results of population pharmacokinetic analyses, females have 25% lower weight-adjusted clearance of VICTOZA® compared to males. Based on the exposure response data, no dose adjustment is necessary based on gender.

*Race and Ethnicity* - Race and ethnicity had no effect on the pharmacokinetics of VICTOZA® based on the results of population pharmacokinetic analyses that included Caucasian, Black, Asian and Hispanic/Non-Hispanic subjects.

*Body Weight* - Body weight significantly affects the pharmacokinetics of VICTOZA® based on results of population pharmacokinetic analyses. The exposure of liraglutide decreases with an increase in baseline body weight. However, the 1.2 mg and 1.8 mg daily doses of VICTOZA® provided adequate systemic exposures over the body weight range of 40 – 160 kg evaluated in the clinical trials. Liraglutide was not studied in patients with body weight >160 kg.

*Pediatric* - VICTOZA® has not been studied in pediatric patients *[see Use in Specific Populations (8.4)].*

*Renal Impairment* - The single-dose pharmacokinetics of VICTOZA® were evaluated in subjects with varying degrees of renal impairment. Subjects with mild (estimated creatinine clearance 50-80 mL/min) to severe (estimated creatinine clearance <30 mL/min) renal impairment and subjects with end-stage renal disease requiring dialysis were included in the trial. Compared to healthy subjects, liraglutide AUC in mild, moderate, and severe renal impairment and in end-stage renal disease was on average 35%, 19%, 29% and 30% lower, respectively *[see Use in Specific Populations (8.6)].*

*Hepatic Impairment* - The single-dose pharmacokinetics of VICTOZA® were evaluated in subjects with varying degrees of hepatic impairment. Subjects with mild (Child Pugh score 5-6) to severe (Child Pugh score > 9) hepatic impairment were included in the trial. Compared to healthy subjects, liraglutide AUC in subjects with mild, moderate and severe hepatic impairment was on average 11%, 14% and 42% lower, respectively *[see Use in Specific Populations (8.7)].*

*Drug Interactions*

*In vitro assessment of drug–drug interactions*

VICTOZA® has low potential for pharmacokinetic drug-drug interactions related to cytochrome P450 (CYP) and plasma protein binding.

*In vivo assessment of drug–drug interactions*

The drug-drug interaction studies were performed at steady state with VICTOZA® 1.8 mg/day. Before administration of concomitant treatment, subjects underwent a 0.6 mg weekly dose increase to reach the maximum dose of 1.8 mg/day. Administration of the interacting drugs was timed so that $C_{max}$ of VICTOZA® (8-12 h) would coincide with the absorption peak of the co-administered drugs.

*Digoxin*

A single dose of digoxin 1 mg was administered 7 hours after the dose of VICTOZA® at steady state. The concomitant administration with VICTOZA® resulted in a reduction of digoxin AUC by 16%; $C_{max}$ decreased by 31%. Digoxin median time to maximal concentration ($T_{max}$) was delayed from 1 h to 1.5 h.

*Lisinopril*

A single dose of lisinopril 20 mg was administered 5 minutes after the dose of VICTOZA® at steady state. The co-administration with VICTOZA® resulted in a reduction of lisinopril AUC by 15%; $C_{max}$

*Atorvastatin*

VICTOZA® did not change the overall exposure (AUC) of atorvastatin following a single dose of atorvastatin 40 mg, administered 5 hours after the dose of VICTOZA® at steady state. Atorvastatin $C_{max}$ was decreased by 38% and median $T_{max}$ was delayed from 1 h to 3 h with VICTOZA®.

*Acetaminophen*

VICTOZA® did not change the overall exposure (AUC) of acetaminophen following a single dose of acetaminophen 1000 mg, administered 8 hours after the dose of VICTOZA® at steady state. Acetaminophen $C_{max}$ was decreased by 31% and median $T_{max}$ was delayed up to 15 minutes.

*Griseofulvin*

VICTOZA® did not change the overall exposure (AUC) of griseofulvin following co-administration of a single dose of griseofulvin 500 mg with VICTOZA® at steady state. Griseofulvin $C_{max}$ increased by 37% while median $T_{max}$ did not change.

*Oral Contraceptives*

A single dose of an oral contraceptive combination product containing 0.03 mg ethinylestradiol and 0.15 mg levonorgestrel was administered under fed conditions and 7 hours after the dose of VICTOZA® at steady state. VICTOZA® lowered ethinylestradiol and levonorgestrel $C_{max}$ by 12% and 13%, respectively. There was no effect of VICTOZA® on the overall exposure (AUC) of ethinylestradiol. VICTOZA® increased the levonorgestrel AUC$_{0-\infty}$ by 18%. VICTOZA® delayed $T_{max}$ for both ethinylestradiol and levonorgestrel by 1.5 h.

*Insulin Detemir*

No pharmacokinetic interaction was observed between VICTOZA® and insulin detemir when separate subcutaneous injections of insulin detemir 0.5 Unit/kg (single-dose) and VICTOZA® 1.8 mg (steady state) were administered in patients with type 2 diabetes.

**13   NONCLINICAL TOXICOLOGY**

**13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility**

A 104-week carcinogenicity study was conducted in male and female CD-1 mice at doses of 0.03, 0.2, 1.0, and 3.0 mg/kg/day liraglutide administered by bolus subcutaneous injection yielding systemic exposures 0.2-, 2-, 10- and 45-times the human exposure, respectively, at the MRHD of 1.8 mg/day based on plasma AUC comparison. A dose-related increase in benign thyroid C-cell adenomas was seen in the 1.0 and the 3.0 mg/kg/day groups with incidences of 13% and 19% in males and 6% and 20% in females, respectively. C-cell adenomas did not occur in control groups or 0.03 and 0.2 mg/kg/day groups. Treatment-related malignant C-cell carcinomas occurred in 3% of females in the 3.0 mg/kg/day group. Thyroid C-cell tumors are rare findings during carcinogenicity testing in mice. A treatment-related increase in fibrosarcomas was seen on the dorsal skin and subcutis, the body surface used for drug injection, in males in the 3 mg/kg/day group. These fibrosarcomas were attributed to the high local concentration of drug near the injection site. The liraglutide concentration in the clinical formulation (6 mg/mL) is 10-times higher than the concentration in the formulation used to administer 3 mg/kg/day liraglutide to mice in the carcinogenicity study (0.6 mg/mL).

A 104-week carcinogenicity study was conducted in male and female Sprague Dawley rats at doses of 0.075, 0.25 and 0.75 mg/kg/day liraglutide administered by bolus subcutaneous injection with exposures 0.5-, 2- and 8-times the human exposure, respectively, resulting from the MRHD based on plasma AUC comparison. A treatment-related increase in benign thyroid C-cell adenomas was seen in males in 0.25 and 0.75 mg/kg/day liraglutide groups with incidences of 12%, 16%, 42%, and 46% in all female liraglutide-treated groups with incidences of 10%, 27%, 33%, and 56% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. A treatment-related increase in malignant thyroid C-cell carcinomas was observed in all male liraglutide-treated groups with incidences of 2%, 8%, 6%, and 14% and in females at 0.25 and 0.75 mg/kg/day with incidences of 0%, 4%, and 6% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. Thyroid C-cell carcinomas are rare findings during carcinogenicity testing in rats.

Studies in mice demonstrated that liraglutide-induced C-cell proliferation was dependent on the GLP-1 receptor and that liraglutide did not cause activation of the REarranged during Transfection (RET) proto-oncogene in thyroid C-cells.

Human relevance of thyroid C-cell tumors in mice and rats is unknown and has not been determined by clinical studies or nonclinical studies *[see Boxed Warning and Warnings and Precautions (5.1)].*

Liraglutide was negative with and without metabolic activation in the Ames test for mutagenicity and in a human peripheral blood lymphocyte chromosome aberration test for clastogenicity. Liraglutide was negative in repeat-dose *in vivo* micronucleus tests in rats.

In rat fertility studies using subcutaneous doses of 0.1, 0.25 and 1.0 mg/kg/day liraglutide, males were treated for 4 weeks prior to and throughout mating and females were treated 2 weeks prior to and throughout mating until gestation day 17. No direct adverse effects on male fertility was observed at doses up to 1.0 mg/kg/day, a high dose yielding an estimated systemic exposure 11- times the human exposure at the MRHD, based on plasma AUC. In female rats, an increase in early embryonic deaths occurred at 1.0 mg/kg/day. Reduced body weight gain and food consumption were observed in females at the 1.0 mg/kg/day dose.

**14   CLINICAL STUDIES**

A total of 6367 patients with type 2 diabetes participated in 9 phase 3 trials. There were 6 double-blind (one of these trials had an open-label active control insulin glargine arm), randomized, controlled clinical trials, one of 52 weeks duration and five of 26 weeks duration (including one 26 week trial in patients with T2DM and moderate renal impairment). There were also three 26 week open-label trials; one comparing VICTOZA® to twice-daily exenatide, one comparing VICTOZA® to sitagliptin and one comparing VICTOZA®+metformin+insulin detemir to VICTOZA®+metformin alone. These multinational trials were conducted to evaluate the glycemic efficacy and safety of VICTOZA® in type 2 diabetes as monotherapy and in combination with one or two oral anti-diabetic medications or insulin detemir. The 8 add-on combination therapy trials enrolled patients who were previously treated with anti-diabetic therapy, and approximately two-thirds of patients in the monotherapy trial also were previously treated with anti-diabetic therapy. In total, 272 (4%) of the 6367 patients in these 9 trials were new to anti-diabetic therapy. In these 9 clinical trials, patients ranged in age from 18-80 years old and 54% were men. Approximately 82% of patients were Caucasian and 6% were Black. In the 6 trials where ethnicity

In each of the placebo controlled trials, treatment with VICTOZA® produced clinically and statistically significant improvements in hemoglobin A$_{1c}$ and fasting plasma glucose (FPG) compared to placebo.

All VICTOZA®-treated patients started at 0.6 mg/day. The dose was increased in weekly intervals by 0.6 mg to reach 1.2 mg or 1.8 mg for patients randomized to these higher doses. VICTOZA® 0.6 mg is not effective for glycemic control and is intended only as a starting dose to reduce gastrointestinal intolerance [see Dosage and Administration (2)].

### 14.1 Monotherapy

In this 52-week trial, 746 patients were randomized to VICTOZA® 1.2 mg, VICTOZA® 1.8 mg, or glimepiride 8 mg. Patients who were randomized to glimepiride were initially treated with 2 mg daily for two weeks, increasing to 4 mg daily for another two weeks, and finally increasing to 8 mg daily. Treatment with VICTOZA® 1.8 mg and 1.2 mg resulted in a statistically significant reduction in HbA$_{1c}$ compared to glimepiride (Table 3). The percentage of patients who discontinued due to ineffective therapy was 3.6% in the VICTOZA® 1.8 mg treatment group, 6.0% in the VICTOZA® 1.2 mg treatment group, and 10.1% in the glimepiride-treatment group.

**Table 3  Results of a 52-week monotherapy trial[a]**

| | VICTOZA® 1.8 mg | VICTOZA® 1.2 mg | Glimepiride 8 mg |
|---|---|---|---|
| Intent–to–Treat Population (N) | 246 | 251 | 248 |
| **HbA$_{1c}$ (%) (Mean)** | | | |
| Baseline | 8.2 | 8.2 | 8.2 |
| Change from baseline (adjusted mean)[b] | -1.1 | -0.8 | -0.5 |
| Difference from glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -0.6** (-0.8, -0.4) | -0.3* (-0.5, -0.1) | |
| Percentage of patients achieving A$_{1c}$<7% | 51 | 43 | 28 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** | | | |
| Baseline | 172 | 168 | 172 |
| Change from baseline (adjusted mean)[b] | -26 | -15 | -5 |
| Difference from glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -20** (-29, -12) | -10* (-19, -1) | |
| **Body Weight (kg) (Mean)** | | | |
| Baseline | 92.6 | 92.1 | 93.3 |
| Change from baseline (adjusted mean)[b] | -2.5 | -2.1 | +1.1 |
| Difference from glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -3.6** (-4.3, -2.9) | -3.2** (-3.9, -2.5) | |

[a]Intent–to–treat population using last observation on study
[b]Least squares mean adjusted for baseline value
*p–value <0.05
**p–value <0.0001



*p-value = 0.0014 for VICTOZA® 1.2 mg compared to glimepiride
†p-value < 0.0001 for VICTOZA® 1.8 mg compared to glimepiride
P values derived from change from baseline ANCOVA model.

**Figure 3  Mean HbA$_{1c}$ for patients who completed the 52-week trial and for the Last Observation Carried Forward (LOCF, intent-to-treat) data at Week 52 (Monotherapy)**

### 14.2 Combination Therapy

*Add–on to Metformin*

In this 26-week trial, 1091 patients were randomized to VICTOZA® 0.6 mg, VICTOZA® 1.2 mg, VICTOZA® 1.8 mg, placebo, or glimepiride 4 mg (one–half of the maximal approved dose in the United States), all as add–on to metformin. Randomization occurred after a 6-week run-in period consisting of a 3-week initial forced metformin titration period followed by a maintenance period of another 3 weeks. During the titration period, doses of metformin were increased up to 2000 mg/day. Treatment with VICTOZA® 1.2 mg and 1.8 mg as add–on to metformin resulted in a significant mean HbA$_{1c}$ reduction relative to placebo add–on to metformin and resulted in a similar mean HbA$_{1c}$ reduction relative to glimepiride 4 mg add–on to metformin (Table 4). The percentage of patients who discontinued due to ineffective therapy was 5.4% in the VICTOZA® 1.8 mg + metformin treatment group, 3.3% in the VICTOZA® 1.2 mg + metformin treatment group, and 23.8% in the placebo + metformin treatment group,

**Table 4  Results of a 26-week trial of VICTOZA® as add–on to metformin[a]**

| | VICTOZA® 1.8 mg + Metformin | VICTOZA® 1.2 mg + Metformin | Placebo + Metformin | Glimepiride 4 mg[f] + Metformin |
|---|---|---|---|---|
| Intent–to–Treat Population (N) | 242 | 240 | 121 | 242 |
| **HbA$_{1c}$ (%) (Mean)** | | | | |
| Baseline | 8.4 | 8.3 | 8.4 | 8.4 |
| Change from baseline (adjusted mean)[b] | -1.0 | -1.0 | +0.1 | -1.0 |
| Difference from placebo + metformin arm (adjusted mean)[b] 95% Confidence Interval | -1.1** (-1.3, -0.9) | -1.1** (-1.3, -0.9) | | |
| Difference from glimepiride + metformin arm (adjusted mean)[b] 95% Confidence Interval | 0.0 (-0.2, 0.2) | 0.0 (-0.2, 0.2) | | |
| Percentage of patients achieving A$_{1c}$<7% | 42 | 35 | 11 | 36 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** | | | | |
| Baseline | 181 | 179 | 182 | 180 |
| Change from baseline (adjusted mean)[b] | -30 | -30 | +7 | -24 |
| Difference from placebo + metformin arm (adjusted mean)[b] 95% Confidence Interval | -38** (-48, -27) | -37** (-47, -26) | | |
| Difference from glimepiride + metformin arm (adjusted mean)[b] 95% Confidence Interval | -7 (-16, 2) | -6 (-15, 3) | | |
| **Body Weight (kg) (Mean)** | | | | |
| Baseline | 88.0 | 88.5 | 91.0 | 89.0 |
| Change from baseline (adjusted mean)[b] | -2.8 | -2.6 | -1.5 | +1.0 |
| Difference from placebo + metformin arm (adjusted mean)[b] 95% Confidence Interval | -1.3* (-2.2, -0.4) | -1.1* (-2.0, -0.2) | | |
| Difference from glimepiride + metformin arm (adjusted mean)[b] 95% Confidence Interval | -3.8** (-4.5, -3.0) | -3.5** (-4.3, -2.8) | | |

[a]Intent–to–treat population using last observation on study
[b]Least squares mean adjusted for baseline value
[f]For glimepiride, one–half of the maximal approved United States dose.
*p–value <0.05
**p–value <0.0001

*VICTOZA® Compared to Sitagliptin, Both as Add–on to Metformin*

In this 26–week, open-label trial, 665 patients on a background of metformin ≥1500 mg per day were randomized to VICTOZA® 1.2 mg once-daily, VICTOZA® 1.8 mg once-daily or sitagliptin 100 mg once-daily, all dosed according to approved labeling. Patients were to continue their current treatment on metformin at a stable, pre-trial dose level and dosing frequency.

The primary endpoint was the change in HbA$_{1c}$ from baseline to Week 26. Treatment with VICTOZA® 1.2 mg and VICTOZA® 1.8 mg resulted in statistically significant reductions in HbA$_{1c}$ relative to sitagliptin 100 mg (Table 5). The percentage of patients who discontinued due to ineffective therapy was 3.1% in the VICTOZA® 1.2 mg group, 0.5% in the VICTOZA® 1.8 mg treatment group, and 4.1% in the sitagliptin 100 mg treatment group. From a mean baseline body weight of 94 kg, there was a mean reduction of 2.7 kg for VICTOZA® 1.2 mg, 3.3 kg for VICTOZA® 1.8 mg, and 0.8 kg for sitagliptin 100 mg.

**Table 5  Results of a 26-week open-label trial of VICTOZA® Compared to Sitagliptin (both in combination with metformin)[a]**

| | VICTOZA® 1.8 mg + Metformin | VICTOZA® 1.2 mg + Metformin | Sitagliptin 100 mg + Metformin |
|---|---|---|---|
| Intent–to–Treat Population (N) | 218 | 221 | 219 |
| **HbA$_{1c}$ (%) (Mean)** | | | |
| Baseline | 8.4 | 8.4 | 8.5 |
| Change from baseline (adjusted mean) | -1.5 | -1.2 | -0.9 |
| Difference from sitagliptin arm (adjusted mean)[b] 95% Confidence Interval | -0.6** (-0.8, -0.4) | -0.3** (-0.5, -0.2) | |
| Percentage of patients achieving A$_{1c}$<7% | 56 | 44 | 22 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** | | | |
| Baseline | 179 | 182 | 180 |
| Change from baseline (adjusted mean) | -39 | -34 | -15 |
| Difference from sitagliptin arm (adjusted mean)[b] 95% Confidence Interval | -24** (-31, -16) | -19** (-26, -12) | |

[a]Intent–to–treat population using last observation on study
[b]Least squares mean adjusted for baseline value



*p-value <0.0001 for VICTOZA® compared to sitagliptin

P values derived from change from baseline ANCOVA model.

**Figure 4  Mean HbA₁c for patients who completed the 26-week trial and for the Last Observation Carried Forward (LOCF, intent-to-treat) data at Week 26**

*Combination Therapy with Metformin and Insulin*

This 26-week open-label trial enrolled 988 patients with inadequate glycemic control (HbA₁c 7-10%) on metformin (≥1500 mg/day) alone or inadequate glycemic control (HbA₁c 7-8.5%) on metformin (≥1500 mg/day) and a sulfonylurea. Patients who were on metformin and a sulfonylurea discontinued the sulfonylurea then all patients entered a 12-week run-in period during which they received add-on therapy with VICTOZA® titrated to 1.8 mg once-daily. At the end of the run-in period, 498 patients (50%) achieved HbA₁c <7% with VICTOZA® 1.8 mg and metformin and continued treatment in a non-randomized, observational arm. Another 167 patients (17%) withdrew from the trial during the run-in period with approximately one-half of these patients doing so because of gastrointestinal adverse reactions *[see Adverse Reactions (6.1)]*. The remaining 323 patients with HbA₁c ≥7% (33% of those who entered the run-in period) were randomized to 26 weeks of once-daily insulin detemir administered in the evening as add-on therapy (N=162) or to continued, unchanged treatment with VICTOZA® 1.8 mg and metformin (N=161). The starting dose of insulin detemir was 10 units/day and the mean dose at the end of the 26-week randomized period was 39 units/day. During the 26 week randomized treatment period, the percentage of patients who discontinued due to ineffective therapy was 11.2% in the group randomized to continued treatment with VICTOZA® 1.8 mg and metformin and 1.2% in the group randomized to add-on therapy with insulin detemir.

Treatment with insulin detemir as add-on to VICTOZA® 1.8 mg + metformin resulted in statistically significant reductions in HbA₁c and FPG compared to unchanged treatment with VICTOZA® 1.8 mg + metformin alone (Table 6). From a mean baseline body weight of 96 kg after randomization, there was a mean reduction of 0.3 kg in the patients who received insulin detemir add-on therapy compared to a mean reduction of 1.1 kg in the patients who continued on unchanged treatment with VICTOZA® 1.8 mg + metformin alone.

**Table 6  Results of a 26-week open label trial of Insulin detemir as add on to VICTOZA® + metformin compared to continued treatment with VICTOZA® + metformin alone in patients not achieving HbA₁c < 7% after 12 weeks of Metformin and VICTOZA®[a]**

|  | Insulin detemir + VICTOZA® + Metformin | VICTOZA® + Metformin |
|---|---|---|
| Intent-to-Treat Population (N) | 162 | 157 |
| **HbA₁c (%) (Mean)** |  |  |
| Baseline (week 0) | 7.6 | 7.6 |
| Change from baseline (adjusted mean) | -0.5 | 0 |
| Difference from VICTOZA® + metformin arm (LS mean)[b] 95% Confidence Interval | -0.5** (-0.7, -0.4) |  |
| Percentage of patients achieving A₁c <7% | 43 | 17 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** |  |  |
| Baseline (week 0) | 166 | 159 |
| Change from baseline (adjusted mean) | -39 | -7 |
| Difference from VICTOZA® + metformin arm (LS mean)[b] 95% Confidence Interval | -31** (-39, -23) |  |

[a]Intent-to-treat population using last observation on study
[b]Least squares mean adjusted for baseline value
**p-value <0.0001

*Add-on to Sulfonylurea*

In this 26-week trial, 1041 patients were randomized to VICTOZA® 0.6 mg, VICTOZA® 1.2 mg, VICTOZA® 1.8 mg, placebo, or rosiglitazone 4 mg (one-half of the maximal approved dose in the United States), all as add-on to sulfonylurea. Randomization occurred after a 4-week run-in period consisting of an initial, 2-week, forced-glimepiride titration period followed by a maintenance period of another 2 weeks. During the titration period, doses of glimepiride were increased to 4 mg/day. The dose of glimepiride could be reduced (at the discretion of the investigator) from 4 mg/day to 3 mg/day or 2 mg/day (minimum) after randomization, in the event of unacceptable hypoglycemia or other adverse events.

Treatment with VICTOZA® 1.2 mg and 1.8 mg as add-on to glimepiride resulted in a statistically significant reduction in mean HbA₁c compared to placebo add-on to glimepiride (Table 7). The percentage of patients who discontinued due to ineffective therapy was 3.0% in the VICTOZA® 1.8 mg + glimepiride treatment group, 3.5% in the VICTOZA® 1.2 mg + glimepiride group, 17.5% in

**Table 7  Results of a 26-week trial of VICTOZA® as add–on to sulfonylurea[a]**

|  | VICTOZA® 1.8 mg + Glimepiride | VICTOZA® 1.2 mg + Glimepiride | Placebo + Glimepiride | Rosiglitazone 4 mg + Glimepiride |
|---|---|---|---|---|
| Intent-to-Treat Population (N) | 234 | 228 | 114 | 231 |
| **HbA₁c (%) (Mean)** |  |  |  |  |
| Baseline | 8.5 | 8.5 | 8.4 | 8.4 |
| Change from baseline (adjusted mean)[b] | -1.1 | -1.1 | +0.2 | -0.4 |
| Difference from placebo + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -1.4** (-1.6, -1.1) | -1.3** (-1.5, -1.1) |  |  |
| Percentage of patients achieving A₁c <7% | 42 | 35 | 7 | 22 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** |  |  |  |  |
| Baseline | 174 | 177 | 171 | 179 |
| Change from baseline (adjusted mean)[b] | -29 | -28 | +18 | -16 |
| Difference from placebo + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -47** (-58, -35) | -46** (-58, -35) |  |  |
| **Body Weight (kg) (Mean)** |  |  |  |  |
| Baseline | 83.0 | 80.0 | 81.9 | 80.6 |
| Change from baseline (adjusted mean)[b] | -0.2 | +0.3 | -0.1 | +2.1 |
| Difference from placebo + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -0.1 (-0.9, 0.6) | 0.4 (-0.4, 1.2) |  |  |

[a]Intent-to-treat population using last observation on study
[b]Least squares mean adjusted for baseline value
[f]For rosiglitazone, one-half of the maximal approved United States dose.
**p-value <0.0001

*Add-on to Metformin and Sulfonylurea*

In this 26-week trial, 581 patients were randomized to VICTOZA® 1.8 mg, placebo, or insulin glargine, all as add-on to metformin and glimepiride. Randomization took place after a 6-week run-in period consisting of a 3-week forced titration and glimepiride titration period followed by a maintenance period of another 3 weeks. During the titration period, doses of metformin and glimepiride were to be increased up to 2000 mg/day and 4 mg/day, respectively. After randomization, patients randomized to VICTOZA® 1.8 mg underwent a 2 week period of titration with VICTOZA®. During the trial, the VICTOZA® and metformin doses were fixed, although glimepiride and insulin glargine doses could be adjusted. Patients titrated glargine twice-weekly during the first 8 weeks of treatment based on self-measured fasting plasma glucose on the day of titration. After Week 8, the frequency of insulin glargine titration was left to the discretion of the investigator, but, at a minimum, the glargine dose was to be revised, if necessary, at Weeks 12 and 18. Only 20% of glargine-treated patients achieved the pre-specified target fasting plasma glucose of ≤100 mg/dL. Therefore, optimal titration of the insulin glargine dose was not achieved in most patients.

Treatment with VICTOZA® as add-on to glimepiride and metformin resulted in a statistically significant mean reduction in HbA₁c compared to placebo add-on to glimepiride and metformin (Table 8). The percentage of patients who discontinued due to ineffective therapy was 0.9% in the VICTOZA® 1.8 mg + metformin + glimepiride treatment group, 0.4% in the insulin glargine + metformin + glimepiride treatment group, and 11.3% in the placebo + metformin + glimepiride treatment group.

**Table 8  Results of a 26-week trial of VICTOZA® as add–on to metformin and sulfonylurea[a]**

|  | VICTOZA® 1.8 mg + Metformin + Glimepiride | Placebo + Metformin + Glimepiride | Insulin glargine[f] + Metformin + Glimepiride |
|---|---|---|---|
| Intent-to-Treat Population (N) | 230 | 114 | 232 |
| **HbA₁c (%) (Mean)** |  |  |  |
| Baseline | 8.3 | 8.3 | 8.1 |
| Change from baseline (adjusted mean)[b] | -1.3 | -0.2 | -1.1 |
| Difference from placebo + metformin + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -1.1** (-1.3, -0.9) |  |  |
| Percentage of patients achieving A₁c <7% | 53 | 15 | 46 |
| **Fasting Plasma Glucose (mg/dL) (Mean)** |  |  |  |
| Baseline | 165 | 170 | 164 |
| Change from baseline (adjusted mean)[b] | -28 | +10 | -32 |
| Difference from placebo + metformin + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -38** (-46, -30) |  |  |
| **Body Weight (kg) (Mean)** |  |  |  |
| Baseline | 85.8 | 85.4 | 85.2 |
| Change from baseline (adjusted mean)[b] | -1.8 | -0.4 | 1.6 |
| Difference from placebo + metformin + glimepiride arm (adjusted mean)[b] 95% Confidence Interval | -1.4* (-2.1, -0.7) |  |  |

[a]Intent-to-treat population using last observation on study
[b]Least squares mean adjusted for baseline value
[f]For insulin glargine, optimal titration regimen was not achieved for 80% of patients.
*p-value <0.05

*VICTOZA® Compared to Exenatide, Both as Add-on to Metformin and/or Sulfonylurea Therapy*

In this 26–week, open-label trial, 464 patients on a background of metformin monotherapy, sulfonylurea monotherapy or a combination of metformin and sulfonylurea were randomized to once daily VICTOZA® 1.8 mg or exenatide 10 mcg twice daily. Maximally tolerated doses of background therapy were to remain unchanged for the duration of the trial. Patients randomized to exenatide started on a dose of 5 mcg twice-daily for 4 weeks and then were escalated to 10 mcg twice daily.

Treatment with VICTOZA® 1.8 mg resulted in statistically significant reductions in HbA$_{1c}$ and FPG relative to exenatide (Table 9). The percentage of patients who discontinued for ineffective therapy was 0.4% in the VICTOZA® treatment group and 0% in the exenatide treatment group. Both treatment groups had a mean decrease from baseline in body weight of approximately 3 kg.

**Table 9  Results of a 26-week open-label trial of VICTOZA® versus Exenatide (both in combination with metformin and/or sulfonylurea)[a]**

| | VICTOZA® 1.8 mg once daily + metformin and/or sulfonylurea | Exenatide 10 mcg twice daily + metformin and/or sulfonylurea |
|---|---|---|
| Intent–to–Treat Population (N) | 233 | 231 |
| HbA$_{1c}$ (%) (Mean) | | |
| Baseline | 8.2 | 8.1 |
| Change from baseline (adjusted mean)[b] | -1.1 | -0.8 |
| Difference from exenatide arm (adjusted mean)[b] | -0.3** | |
| 95% Confidence Interval | (-0.5, -0.2) | |
| Percentage of patients achieving A$_{1c}$ <7% | 54 | 43 |
| Fasting Plasma Glucose (mg/dL) (Mean) | | |
| Baseline | 176 | 171 |
| Change from baseline (adjusted mean)[b] | -29 | -11 |
| Difference from exenatide arm (adjusted mean)[b] | -18** | |
| 95% Confidence Interval | (-25, -12) | |

[a]Intent–to–treat population using last observation carried forward
[d]Least squares mean adjusted for baseline value
**p–value <0.0001

*Add–on to Metformin and Thiazolidinedione*

In this 26–week trial, 533 patients were randomized to VICTOZA® 1.2 mg, VICTOZA® 1.8 mg or placebo, all as add–on to rosiglitazone (8 mg) plus metformin (2000 mg). Patients underwent a 9 week run–in period (3-week forced dose escalation followed by a 6-week dose maintenance phase) with rosiglitazone (starting at 4 mg and increasing to 8 mg/day within 2 weeks) and metformin (starting at 500 mg with increasing weekly increments of 500 mg to a final dose of 2000 mg/day). Only patients who tolerated the final dose of rosiglitazone (8 mg/day) and metformin (2000 mg/day) and completed the 6-week dose maintenance phase were eligible for randomization into the trial.

Treatment with VICTOZA® as add–on to metformin and rosiglitazone produced a statistically significant reduction in mean HbA$_{1c}$ compared to placebo add–on to metformin and rosiglitazone (Table 10). The percentage of patients who discontinued due to ineffective therapy was 1.7% in the VICTOZA® 1.8 mg + metformin + rosiglitazone treatment group, 1.7% in the VICTOZA® 1.2 mg + metformin + rosiglitazone treatment group, and 16.4% in the placebo + metformin + rosiglitazone treatment group.

**Table 10  Results of a 26-week trial of VICTOZA® as add–on to metformin and thiazolidinedione[a]**

| | VICTOZA® 1.8 mg + Metformin + Rosiglitazone | VICTOZA® 1.2 mg + Metformin + Rosiglitazone | Placebo + Metformin + Rosiglitazone |
|---|---|---|---|
| Intent–to–Treat Population (N) | 178 | 177 | 175 |
| HbA$_{1c}$ (%) (Mean) | | | |
| Baseline | 8.6 | 8.5 | 8.4 |
| Change from baseline (adjusted mean)[b] | -1.5 | -1.5 | -0.5 |
| Difference from placebo + metformin + rosiglitazone arm (adjusted mean)[b] | -0.9** | -0.9** | |
| 95% Confidence Interval | (-1.1, -0.8) | (-1.1, -0.8) | |
| Percentage of patients achieving A$_{1c}$ <7% | 54 | 57 | 28 |
| Fasting Plasma Glucose (mg/dL) (Mean) | | | |
| Baseline | 185 | 181 | 179 |
| Change from baseline (adjusted mean)[b] | -44 | -40 | -8 |
| Difference from placebo + metformin + rosiglitazone arm (adjusted mean)[b] | -36** | -32** | |
| 95% Confidence Interval | (-44, -27) | (-41, -23) | |
| Body Weight (kg) (Mean) | | | |
| Baseline | 94.9 | 95.3 | 98.5 |
| Change from baseline (adjusted mean)[b] | -2.0 | -1.0 | +0.6 |
| Difference from placebo + metformin + rosiglitazone arm (adjusted mean)[b] | -2.6** | -1.6** | |
| 95% Confidence Interval | (-3.4, -1.8) | (-2.4, -1.0) | |

[a]Intent–to–treat population using last observation on study
[b]Least squares mean adjusted for baseline value

## 14.3 Type 2 Diabetes Mellitus Patients with Moderate Renal Impairment

*VICTOZA® Compared to Placebo Both With or Without metformin and/or Sulfonylurea and/or Pioglitazone and/or Basal or Premix insulin*

In this 26-week, double-blind, randomized, placebo-controlled, parallel-group trial, 279 patients with moderate renal impairment, as per MDRD formula (eGFR 30–59 mL/min/1.73 m²), were randomized to VICTOZA® or placebo once daily. VICTOZA® was added to the patient's stable pre-trial antidiabetic regimen (insulin therapy and/or metformin, pioglitazone, or sulfonylurea). The dose of VICTOZA® was escalated according to approved labeling to achieve a dose of 1.8 mg per day. The insulin dose was reduced by 20% at randomization for patients with baseline HbA$_{1c}$ ≤ 8% and fixed until liraglutide dose escalation was complete. Dose reduction of insulin and SU was allowed in case of hypoglycemia; up titration of insulin was allowed but not beyond the pre-trial dose.

The mean age of participants was 67 years, and the mean duration of diabetes was 15 years. Participants were 50.5% male, 92.3% White, 6.6% Black or African American, and 7.2% of Hispanic ethnicity. The mean BMI was 33.9 kg/m². Approximately half of patients had an eGFR between 30 and <45 mL/min/1.73 m².

Treatment with VICTOZA® resulted in a statistically significant reduction in HbA$_{1c}$ from baseline at Week 26 compared to placebo (see Table 11). 123 patients reached the 1.8 mg dose of VICTOZA®.

**Table 11  Results of a 26-week trial of VICTOZA® compared to placebo in Patients with Renal Impairment[a]**

| | VICTOZA® 1.8 mg + insulin and/or OAD | Placebo + insulin and/or OAD |
|---|---|---|
| Intent to Treat Population (N) | 140 | 137 |
| HbA$_{1c}$ (%) | | |
| Baseline (mean) | 8.1 | 8.0 |
| Change from baseline (estimated mean)[b,c] | -0.9 | -0.4 |
| Difference from placebo[b,c] | -0.6* | |
| 95% Confidence Interval | (-0.8, -0.3) | |
| Proportion achieving HbA$_{1c}$ < 7%[d] | 39.3 | 19.7 |
| FPG (mg/dL) | | |
| Baseline (mean) | 171 | 167 |
| Change from baseline (estimated mean)[e] | -22 | -10 |
| Difference from placebo[e] | -12** | |
| 95% Confidence Interval | (-23, -0.8) | |

[a]Intent-to-treat population
[b]Estimated using a mixed model for repeated measurement with treatment, country, stratification groups as factors and baseline as a covariate, all nested within visit. Multiple imputation method modeled "wash out" of the treatment effect for patients having missing data who discontinued treatment.
[c]Early treatment discontinuation, before week 26, occurred in 25% and 22% of VICTOZA® and placebo patients, respectively.
[d]Based on the known number of subjects achieving HbA$_{1c}$ < 7%. When applying the multiple imputation method described in b) above, the estimated percents achieving HbA$_{1c}$ < 7% are 47.6% and 24.9% for VICTOZA® and placebo, respectively.
[e]Estimated using a mixed model for repeated measurement with treatment, country, stratification groups as factors and baseline as a covariate, all nested within visit.
*p-value <0.0001
**p-value <0.05

## 16  HOW SUPPLIED/STORAGE AND HANDLING

### 16.1 How Supplied

VICTOZA® is available in the following package sizes containing disposable, pre-filled, multi-dose pens. Each individual pen delivers doses of 0.6 mg, 1.2 mg, or 1.8 mg (6 mg/mL, 3 mL).

  2 x VICTOZA® pen            NDC 0169-4060-12

  3 x VICTOZA® pen            NDC 0169-4060-13

Each VICTOZA® pen is for use by a single patient. A VICTOZA® pen must never be shared between patients, even if the needle is changed.

### 16.2 Recommended Storage

Prior to first use, VICTOZA® should be stored in a refrigerator between 36°F to 46°F (2°C to 8°C) (Table 12). Do not store in the freezer or directly adjacent to the refrigerator cooling element. Do not freeze VICTOZA® and do not use VICTOZA® if it has been frozen.

After initial use of the VICTOZA® pen, the pen can be stored for 30 days at controlled room temperature (59°F to 86°F; 15°C to 30°C) or in a refrigerator (36°F to 46°F; 2°C to 8°C). Keep the pen cap on when not in use. VICTOZA® should be protected from excessive heat and sunlight. Always remove and safely discard the needle after each injection and store the VICTOZA® pen without an injection needle attached. This will reduce the potential for contamination, infection, and leakage while also ensuring dosing accuracy. **Always use a new needle for each injection to prevent contamination.**

**Table 12  Recommended Storage Conditions for the VICTOZA® Pen**

| Prior to first use | After first use | |
|---|---|---|
| Refrigerated 36°F to 46°F (2°C to 8°C) | Room Temperature 59°F to 86°F (15°C to 30°C) | Refrigerated 36°F to 46°F (2°C to 8°C) |

**17    PATIENT COUNSELING INFORMATION**

**FDA-Approved Medication Guide**

See separate leaflet.

**Risk of Thyroid C-cell Tumors**

Inform patients that liraglutide causes benign and malignant thyroid C-cell tumors in mice and rats and that the human relevance of this finding has not been determined. Counsel patients to report symptoms of thyroid tumors (e.g., a lump in the neck, hoarseness, dysphagia, or dyspnea) to their physician *[see Boxed Warning and Warnings and Precautions (5.1)]*.

**Dehydration and Renal Failure**

Patients treated with VICTOZA® should be advised of the potential risk of dehydration due to gastrointestinal adverse reactions and take precautions to avoid fluid depletion. Patients should be informed of the potential risk for worsening renal function, which in some cases may require dialysis.

**Pancreatitis**

Patients should be informed of the potential risk for pancreatitis. Explain that persistent severe abdominal pain that may radiate to the back and which may or may not be accompanied by vomiting, is the hallmark symptom of acute pancreatitis. Instruct patients to discontinue VICTOZA® promptly and contact their physician if persistent severe abdominal pain occurs *[see Warnings and Precautions (5.2)]*.

**Never Share a VICTOZA® Pen Between Patients**

Advise patients that they must never share a VICTOZA® pen with another person, even if the needle is changed, because doing so carries a risk for transmission of blood-borne pathogens.

**Hypersensitivity Reactions**

Patients should be informed that serious hypersensitivity reactions have been reported during post-marketing use of VICTOZA®. If symptoms of hypersensitivity reactions occur, patients must stop taking VICTOZA® and seek medical advice promptly *[see Warnings and Precautions (5.6)]*.

**Jaundice and Hepatitis**

Inform patients that jaundice and hepatitis have been reported during postmarketing use of liraglutide. Instruct patients to contact their physician if they develop jaundice.

**Instructions**

Patients should be informed of the potential risks and benefits of VICTOZA® and of alternative modes of therapy. Patients should also be informed about the importance of adherence to dietary instructions, regular physical activity, periodic blood glucose monitoring and $A_{1c}$ testing, recognition and management of hypoglycemia and hyperglycemia, and assessment for diabetes complications. During periods of stress such as fever, trauma, infection, or surgery, medication requirements may change and patients should be advised to seek medical advice promptly.

Patients should be advised that the most common side effects of VICTOZA® are headache, nausea and diarrhea. Nausea is most common when first starting VICTOZA®, but decreases over time in the majority of patients and does not typically require discontinuation of VICTOZA®.

Physicians should instruct their patients to read the Patient Medication Guide before starting VICTOZA® therapy and to reread each time the prescription is renewed. Patients should be instructed to inform their doctor or pharmacist if they develop any unusual symptom, or if any known symptom persists or worsens.

Inform patients not to take an extra dose of VICTOZA® to make up for a missed dose. If a dose is missed, the once-daily regimen should be resumed as prescribed with the next scheduled dose.

If more than 3 days have elapsed since the last dose, the patient should be advised to reinitiate VICTOZA® at 0.6 mg to mitigate any gastrointestinal symptoms associated with reinitiation of treatment. VICTOZA® should be titrated at the discretion of the prescribing physician *[see Dosage and Administration (2)]*.

Date of Issue: April 21, 2016
Version: 9
*VICTOZA® and Saxenda® are registered trademarks of Novo Nordisk A/S.*
**PATENT Information: http://novonordisk-us.com/patients/products/product-patents.html**
Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark

For information about VICTOZA® contact:
Novo Nordisk Inc.
800 Scudders Mill Road
Plainsboro, NJ 08536
1-877-484-2869
© 2010–2016 Novo Nordisk

**Medication Guide**
**Victoza® (VIC-tow-za)**
**(liraglutide) injection**
**solution, for subcutaneous use**

Read this Medication Guide before you start using Victoza® and each time you get a refill. There may be new information. This information does not take the place of talking to your healthcare provider about your medical condition or your treatment.

**What is the most important information I should know about Victoza®?**
**Victoza® may cause serious side effects, including:**
- **Possible thyroid tumors, including cancer.** Tell your healthcare provider if you get a lump or swelling in your neck, hoarseness, trouble swallowing, or shortness of breath. These may be symptoms of thyroid cancer. In studies with rats and mice, Victoza® and medicines that work like Victoza® caused thyroid tumors, including thyroid cancer. It is not known if Victoza® will cause thyroid tumors or a type of thyroid cancer called medullary thyroid carcinoma (MTC) in people.
- Do not use Victoza® if you or any of your family have ever had a type of thyroid cancer called medullary thyroid carcinoma (MTC), or if you have an endocrine system condition called Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).

**What is Victoza®?**
Victoza® is an injectable prescription medicine that may improve blood sugar (glucose) in adults with type 2 diabetes mellitus, and should be used along with diet and exercise.
- Victoza® is not recommended as the first choice of medicine for treating diabetes.
- It is not known if Victoza® can be used in people who have had pancreatitis.
- Victoza® is not a substitute for insulin and is not for use in people with type 1 diabetes or people with diabetic ketoacidosis.
- It is not known if Victoza® can be used with mealtime insulin.
- It is not known if Victoza® is safe and effective for use in children.

**Who should not use Victoza®?**
**Do not use Victoza® if:**
- you or any of your family have ever had a type of thyroid cancer called medullary thyroid carcinoma (MTC) or if you have an endocrine system condition called Multiple Endocrine Neoplasia syndrome type 2 (MEN 2).
- you are allergic to liraglutide or any of the ingredients in Victoza®. See the end of this Medication Guide for a complete list of ingredients in Victoza®.

**What should I tell my healthcare provider before using Victoza®?**
**Before using Victoza®, tell your healthcare provider if you:**
- have or have had problems with your pancreas, kidneys, or liver
- have severe problems with your stomach, such as slowed emptying of your stomach (gastroparesis) or problems with digesting food
- have any other medical conditions
- are pregnant or plan to become pregnant. It is not known if Victoza® will harm your unborn baby. Tell your healthcare provider if you become pregnant while using Victoza®.
- are breastfeeding or plan to breastfeed. It is not known if Victoza® passes into your breast milk. You should not use Victoza® while breastfeeding without first talking with your healthcare provider.
**Tell your healthcare provider about all the medicines you take,** including prescription and over-the-counter medicines, vitamins, and herbal supplements. Victoza® may affect the way some medicines work and some medicines may affect the way Victoza® works.
**Before using Victoza®, talk to your healthcare provider about low blood sugar and how to manage it.** Tell your healthcare provider if you are taking other medicines to treat diabetes, including insulin or sulfonylureas.
Know the medicines you take. Keep a list of them to show your healthcare provider and pharmacist when you get a new medicine.

**How should I use Victoza®?**
- Read the **Instructions for Use** that comes with Victoza®.
- Use Victoza® exactly as your healthcare provider tells you to.
- **Your healthcare provider should show you how to use Victoza® before you use it for the first time.**
- Victoza® is injected under the skin (subcutaneously) of your stomach (abdomen), thigh, or upper arm. **Do not** inject Victoza® into a muscle (intramuscularly) or vein (intravenously).
- **Use Victoza® 1 time each day, at any time of the day.**
- If you miss a dose of Victoza®, take the missed dose at the next scheduled dose. **Do not** take 2 doses of Victoza® at the same time.
- Victoza® may be taken with or without food.
- **Do not** mix insulin and Victoza® together in the same injection.
- You may give an injection of Victoza® and insulin in the same body area (such as your stomach area), but not right next to each other.
- Change (rotate) your injection site with each injection. **Do not** use the same site for each injection.
- **Do not share your Victoza® pen with other people, even if the needle has been changed.** You may give other people a serious infection, or get a serious infection from them.
**Your dose of Victoza® and other diabetes medicines may need to change because of:**
- change in level of physical activity or exercise, weight gain or loss, increased stress, illness, change in diet, or because of other medicines you take.

**What are the possible side effects of Victoza®?**
**Victoza® may cause serious side effects, including:**
- See "What is the most important information I should know about Victoza®?"
- **inflammation of your pancreas (pancreatitis).** Stop using Victoza® and call your healthcare provider right away if you have severe pain in your stomach area (abdomen) that will not go away, with or without vomiting. You may feel the pain from your abdomen to your back.
- **low blood sugar (hypoglycemia).** Your risk for getting low blood sugar may be higher if you use Victoza® with another medicine that can cause low blood sugar, such as a sulfonylurea or insulin.
  **Signs and symptoms of low blood sugar may include:**

| | | |
|---|---|---|
| • dizziness or light-headedness | • blurred vision | • anxiety, irritability, or mood changes |
| • sweating | • slurred speech | • hunger |
| • confusion or drowsiness | • shakiness | • weakness |
| • headache | • fast heartbeat | • feeling jittery |

- **kidney problems (kidney failure).** In people who have kidney problems, diarrhea, nausea, and vomiting may cause a loss of fluids (dehydration) which may cause kidney problems to get worse.
- **serious allergic reactions.** Stop using Victoza® and get medical help right away, if you have any symptoms of a serious allergic reaction including itching, rash, or difficulty breathing

**The most common side effects of Victoza®** may include headache, nausea, diarrhea, vomiting, anti-liraglutide antibodies in your blood.

Talk to your healthcare provider about any side effect that bothers you or does not go away. These are not all the possible side effects of Victoza®.

Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Victoza®.**

Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. Do not use Victoza® for a condition for which it was not prescribed. Do not give Victoza® to other people, even if they have the same symptoms that you have. It may harm them.

This Medication Guide summarizes the most important information about Victoza®. If you would like more information, talk with your healthcare provider. You can ask your pharmacist or healthcare provider for information about Victoza® that is written for health professionals.

For more information, go to victoza.com or call 1-877-484-2869.

**What are the ingredients in Victoza®?**
**Active Ingredient:** liraglutide
**Inactive Ingredients:** disodium phosphate dihydrate, propylene glycol, phenol and water for injection

This Medication Guide has been approved by the U.S. Food and Drug Administration.

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark
*Victoza® is a registered trademark of Novo Nordisk A/S.*
PATENT Information: http://novonordisk-us.com/patients/products/product-patents.html.
Revised: May 28, 2016
© 2010-2016 Novo Nordisk



**Instructions for Use**
Victoza® (liraglutide) injection



Victoza® Pen — Pen cap, Rubber stopper, Cartridge tip, Cartridge, Cartridge scale, Dose display, Pointer, Dose button, Flow check symbol, Dose selector

**Needle (example)**
Outer needle cap, Inner needle cap, Needle, Protective tab

**If you are having problems using your Victoza® pen, call toll-free 1-877-484-2869 or visit victoza.com**

First read the Medication Guide that comes with your Victoza® pen and then read these Patient Instructions for Use for information about how to use your Victoza® pen the right way.

These instructions do not take the place of talking with your healthcare provider about your medical condition or your treatment.

**Do not share your Victoza® Pen with other people, even if the needle has been changed. You may give other people a serious infection, or get a serious infection from them.**

Your Victoza® pen contains 3 mL of Victoza® and will deliver doses of 0.6 mg, 1.2 mg or 1.8 mg. The number of doses that you can take with a Victoza® pen depends on the dose of medicine that is prescribed for you. Your healthcare provider will tell you how much Victoza® to take.

Victoza® should be used with Novo Nordisk disposable needles. Talk to your healthcare provider or pharmacist for more information about needles for your Victoza® pen.

**Important Information**

⚠ Do not share your Victoza® pen with other people, even if the needle has been changed. You may give other people a serious infection, or get a serious infection from them.

⚠ Always use a new needle for each injection. Do not reuse or share your needles with other people. You may give other people a serious infection, or get a serious infection from them.

⚠ Keep your Victoza® pen and all medicines out of the reach of children.

⚠ If you drop your Victoza® pen, repeat "First Time Use For Each New Pen" (steps A through D).

⚠ Be careful not to bend or damage the needle.

⚠ Do not use the cartridge scale to measure how much Victoza® to inject.

⚠ Be careful when handling used needles to avoid needle stick injuries.

⚠ You can use your Victoza® pen for up to 30 days after you use it the first time.

**First Time Use for Each New Pen**

**Step A. Check the Pen**
• Take your new Victoza® pen out of the refrigerator.
• Wash hands with soap and water before use.
• Check pen label before each use to make sure it is your Victoza® pen.
• Pull off pen cap.
• Check Victoza® in the cartridge. The liquid should be clear, colorless and free of particles. If not, do not use.
• Wipe the rubber stopper with an alcohol swab.

**Step B. Attach the Needle**
• Remove protective tab from outer needle cap.
• Push outer needle cap containing the needle straight onto the pen, then screw needle on until secure.
• Pull off outer needle cap. Do not throw away.
• Pull off inner needle cap and throw away. A small drop of liquid may appear. This is normal.

**Step C. Dial to the Flow Check Symbol**
This step is done only ONCE for each new pen and is ONLY required the first time you use a needle.
• Turn dose selector until flow check symbol (---) lines up with pointer. The flow check symbol does not administer the dose as prescribed by your healthcare provider.
• To select the dose prescribed by your healthcare provider, continue to Step G under "Routine Use".

**Step D. Prepare the Pen**
• Hold pen with needle pointing up.
• Tap cartridge gently with your finger a few times to bring any air bubbles to the top of the cartridge.
• Keep needle pointing up and press dose button until 0 mg lines up with pointer. Repeat steps C and D, up to 6 times, until a drop of Victoza® appears at the needle tip.

If you still see no drop of Victoza®, use a new pen and contact


A


B



C

Flow check symbol selected


D

**Continue to Step G under "Routine Use"** ⇨

**Routine Use**

**Step E. Check the Pen**
• Take your Victoza® pen from where it is stored.
• Wash hands with soap and water before use.
• Check pen label before each use to make sure it is your Victoza® pen.
• Pull off pen cap.
• Check Victoza® in the cartridge. The liquid should be clear, colorless and free of particles. If not, do not use.
• Wipe the rubber stopper with an alcohol swab.

**Step F. Attach the Needle**
• Remove protective tab from outer needle cap.
• Push outer needle cap containing the needle straight onto the pen, then screw needle on until secure.
• Pull off outer needle cap. Do not throw away.
• Pull off inner needle cap and throw away. A small drop of liquid may appear. This is normal.

**Step G. Dial the Dose**
• Victoza® pen can give a dose of 0.6 mg (starting dose), 1.2 mg or 1.8 mg. Be sure that you know the dose of Victoza® that is prescribed for you.
• Turn the dose selector until your needed dose lines up with the pointer (0.6 mg, 1.2 mg or 1.8 mg).
• You will hear a "click" every time you turn the dose selector. **Do not set the dose by counting the number of clicks you hear.**
• If you select a wrong dose, change it by turning the dose selector backwards or forwards until the correct dose lines up with the pointer. Be careful not to press the dose button when turning the dose selector. This may cause Victoza® to come out.

**Step H. Injecting the Dose**
• Insert needle into your skin in the stomach, thigh or upper arm. Use the injection technique shown to you by your healthcare provider. **Do not inject Victoza® into a vein or muscle.**
• Press down on the center of the dose button to inject until 0 mg lines up with the pointer.
• Be careful not to touch the dose display with your other fingers. This may block the injection.
• Keep the dose button pressed down and make sure that you keep the needle under the skin for a full count of 6 seconds to make sure the full dose is injected. Keep your thumb on the injection button until you remove the needle from your skin.
• Change (rotate) your injection sites within the area you choose for each dose. **Do not** use the same injection site for each injection.

**Step I. Withdraw Needle**
• You may see a drop of Victoza® at the needle tip. This is normal and it does not affect the dose you just received. If blood appears after you take the needle out of your skin, apply light pressure, but **do not rub** the area.

**Step J. Remove and Dispose of the Needle**
• Carefully put the outer needle cap over the needle. Unscrew the needle.
• Safely remove the needle from your Victoza® pen after each use.
• Put your used VICTOZA® pen and needles in a FDA-cleared sharps disposal container right away after use. Do not throw away (dispose of) loose needles and pens in your household trash.
• If you do not have a FDA-cleared sharps disposal container, you may use a household container that is:
  ○ made of a heavy-duty plastic
  ○ can be closed with a tight-fitting, puncture-resistant lid, without sharps being able to come out
  ○ upright and stable during use
  ○ leak-resistant
  ○ properly labeled to warn of hazardous waste inside the container
• When your sharps disposal container is almost full, you will need to follow your community guidelines for the right way to dispose of your sharps disposal container. There may be state or local laws about how you should throw away used needles and syringes. Do not reuse or share your needles with other people. For more information about the safe sharps disposal, and for specific information about sharps disposal in the state that you live in, go to the FDA's website at: http://www.fda.gov/safesharpsdisposal.
• Do not dispose of your used sharps disposal container in your household trash unless your community guidelines permit this. Do not recycle your used sharps disposal container.

**Caring for your Victoza® pen**
• After removing the needle, put the pen cap on your Victoza® pen and store your Victoza® pen without the needle attached.
• Do not try to refill your Victoza® pen – it is prefilled and is disposable.
• Do not try to repair your pen or pull it apart.
• Keep your Victoza® pen away from dust, dirt and liquids.


E


F








G


0.6 mg selected

1.2 mg selected

1.8 mg selected



H

6

I

J

**How should I store Victoza®?**

**Before use:**

- Store your new, unused Victoza® pen in the refrigerator at 36°F to 46°F (2°C to 8°C).
- If Victoza® is stored outside of refrigeration (by mistake) prior to first use, it should be used or thrown away within 30 days.
- Do not freeze Victoza® or use Victoza® if it has been frozen. Do not store Victoza® near the refrigerator cooling element.

**Pen in use:**

- Store your Victoza® pen for 30 days at 59°F to 86°F (15°C to 30°C), or in a refrigerator at 36°F to 46°F (2°C to 8°C).
- When carrying the pen away from home, store the pen at a temperature between 59°F to 86°F (15°C to 30°C).
- If Victoza® has been exposed to temperatures above 86°F (30°C), it should be thrown away.
- Protect your Victoza® pen from heat and sunlight.
- Keep the pen cap on when your Victoza® pen is not in use.
- Use a Victoza® pen for only 30 days. Throw away a used Victoza® pen after 30 days, even if some medicine is left in the pen.

# EXHIBIT R

SAXENDA FDA FULL PRESCRIBING INFORMATION

# Saxenda®
## liraglutide (rDNA origin) injection

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use SAXENDA® safely and effectively. See full prescribing information for SAXENDA®.**
**SAXENDA® (liraglutide [rDNA origin] injection), solution for subcutaneous use**
**Initial U.S. Approval: 2010**

---

**WARNING: RISK OF THYROID C-CELL TUMORS**
*See full prescribing information for complete boxed warning.*

- **Liraglutide causes thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether Saxenda® causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined (5.1).**
- **Saxenda® is contraindicated in patients with a personal or family history of MTC or in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the risk of MTC and the symptoms of thyroid tumors (4, 5.1, 13.1).**

---

————— **INDICATIONS AND USAGE** —————

Saxenda® is a glucagon-like peptide-1 (GLP-1) receptor agonist indicated as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adult patients with an initial body mass index (BMI) of

- 30 kg/m² or greater (obese) (1) or
- 27 kg/m² or greater (overweight) in the presence of at least one weight-related comorbid condition (e.g. hypertension, type 2 diabetes mellitus, or dyslipidemia) (1).

Limitations of Use:

- Saxenda® is not indicated for the treatment of type 2 diabetes (1).
- Saxenda® should not be used in combination with any other GLP-1 receptor agonist (1).
- Saxenda® should not be used with insulin (1, 5.4).

- The effects of Saxenda® on cardiovascular morbidity and mortality have not been established (1).
- The safety and efficacy of coadministration with other products for weight loss have not been established (1).
- Saxenda® has not been studied in patients with a history of pancreatitis (1, 5.2).

————— **DOSAGE AND ADMINISTRATION** —————

- Recommended dose of Saxenda® is 3 mg daily. Administer at any time of day, without regard to the timing of meals (2).
- Initiate at 0.6 mg per day for one week. In weekly intervals, increase the dose until a dose of 3 mg is reached (2).
- Inject subcutaneously in the abdomen, thigh or upper arm (2).
- The injection site and timing can be changed without dose adjustment (2).

————— **DOSAGE FORMS AND STRENGTHS** —————

- Solution for subcutaneous injection, pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg (6 mg/mL, 3 mL) (3).

————— **CONTRAINDICATIONS** —————

- Personal or family history of medullary thyroid carcinoma or Multiple Endocrine Neoplasia syndrome type 2 (4, 5.1).
- Hypersensitivity to liraglutide or any product components (4, 5.7).
- Pregnancy (4, 8.1).

————— **WARNINGS AND PRECAUTIONS** —————

- Thyroid C-cell Tumors: Counsel patients regarding the risk of medullary thyroid carcinoma and the symptoms of thyroid tumors (5.1).
- Acute Pancreatitis: Discontinue promptly if pancreatitis is suspected. Do not restart if pancreatitis is confirmed (5.2).
- Acute Gallbladder Disease: If cholelithiasis or cholecystitis are suspected, gallbladder studies are indicated (5.3).
- Serious Hypoglycemia: Can occur when Saxenda® is used with an insulin secretagogue (e.g. a sulfonylurea). Consider lowering the dose of anti-diabetic drugs to reduce the risk of hypoglycemia (2, 5.4).
- Heart Rate Increase: Monitor heart rate at regular intervals (5.5).
- Renal Impairment: Has been reported postmarketing, usually in association with nausea, vomiting, diarrhea, or dehydration which may sometimes require hemodialysis. Use caution when

initiating or escalating doses of Saxenda® in patients with renal impairment (5.6).
- Hypersensitivity Reactions: Postmarketing reports of serious hypersensitivity reactions (e.g., anaphylactic reactions and angioedema). Discontinue Saxenda® and other suspect medications and promptly seek medical advice (5.7).
- Suicidal Behavior and Ideation: Monitor for depression or suicidal thoughts. Discontinue Saxenda® if symptoms develop (5.8).

————— **ADVERSE REACTIONS** —————

- Most common adverse reactions, reported in greater than or equal to 5% are: nausea, hypoglycemia, diarrhea, constipation, vomiting, headache, decreased appetite, dyspepsia, fatigue, dizziness, abdominal pain, and increased lipase (6.1).

**To report SUSPECTED ADVERSE REACTIONS, contact Novo Nordisk Inc. at 1-877-484-2869 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

————— **DRUG INTERACTIONS** —————

- Saxenda® delays gastric emptying. May impact absorption of concomitantly administered oral medications. Use with caution (7).

————— **USE IN SPECIFIC POPULATIONS** —————

- Nursing Mothers: Discontinue drug or nursing (8.3).
- Pediatric Use: Safety and effectiveness not established and use not recommended (8.4).

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**
**Revised: 1/2015**

**FULL PRESCRIBING INFORMATION: CONTENTS***
**BOXED WARNING: RISK OF THYROID C–CELL TUMORS**
**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
**5 WARNINGS AND PRECAUTIONS**
 5.1 Risk of Thyroid C-cell Tumors
 5.2 Acute Pancreatitis
 5.3 Acute Gallbladder Disease
 5.4 Risk for Hypoglycemia with Concomitant Use of Anti-Diabetic Therapy
 5.5 Heart Rate Increase
 5.6 Renal Impairment
 5.7 Hypersensitivity Reactions
 5.8 Suicidal Behavior and Ideation
**6 ADVERSE REACTIONS**
 6.1 Clinical Trials Experience
 6.2 Postmarketing Experience
**7 DRUG INTERACTIONS**
 7.1 Oral Medications

**8 USE IN SPECIFIC POPULATIONS**
 8.1 Pregnancy
 8.3 Nursing Mothers
 8.4 Pediatric Use
 8.5 Geriatric Use
 8.6 Renal Impairment
 8.7 Hepatic Impairment
 8.8 Gastroparesis
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
 12.1 Mechanism of Action
 12.2 Pharmacodynamics
 12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
 16.1 How Supplied
 16.2 Recommended Storage
**17 PATIENT COUNSELING INFORMATION**
 17.1 FDA-Approved Medication Guide

 17.2 Instructions
 17.3 Risk of Thyroid C-cell Tumors
 17.4 Acute Pancreatitis
 17.5 Acute Gallbladder Disease
 17.6 Hypoglycemia in Patients with Type 2 Diabetes Mellitus on Anti-Diabetic Therapy
 17.7 Heart Rate Increase
 17.8 Dehydration and Renal Impairment
 17.9 Hypersensitivity Reactions
 17.10 Suicidal Behavior and Ideation
 17.11 Jaundice and Hepatitis
 17.12 Never Share a Saxenda® Pen Between Patients

*Sections or subsections omitted from the full prescribing information are not listed.

# FULL PRESCRIBING INFORMATION

> **WARNING: RISK OF THYROID C-CELL TUMORS**
> - Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors at clinically relevant exposures in both genders of rats and mice. It is unknown whether Saxenda® causes thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined *[see Warnings and Precautions (5.1) and Nonclinical Toxicology (13.1)]*.
> - Saxenda® is contraindicated in patients with a personal or family history of MTC and in patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). Counsel patients regarding the risk of MTC with use of Saxenda® and inform them of symptoms of thyroid tumors (e.g., a mass in the neck, dysphagia, dyspnea, persistent hoarseness). Routine monitoring of serum calcitonin or using thyroid ultrasound is of uncertain value for early detection of MTC in patients treated with Saxenda® *[see Contraindications (4), Warnings and Precautions (5.1)]*.

## 1    INDICATIONS AND USAGE

Saxenda® is indicated as an adjunct to a reduced-calorie diet and increased physical activity for chronic weight management in adult patients with an initial body mass index (BMI) of

- 30 kg/m² or greater (obese), or
- 27 kg/m² or greater (overweight) in the presence of at least one weight-related comorbid condition (e.g., hypertension, type 2 diabetes mellitus, or dyslipidemia)

Limitations of Use

- Saxenda® is not indicated for the treatment of type 2 diabetes mellitus.

## 3    DOSAGE FORMS AND STRENGTHS

Solution for subcutaneous injection, pre-filled, multi-dose pen that delivers doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg, or 3 mg (6 mg/mL, 3 mL).

## 4    CONTRAINDICATIONS

Saxenda® is contraindicated in the following conditions:

- Patients with a personal or family history of medullary thyroid carcinoma (MTC) or patients with Multiple Endocrine Neoplasia syndrome type 2 (MEN 2) *[see Warnings and Precautions (5.1)]*
- Patients with a prior serious hypersensitivity reaction to liraglutide or to any of the product components *[see Warnings and Precautions (5.7)]*

---

- Saxenda® and Victoza® both contain the same active ingredient, liraglutide, and therefore should not be used together. Saxenda® should not be used in combination with any other GLP-1 receptor agonist.
- Saxenda® has not been studied in patients taking insulin. Saxenda® and insulin should not be used together *[see Warnings and Precautions (5.4)]*.
- The effects of Saxenda® on cardiovascular morbidity and mortality have not been established.
- The safety and effectiveness of Saxenda® in combination with other products intended for weight loss, including prescription drugs, over-the-counter drugs, and herbal preparations, have not been established.
- Saxenda® has not been studied in patients with a history of pancreatitis *[see Warnings and Precautions (5.2)]*.

## 2    DOSAGE AND ADMINISTRATION

The recommended dosage of Saxenda® is 3 mg daily. The dose escalation schedule in Table 1 should be used to reduce the likelihood of gastrointestinal symptoms. If patients do not tolerate an increased dose during dose escalation, consider delaying dose escalation for approximately one additional week. Saxenda® should be discontinued, however, if a patient cannot tolerate the 3 mg dose, as efficacy has not been established at lower doses (0.6, 1.2, 1.8, and 2.4 mg).

**Table 1. Dose Escalation Schedule**

| Week | Daily Dose |
|---|---|
| 1 | 0.6 mg |
| 2 | 1.2 mg |
| 3 | 1.8 mg |
| 4 | 2.4 mg |
| 5 and onward | 3 mg |

Saxenda® should be taken once daily at any time of day, without regard to the timing of meals. Saxenda® can be injected subcutaneously in the abdomen, thigh, or upper arm. The injection site and

---

timing can be changed without dose adjustment. Saxenda® must not be administered intravenously or intramuscularly.

When initiating Saxenda® in patients taking insulin secretagogues (such as sulfonylureas), consider reducing the dose of the insulin secretagogue (for example, by one-half) to reduce the risk for hypoglycemia, and monitor blood glucose. Saxenda® and insulin should not be used together *[see Warnings and Precautions (5.4) and Adverse Reactions (6.1)]*. Conversely, if discontinuing Saxenda® in patients with type 2 diabetes, monitor for an increase in blood glucose.

Evaluate the change in body weight 16 weeks after initiating Saxenda® and discontinue Saxenda® if the patient has not lost at least 4% of baseline body weight, since it is unlikely that the patient will achieve and sustain clinically meaningful weight loss with continued treatment.

If a dose is missed, the once-daily regimen should be resumed as prescribed with the next scheduled dose. An extra dose or increase in dose should not be taken to make up for the missed dose. If more than 3 days have elapsed since the last Saxenda® dose, patients should reinitiate Saxenda® at 0.6 mg daily and follow the dose escalation schedule in Table 1, which may reduce the occurrence of gastrointestinal symptoms associated with reinitiation of treatment.

Prior to initiation of Saxenda®, patients should be trained by their healthcare professional on proper injection technique. Training reduces the risk of administration errors such as needle sticks and incomplete dosing. Refer to the accompanying Instructions for Use for complete administration instructions with illustrations.

Saxenda® solution should be inspected prior to each injection, and the solution should be used only if it is clear, colorless, and contains no particles.

BMI is calculated by dividing weight in (kilograms) by height (in meters) squared. A chart for determining BMI based on height and weight is provided in Table 2.

**Table 2. BMI Conversion Chart**

| Weight (lb) → | 125 | 130 | 135 | 140 | 145 | 150 | 155 | 160 | 165 | 170 | 175 | 180 | 185 | 190 | 195 | 200 | 205 | 210 | 215 | 220 | 225 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Weight (kg) → | 56.8 | 59.1 | 61.4 | 63.6 | 65.9 | 68.2 | 70.5 | 72.7 | 75.0 | 77.3 | 79.5 | 81.8 | 84.1 | 86.4 | 88.6 | 90.9 | 93.2 | 95.5 | 97.7 | 100.0 | 102.3 |
| Height (in) / (cm) | | | | | | | | | | | | | | | | | | | | | |
| 58 / 147.3 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| 59 / 149.9 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 43 | 44 | 45 | 46 |
| 60 / 152.4 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 |
| 61 / 154.9 | 24 | 25 | 26 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 37 | 38 | 39 | 40 | 41 | 42 |
| 62 / 157.5 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 |
| 63 / 160.0 | 22 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 35 | 36 | 37 | 38 | 39 | 40 |
| 64 / 162.6 | 22 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 28 | 29 | 30 | 31 | 32 | 33 | 33 | 34 | 35 | 36 | 37 | 38 | 39 |
| 65 / 165.1 | 21 | 22 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 29 | 30 | 31 | 32 | 32 | 33 | 34 | 35 | 36 | 37 | 38 |
| 66 / 167.6 | 20 | 21 | 22 | 23 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 35 | 35 | 36 |
| 67 / 170.2 | 20 | 20 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 34 | 35 |
| 68 / 172.7 | 19 | 20 | 21 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 33 | 34 |
| 69 / 175.3 | 18 | 19 | 20 | 21 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 30 | 31 | 32 | 33 | 33 |
| 70 / 177.8 | 18 | 19 | 19 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 29 | 30 | 31 | 32 | 32 |
| 71 / 180.3 | 17 | 18 | 19 | 20 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 29 | 30 | 31 | 31 |
| 72 / 182.9 | 17 | 18 | 18 | 19 | 20 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 | 29 | 30 | 31 |
| 73 / 185.4 | 17 | 17 | 18 | 19 | 19 | 20 | 20 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 | 29 | 30 |
| 74 / 188.0 | 16 | 17 | 17 | 18 | 19 | 19 | 20 | 21 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 | 29 |
| 75 / 190.5 | 16 | 16 | 17 | 18 | 18 | 19 | 19 | 20 | 21 | 21 | 22 | 22 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 28 | 28 |
| 76 / 193.0 | 15 | 16 | 16 | 17 | 18 | 18 | 19 | 20 | 20 | 21 | 21 | 22 | 23 | 23 | 24 | 24 | 25 | 26 | 26 | 27 | 27 |

---

- Pregnancy *[see Use in Specific Populations (8.1)]*

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Risk of Thyroid C-cell Tumors

Liraglutide causes dose-dependent and treatment-duration-dependent thyroid C-cell tumors (adenomas and/or carcinomas) at clinically relevant exposures in both genders of rats and mice *[see Nonclinical Toxicology (13.1)]*. Malignant thyroid C-cell carcinomas were detected in rats and mice. It is unknown whether Saxenda® will cause thyroid C-cell tumors, including medullary thyroid carcinoma (MTC), in humans, as the human relevance of liraglutide-induced rodent thyroid C-cell tumors has not been determined.

---

Cases of MTC in patients treated with liraglutide have been reported in the postmarketing period; the data in these reports are insufficient to establish or exclude a causal relationship between MTC and liraglutide use in humans.

Saxenda® is contraindicated in patients with a personal or family history of MTC or in patients with MEN 2. Counsel patients regarding the risk for MTC and inform them of symptoms of thyroid tumors (e.g., a mass in the neck, dysphagia, dyspnea, persistent hoarseness).

Routine monitoring of serum calcitonin or using thyroid ultrasound is of uncertain value for early detection of MTC in patients treated with Saxenda®. Such monitoring may increase the risk of unnecessary procedures, due to low test specificity for serum

calcitonin and a high background incidence of thyroid disease. Significantly elevated serum calcitonin may indicate MTC, and patients with MTC usually have calcitonin values greater than 50 ng/L. If serum calcitonin is measured and found to be elevated, the patient should be further evaluated. Patients with thyroid nodules noted on physical examination or neck imaging should also be further evaluated.

### 5.2  Acute Pancreatitis

Based on spontaneous postmarketing reports, acute pancreatitis, including fatal and non-fatal hemorrhagic or necrotizing pancreatitis, has been observed in patients treated with liraglutide. After initiation of Saxenda®, observe patients carefully for signs and symptoms of pancreatitis (including persistent severe abdominal pain, sometimes radiating to the back and which may or may not be accompanied by vomiting). If pancreatitis is suspected, Saxenda® should promptly be discontinued and appropriate management should be initiated. If pancreatitis is confirmed, Saxenda® should not be restarted.

In Saxenda® clinical trials, acute pancreatitis was confirmed by adjudication in 9 (0.3%) of 3291 Saxenda®-treated patients and 1 (0.1%) of 1843 placebo-treated patients. In addition, there were 2 cases of acute pancreatitis in Saxenda®-treated patients who prematurely withdrew from these clinical trials, occurring 74 and 124 days after the last dose, and 1 additional case in a Saxenda®-treated patient during an off-treatment follow-up period within 2 weeks of discontinuing Saxenda®.

It is unknown whether patients with a history of pancreatitis are at increased risk for pancreatitis while using Saxenda®, since these patients were excluded from clinical trials.

### 5.3  Acute Gallbladder Disease

In Saxenda® clinical trials, 1.5% of Saxenda®-treated patients reported adverse events of cholelithiasis versus 0.5% of placebo-treated patients. The incidence of cholecystitis was 0.6% in Saxenda®-treated patients versus 0.2% in placebo-treated patients. The majority of Saxenda®-treated patients with adverse events of cholelithiasis and cholecystitis required cholecystectomy. Substantial or rapid weight loss can increase the risk of cholelithiasis; however, the incidence of acute gallbladder disease was greater in Saxenda®-treated patients than in placebo-treated patients even after accounting for the degree of weight loss. If cholelithiasis is suspected, gallbladder studies and appropriate clinical follow-up are indicated.

### 5.4  Risk for Hypoglycemia with Concomitant Use of Anti-Diabetic Therapy

The risk for serious hypoglycemia is increased when Saxenda® is used in combination with insulin secretagogues (for example, sulfonylureas) in patients with type 2 diabetes mellitus. Therefore, patients may require a lower dose of sulfonylurea (or other concomitantly administered insulin secretagogues) in this setting [see Dosage and Administration (2) and Adverse Reactions (6.1)]. Saxenda® should not be used in patients taking insulin.

Saxenda® can lower blood glucose [see Clinical Pharmacology (12.2)]. Monitor blood glucose parameters prior to starting Saxenda® and during Saxenda® treatment in patients with type 2 diabetes. If needed, adjust co-administered anti-diabetic drugs based on glucose monitoring results and risk of hypoglycemia.

### 5.5  Heart Rate Increase

Mean increases in resting heart rate of 2 to 3 beats per minute (bpm) were observed with routine clinical monitoring in Saxenda®-treated patients compared to placebo in clinical trials. More patients treated with Saxenda®, compared with placebo, had changes from baseline at two consecutive visits of more than 10 bpm (34% versus 19%, respectively) and 20 bpm (5% versus 2%, respectively). At least one resting heart rate exceeding 100 bpm was recorded for 6% of Saxenda®-treated patients compared with 4% of placebo-treated patients, with this occurring at two consecutive study visits for 0.9% and 0.3%, respectively. Tachycardia was reported as an adverse reaction in 0.6% of Saxenda®-treated patients and in 0.1% of placebo-treated patients.

In a clinical pharmacology trial that monitored heart rate continuously for 24 hours, Saxenda® treatment was associated with a heart rate that was 4 to 9 bpm higher than that observed with placebo.

The clinical significance of the heart rate elevation with Saxenda® treatment is unclear, especially for patients with cardiac and cerebrovascular disease as a result of limited exposure in these patients in clinical trials.

Heart rate should be monitored at regular intervals consistent with usual clinical practice. Patients should inform health care providers of palpitations or feelings of a racing heartbeat while at rest during Saxenda® treatment. For patients who experience a sustained increase in resting heart rate while taking Saxenda®, Saxenda® should be discontinued.

### 5.6  Renal Impairment

In patients treated with GLP-1 receptor agonists, including Saxenda®, there have been reports of acute renal failure and

worsening of chronic renal failure, sometimes requiring hemodialysis [see Adverse Reactions (6.2)]. Some of these events were reported in patients without known underlying renal disease. A majority of the reported events occurred in patients who had experienced nausea, vomiting, or diarrhea leading to volume depletion. Some of the reported events occurred in patients receiving one or more medications known to affect renal function or volume status. Altered renal function has been reversed in many of the reported cases with supportive treatment and discontinuation of potentially causative agents, including liraglutide. Use caution when initiating or escalating doses of Saxenda® in patients with renal impairment [see Use in Specific Populations (8.6)].

### 5.7  Hypersensitivity Reactions

There have been reports of serious hypersensitivity reactions (e.g., anaphylactic reactions and angioedema) in patients treated with liraglutide [see Adverse Reactions (6.1, 6.2)]. If a hypersensitivity reaction occurs, the patient should discontinue Saxenda® and other suspect medications and promptly seek medical advice.

Angioedema has also been reported with other GLP-1 receptor agonists. Use caution in a patient with a history of angioedema with another GLP-1 receptor agonist because it is unknown whether such patients will be predisposed to angioedema with Saxenda®.

### 5.8  Suicidal Behavior and Ideation

In Saxenda® clinical trials, 6 (0.2%) of 3384 Saxenda®-treated patients and none of the 1941 placebo-treated patients reported suicidal ideation; one of these Saxenda®-treated patients attempted suicide. Patients treated with Saxenda® should be monitored for the emergence or worsening of depression, suicidal thoughts or behavior, and/or any unusual changes in mood or behavior. Discontinue Saxenda® in patients who experience suicidal thoughts or behaviors. Avoid Saxenda® in patients with a history of suicidal attempts or active suicidal ideation.

## 6  ADVERSE REACTIONS

The following serious adverse reactions are described below or elsewhere in the prescribing information:

- Risk of Thyroid C-Cell Tumors [see Warnings and Precautions (5.1)]
- Acute Pancreatitis [see Warnings and Precautions (5.2)]
- Acute Gallbladder Disease [see Warnings and Precautions (5.3)]
- Risk for Hypoglycemia with Concomitant Use of Anti-Diabetic Therapy [see Warnings and Precautions (5.4)]
- Heart Rate Increase [see Warnings and Precautions (5.5)]
- Renal Impairment [see Warnings and Precautions (5.6)]
- Hypersensitivity Reactions [see Warnings and Precautions (5.7)]
- Suicidal Behavior and Ideation [see Warnings and Precautions (5.8)]

### 6.1  Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Saxenda® was evaluated for safety in 5 double-blind, placebo controlled trials that included 3384 overweight or obese patients treated with Saxenda® for a treatment period up to 56 weeks (3 trials), 52 weeks (1 trial), and 32 weeks (1 trial). All patients received study drug in addition to diet and exercise counseling. In these trials, patients received Saxenda® for a mean treatment duration of 45.9 weeks (median, 55.9 weeks). (The other, 1087 Saxenda®-treated patients and 497 placebo-treated patients have been exposed in their original randomized groups beyond the primary endpoint for an additional mean duration of 53.0 weeks (median, 56.9 weeks). Baseline characteristics included a mean age of 47 years, 71% women, 85% white, 39% with hypertension, 15% with type 2 diabetes, 34% with dyslipidemia, 29% with a BMI greater than 40 kg/m², and 9% with cardiovascular disease. Dosing was initiated and increased weekly to reach the 3 mg dose.

In clinical trials, 9.8% of patients treated with Saxenda® and 4.3% of patients treated with placebo prematurely discontinued treatment as a result of adverse reactions. The most common adverse reactions leading to discontinuation were nausea (2.9% versus 0.2% for Saxenda® and placebo, respectively), vomiting (1.7% versus less than 0.1%), and diarrhea (1.4% versus 0%).

Adverse reactions reported in greater than or equal to 2% of Saxenda®-treated patients and more frequently than in placebo-treated patients are shown in Table 3.

**Table 3. Adverse Reactions Reported in Greater Than or Equal to 2% of Saxenda®-treated Patients and More Frequently than with Placebo**

| | Placebo N = 1941 % | Saxenda N = 3384 % |
|---|---|---|
| **Gastrointestinal Disorders** | | |
| Nausea | 13.8 | 39.3 |
| Diarrhea | 9.9 | 20.9 |
| Constipation | 8.5 | 19.4 |
| Vomiting | 3.9 | 15.7 |
| Dyspepsia | 2.7 | 9.6 |
| Abdominal Pain | 3.1 | 5.4 |
| Upper Abdominal Pain | 2.7 | 5.1 |
| Gastroesophageal Reflux Disease | 1.7 | 4.7 |
| Abdominal Distension | 3.0 | 4.5 |
| Eructation | 0.2 | 4.5 |
| Flatulence | 2.5 | 4.0 |
| Dry Mouth | 1.0 | 2.3 |
| **Metabolism and Nutrition Disorders** | | |
| Hypoglycemia in T2DM[1] | 12.7 | 23.0 |
| Decreased Appetite | 2.3 | 10.0 |
| **Nervous System Disorders** | | |
| Headache | 12.6 | 13.6 |
| Dizziness | 5.0 | 6.9 |
| **General Disorders and Administration Site Conditions** | | |
| Fatigue | 4.6 | 7.5 |
| Injection Site Erythema | 0.2 | 2.5 |
| Injection Site Reaction | 0.6 | 2.5 |
| Asthenia | 0.8 | 2.1 |
| **Infections and Infestations** | | |
| Gastroenteritis | 3.2 | 4.7 |
| Urinary Tract Infection | 3.1 | 4.3 |
| Viral Gastroenteritis | 1.6 | 2.8 |
| **Investigations** | | |
| Increased Lipase | 2.2 | 5.3 |
| **Psychiatric Disorders** | | |
| Insomnia | 1.7 | 2.4 |
| Anxiety | 1.6 | 2.0 |

[1] Documented symptomatic (defined as documented symptoms of hypoglycemia in combination with a plasma glucose less than or equal to 70 mg/dL) in patients with type 2 diabetes (Study 2). See text below for further information regarding hypoglycemia in patients with and without type 2 diabetes. T2DM = type 2 diabetes mellitus

Hypoglycemia

Saxenda® can lower blood glucose. In a clinical trial involving patients with type 2 diabetes mellitus and overweight or obesity, severe hypoglycemia (defined as requiring the assistance of another person) occurred in 3 (0.7%) of 422 Saxenda®-treated patients and in none of the 212 placebo-treated patients. Each of these 3 Saxenda®-treated patients was also taking a sulfonylurea. In the same trial, among patients taking a sulfonylurea, documented symptomatic hypoglycemia (defined as documented symptoms of hypoglycemia in combination with a plasma glucose less than or equal to 70 mg/dL) occurred in 48 (43.6%) of 110 Saxenda®-treated patients and 15 (27.3%) of 55 placebo-treated patients. The doses of sulfonylureas were reduced by 50% at the beginning of the trial per protocol. The frequency of hypoglycemia may be higher if the dose of sulfonylurea is not reduced. Among patients not taking a sulfonylurea, documented symptomatic hypoglycemia occurred in 49 (15.7%) of 312 Saxenda®-treated patients and 12 (7.6%) of 157 placebo-treated patients.

In Saxenda® clinical trials involving patients without type 2 diabetes mellitus, there was no systematic capturing or reporting of hypoglycemia, as patients were not provided with blood glucose meters or hypoglycemia diaries. Spontaneously reported symptomatic episodes of unconfirmed hypoglycemia were reported by 46 (1.6%) of 2962 Saxenda®-treated patients and 19 (1.1%) of 1729 placebo-treated patients. Fasting plasma glucose values obtained at routine clinic visits less than or equal to 70 mg/dL, irrespective of hypoglycemic symptoms, were reported as "hypoglycemia" in 92 (3.1%) Saxenda®-treated patients and 13 (0.8%) placebo-treated patients.

Gastrointestinal Adverse Reactions

In the clinical trials, approximately 68% of Saxenda®-treated patients and 39% of placebo-treated patients reported gastrointestinal disorders; the most frequently reported was nausea (39% and 14% of patients treated with Saxenda® and placebo, respectively). The percentage of patients reporting nausea declined as treatment continued. Other common adverse reactions that occurred at a higher incidence among Saxenda®-treated patients included diarrhea, constipation, vomiting, dyspepsia, abdominal pain, dry mouth, gastritis, gastroesophageal reflux disease, flatulence, eructation and abdominal distension. Most episodes of gastrointestinal events were mild or moderate and did not lead to discontinuation of therapy (6.2% with Saxenda® versus 0.8% with placebo discontinued treatment as a result of gastrointestinal adverse reactions). There have been reports of gastrointestinal adverse reactions, such as nausea, vomiting, and diarrhea, associated with volume depletion and renal impairment [see Warnings and Precautions (5.6)].

Asthenia, Fatigue, Malaise, Dysgeusia and Dizziness

Events of asthenia, fatigue, malaise, dysgeusia and dizziness were mainly reported within the first 12 weeks of treatment with Saxenda® and were often co-reported with gastrointestinal events such as nausea, vomiting, and diarrhea.

Immunogenicity

Patients treated with Saxenda® may develop anti-liraglutide antibodies. Anti-liraglutide antibodies were detected in 42 (2.8%) of 1505 Saxenda®-treated patients with a post-baseline assessment. Antibodies that had a neutralizing effect on liraglutide in an in vitro assay occurred in 18 (1.2%) of 1505 Saxenda®-treated patients. Presence of antibodies may be associated with a higher incidence of injection site reactions and reports of low blood glucose. In clinical trials, these events were usually classified as mild and resolved while patients continued on treatment.

The detection of antibody formation is highly dependent on the sensitivity and specificity of the assay. Additionally, the observed incidence of antibody (including neutralizing antibody) positivity in an assay may be influenced by several factors including assay methodology, sample handling, timing of sample collection, concomitant medications, and underlying disease. For these reasons, the incidence of antibodies to Saxenda® cannot be directly compared with the incidence of antibodies of other products.

Allergic reactions

Urticaria was reported in 0.7% of Saxenda®-treated patients and 0.5% of placebo-treated patients. Anaphylactic reactions, asthma, bronchial hyperreactivity, bronchospasm, oropharyngeal swelling, facial swelling, angioedema, pharyngeal edema, type IV hypersensitivity reactions have been reported in patients treated with liraglutide in clinical trials. Cases of anaphylactic reactions with additional symptoms such as hypotension, palpitations, dyspnea, and edema have been reported with marketed use of liraglutide. Anaphylactic reactions may potentially be life-threatening.

Injection site reactions

Injection site reactions were reported in approximately 13.9% of Saxenda®-treated patients and 10.5% of placebo-treated patients. The most common reactions, each reported by 1% to 2.5% of Saxenda®-treated patients and more commonly than by placebo-treated patients, included erythema, pruritus, and rash at the injection site. 0.6% of Saxenda®-treated patients and 0.5% of placebo-treated patients discontinued treatment due to injection site reactions.

Breast Cancer

In Saxenda® clinical trials breast cancer confirmed by adjudication was reported in 14 (0.6%) of 2379 Saxenda®-treated women compared with 3 (0.2%) of 1300 placebo-treated women, including invasive cancer (11 Saxenda®- and 2 placebo-treated women) and ductal carcinoma in situ (3 Saxenda®- and 1 placebo-treated woman). The majority of cancers were estrogen- and progesterone-receptor positive. There were too few cases to determine whether these cases were related to Saxenda®. In addition, there are insufficient data to determine whether Saxenda® has an effect on pre-existing breast neoplasia.

Papillary Thyroid Cancer

In Saxenda® clinical trials, papillary thyroid carcinoma confirmed by adjudication was reported in 7 (0.2%) of 3291 Saxenda®-treated patients compared with no cases among 1843 placebo-treated patients. Four of these papillary thyroid carcinomas were less than 1 cm in greatest diameter and 4 were diagnosed in surgical pathology specimens after thyroidectomy prompted by findings identified prior to treatment.

Colorectal Neoplasms

In Saxenda® clinical trials, benign colorectal neoplasms (mostly colon adenomas) confirmed by adjudication were reported in 17

(0.5%) of 3291 Saxenda®-treated patients compared with 4 (0.2%) of 1843 placebo-treated patients. Two positively adjudicated cases of malignant colorectal carcinoma were reported in Saxenda®-treated patients (0.1%) and none in placebo-treated patients.

Cardiac Conduction Disorders

In Saxenda® clinical trials, 11 (0.3%) of 3384 Saxenda®-treated patients compared with none of the 1941 placebo-treated patients had a cardiac conduction disorder, reported as first degree atrioventricular block, right bundle branch block, or left bundle branch block.

Hypotension

Adverse reactions related to hypotension (that is, reports of hypotension, orthostatic hypotension, circulatory collapse, and decreased blood pressure) were reported more frequently with Saxenda® (1.1%) compared with placebo (0.5%) in Saxenda® clinical trials. Systolic blood pressure decreases to less than 80 mmHg were observed in 4 (0.1%) Saxenda®-treated patients compared with no placebo-treated patients. One of the Saxenda®-treated patients had hypotension associated with gastrointestinal adverse reactions and renal failure [see Warnings and Precautions (5.6)].

Laboratory Abnormalities

Liver Enzymes

Increases in alanine aminotransferase (ALT) greater than or equal to 10 times the upper limit of normal were observed in 5 (0.15%) Saxenda®-treated patients (two of whom had ALT greater than 20 and 40 times the upper limit of normal) compared with 1 (0.05%) placebo-treated patient during the Saxenda® clinical trials. Because clinical evaluation to exclude alternative causes of ALT and aspartate aminotransferase (AST) increases was not done in most cases, the relationship to Saxenda® is uncertain. Some increases in ALT and AST were associated with other confounding factors (such as gallstones).

Serum Calcitonin

Calcitonin, a biological marker of MTC, was measured throughout the clinical development program [see Warnings and Precautions (5.1)]. More patients treated with Saxenda® in the clinical trials were observed to have high calcitonin values during treatment, compared with placebo. The proportion of patients with calcitonin greater than or equal to 2 times the upper limit of normal at the end of the trial was 1.2% in Saxenda®-treated patients and 0.6% in placebo-treated patients. Calcitonin values greater than 20 ng/L at the end of the trial occurred in 0.5% of Saxenda®-treated patients and 0.2% of placebo-treated patients; among patients with pretreatment serum calcitonin less than 20 ng/L, none had calcitonin elevations to greater than 50 ng/L at the end of the trial.

Serum Lipase and Amylase

Serum lipase and amylase were routinely measured in the Saxenda® clinical trials. Among Saxenda®-treated patients, 2.1% had a lipase value at anytime during treatment of greater than or equal to 3 times the upper limit of normal compared with 1.0% of placebo-treated patients. 0.1% of Saxenda®-treated patients had an amylase value at anytime in the trial of greater than or equal to 3 times the upper limit of normal versus 0.1% of placebo-treated patients. The clinical significance of elevations in lipase or amylase with Saxenda® is unknown in the absence of other signs and symptoms of pancreatitis [see Warnings and Precautions (5.2)].

6.2    Post-Marketing Experience

The following adverse reactions have been reported during post-approval use of liraglutide, the active ingredient of Saxenda®. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

Neoplasms

Medullary thyroid carcinoma [see Warnings and Precautions (5.1)]

Gastrointestinal Disorders

Acute pancreatitis, hemorrhagic and necrotizing pancreatitis, sometimes resulting in death [see Warnings and Precautions (5.2)]

Metabolism and Nutrition Disorders

Dehydration resulting from nausea, vomiting and diarrhea [see Adverse Reactions (6.1)]

Renal and Urinary Disorders

Increased serum creatinine, acute renal failure or worsening of chronic renal failure, sometimes requiring hemodialysis [see Warnings and Precautions (5.6)]

General Disorders and Administration Site Conditions

Allergic reactions: rash and pruritus [see Adverse Reactions (6.1)]

Immune System Disorders

Angioedema and anaphylactic reactions [see Warnings and Precautions (5.7)]

Hepatobiliary Disorders

Elevations of liver enzymes, hyperbilirubinemia, cholestasis and hepatitis [see Adverse Reactions (6.1)]

7    DRUG INTERACTIONS

7.1    Oral Medications

Saxenda® causes a delay of gastric emptying, and thereby has the potential to impact the absorption of concomitantly administered oral medications. In clinical pharmacology trials, liraglutide did not affect the absorption of the tested orally administered medications to any clinically relevant degree. Nonetheless, monitor for potential consequences of delayed absorption of oral medications concomitantly administered with Saxenda®.

8    USE IN SPECIFIC POPULATIONS

8.1    Pregnancy

Pregnancy Category X.

Risk Summary

Saxenda® is contraindicated during pregnancy because weight loss offers no potential benefit to a pregnant woman and may result in fetal harm. There are no adequate and well-controlled studies of Saxenda® in pregnant women. Saxenda® should not be used during pregnancy. If a patient wishes to become pregnant, or pregnancy occurs, treatment with Saxenda® should be discontinued.

Clinical Considerations

A minimum weight gain, and no weight loss, is recommended for all pregnant women, including those who are already overweight or obese, due to the necessary weight gain that occurs in maternal tissues during pregnancy.

Animal Data

Liraglutide has been shown to be teratogenic in rats at or above 0.8-times systemic exposures in obese humans resulting from the maximum recommended human dose (MRHD) of 3 mg/day based on plasma area under the time-concentration curve (AUC) comparison. Liraglutide has been shown to cause reduced growth and increased total major abnormalities in rabbits at systemic exposures below exposure in obese humans at the MRHD based on plasma AUC comparison.

Female rats given subcutaneous doses of 0.1, 0.25 and 1 mg/kg/day liraglutide beginning 2 weeks before mating through gestation day 17 had estimated systemic exposures 0.8-, 3-, and 11-times the exposure in obese humans at the MRHD based on plasma AUC comparison. The number of early embryonic deaths in the 1 mg/kg/day group increased slightly. Fetal abnormalities and variations in kidneys and blood vessels, irregular ossification of the skull, and a more complete state of ossification occurred at all doses. Mottled liver and minimally kinked ribs occurred at the highest dose. The incidence of fetal malformations in liraglutide-treated groups exceeding concurrent and historical controls were misshapen oropharynx and/or narrowed opening into larynx at 0.1 mg/kg/day and umbilical hernia at 0.1 and 0.25 mg/kg/day.

Pregnant rabbits given subcutaneous doses of 0.01, 0.025 and 0.05 mg/kg/day liraglutide from gestation day 6 through day 18 inclusive, had estimated systemic exposures less than the exposure in obese humans at the MRHD of 3 mg/day at all doses, based on plasma AUC comparison. Liraglutide decreased fetal weight and dose-dependently increased the incidence of total major fetal abnormalities at all doses. The incidence of malformations exceeded concurrent and historical controls at 0.01 mg/kg/day (kidneys, scapula), greater than or equal to 0.01 mg/kg/day (eyes, forelimb), 0.025 mg/kg/day (brain, tail and sacral vertebrae, major blood vessels and heart, umbilicus), greater than or equal to 0.025 mg/kg/day (sternum) and at 0.05 mg/kg/day (parietal bones, major blood vessels). Irregular ossification and/or skeletal abnormalities occurred in the skull and jaw, vertebrae and ribs, sternum, pelvis, tail, and scapula; and dose-dependent minor skeletal variations were observed. Visceral abnormalities occurred in blood vessels, lung, liver, and esophagus. Bilobed or bifurcated gallbladder was seen in all treatment groups, but not in the control group.

In pregnant female rats given subcutaneous doses of 0.1, 0.25 and 1 mg/kg/day liraglutide from gestation day 6 through weaning or termination of nursing on lactation day 24, estimated systemic exposures were 0.8-, 3-, and 11-times exposure in obese humans at the MRHD of 3 mg/day, based on plasma AUC comparison. A slight delay in parturition was observed in the majority of treated rats. Group mean body weight of neonatal rats from liraglutide-treated dams was lower than neonatal rats from control group dams. Bloody scabs and agitated behavior occurred in male rats descended from dams treated with 1 mg/kg/day liraglutide. Group mean body weight from birth to postpartum day 14 trended lower in $F_2$ generation rats descended from liraglutide-treated rats

compared to $F_2$ generation rats descended from controls, but differences did not reach statistical significance for any group.

### 8.3 Nursing Mothers

It is not known whether Saxenda® is excreted in human milk. Because many drugs are excreted in human milk, and because of the potential for tumorigenicity shown for liraglutide in animal studies, a decision should be made whether to discontinue nursing or to discontinue Saxenda®, taking into account the importance of the drug to the mother. In lactating rats, liraglutide was excreted unchanged in milk at concentrations approximately 50% of maternal plasma concentrations.

### 8.4 Pediatric Use

Safety and effectiveness of Saxenda® have not been established in pediatric patients. Saxenda® is not recommended for use in pediatric patients.

### 8.5 Geriatric Use

In the Saxenda® clinical trials, 232 (6.9%) of the Saxenda®-treated patients were 65 years of age and over, and 17 (0.5%) of the Saxenda®-treated patients were 75 years of age and over. No overall differences in safety or effectiveness were observed between these patients and younger patients, but greater sensitivity of some older individuals cannot be ruled out.

### 8.6 Renal Impairment

There is limited experience with Saxenda® in patients with mild, moderate, and severe renal impairment, including end-stage renal disease. However, there have been postmarketing reports of acute renal failure and worsening of chronic renal failure with liraglutide, which may sometimes require hemodialysis *[see Warnings and Precautions (5.6) and Adverse Reactions (6.2)]*. Saxenda® should be used with caution in this patient population *[see Clinical Pharmacology (12.3)]*.

### 8.7 Hepatic Impairment

There is limited experience in patients with mild, moderate, or severe hepatic impairment. Therefore, Saxenda® should be used with caution in this patient population *[see Clinical Pharmacology (12.3)]*.

### 8.8 Gastroparesis

Saxenda® slows gastric emptying. Saxenda® has not been studied in patients with pre-existing gastroparesis.

## 10    OVERDOSAGE

Overdoses have been reported in clinical trials and post-marketing use of liraglutide. Effects have included severe nausea and severe vomiting. In the event of overdosage, appropriate supportive treatment should be initiated according to the patient's clinical signs and symptoms.

## 11    DESCRIPTION

Saxenda® contains liraglutide, an analog of human GLP-1 and acts as a GLP-1 receptor agonist. The peptide precursor of liraglutide, produced by a process that includes expression of recombinant DNA in *Saccharomyces cerevisiae*, has been engineered to be 97% homologous to native human GLP-1 by substituting arginine for lysine at position 34. Liraglutide is made by attaching a C-16 fatty acid (palmitic acid) with a glutamic acid spacer on the remaining lysine residue at position 26 of the peptide precursor. The molecular formula of liraglutide is $C_{172}H_{265}N_{43}O_{51}$ and the molecular weight is 3751.2 Daltons. The structural formula (Figure 1) is:



**Figure 1. Structural Formula of liraglutide**

Saxenda® is a clear, colorless solution. Each 1 mL of Saxenda® solution contains 6 mg of liraglutide and the following inactive ingredients: disodium phosphate dihydrate, 1.42 mg; propylene glycol, 14 mg; phenol, 5.5 mg; and water for injection. Each pre-filled pen contains a 3 mL solution of Saxenda® equivalent to 18 mg liraglutide (free-base, anhydrous).

## 12    CLINICAL PHARMACOLOGY

### 12.1    Mechanism of Action

Liraglutide is an acylated human glucagon-like peptide-1 (GLP-1) receptor agonist with 97% amino acid sequence homology to endogenous human GLP-1(7-37). Like endogenous GLP-1, liraglutide binds to and activates the GLP-1 receptor, a cell-surface receptor coupled to adenylyl cyclase activation through the stimulatory G-protein, Gs. Endogenous GLP-1 has a half-life of 1.5-2 minutes due to degradation by the ubiquitous endogenous enzymes, dipeptidyl peptidase 4 (DPP-4) and neutral endopeptidases (NEP). Unlike native GLP-1, liraglutide is stable against metabolic degradation by both peptidases and has a plasma half-life of 13 hours after subcutaneous administration. The pharmacokinetic profile of liraglutide, which makes it suitable for once-daily administration, is a result of self-association that delays absorption, plasma protein binding, and stability against metabolic degradation by DPP-4 and NEP.

GLP-1 is a physiological regulator of appetite and calorie intake, and the GLP-1 receptor is present in several areas of the brain involved in appetite regulation. In animal studies, peripheral administration of liraglutide resulted in the presence of liraglutide in specific brain regions regulating appetite, including the hypothalamus. Although liraglutide activated neurons in brain regions known to regulate appetite, specific brain regions mediating the effects of liraglutide on appetite were not identified in rats.

### 12.2    Pharmacodynamics

Liraglutide lowers body weight through decreased calorie intake. Liraglutide does not increase 24-hour energy expenditure.

As with other GLP-1 receptor agonists, liraglutide stimulates insulin secretion and reduces glucagon secretion in a glucose-dependent manner. These effects can lead to a reduction of blood glucose.

*Cardiac Electrophysiology (QTc) in healthy volunteers*

The effect of liraglutide on cardiac repolarization was tested in a QTc study. Liraglutide at steady-state concentrations after daily doses up to 1.8 mg did not produce QTc prolongation. The maximum liraglutide plasma concentration ($C_{max}$) in overweight and obese subjects treated with liraglutide 3 mg is similar to the $C_{max}$ observed in the liraglutide QTc study in healthy volunteers.

### 12.3    Pharmacokinetics

Absorption - Following subcutaneous administration, maximum concentrations of liraglutide are achieved at 11 hours post dosing. The average liraglutide steady state concentration ($AUC_{\tau/24}$) reached approximately 116 ng/mL in obese (BMI 30-40 kg/m²) subjects following administration of liraglutide. Liraglutide exposure increased proportionally in the dose range of 0.6 mg to 3 mg. The intra-subject coefficient of variation for liraglutide AUC was 11% following single dose administration. Liraglutide exposures were considered similar among three subcutaneous injection sites (upper arm, abdomen, and thigh). Absolute bioavailability of liraglutide following subcutaneous administration is approximately 55%.

Distribution - The mean apparent volume of distribution after subcutaneous administration of liraglutide 3 mg is 20-25 L (for a person weighing approximately 100 kg). The mean volume of distribution after intravenous administration of liraglutide is 0.07 L/kg. Liraglutide is extensively bound to plasma protein (greater than 98%).

Metabolism - During the initial 24 hours following administration of a single [3H]-liraglutide dose to healthy subjects, the major component in plasma was intact liraglutide. Liraglutide is endogenously metabolized in a similar manner to large proteins without a specific organ as a major route of elimination.

Elimination - Following a [3H]-liraglutide dose, intact liraglutide was not detected in urine or feces. Only a minor part of the administered radioactivity was excreted as liraglutide-related metabolites in urine or feces (6% and 5%, respectively). The majority of urine and feces radioactivity was excreted during the first 6-8 days. The mean apparent clearance following subcutaneous administration of a single dose of liraglutide is approximately 0.9-1.4 L/h with an elimination half-life of approximately 13 hours, making liraglutide suitable for once daily administration.

**Specific Populations**

Elderly - No dosage adjustment is required based on age. Age had no effect on the pharmacokinetics of liraglutide based on a pharmacokinetic study in healthy subjects (65 to 83 years) and population pharmacokinetic analyses of data from overweight and obese patients 18 to 82 years of age *[see Use in Specific Populations (8.5)]*.

Gender - Based on the results of population pharmacokinetic analyses, females have 24% lower weight adjusted clearance of Saxenda® compared to males. Based on the exposure response data, no dose adjustment is necessary based on gender.

Race and Ethnicity - Race and ethnicity had no effect on the pharmacokinetics of liraglutide based on the results of population phar-

macokinetic analyses that included overweight and obese patients of Caucasian, Black, Asian and Hispanic/Non-Hispanic groups.

Body Weight - Body weight significantly affects the pharmacokinetics of liraglutide based on results of population pharmacokinetic analyses conducted in patients with body weight range of 60-234 kg. The exposure of liraglutide decreases as baseline body weight increases.

Pediatric - Saxenda® has not been studied in pediatric patients *[see Use in Specific Populations (8.4)]*.

Renal Impairment - The single-dose pharmacokinetics of liraglutide were evaluated in subjects with varying degrees of renal impairment. Subjects with mild (estimated creatinine clearance 50-80 mL/min) to severe (estimated creatinine clearance less than 30 mL/min) renal impairment and subjects with end-stage renal disease requiring dialysis were included in the trial. Compared to healthy subjects, liraglutide AUC in mild, moderate, and severe renal impairment and in end-stage renal disease was on average 35%, 19%, 29% and 30% lower, respectively *[see Use in Specific Populations (8.6)]*.

Hepatic Impairment - The single-dose pharmacokinetics of liraglutide were evaluated in subjects with varying degrees of hepatic impairment. Subjects with mild (Child Pugh score 5-6) to severe (Child Pugh score greater than 9) hepatic impairment were included in the trial. Compared to healthy subjects, liraglutide AUC in subjects with mild, moderate and severe hepatic impairment was on average 11%, 14% and 42% lower, respectively *[see Use in Specific Populations (8.7)]*.

*Drug Interactions*

*In vitro assessment of drug-drug interactions*

Liraglutide has low potential for pharmacokinetic drug-drug interactions related to cytochrome P450 (CYP) and plasma protein binding.

*In vivo assessment of drug-drug interactions*

The drug-drug interaction studies were performed at steady state with liraglutide 1.8 mg/day. The effect on rate of gastric emptying was equivalent between liraglutide 1.8 mg and 3 mg (acetaminophen $AUC_{0-300min}$). Administration of the interacting drugs was timed so that $C_{max}$ of liraglutide (8-12 h) would coincide with the absorption peak of the co-administered drugs.

*Oral Contraceptives*

A single dose of an oral contraceptive combination product containing 0.03 mg ethinylestradiol and 0.15 mg levonorgestrel was administered under fed conditions and 7 hours after the dose of liraglutide at steady state. Liraglutide lowered ethinylestradiol and levonorgestrel $C_{max}$ by 12% and 13%, respectively. There was no effect of liraglutide on the overall exposure (AUC) of ethinylestradiol. Liraglutide increased the levonorgestrel $AUC_{0-\infty}$ by 18%. Liraglutide delayed $T_{max}$ for both ethinylestradiol and levonorgestrel by 1.5 h.

*Digoxin*

A single dose of digoxin 1 mg was administered 7 hours after the dose of liraglutide at steady state. The concomitant administration with liraglutide resulted in a reduction of digoxin AUC by 16%; $C_{max}$ decreased by 31%. Digoxin median time to maximal concentration ($T_{max}$) was delayed from 1 h to 1.5 h.

*Lisinopril*

A single dose of lisinopril 20 mg was administered 5 minutes after the dose of liraglutide at steady state. The co-administration with liraglutide resulted in a reduction of lisinopril AUC by 15%; $C_{max}$ decreased by 27%. Lisinopril median $T_{max}$ was delayed from 6 h to 8 h with liraglutide.

*Atorvastatin*

Liraglutide did not change the overall exposure (AUC) of atorvastatin following a single dose of atorvastatin 40 mg, administered 5 hours after the dose of liraglutide at steady state. Atorvastatin $C_{max}$ was decreased by 38% and median $T_{max}$ was delayed from 1 h to 3 h with liraglutide.

*Acetaminophen*

Liraglutide did not change the overall exposure (AUC) of acetaminophen following a single dose of acetaminophen 1000 mg, administered 8 hours after the dose of liraglutide at steady state. Acetaminophen $C_{max}$ was decreased by 31% and median $T_{max}$ was delayed up to 15 minutes.

*Griseofulvin*

Liraglutide did not change the overall exposure (AUC) of griseofulvin following co-administration of a single dose of griseofulvin 500 mg with liraglutide at steady state. Griseofulvin $C_{max}$ increased by 37% while median $T_{max}$ did not change.

*Insulin Detemir*

No pharmacokinetic interaction was observed between liraglutide and insulin detemir when separate subcutaneous injections of insulin detemir 0.5 Unit/kg (single-dose) and liraglutide 1.8 mg

(steady state) were administered to patients with type 2 diabetes mellitus.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

A 104-week carcinogenicity study was conducted in male and female CD-1 mice at doses of 0.03, 0.2, 1, and 3 mg/kg/day liraglutide administered by bolus subcutaneous injection yielding systemic exposures 0.2-, 2-, 10- and 43-times the exposure in obese humans, respectively, at the maximum recommended human dose (MRHD) of 3 mg/day based on plasma AUC comparison. A dose-related increase in benign thyroid C-cell adenomas was seen in the 1 and the 3 mg/kg/day groups with incidences of 13% and 19% in males and 6% and 20% in females, respectively. C-cell adenomas did not occur in control groups or 0.03 and 0.2 mg/kg/day groups. Treatment-related malignant C-cell carcinomas occurred in 3% of females in the 3 mg/kg/day group. Thyroid C-cell tumors are rare findings during carcinogenicity testing in mice. A treatment-related increase in fibrosarcomas was seen on the dorsal skin and subcutis, the body surface used for drug injection, in males in the 3 mg/kg/day group. These fibrosarcomas were attributed to the high local concentration of drug near the injection site. The liraglutide concentration in the clinical formulation (6 mg/mL) is 10-times higher than the concentration in the formulation used to administer 3 mg/kg/day liraglutide to mice in the carcinogenicity study (0.6 mg/mL).

A 104-week carcinogenicity study was conducted in male and female Sprague Dawley rats at doses of 0.075, 0.25 and 0.75 mg/kg/day liraglutide administered by bolus subcutaneous injection with exposures 0.5-, 2- and 7-times the exposure in obese humans, respectively, resulting from the MRHD based on plasma AUC comparison. A treatment-related increase in benign thyroid C-cell adenomas was seen in males in 0.25 and 0.75 mg/kg/day liraglutide groups with incidences of 12%, 16%, 42%, and 46% and in all female liraglutide-treated groups with incidences of 10%, 27%, 33%, and 56% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. A treatment-related increase in malignant thyroid C-cell carcinomas was observed in all male liraglutide-treated groups with incidences of 2%, 8%, 6%, and 14% and in females at 0.25 and 0.75 mg/kg/day with incidences of 0%, 0%, 4%, and 6% in 0 (control), 0.075, 0.25, and 0.75 mg/kg/day groups, respectively. Thyroid C-cell carcinomas are rare findings during carcinogenicity testing in rats.

Studies in mice demonstrated that liraglutide-induced C-cell proliferation was dependent on the GLP-1 receptor and that liraglutide did not cause activation of the REarranged during Transfection (RET) proto-oncogene in thyroid C-cells.

Human relevance of thyroid C-cell tumors in mice and rats is unknown and has not been determined by clinical studies or nonclinical studies *[see Boxed Warning and Warnings and Precautions (5.1)]*.

Liraglutide was negative with and without metabolic activation in the Ames test for mutagenicity and in a human peripheral blood lymphocyte chromosome aberration test for clastogenicity. Liraglutide was negative in repeat-dose *in vivo* micronucleus tests in rats.

In rat fertility studies using subcutaneous doses of 0.1, 0.25 and 1 mg/kg/day liraglutide, males were treated for 4 weeks prior to and throughout mating and females were treated 2 weeks prior to and throughout mating until gestation day 17. No direct adverse effects on male fertility was observed at doses up to 1 mg/kg/day, a high dose yielding an estimated systemic exposure 11-times the exposure in obese humans at the MRHD, based on plasma AUC comparison. In female rats, an increase in early embryonic deaths occurred at 1 mg/kg/day. Reduced body weight gain and food consumption were observed in females at the 1 mg/kg/day dose.

## 14 CLINICAL STUDIES

The safety and efficacy of Saxenda® for chronic weight management in conjunction with reduced caloric intake and increased physical activity were studied in three 56-week, randomized, double-blind, placebo-controlled trials. In all studies, Saxenda® was titrated to 3 mg daily during a 4-week period. All patients received instruction for a reduced calorie diet (approximately 500 kcal/day deficit) and exercise counseling (recommended increase in physical activity of minimum 150 mins/week) that began with the first dose of study medication or placebo and continued throughout the trial.

Study 1 was a 56-week trial that enrolled 3731 patients with obesity (BMI greater than or equal to 30 kg/m²) or with overweight (BMI 27-29.9 kg/m²) and at least one weight-related comorbid condition such as treated or untreated dyslipidemia or hypertension; patients with type 2 diabetes mellitus were excluded. Patients were randomized in a 2:1 ratio to either Saxenda® or placebo. The mean age was 45 years (range 18-78), 79% were women, 85% were Caucasian, 10% were African American, and 11% were Hispanic/

Latino. Mean baseline body weight was 106.3 kg and mean BMI was 38.3 kg/m².

Study 2 was a 56-week trial that enrolled 635 patients with type 2 diabetes and with either overweight or obesity (as defined above). Patients were to have an HbA₁c of 7-10% and be treated with metformin, a sulfonylurea, or a glitazone as single agent or in any combination, or with diet and exercise alone. Patients were randomized in a 2:1 ratio to receive either Saxenda® or placebo. The mean age was 55 years (range 18-82), 50% were women, 83% were Caucasian, 12% were African American, and 10% were Hispanic/Latino. Mean baseline body weight was 105.9 kg and mean BMI was 37.1 kg/m².

Study 3 was a 56-week trial that enrolled 422 patients with obesity (BMI greater than or equal to 30 kg/m²) or with overweight (BMI 27-29.9 kg/m²) and at least one weight-related comorbid condition such as treated or untreated dyslipidemia or hypertension; patients with type 2 diabetes mellitus were excluded. All patients were first treated with a low-calorie diet (total energy intake 1200-1400 kcal/day) in a run-in period lasting up to 12 weeks. Patients who lost at least 5% of their screening body weight after 4 to 12 weeks during the run-in were then randomized, with equal allocation, to receive either Saxenda® or placebo for 56 weeks. The mean age was 46 years (range 18-73), 81% were women, 84% were Caucasian, 13% were African American, and 7% were Hispanic/Latino. Mean baseline body weight was 99.6 kg and mean BMI was 35.6 kg/m².

The proportions of patients who discontinued study drug in the 56-week trials were 27% for the Saxenda®-treated group and 35% for the placebo-treated group. Approximately 10% of patients

treated with Saxenda® and 4% of patients treated with placebo discontinued treatment due to an adverse reaction *[see Adverse Reactions (6.1)]*. The majority of patients who discontinued Saxenda® due to adverse reactions did so during the first few months of treatment.

### Effect of Saxenda® on Body Weight

For Study 1 and Study 2, the primary efficacy parameters were mean percent change in body weight and the percentages of patients achieving greater than or equal to 5% and 10% weight loss from baseline to week 56. For Study 3, the primary efficacy parameters were mean percent change in body weight from randomization to week 56, the percentage of patients not gaining more than 0.5% body weight from randomization (i.e., after run-in) to week 56, and the percentage of patients achieving greater than or equal to 5% weight loss from randomization to week 56. Because losing at least 5% of fasting body weight through lifestyle intervention during the 4- to 12-week run-in was a condition for their continued participation in the randomized treatment period, the results may not reflect those expected in the general population.

Table 4 presents the results for the changes in weight observed in Studies 1, 2, and 3. After 56 weeks, treatment with Saxenda® resulted in a statistically significant reduction in weight compared with placebo. Statistically significantly greater proportions of patients treated with Saxenda® achieved 5% and 10% weight loss than those treated with placebo. In Study 3, statistically significantly more patients randomized to Saxenda® than placebo had not gained more than 0.5% of body weight from randomization to week 56.

**Table 4. Changes in Weight at Week 56 for Studies 1, 2, and 3**

| | Study 1 (Obesity or overweight with comorbidity) | | Study 2 (Type 2 diabetes with obesity or overweight) | | Study 3 (Obesity or overweight with comorbidity following at least 5% weight loss with diet) | |
|---|---|---|---|---|---|---|
| | Saxenda® N=2487 | Placebo N=1244 | Saxenda® N=423 | Placebo N=212 | Saxenda® N=212 | Placebo N=210 |
| **Weight** | | | | | | |
| Baseline mean (SD) (kg) | 106.2 (21.2) | 106.2 (21.7) | 105.7 (21.9) | 106.5 (21.3) | 100.4 (20.8) | 98.7 (21.2) |
| Percent change from baseline (LSMean) | -7.4 | -3.0 | -5.4 | -1.7 | -4.9 | 0.3 |
| Difference from placebo (LSMean) (95% CI) | -4.5* (-5.2;-3.8) | | -3.7* (-4.7;-2.7) | | -5.2* (-6.8;-3.5) | |
| **% of Patients losing greater than or equal to 5% body weight** | 62.3% | 34.4% | 49.0% | 16.4% | 44.2% | 21.7% |
| Difference from placebo (95% CI) | 27.9* (23.9;31.9) | | 32.6* (25.1;40.1) | | 22.6* (13.9;31.3) | |
| **% of Patients losing greater than 10% body weight** | 33.9% | 15.4% | 22.4% | 5.5% | 25.4% | 6.9% |
| Difference from placebo (LSMean) (95% CI) | 18.5* (15.2;21.7) | | 16.9* (11.7;22.1) | | 18.5* (11.7;25.3) | |

SD = Standard Deviation; CI = Confidence Interval

*p < 0.0001 compared to placebo. Type 1 error was controlled across the three endpoints.

Includes all randomized subjects who had a baseline body weight measurement. All available body weight data during the 56 week treatment period are included in the analysis. In Studies 1 and 2 missing values for week 56 were handled using multiple imputations analysis. In Study 3 missing values for week 56 were handled using weighted regression analysis.

The cumulative frequency distributions of change in body weight from baseline to week 56 are shown in Figure 2 for Studies 1 and 2. One way to interpret this figure is to select a change in body weight of interest on the horizontal axis and note the corresponding proportions of patients (vertical axis) in each treatment group who achieved at least that degree of weight loss. For example, note that the vertical line arising from -10% in Study 1 intersects the Saxenda® and placebo curves at approximately 34% and 15%, respectively, which correspond to the values shown in Table 4.

 

ITT, multiple imputations (MI)  ITT, multiple imputations (MI)

**Figure 2. Change in body weight (%) from baseline to week 56 (Study 1 on left and Study 2 on right)**

The time courses of weight loss with Saxenda® and placebo from baseline through week 56 are depicted in Figures 3 and 4.

 

| N, Saxenda® | 2487 | 2273 | 2159 | 2073 | 1996 | 1919 | | 1812 | 1844 |
| N, Placebo | 1244 | 1150 | 1057 | 983 | 923 | 857 | | 848 | 1244 |

| N, Saxenda® | 423 | 385 | 365 | 349 | 345 | 329 | | 318 | 423 |
| N, Placebo | 212 | 197 | 188 | 181 | 167 | 154 | | 116 | 212 |

Observed values for patients on study drug completing each scheduled visit, and ITT with multiple imputations (ITT-MI)

Observed values for patients on study drug completing each scheduled visit, and ITT with multiple imputations (ITT-MI)

**Figure 3. Change from baseline (%) in body weight (Study 1 on left and Study 2 on right)**



| N, Saxenda® | | 212 | | | 190 | | 172 | |
| N, Placebo | | 210 | | | 180 | | 169 | |

Observed values for patients on study drug completing each scheduled visit, and ITT with weighted average (ITT-WA)

**Figure 4. Change from baseline (%) in body weight during Study 3**

### Effect of Saxenda® on Anthropometry and Cardiometabolic Parameters

Changes in waist circumference and cardiometabolic parameters with Saxenda® are shown in Table 5 for Study 1 (patients without diabetes mellitus) and Table 6 for Study 2 (patients with type 2 diabetes). Results from Study 3, which also enrolled patients without diabetes mellitus, were similar to Study 1.

**Table 5. Mean Changes in Anthropometry and Cardiometabolic Parameters in Study 1 (Patients without Diabetes)**

| | Saxenda® N = 2487 | | Placebo N = 1244 | | |
| --- | --- | --- | --- | --- | --- |
| | Baseline | Change from Baseline (LSMean[1]) | Baseline | Change from Baseline (LSMean[1]) | Saxenda® minus Placebo (LSMean) |
| Waist Circumference (cm) | 115.0 | -8.2 | 114.5 | -4.0 | -4.2 |
| Systolic blood pressure (mmHg) | 123.0 | -4.3 | 123.3 | -1.5 | -2.8 |
| Diastolic blood pressure (mmHg) | 78.7 | -2.7 | 78.9 | -1.8 | -0.9 |
| Heart Rate (bpm) | 71.4 | 2.6 | 71.3 | 0.1 | 2.5 |
| | Baseline | % Change from Baseline (LSMean[1]) | Baseline | % Change from Baseline (LSMean[1]) | Relative Difference of Saxenda® to Placebo (LSMean) |
| Total Cholesterol (mg/dL)* | 193.8 | -3.2 | 194.4 | -0.9 | -2.3 |
| LDL Cholesterol (mg/dL)* | 111.8 | -3.1 | 112.3 | -0.7 | -2.4 |
| HDL Cholesterol (mg/dL)* | 51.4 | 2.3 | 50.9 | 0.5 | 1.9 |
| Triglycerides (mg/dL)[†] | 125.7 | -13.0 | 128.3 | -4.1 | -7.1 |

Based on last observation carried forward method while on study drug

[1] Least squares mean adjusted for treatment, country, sex, pre-diabetes status at screening, baseline BMI stratum and an interaction between pre-diabetes status at screening and BMI stratum as fixed factors, and the baseline value as covariate.

*Baseline value is the geometric mean

[†] Values are baseline median, median % change, and the Hodges-Lehmann estimate of the median treatment difference.

**Table 6. Mean Changes in Anthropometry and Cardiometabolic Parameters in Study 2 (Patients with Diabetes Mellitus)**

| | Saxenda® N = 423 | | Placebo N = 212 | | |
| --- | --- | --- | --- | --- | --- |
| | Baseline | Change from Baseline (LSMean[1]) | Baseline | Change from Baseline (LSMean[1]) | Saxenda® minus Placebo (LSMean) |
| Waist Circumference (cm) | 118.1 | -6.0 | 117.3 | -2.8 | -3.2 |
| Systolic blood pressure (mmHg) | 128.9 | -3.0 | 129.2 | -0.4 | -2.6 |
| Diastolic blood pressure (mmHg) | 79.0 | -1.0 | 79.3 | -0.6 | -0.4 |
| Heart Rate (bpm) | 74.0 | 2.0 | 74.0 | -1.5 | 3.4 |
| | Baseline | % Change from Baseline (LSMean[1]) | Baseline | % Change from Baseline (LSMean[1]) | Relative Difference of Saxenda® to Placebo (LSMean) |
| Total Cholesterol (mg/dL)* | 171.0 | -1.4 | 169.4 | 2.4 | -3.7 |
| LDL Cholesterol (mg/dL)* | 86.4 | 0.9 | 85.2 | 3.3 | -2.3 |
| HDL Cholesterol (mg/dL)* | 45.2 | 4.8 | 45.4 | 1.9 | 2.9 |
| Triglycerides (mg/dL)[†] | 156.2 | -14.5 | 155.8 | -0.7 | -13.5 |

Based on last observation carried forward method while on study drug

[1] Least squares mean adjusted for treatment, country, sex, background treatment, baseline HbA$_{1c}$ stratum and an interaction between background treatment and HbA$_{1c}$ stratum as fixed factors, and the baseline value as covariate.

*Baseline value is the geometric mean

[†] Values are baseline median, median % change, and the Hodges-Lehmann estimate of the median treatment difference.

---

## 16   HOW SUPPLIED/STORAGE AND HANDLING

### 16.1   How Supplied

Saxenda® is available in the following package sizes containing disposable, pre-filled, multi-dose pens. Each individual pen delivers doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg (6 mg/mL, 3 mL).

| 3 x Saxenda® pen | NDC 0169-2800-13 |
| 5 x Saxenda® pen | NDC 0169-2800-15 |

Each Saxenda® pen is for use by a single patient. A Saxenda® pen should never be shared between patients, even if the needle is changed.

### 16.2   Recommended Storage

Prior to first use, Saxenda® should be stored in a refrigerator between 36°F to 46°F (2°C to 8°C) (Table 7). Do not store in the freezer or directly adjacent to the refrigerator cooling element. Do not freeze Saxenda® and do not use Saxenda® if it has been frozen.

After initial use of Saxenda® pen, the pen can be stored for 30 days at controlled room temperature (59°F to 86°F; 15°C to 30°C) or in a refrigerator (36°F to 46°F; 2°C to 8°C). Keep the pen cap on when not in use. Saxenda® should be protected from excessive heat and sunlight. Always remove and safely placed the needle after each injection and store the Saxenda® pen without an injection needle attached. This will reduce the potential for contamination, infection, and leakage while also ensuring dosing accuracy.

**Table 7. Recommended Storage Conditions for Saxenda®**

| Prior to first use | After first use | |
| --- | --- | --- |
| Refrigerated 36°F to 46°F (2°C to 8°C) | Room Temperature 59°F to 86°F (15°C to 30°C) | Refrigerated 36°F to 46°F (2°C to 8°C) |
| Until expiration date | 30 days | |

## 17   PATIENT COUNSELING INFORMATION

### 17.1   FDA-Approved Medication Guide

See FDA-Approved Medication Guide.

### 17.2   Instructions

Saxenda® is indicated for chronic weight management in conjunction with a reduced-calorie diet and increased physical activity.

Advise patients to take Saxenda® exactly as prescribed. Patients should be instructed to follow the dose escalation schedule and not to take more than the recommended dose of Saxenda®.

Instruct patients to discontinue use of Saxenda® if they have not achieved 4% weight loss by 16 weeks of treatment.

### 17.3   Risk of Thyroid C-cell Tumors

Inform patients that liraglutide causes benign and malignant thyroid C-cell tumors in mice and rats and that the human relevance of this finding has not been determined. Counsel patients to report symptoms of thyroid tumors (e.g., a lump in the neck, hoarseness, dysphagia or dyspnea) to their physician *[see Boxed Warning and Warnings and Precautions (5.1)]*.

### 17.4   Acute Pancreatitis

Patients should be informed of the potential risk for acute pancreatitis. Explain that persistent severe abdominal pain that may radiate to the back and which may or may not be accompanied by vomiting, is the hallmark symptom of acute pancreatitis. Instruct patients to discontinue Saxenda® promptly and contact their physician if persistent severe abdominal pain occurs.

### 17.5   Acute Gallbladder Disease

Patients should be informed that substantial or rapid weight loss can increase the risk of cholelithiasis. Cholelithiasis may also occur in the absence of substantial or rapid weight loss. Patients should be instructed to contact their physician if cholelithiasis is suspected for appropriate clinical follow-up.

### 17.6   Hypoglycemia in Patients with Type 2 Diabetes Mellitus on Anti-Diabetic Therapy

Patients with type 2 diabetes mellitus on anti-diabetic therapy should be advised to monitor their blood glucose levels and report symptoms of hypoglycemia to their physician.

### 17.7   Heart Rate Increase

Patients should be informed to report symptoms of sustained periods of heart pounding or racing while at rest to their physician. For patients who experience a sustained increase in resting heart rate while taking Saxenda®, Saxenda® should be discontinued.

### 17.8   Dehydration and Renal Impairment

Patients treated with Saxenda® should be advised of the potential risk of dehydration due to gastrointestinal adverse reactions and take precautions to avoid fluid depletion. Patients should be informed of the potential risk for worsening renal function, which in some cases may require dialysis.

### 17.9  Hypersensitivity Reactions
Patients should be informed that serious hypersensitivity reactions have been reported during use of liraglutide. If symptoms of hypersensitivity reactions occur, patients must stop taking Saxenda® and seek medical advice promptly.

### 17.10  Suicidal Behavior and Ideation
Patients treated with Saxenda® should be advised to report emergence or worsening of depression, suicidal thoughts or behavior, and/or any unusual changes in mood or behavior. Patients should be informed that if they experience suicidal thoughts or behaviors, Saxenda® should be discontinued.

### 17.11  Jaundice and Hepatitis
Inform patients that jaundice and hepatitis have been reported during postmarketing use of liraglutide. Instruct patients to contact their physician if they develop jaundice.

### 17.12  Never Share a Saxenda® Pen Between Patients
Patients should be informed that they should never share a Saxenda® pen with another person, even if the needle is changed. Sharing of the pen between patients may pose a risk of transmission of infection.

Version: 2

*Saxenda® and Victoza® are registered trademarks of Novo Nordisk A/S.*

Saxenda® is covered by US Patent Nos. 6,268,343, 6,458,924, 7,235,627, 8,114,833 and other patents pending.

Saxenda® pen is covered by US Patent Nos. 6,899,699, 7,686,786, 8,672,898, 8,684,969 and other patents pending.

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark

For information about Saxenda® contact:
Novo Nordisk Inc.
800 Scudders Mill Road
Plainsboro, NJ 08536
1-844-363-4448

© 2014-2016 Novo Nordisk
USA16SAM01115      4/2016



**Medication Guide**

**Saxenda® (sax-end-ah)**
**(liraglutide [rDNA origin])**
**Injection**

Read this Medication Guide and Patient Instructions for Use that come with Saxenda® before you start using Saxenda® and each time you get a refill. There may be new information. This Medication Guide does not take the place of talking with your healthcare provider about your medical condition or your treatment. If you have questions about Saxenda® after reading this information, ask your healthcare provider or pharmacist.

**What is the most important information I should know about Saxenda®?**

Serious side effects may happen in people who take Saxenda®, including:

**1. Possible thyroid tumors, including cancer.** During the drug testing process, the medicine in Saxenda® caused rats and mice to develop tumors of the thyroid gland. Some of these tumors were cancers. It is not known if Saxenda® will cause thyroid tumors or a type of thyroid cancer called medullary thyroid cancer in people. If medullary thyroid cancer occurs, it may lead to death if not detected and treated early. If you develop tumors or cancer of the thyroid, your thyroid may have to be surgically removed.

- Before you start taking Saxenda®, tell your healthcare provider if you or any of your family members have had thyroid cancer, especially medullary thyroid cancer, or Multiple Endocrine Neoplasia syndrome type 2. Do not take Saxenda® if you or any of your family members have medullary thyroid cancer, or if you have Multiple Endocrine Neoplasia syndrome type 2. People with these conditions already have a higher chance of developing medullary thyroid cancer in general and should not take Saxenda®.
- While taking Saxenda®, tell your healthcare provider if you get a lump or swelling in your neck, hoarseness, trouble swallowing, or shortness of breath. These may be symptoms of thyroid cancer.

**2. Inflammation of the pancreas (pancreatitis),** which may be severe and lead to death.

**Before taking Saxenda®, tell your healthcare provider if you have had:**
- pancreatitis
- stones in your gallbladder (gallstones)
- a history of alcoholism
- high blood triglyceride levels

These medical conditions can make you more likely to get pancreatitis in general. It is not known if having these conditions will lead to a higher chance of getting pancreatitis while taking Saxenda®.

**While taking Saxenda®:**

Stop taking Saxenda® and call your healthcare provider right away if you have pain in your stomach area (abdomen) that is severe and will not go away. The pain may happen with or without vomiting. The pain may be felt going from your abdomen through to your back. This type of pain may be a symptom of pancreatitis.

**What is Saxenda®?**

- Saxenda® is an injectable prescription medicine that may help some obese adults or overweight adults who also have weight related medical problems lose weight and keep the weight off.
- Saxenda® should be used with a reduced calorie diet and increased physical activity.
- Saxenda® is not for the treatment of type 2 diabetes mellitus.
- Saxenda® and Victoza® have the same active ingredient, liraglutide. Saxenda® and Victoza® should not be used together.
- Saxenda® should not be used with other GLP-1 receptor agonist medicines.
- Saxenda® and insulin should not be used together.
- It is not known if Saxenda® is safe and effective when taken with other prescription, over-the-counter, or herbal weight loss products.
- It is not known if Saxenda® changes your risk of heart problems or stroke or of death due to heart problems or stroke.
- It is not known if Saxenda® can be used safely in people who have had pancreatitis.
- It is not known if Saxenda® is safe and effective in children under 18 years of age. Saxenda® is not recommended for use in children.

**Who should not use Saxenda®?**

**Do not use Saxenda® if:**
- you or any of your family members have a history of medullary thyroid cancer.
- you have Multiple Endocrine Neoplasia syndrome type 2 (MEN 2). This is a disease where people have tumors in more than one gland in their body.
- you are allergic to liraglutide or any of the ingredients in Saxenda®. See the end of this Medication Guide for a complete list of ingredients in Saxenda®.

Symptoms of a serious allergic reaction may include:
- ○ swelling of your face, lips, tongue, or throat
- ○ fainting or feeling dizzy
- ○ very rapid heartbeat
- ○ problems breathing or swallowing
- ○ severe rash or itching

Talk with your healthcare provider if you are not sure if you have any of these conditions.

- are pregnant or planning to become pregnant. Saxenda® may harm your unborn baby.

**What should I tell my healthcare provider before using Saxenda®?**

Before taking Saxenda®, tell your healthcare provider if you:

- have any of the conditions listed in the section "What is the most important information I should know about Saxenda®?"
- are taking certain medications called GLP-1 receptor agonists.
- are allergic to liraglutide or any of the other ingredients in Saxenda®. See the end of this Medication Guide for a list of ingredients in Saxenda®.
- have severe problems with your stomach, such as slowed emptying of your stomach (gastroparesis) or problems with digesting food.
- have or have had kidney or liver problems.
- have or have had depression or suicidal thoughts.
- have any other medical conditions.
- are pregnant or plan to become pregnant. Saxenda® may harm your unborn baby. Tell your healthcare provider if you become pregnant while taking Saxenda®. If you are pregnant you should stop using Saxenda®.
- are breastfeeding or plan to breastfeed. It is not known if Saxenda® passes into your breast milk. You and your healthcare provider should decide if you will take Saxenda® or breastfeed. You should not do both without talking with your healthcare provider first.

Tell your healthcare provider about all the medicines you take including prescription and non-prescription medicines, vitamins, and herbal supplements. Saxenda® slows stomach emptying and can affect medicines that need to pass through the stomach quickly. Saxenda® may affect the way some medicines work and some other medicines may affect the way Saxenda® works. Tell your healthcare provider if you take other diabetes medicines, especially sulfonylurea medicines or insulin.

Know the medicines you take. Keep a list of them with you to show your healthcare provider and pharmacist each time you get a new medicine.

**How should I use Saxenda®?**

- Use Saxenda® exactly as prescribed by your healthcare provider. Your dose should be increased after using Saxenda® for 1 week until you reach the 3 mg dose. After that, do not change your dose unless your healthcare provider tells you to.
- Saxenda® is injected 1 time each day, at any time during the day.
- You can take Saxenda® with or without food.
- Your doctor should start you on a diet and exercise program when you start taking Saxenda®. Stay on this program while you are taking Saxenda®.
- Saxenda® comes in a prefilled pen.
- Your healthcare provider must teach you how to inject Saxenda® before you use it for the first time. If you have questions or do not understand the instructions, talk to your healthcare provider or pharmacist. See the Patient Instructions for Use that come with this Medication Guide for detailed information about the right way to use your Saxenda® pen.
- Pen needles are not included. Use the Saxenda® pen with Novo Nordisk disposable needles. You may need a prescription to get pen needles from your pharmacist. Ask your healthcare provider which needle size is best for you.

- When starting a new prefilled Saxenda® pen, you must follow the "Check the Saxenda® flow with each new pen" (see the detailed Patient Instructions for Use that comes with this Medication Guide). You only need to do this 1 time with each new pen. You should also do this if you drop your pen. If you do the "Check the Saxenda® flow with each new pen" before each injection, you will run out of medicine too soon.
- Inject your dose of Saxenda® under the skin (subcutaneous injection) in your stomach area (abdomen), upper leg (thigh), or upper arm, as instructed by your healthcare provider. **Do not inject into a vein or muscle.**
- If you take too much Saxenda®, call your healthcare provider right away. Too much Saxenda® may cause severe nausea and vomiting.
- If you miss your daily dose of Saxenda®, use Saxenda® as soon as you remember. Then take your next daily dose as usual on the following day. Do not take an extra dose of Saxenda® or increase your dose on the following day to make up for your missed dose. If you miss your dose of Saxenda® for **3 days or more**, call your healthcare provider to talk about how to restart your treatment.
- Never share your Saxenda® pen or needles with another person. You may give an infection to them, or get an infection from them.

**What are the possible side effects of Saxenda®?**

Saxenda® **may cause serious side effects, including:**

- **possible thyroid tumors, including cancer.** See "What is the most important information I should know about Saxenda®?"
- **inflammation of the pancreas (pancreatitis).** See "What is the most important information I should know about Saxenda®?"
- **gallbladder problems.** Saxenda® may cause gallbladder problems including gallstones. Some gallbladder problems need surgery. Call your healthcare provider if you have any of the following symptoms:
  - pain in your upper stomach (abdomen)
  - fever
  - yellowing of your skin or eyes (jaundice)
  - clay-colored stools
- **low blood sugar (hypoglycemia) in people with type 2 diabetes mellitus who also take medicines to treat type 2 diabetes mellitus.** Saxenda® can cause low blood sugar in people with type 2 diabetes mellitus who also take medicines used to treat type 2 diabetes mellitus (such as sulfonylureas). In some people, the blood sugar may get so low that they need another person to help them. If you take a sulfonylurea medicine, the dose may need to be lowered while you use Saxenda®. Signs and symptoms of low blood sugar may include:

| | |
|---|---|
| • shakiness | • confusion |
| • sweating | • irritability |
| • headache | • hunger |
| • drowsiness | • fast heartbeat |
| • weakness | • feeling jittery |
| • dizziness | |

Talk to your healthcare provider about how to recognize and treat low blood sugar. Make sure that your family and other people who are around you a lot know how to recognize and treat low blood sugar. You should check your blood sugar before you start taking Saxenda® and while you take Saxenda®.

- **increased heart rate.** Saxenda® can increase your heart rate while you are at rest. Your healthcare provider should check your heart rate while you take Saxenda®. Tell your healthcare provider if you feel your heart racing or pounding in your chest and it lasts for several minutes when taking Saxenda®.
- **kidney problems (kidney failure).** Saxenda® may cause nausea, vomiting or diarrhea leading to loss of fluids (dehydration). Dehydration may cause kidney failure which can lead to the need for dialysis. This can happen in people who have never had kidney problems before. Drinking plenty of fluids may reduce your chance of dehydration.

Call your healthcare provider right away if you have nausea, vomiting, or diarrhea that does not go away, or if you cannot drink liquids by mouth.

- **serious allergic reactions.** Serious allergic reactions can happen with Saxenda®. Stop using Saxenda®, and get medical help right away if you have any symptoms of a serious allergic reaction. **See "Who should not use Saxenda®?"**

- **depression or thoughts of suicide.** You should pay attention to any mental changes, especially sudden changes, in your mood, behaviors, thoughts, or feelings. Call your healthcare provider right away if you have any mental changes that are new, worse, or worry you.

Common side effects of Saxenda® include:

- nausea
- diarrhea
- constipation
- low blood sugar (hypoglycemia)
- vomiting
- headache
- decreased appetite
- upset stomach
- tiredness
- dizziness
- stomach pain
- changes in enzyme (lipase) levels in your blood

Nausea is most common when first starting Saxenda®, but decreases over time in most people as their body gets used to the medicine.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

These are not all the side effects with Saxenda®. For more information, ask your healthcare provider or pharmacist.

Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**Keep your Saxenda® pen, pen needles, and all medicines out of the reach of children.**

**General information about the safe and effective use of Saxenda®.**

Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. Do not use Saxenda® for a condition for which it was not prescribed. Do not give Saxenda® to other people, even if they have the same symptoms you have. It may harm them.

This Medication Guide summarizes the most important information you should know about using Saxenda®. If you would like more information, talk with your healthcare provider. You can ask your pharmacist or healthcare provider for information about Saxenda® that is written for health professionals.

For more information, go to saxenda.com or call 1-844-363-4448.

**What are the ingredients in Saxenda®?**

**Active Ingredient:** liraglutide

**Inactive Ingredients**: disodium phosphate dihydrate, propylene glycol, phenol and water for injection

*For more information go to www.saxenda.com*

Manufactured by:
Novo Nordisk A/S
DK-2880 Bagsvaerd, Denmark
For information about Saxenda® contact:
Novo Nordisk Inc.
800 Scudders Mill Road
Plainsboro, NJ 08536
1-844-363-4448
Issued: December 2014
Version: 1
This Medication Guide has been approved by the U.S. Food and Drug Administration.

Saxenda®, Victoza®, NovoFine®, and NovoTwist® are registered trademarks of Novo Nordisk A/S.

Saxenda® is covered by US Patent Nos. 6,268,343, 6,458,924, 7,235,627 and 8,114,833 and other patents pending.

Saxenda® pen is covered by US Patent Nos. 6,899,699, 7,686,786, 8,672,898, 8,684,969 and other patents pending.

© 2014-2016 Novo Nordisk
USA16SAM01115   4/2016

**Instructions for Use**
- **Read these instructions carefully before using your Saxenda® pen.**
- **Do not use your pen without proper training from your healthcare provider.** Make sure that you know how to give yourself an injection with the pen before you start your treatment.
- ⚠ **If you are blind or have poor eyesight and cannot read the dose counter on the pen, do not use this pen without help.** Get help from a person with good eyesight who is trained to use the Saxenda® pen.
- **You can refresh your training at any time by watching the online training video at www.saxenda.com.**
- **Start by checking your pen to make sure that it contains Saxenda®,** then look at the pictures below to get to know the different parts of your pen and needle.
- **Your pen is a prefilled dial-a-dose pen.** It contains 18 mg of liraglutide, and you can select doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg. Your pen is made to be used with **NovoFine®** or **NovoTwist®** disposable needles up to a length of 8 mm.

**Saxenda® pen and needle (example)**



Pen scale | Pen window | Dose counter | Dose selector
Dose pointer | Dose button
Pen cap | Flow check symbol

**NovoFine®**
Outer needle cap | Inner needle cap | Needle | Paper tab

**NovoTwist®**
Outer needle cap | Inner needle cap | Needle | Paper tab

**Step 1. Prepare your pen with a new needle**



A
- **Wash your hands** with soap and water.
- **Check the name and colored label of** your pen, to make sure that it contains Saxenda®. This is especially important if you take more than 1 type of medicine.
- **Pull off the pen cap.**



B
- **Check that Saxenda® in your pen is clear** and colorless. Look through the pen window. If Saxenda® looks cloudy, do not use the pen.



C NovoFine® NovoTwist®
- **Take a new needle,** and tear off the paper tab.

---



D NovoFine® NovoTwist®
- **Push the needle straight onto the pen. Turn until it is on tight.**



E NovoFine® NovoTwist®
- **Pull off the outer needle cap.** Do not throw it away.



F NovoFine® NovoTwist®
- **Pull off the inner needle cap** and throw it away. A drop of Saxenda® may appear at the needle tip. This is normal, but you must still check the Saxenda® flow, if you use a new pen for the first time.

⚠ **Always use a new needle for each injection.** This will prevent contamination, infection, leakage of Saxenda®, and blocked needles leading to the wrong dose. **Never use a bent or damaged needle.**

ⓘ **Do not attach a new needle** to your pen until you are ready to take your injection.

**Step 2. Check the Saxenda® flow with each new pen.**



G
- Check the Saxenda® flow **before your first injection with each new pen.** If your Saxenda® pen is already in use, go to Step 3 "Select your dose".
- Turn the dose selector **until the dose counter shows the flow check symbol ( ••• ).**

Flow check symbol selected

H
- Hold the pen with the needle pointing up. **Press and hold the dose button** until the dose counter shows 0. The 0 must line up with the dose pointer. A drop of Saxenda® will appear at the needle tip.
- If no drop appears, repeat Step 2 above as shown in Figures **G** and **H** up to 6 times. If there is still no drop, change the needle and repeat Step 2 as shown in Figures **G** and **H** 1 more time.

**Do not use the pen** if a drop of Saxenda® still does not appear. Contact Novo Nordisk at 1-844-363-4448.

⚠ **Always make sure that a drop appears** at the needle tip before you use a new pen for the first time. This makes sure that Saxenda® flows.

If no drop appears, you will **not** inject any Saxenda®, even though the dose counter may move. **This may mean that there is a blocked or damaged needle.**

---

ⓘ A small drop may remain at the needle tip, but it will not be injected.

**Only check the Saxenda® flow before your first injection with each new pen.**

**Step 3. Select your dose**



I
- Turn the dose selector until the dose counter shows your dose (0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg). Make sure you know the dose of Saxenda® you should use. If you select the wrong dose, you can turn the dose selector forward or backwards to the correct dose.

Example 0.6 mg selected

⚠ **Always use the dose counter and the dose pointer to see how many mg you select.** You will hear a "click" every time you turn the dose selector. **Do not set the dose by counting the number of clicks you hear.** Do not use the pen scale to set the dose. It does not show exactly how much Saxenda® is left in your pen.

**Only doses of 0.6 mg, 1.2 mg, 1.8 mg, 2.4 mg or 3 mg can be selected with the dose selector.** The selected dose must line up exactly with the dose pointer to make sure that you get a correct dose.

ⓘ The dose selector changes the dose. Only the dose counter and dose pointer will show how many mg you select for each dose. You can select up to 3 mg each dose. When your pen contains less than 3 mg the dose counter stops before 3 mg is shown. The dose selector clicks differently when turned forward, backwards or past the number of mg left. Do not count the pen clicks.

ⓘ **How much Saxenda® is left?**



J
- The **pen scale** shows you about how much Saxenda® is left in your pen.

Example Approx. 3 mg left



K
- To see how much **Saxenda® is left,** use the dose counter: Turn the dose selector until the **dose counter** stops. If it shows 3, **at least 3 mg** are left in your pen. If the **dose counter stops before 3 mg,** there is not enough Saxenda® left for a full dose of 3 mg.

Example Dose counter stopped: 2.4 mg left

ⓘ **If you need more Saxenda® than what is left in your pen**
Only if trained or told by your healthcare provider, you may split your dose between your current pen and a new pen. Use a calculator to plan the doses as instructed by your healthcare provider.

⚠ **Be very careful to calculate correctly.**
If you are not sure how to split your dose using 2 pens, then select and inject the dose you need with a new pen.

**Step 4. Inject your dose**



L
- **Insert the needle into your skin** as your healthcare provider has shown you.
- **Make sure you can see the dose counter.** Do not cover it with your fingers. This could stop the injection.

- **Press and hold down the dose button until the dose counter shows 0.** The 0 must line up with the dose pointer. You may then hear or feel a click.



- **Keep the needle in your skin after** the dose counter has returned to 0 and **count slowly to 6.**
- If the needle is removed earlier, you may see a stream of Saxenda® coming from the needle tip. If this happens, the full dose will not be delivered.



Count slowly:

1-2-3-4-5-6

- **Remove the needle from your skin.** If blood appears at the injection site, press lightly. Do not rub the area.
- ⚠ **Always watch the dose counter to know how many mg you inject.** Hold the dose button down until the dose counter shows 0.



**How to identify a blocked or damaged needle?**

- If 0 does not appear in the dose counter after continuously pressing the dose button, you may have used a blocked or damaged needle.
- If this happens you have **not** received **any** Saxenda® even though the dose counter has moved from the original dose that you have set.

**How to handle a blocked needle?**

Change the needle as described in Step 5, and repeat all steps starting with Step 1: **"Prepare your pen with a new needle"**. Make sure you select the full dose you need. **Never touch the dose counter when you inject.** This can stop the injection.

ⓘ You may see a drop of Saxenda® at the needle tip after injecting. This is normal and does not affect your dose.

**Step 5. After your injection**

- **Carefully remove the needle from the pen.** Do not put the needle caps back on the needle, to avoid needle sticks.

NovoFine®        NovoTwist®

 

- **Place the needle in a sharps container** right away to reduce the risk of needle sticks.



---

- **Put the pen cap on** your pen after each use to protect Saxenda® from light.

ⓘ If you do not have a sharps container, follow a 1-handed needle recapping method. Carefully slip the needle into the outer needle cap. Dispose of the needle in a sharps container as soon as possible.

⚠ **Never try to put the inner needle cap back on the needle.** You may stick yourself with the needle. **Always remove the needle from your pen.** This prevents contamination, infection, leakage of Saxenda®, and blocked needles leading to the wrong dose. If the needle is blocked, you will **not** inject any Saxenda®.

ⓘ **Always dispose of the needle after each injection.**

- **Do not throw away in the household trash.** Put the needle and any empty Saxenda® pen or any pen used for 30 days still containing Saxenda® in a FDA-cleared sharps disposal container right away after use.
- If you do not have a FDA-cleared sharps disposal container, you may use a household container that is:
  - ○ made of a heavy-duty plastic
  - ○ can be closed with a tight-fitting, puncture-resistant lid, without sharps being able to come out upright and stable during use
  - ○ leak-resistant
  - ○ properly labeled to warn of hazardous waste inside the container
- When your sharps disposal container is almost full, you will need to follow your community guidelines for the right way to dispose of your sharps disposal container. There may be state or local laws about how you should throw away used needles and syringes. For more information about the safe sharps disposal, and for specific information about sharps disposal in the state that you live in, go to the FDA's website at: http://www.fda.gov/safesharpsdisposal
- Do not dispose of your used sharps disposal container in your household trash unless your community guidelines permit this. Do not recycle your used sharps disposal container.
- Safely dispose of Saxenda® that is out of date or no longer needed.

---

⚠ **Important**

- Caregivers must **be very careful when handling used needles** to prevent needle sticks and cross infection.
- Never use a syringe to withdraw Saxenda® from your pen.
- **Always carry an extra pen and new needles** with you, in case of loss or damage.
- Always keep your pen and needles **out of reach of others**, especially children.
- **Do not share your Saxenda® pen or needles with anyone else.** You may give an infection to them or get an infection from them.
- **Always keep your pen with you.** Do not leave it in a car or other place where it can get too hot or too cold.

---

**Caring for your pen**

- **Do not drop your pen or** knock it against hard surfaces. If you drop it or suspect a problem, attach a new needle and check the Saxenda® flow before you inject.
- **Do not try to repair your pen** or pull it apart.
- **Do not expose your pen to dust, dirt or liquid.**
- **Do not wash, soak, or lubricate your pen.** If necessary, clean it with mild detergent on a moistened cloth.

**How should I store my Saxenda® pen?**

- Store your **new, unused** Saxenda® pens in the refrigerator at 36°F to 46°F (2°C to 8°C).
- **Store your pen in use** for 30 days at 59°F to 86°F (15°C to 30°C) or in a refrigerator at 36°F to 46°F (2°C to 8°C).

---



- The Saxenda® pen you are using should be thrown away after 30 days, even if it still has Saxenda® left in it.
- **Do not** freeze Saxenda®. **Do not** use Saxenda® if it has been frozen.
- Unused Saxenda® pens may be used until the expiration date printed on the label, if kept in the refrigerator.
- Keep Saxenda® away from heat and out of the light.

---

**This Medication Guide and Instructions for Use have been approved by the U.S. Food and Drug Administration.**

March 2016

© 2014-2016 Novo Nordisk
US16SAM01115    4/2016

novo nordisk

# EXHIBIT S

COMPARISON LISTING OF SAXENDA AND VICTOZA ADVERSE REACTIONS EXCERPTED FROM FDA FULL PRESCRIBING INFORMATION

# EXHIBIT S

**Comparison listing of Saxenda and Victoza Adverse Reactions Excerpted from
FDA Full Prescribing Information**

*SAXENDA: Adverse Reactions*

Thyroid C-Cell Tumors
Acute Pancreatitis
Acute Gall Bladder Disease
Hypoglycemia
Heart Rate Increase
Renal Impairment
Hypersensitivity Reactions
Suicidal Behavior
Nausea
Diarrhea
Constipation
Vomiting
Dyspepsia
Abdominal Pain
Upper Abdominal Pain
Gastroesophageal Reflux Disease
Abdominal Distension
Eructation
Flatulence
Dry Mouth
Decreased Appetite
Headache
Dizziness
Fatigue
Injection Site Erythema
Injection Site Reaction
Asthenia
Gastroenteritis
Urinary Tract Infection
Viral Gastroenteritis
Increased Lipase
Insomnia
Anxiety
Hypoglycemia
Gastrointestinal Reactions
Asthenia, Fatigue, Maliase,
Dysgeusia and Dizziness
Immunogenicity
Allergic reactions
Injection Site Reactions

Breast Cancer
Papillary Thyroid Cancer
Colorectal Neoplasms
Cardiac Conduction Disorders
Hypotension
Laboratory Abnormalities:
    Liver Enzymes
    Serum Calcitonin
    Serum Lipase and
    Amylase
Post Marketing Experience:
    Neoplasms – Medullary
    Thyroid Carcinoma
    Gastrointestinal Disorders
    Metabolism & Nutrition
    Disorders
    Renal & Urinary
    Disorders
    General Disorders
    Immune System
    Disorders
    Hepatobiliary Disorders

### *VICTOZA - Adverse Reactions*
Thyroid C-Cell Tumors
Pancreatitis
Acute Gall Bladder Disease
Use with Medications Known To
Cause Hypoglycemia
Renal Impairment
Hypersensitivity Reactions
Nausea
Diarrhea
Headache
Nasopharyngitis
Vomiting
Decreased appetite
Dyspepsia
Upper Respiratory Infection
Constipation
Back Pain
Hypoglycemia
Injection Site Reaction
Gastrointestinal Reactions
Malignancy
Papillary Thyroid carcinoma
Cholelithiasis or Cholecystitis*
Immunogenicity
Laboratory Tests:
      Bilirubin
      Calcitonin
      Lipase and Amylase
Post Marketing Experience:
      Medullary Thyroid
      Carcinoma
      Dehydration
      Increased Serum
      Creatine,
      Acute renal Failure
      Allergic Reactions
      Acute Pancreatitis
      Hepatobiliary Disorders